# 25-2995

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 25-2995

——◄•••►——

DAHLIA DOE, SARA DOE, NESMA DOE, LAILA DOE, WALEED DOE, MUSTAFA DOE, AHMAD DOE,

*Plaintiffs-Appellees,*

—v.—

SECRETARY KRISTI NOEM, United States Department of Homeland Security, in her official capacity, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, UNITED STATES OF AMERICA,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX: VOLUME I (pp. 1–298)

INTERNATIONAL REFUGEE ASSISTANCE PROJECT,
*Attorney for Plaintiffs-Appellees.*
One Battery Park Plaza, 33rd floor
New York, New York 10004
(929) 246-0154

JAY CLAYTON,
*United States Attorney for the Southern District of New York,*
*Attorney for Defendants-Appellants.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2713

**TABLE OF CONTENTS**

Southern District of New York Civil Docket Sheet for Case No. 25 Civ. 8686 ......JA 1

Complaint..................................................................................................JA 19

Declaration of Guadalupe Aguirre in Support of Plaintiffs'
    Motion to Postpone Effective Date of Agency Action,
    dated October 21, 2025 ...................................................................JA 82

Government Accountability Office Report Titled "Temporary
    Protected Status: Steps Taken to Inform and Communicate
    Secretary of Homeland Security's Decisions,"
    Exhibit 1 to the Aguirre Declaration..............................................JA 92

Document Titled "TPS Terminations and Associated Orderly
    Transition Periods Prior to Current Trump Administration,"
    Exhibit 2 to the Aguirre Declaration.............................................JA 157

Transcript of Confirmation Hearing of Secretary Kristi Noem,
    Exhibit 3 to the Aguirre Declaration .............................................JA 161

News Article Titled "Vance Vows an End to Programs for Legal Immigrants,"
    Exhibit 4 to the Aguirre Declaration .............................................JA 253

News Article Titled "Sweeping Raids, Giant Camps and Mass
    Deportations: Inside Trump's 2025 Immigration Plans,"
    Exhibit 5 to the Aguirre Declaration .............................................JA 257

News Article Titled "Trump says he would revoke Temporary
    Protected Status for Haitian migrants in Springfield if elected,"
    Exhibit 6 to the Aguirre Declaration .............................................JA 272

Declaration of Aaron Reichlin-Melnick,
    Exhibit 7 to the Aguirre Declaration .............................................JA 286

Screen Capture of X Post by Secretary Kristi Noem,
    Exhibit 8 to the Aguirre Declaration .............................................JA 297

Press Release by U.S. Department of Homeland Security
    Titled "Secretary Noem Rescinds Previous Administration's
    Extension of Haiti's Temporary Protected Status,"
    Exhibit 9 to the Aguirre Declaration .............................................JA 299

Screen Capture of U.S. State Department Webpage
    Titled "Afghanistan Travel Advisory,"
    Exhibit 10 to the Aguirre Declaration .......................................JA 301

Screen Capture of U.S. State Department Webpage
     Titled "Cameroon Travel Advisory,"
     Exhibit 11 to the Aguirre Declaration ........................................................JA 306

Screen Capture of U.S. State Department Webpage
     Titled "Nepal Travel Advisory,"
     Exhibit 12 to the Aguirre Declaration ........................................................JA 311

Screen Capture of U.S. State Department Webpage
     Titled "Haiti Travel Advisory,"
     Exhibit 13 to the Aguirre Declaration ........................................................JA 315

Screen Capture of U.S. State Department Webpage
     Titled "Honduras Travel Advisory,"
     Exhibit 14 to the Aguirre Declaration ........................................................JA 322

Screen Capture of U.S. State Department Webpage
     Titled "Nicaragua Travel Advisory,"
     Exhibit 15 to the Aguirre Declaration ........................................................JA 327

Press Release by U.S. Citizenship and Immigration
     Services Titled "Secretary Noem Announces the
     Termination of Temporary Protected Status for Syria,"
     Exhibit 16 to the Aguirre Declaration ........................................................JA 333

Congressional Research Service Report
     Titled "Syria: Transition and U.S. Policy,"
     Exhibit 17 to the Aguirre Declaration ........................................................JA 335

Report Titled "Syria – Security Situation,"
     Exhibit 18 to the Aguirre Declaration ........................................................JA 377

Screen Capture of U.S. State Department
     Webpage Titled "Syria Travel Advisory,"
     Exhibit 19 to the Aguirre Declaration ........................................................JA 437

Email Thread with Subject Line "Nicaragua DM,"
     Exhibit 20 to the Aguirre Declaration ........................................................JA 443

Email Thread with Subject Line "Honduras and Nicaragua TPS,"
     Exhibit 21 to the Aguirre Declaration ........................................................JA 446

Email Thread with Subject Line "Honduras
     and Nicaragua Recommendations,"
     Exhibit 22 to the Aguirre Declaration ........................................................JA 449

ii

Email Thread with Subject Line "Relevant
   Quotes from updated Venezuela COI sources
   (012825)_positive improvements highlighted,"
   Exhibit 23 to the Aguirre Declaration ......................................................JA 453

Screen Capture of Webpage Titled "Conflict in Syria,"
   Exhibit 24 to the Aguirre Declaration ......................................................JA 456

Screen Capture of News Article Titled "Syria risks
   rupturing as armed camps face off across the Euphrates,"
   Exhibit 25 to the Aguirre Declaration ......................................................JA 466

Screen Capture of News Article Titled "Israel strikes Syria's
   capital, Damascus, pledging to defend Druze minorities,"
   Exhibit 26 to the Aguirre Declaration ......................................................JA 483

Screen Capture of Webpage Titled "UNHCR deputy chief calls
   for support to end displacement for millions of Syrians,"
   Exhibit 27 to the Aguirre Declaration ......................................................JA 500

Screen Capture of Webpage Titled "Syrian Arab Republic: At a glance |
   Urgently Prioritized Humanitarian Response Priorities 2025,"
   Exhibit 28 to the Aguirre Declaration ......................................................JA 503

Report Titled "Syrian Arab Republic:
   Humanitarian Situation Report No. 14,"
   Exhibit 29 to the Aguirre Declaration ......................................................JA 511

Transcript of CNN Interview with Secretary Kristi Noem,
   Exhibit 30 to the Aguirre Declaration ......................................................JA 524

Declaration of Plaintiff Dahlia Doe,
   Exhibit 39 to the Aguirre Declaration ......................................................JA 537

Declaration of Plaintiff Sara Doe,
   Exhibit 40 to the Aguirre Declaration ......................................................JA 543

Declaration of Plaintiff Nesma Doe,
   Exhibit 41 to the Aguirre Declaration ......................................................JA 548

Declaration of Plaintiff Laila Doe,
   Exhibit 42 to the Aguirre Declaration ......................................................JA 554

Declaration of Plaintiff Waleed Doe,
   Exhibit 43 to the Aguirre Declaration ......................................................JA 559

Declaration of Plaintiff Mustafa Doe,
   Exhibit 44 to the Aguirre Declaration ......................................................JA 564

Declaration of Plaintiff Ahmad Doe,
Exhibit 45 to the Aguirre Declaration ........................................................JA 570

Declaration of Stacy Tolchin,
Exhibit 46 to the Aguirre Declaration ........................................................JA 574

Screen Capture of Webpage Titled "Syrian crisis.
After 14 years of conflict and crisis, children
continue to pay the heaviest price,"
Exhibit 47 to the Aguirre Declaration ........................................................JA 582

Report Titled "The Contributions of Temporary
Protected Status Holders to the U.S. Economy,"
Exhibit 48 to the Aguirre Declaration ........................................................JA 594

Declaration of Megan Hauptman in Support of Plaintiffs' Reply in
Support of Motion to Postpone Effective Date of Agency Action,
dated November 6, 2025..............................................................................JA 604

Email Thread with Subject Line "TPS Data Pull for
PS/NS/Fraud" and "TPS Data Pull for Cameroon, Nepal,"
Exhibit 1 to the Hauptman Declaration ......................................................JA 607

Document Titled "Presidential Determination on
Refugee Admissions for Fiscal Year 2026,"
Exhibit 2 to the Hauptman Declaration ......................................................JA 614

Document Titled "Termination of the Designation of
South Sudan for Temporary Protected Status,"
Exhibit 3 to the Hauptman Declaration ......................................................JA 617

Transcript of Oral Ruling of Judge Katherine Polk Failla
on November 19, 2025[1]..............................................................................JA 622

Order Granting Preliminary Injunction, dated November 19, 2025 .................JA 657

Notice of Appeal .........................................................................................JA 659

Termination of the Designation of Syria for Temporary Protected Status,
dated September 22, 2025, 90 Fed. Reg. 45,398–403 ...................................JA 660

---

[1] Though the transcript itself is dated November 18, the oral ruling was delivered
on November 19. JA 15.

**JA 1**

APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:25-cv-08686-KPF

| | |
|---|---|
| Doe et al v. Noem et al | Date Filed: 10/20/2025 |
| Assigned to: Judge Katherine Polk Failla | Jury Demand: None |
| Cause: 05:551 Administrative Procedure Act | Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**Dahlia Doe**                    represented by    **Ghita Schwarz**
International Refugee Assistance Project
One Battery Park Plaza
Ste 33d Floor
New York, NY 10004
646-939-9169
Email: gschwarz@refugeerights.org
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
Muslim Advocates
1032 15th Street N.W. #362
Washington, DC 20005
202-655-2969
Email: golnaz@muslimadvocates.org
*ATTORNEY TO BE NOTICED*

**Johnny Sinodis**
Van Der Hout, LLP
360 Post St.
Ste 800
San Francisco, CA 94104
415-821-8820
Fax: 415-981-3003
Email: ndca@vblaw.com
*ATTORNEY TO BE NOTICED*

**Marc Van Der Hout**
Van Der Hout LLP
360 Post St.
Ste 800
San Francisco, CA 94108
415-981-3000
Fax: 415-981-3003
Email: ndca@vblaw.com
*ATTORNEY TO BE NOTICED*

**Megan McLaughlin Hauptman**

JA 2

International Refugee Assistance Project
650 Massachusetts Ave NW
Suite 600
Washington, DC 20009
646-939-7329
Email: mhauptman@refugeerights.org
*ATTORNEY TO BE NOTICED*

**Nargis Aslami**
Muslim Advocates
1032 15th St. N.W.
Ste #362
Washington D.C., DC 20005
202-897-1895
Email: nargis@muslimadvocates.org
*ATTORNEY TO BE NOTICED*

**Oona Cahill**
360 Post St.
Ste 800
San Francisco, CA 94108
415-981-3000
Email: ocah@vblaw.com
*ATTORNEY TO BE NOTICED*

**Sadaf Hasan**
Muslim Advocates
Muslim Advocates
PO Box 34440
Washington, DC 20043
347-249-9013
Email: sadaf@muslimadvocates.org
*ATTORNEY TO BE NOTICED*

**Guadalupe V Aguirre**
International Refugee Assistance Project
Litigation
One Battery Park Plaza
33rd FL IRAP
New York, NY 10004
929-246-0154
Email: laguirre@refugeerights.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sara Doe**                    represented by  **Ghita Schwarz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johnny Sinodis**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Van Der Hout**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan McLaughlin Hauptman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nargis Aslami**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oona Cahill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sadaf Hasan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Guadalupe V Aguirre**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nesma Doe**                                   represented by   **Ghita Schwarz**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Golnaz Fakhimi**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Johnny Sinodis**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Marc Van Der Hout**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Megan McLaughlin Hauptman**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Nargis Aslami**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Oona Cahill**
                                                                 (See above for address)

JA 4

*ATTORNEY TO BE NOTICED*

**Sadaf Hasan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Guadalupe V Aguirre**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Laila Doe**                     represented by     **Ghita Schwarz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johnny Sinodis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Van Der Hout**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan McLaughlin Hauptman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nargis Aslami**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oona Cahill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sadaf Hasan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Guadalupe V Aguirre**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Waleed Doe**                     represented by     **Ghita Schwarz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Johnny Sinodis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Van Der Hout**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan McLaughlin Hauptman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nargis Aslami**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oona Cahill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sadaf Hasan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Guadalupe V Aguirre**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mustafa Doe**                    represented by   **Ghita Schwarz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johnny Sinodis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Van Der Hout**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan McLaughlin Hauptman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nargis Aslami**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oona Cahill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sadaf Hasan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Guadalupe V Aguirre**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ahmad Doe**                                   represented by **Ghita Schwarz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Golnaz Fakhimi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johnny Sinodis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Van Der Hout**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan McLaughlin Hauptman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nargis Aslami**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oona Cahill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sadaf Hasan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Guadalupe V Aguirre**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**JA 7**

**Secretary Kristi Noem**                        represented by  **Mark Osmond**
*United States Department of Homeland*                            DOJ-USAO
*Security, in her official capacity*                             86 Chambers Street
                                                                 New York, NY 10007
                                                                 212-637-2713
                                                                 Email: mark.osmond@usdoj.gov
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Rebecca Lynn Salk**
                                                                 DOJ-USAO
                                                                 86 Chambers Street
                                                                 3rd Floor
                                                                 New York, NY 10007
                                                                 212-637-2614
                                                                 Email: rebecca.salk@usdoj.gov
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Rebecca Sol Tinio**
                                                                 U.S. Attorney's Office, SDNY
                                                                 86 Chambers Street, 3rd Floor
                                                                 New York, NY 10007
                                                                 (212) 637-2774
                                                                 Fax: (212) 637-2702
                                                                 Email: rebecca.tinio@usdoj.gov
                                                                 *TERMINATED: 01/22/2026*

**Defendant**

**United States Department of Homeland**         represented by  **Mark Osmond**
**Security**                                                     (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Rebecca Lynn Salk**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Rebecca Sol Tinio**
                                                                 (See above for address)
                                                                 *TERMINATED: 01/22/2026*

**Defendant**

**United States Citizenship and**                represented by  **Mark Osmond**
**Immigration Services**                                         (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Rebecca Lynn Salk**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Rebecca Sol Tinio**
                                                                 (See above for address)
                                                                 *TERMINATED: 01/22/2026*

**Defendant**

2/21/26, 1:13 PM                                     SDNY CM/ECF NextGen Version 1.8.5

**United States of America**                    represented by   **Mark Osmond**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Lynn Salk**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Sol Tinio**
(See above for address)
*TERMINATED: 01/22/2026*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/20/2025 | 1 | COMPLAINT against Kristi Noem, UNITED STATES OF AMERICA, United States Citizenship and Immigration Services, United States Department of Homeland Security. (Filing Fee $ 405.00, Receipt Number ANYSDC-31875532)Document filed by Mustafa Doe, Nesma Doe, Ahmad Doe, Sara Doe, Dahlia Doe, Laila Doe, Waleed Doe..(Aguirre, Guadalupe) (Entered: 10/20/2025) |
| 10/20/2025 | 2 | CIVIL COVER SHEET filed..(Aguirre, Guadalupe) (Entered: 10/20/2025) |
| 10/20/2025 | 3 | **FILING ERROR - DEFICIENT SUMMONS REQUEST As To -** REQUEST FOR ISSUANCE OF SUMMONS as to United States Attorney's Office, re: 1 Complaint. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) Modified on 10/21/2025 (sj). (Entered: 10/20/2025) |
| 10/20/2025 | 4 | **FILING ERROR - DEFICIENT SUMMONS REQUEST - PDF ERROR** REQUEST FOR ISSUANCE OF SUMMONS as to United States Citizenship and Immigration Services, re: 1 Complaint,. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) Modified on 10/21/2025 (sj). (Entered: 10/20/2025) |
| 10/20/2025 | 5 | **FILING ERROR - DEFICIENT SUMMONS REQUEST - PDF ERROR** REQUEST FOR ISSUANCE OF SUMMONS as to Kristi Noem, re: 1 Complaint,. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe.. (Aguirre, Guadalupe) Modified on 10/21/2025 (sj). (Entered: 10/20/2025) |
| 10/20/2025 | 6 | **FILING ERROR - DEFICIENT SUMMONS REQUEST - PDF ERROR** REQUEST FOR ISSUANCE OF SUMMONS as to United States Department of Homeland Security, re: 1 Complaint,. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) Modified on 10/21/2025 (sj). (Entered: 10/20/2025) |
| 10/20/2025 | 7 | NOTICE OF APPEARANCE by Ghita Schwarz on behalf of Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Schwarz, Ghita) (Entered: 10/20/2025) |
| 10/21/2025 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Guadalupe V Aguirre. The party information for the following party/parties has been modified: Kristi Noem, UNITED STATES OF AMERICA. The information for the party/parties has been modified for the following reason/reasons: party name was entered in all caps; party text contained a typographical error. (sj)** (Entered: 10/21/2025) |

2/21/26, 1:13 PM                                                    SDNY CM/ECF NextGen Version 1.8.5

| | | |
|---|---|---|
| 10/21/2025 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Katherine Polk Failla. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(sj) (Entered: 10/21/2025) |
| 10/21/2025 | | Magistrate Judge Barbara C. Moses is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (sj) (Entered: 10/21/2025) |
| 10/21/2025 | | Case Designated ECF. (sj) (Entered: 10/21/2025) |
| 10/21/2025 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Guadalupe V Aguirre to RE-FILE Document No. 6 Request for Issuance of Summons, 3 Request for Issuance of Summons, 4 Request for Issuance of Summons, 5 Request for Issuance of Summons. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the issuance of summons is not correct; Filing Court was omitted on PDF; The Defendant as to whom the summons request is for must be listed in docket entry. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (sj) (Entered: 10/21/2025) |
| 10/21/2025 | 8 | FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST PDF ERROR - REQUEST FOR ISSUANCE OF SUMMONS as to United States Attorney's Office, re: 1 Complaint,. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) Modified on 10/22/2025 (pc). (Entered: 10/21/2025) |
| 10/21/2025 | 9 | REQUEST FOR ISSUANCE OF SUMMONS as to United States Department of Homeland Security, re: 1 Complaint,. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) (Entered: 10/21/2025) |
| 10/21/2025 | 10 | REQUEST FOR ISSUANCE OF SUMMONS as to Kristi Noem, re: 1 Complaint,. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) (Entered: 10/21/2025) |
| 10/21/2025 | 11 | REQUEST FOR ISSUANCE OF SUMMONS as to United States Citizenship and Immigration Services, re: 1 Complaint,. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) (Entered: 10/21/2025) |
| 10/21/2025 | 12 | LETTER addressed to Judge Katherine Polk Failla from Guadalupe Aguirre dated 10/21/2025 re: Plaintiffs' Intent to Move for Expedited Preliminary Relief. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe.. (Aguirre, Guadalupe) (Entered: 10/21/2025) |
| 10/21/2025 | 13 | NOTICE OF APPEARANCE by Golnaz Fakhimi on behalf of Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Fakhimi, Golnaz) (Entered: 10/21/2025) |
| 10/21/2025 | 14 | MOTION for leave to proceed under pseudonyms . Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) |

| | | |
|---|---|---|
| | | (Entered: 10/21/2025) |
| 10/21/2025 | 15 | MEMORANDUM OF LAW in Support re: 14 MOTION for leave to proceed under pseudonyms . . Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) (Entered: 10/21/2025) |
| 10/21/2025 | 16 | NOTICE OF APPEARANCE by Rebecca Lynn Salk on behalf of Kristi Noem, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States of America..(Salk, Rebecca) (Entered: 10/21/2025) |
| 10/21/2025 | 17 | DECLARATION of Guadalupe Aguirre in Support re: 14 MOTION for leave to proceed under pseudonyms .. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Exhibit Declaration of Dahlia Doe, # 2 Exhibit Declaration of Sara Doe, # 3 Exhibit Declaration of Nesma Doe, # 4 Exhibit Declaration of Laila Doe, # 5 Exhibit Declaration of Waleed Doe, # 6 Exhibit Declaration of Mustafa Doe, # 7 Exhibit Declaration of Ahmad Doe, # 8 Proposed Order Proposed Order).(Aguirre, Guadalupe) (Entered: 10/21/2025) |
| 10/21/2025 | 18 | MOTION for Megan M. Hauptman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-31881769. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Affidavit Affidavit in support of motion for pro hac vice admission, # 2 Exhibit Certificate of good standing, # 3 Proposed Order Proposed order).(Hauptman, Megan) (Entered: 10/21/2025) |
| 10/21/2025 | 19 | MOTION for Preliminary Injunction . Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) (Entered: 10/21/2025) |
| 10/21/2025 | 20 | DECLARATION of Guadalupe Aguirre in Support re: 19 MOTION for Preliminary Injunction .. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Exhibit # 1, # 2 Exhibit # 2, # 3 Exhibit # 3, # 4 Exhibit # 4, # 5 Exhibit # 5, # 6 Exhibit # 6, # 7 Exhibit # 7, # 8 Exhibit # 8, # 9 Exhibit # 9, # 10 Exhibit # 10, # 11 Exhibit # 11, # 12 Exhibit # 12, # 13 Exhibit # 13, # 14 Exhibit # 14, # 15 Exhibit # 15, # 16 Exhibit # 16, # 17 Exhibit # 17, # 18 Exhibit # 18, # 19 Exhibit # 19, # 20 Exhibit # 20, # 21 Exhibit # 21, # 22 Exhibit # 22, # 23 Exhibit # 23, # 24 Exhibit # 24, # 25 Exhibit # 25, # 26 Exhibit # 26, # 27 Exhibit # 27, # 28 Exhibit # 28, # 29 Exhibit # 29, # 30 Exhibit # 30, # 31 Exhibit # 31, # 32 Exhibit # 32, # 33 Exhibit # 33, # 34 Exhibit # 34, # 35 Exhibit # 35, # 36 Exhibit # 36, # 37 Exhibit # 37, # 38 Exhibit # 38, # 39 Exhibit # 39, # 40 Exhibit # 40, # 41 Exhibit # 41, # 42 Exhibit # 42, # 43 Exhibit # 43, # 44 Exhibit # 44, # 45 Exhibit # 45, # 46 Exhibit # 46, # 47 Exhibit # 47, # 48 Exhibit # 48, # 49 Exhibit # 49, # 50 Exhibit # 50).(Aguirre, Guadalupe) (Entered: 10/21/2025) |
| 10/21/2025 | 21 | MEMORANDUM OF LAW in Support re: 19 MOTION for Preliminary Injunction . . Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Proposed Order Proposed Order).(Aguirre, Guadalupe) (Entered: 10/21/2025) |
| 10/22/2025 | 22 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Johnny Sinodis to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-31886637. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Proposed Order Proposed Order).(Sinodis, Johnny) Modified on 10/23/2025 (rju). (Entered: 10/22/2025) |
| 10/22/2025 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Guadalupe V Aguirre to RE-FILE |

| | | |
|---|---|---|
| | | **Document No. 8 Request for Issuance of Summons,. The filing is deficient for the following reason(s): Summonses can only be issued to defendants listed on the complaint caption title. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (pc)** (Entered: 10/22/2025) |
| 10/22/2025 | 23 | ORDER with respect to 14 Motion. Plaintiffs filed this case on October 20, 2025. (Dkt. #1). One day later, Plaintiffs filed a motion for leave to proceed under pseudonyms (Dkt. #14), and a motion for a preliminary injunction (Dkt. #21). The parties are hereby ORDERED to appear for a conference regarding Plaintiffs' pending motions on October 24, 2025, at 3:30 p.m. in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York. Furthermore, if the Government wishes to file a written response to Plaintiffs' motions, the Court expects the response by 5:00 p.m. on October 23, 2025. SO ORDERED. (Signed by Judge Katherine Polk Failla on 10/22/2025) (jjc) (Entered: 10/22/2025) |
| 10/22/2025 | | Set/Reset Deadlines: ( Responses due by 10/23/2025), Set/Reset Hearings:( Status Conference set for 10/24/2025 at 03:30 PM in Courtroom 618, 40 Centre Street, New York, NY 10007 before Judge Katherine Polk Failla.) (jjc) (Entered: 10/22/2025) |
| 10/23/2025 | 24 | LETTER addressed to Judge Katherine Polk Failla from Guadalupe Aguirre dated 10/23/2025 re: Parties' Agreed-Upon Briefing Schedule for Plaintiffs' Motion for Preliminary Relief. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) (Entered: 10/23/2025) |
| 10/23/2025 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 18 MOTION for Megan M. Hauptman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-31881769. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 10/23/2025) |
| 10/23/2025 | 25 | ORDER FOR ADMISSION PRO HAC VICE granting 18 Motion for Megan M. Hauptman to Appear Pro Hac Vice. The Clerk of Court is directed to terminate the pending motion at docketentry 18.. (Signed by Judge Katherine Polk Failla on 10/23/2025) (rro) (Entered: 10/23/2025) |
| 10/23/2025 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 22 MOTION for Johnny Sinodis to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-31886637. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of California;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (rju)** (Entered: 10/23/2025) |
| 10/23/2025 | 26 | REQUEST FOR ISSUANCE OF SUMMONS as to United States of America, re: 1 Complaint,. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe..(Aguirre, Guadalupe) (Entered: 10/23/2025) |
| 10/23/2025 | 27 | ELECTRONIC SUMMONS ISSUED as to United States of America,.(gp) (Entered: 10/23/2025) |
| 10/23/2025 | 28 | ELECTRONIC SUMMONS ISSUED as to United States Department of Homeland Security,.(gp) (Entered: 10/23/2025) |
| 10/23/2025 | 29 | ELECTRONIC SUMMONS ISSUED as to United States Citizenship and Immigration Services.(gp) (Entered: 10/23/2025) |

2/21/26, 1:13 PM                                    SDNY CM/ECF NextGen Version 1.8.5

| 10/23/2025 | 30 | ELECTRONIC SUMMONS ISSUED as to Kristi Noem,.(gp) (Entered: 10/23/2025) |
|---|---|---|
| 10/24/2025 | | Minute Entry for proceedings held before Judge Katherine Polk Failla: Status Conference held on 10/24/2025. Attorneys Guadalupe V. Aguirre, Megan McLaughlin Hauptman, and Ghita Schwarz representing Plaintiffs present. AUSAs Adam Gitlin and Mark Osmond. Plaintiffs' motion to proceed under pseudonyms is GRANTED. The parties briefing schedule is GRANTED. The preliminary injunction hearing is set for November 14, 2025 at 10:00 a.m. (Court Reporter Lisa O'Brien) (tn) (Entered: 10/28/2025) |
| 10/24/2025 | | Set/Reset Hearings: Show Cause Hearing set for 11/14/2025 at 10:00 AM in Courtroom 618, 40 Centre Street, New York, NY 10007 before Judge Katherine Polk Failla. (tn) (Entered: 10/28/2025) |
| 10/27/2025 | 31 | MOTION for Johnny Sinodis to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Affidavit of Johnny Sinodis, # 3 Proposed Order Proposed Order).(Sinodis, Johnny) (Entered: 10/27/2025) |
| 10/27/2025 | 32 | MOTION for Oona Cahill to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-31907885. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Affidavit of Oona Cahill, # 3 Proposed Order Proposed Order).(Cahill, Oona) (Entered: 10/27/2025) |
| 10/28/2025 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 31 MOTION for Johnny Sinodis to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 10/28/2025) |
| 10/28/2025 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 32 MOTION for Oona Cahill to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-31907885. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 10/28/2025) |
| 10/28/2025 | 33 | ORDER FOR ADMISSION PRO HAC VICE granting 31 Motion for Johnny Sinodis to Appear Pro Hac Vice. The Clerk of Court is directed to terminate the pending motion at docket entry 31. (Signed by Judge Katherine Polk Failla on 10/28/2025) (rro) (Entered: 10/28/2025) |
| 10/28/2025 | 34 | ORDER FOR ADMISSION PRO HAC VICE granting 32 Motion for Oona Cahill to Appear Pro Hac Vice. The Clerk of Court is directed to terminate the pending motion at docket entry 32. (Signed by Judge Katherine Polk Failla on 10/28/2025) (rro) (Entered: 10/28/2025) |
| 10/30/2025 | 35 | LETTER MOTION to Compel Defendants Noem, Department of Homeland Security, U.S. Citizenship and Immigration Services, and United States of America to Produce the Certified Administrative Record addressed to Judge Katherine Polk Failla from Guadalupe Aguirre dated 10/30/2025. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Exhibit Letter Request, # 2 Exhibit Parties' Email Correspondence, # 3 Proposed Order Proposed Order Re Production of CAR).(Aguirre, Guadalupe) (Entered: 10/30/2025) |
| 10/31/2025 | 36 | MEMORANDUM OF LAW in Opposition re: 19 MOTION for Preliminary Injunction . . Document filed by Kristi Noem, United States Citizenship and Immigration Services, |

2/21/26, 1:13 PM                                                    SDNY CM/ECF NextGen Version 1.8.5

| | | United States Department of Homeland Security, United States of America..(Osmond, Mark) (Entered: 10/31/2025) |
|---|---|---|
| 11/03/2025 | 37 | LETTER RESPONSE in Opposition to Motion addressed to Judge Katherine Polk Failla from Mark Osmond dated 11/3/2025 re: 35 LETTER MOTION to Compel Defendants Noem, Department of Homeland Security, U.S. Citizenship and Immigration Services, and United States of America to Produce the Certified Administrative Record addressed to Judge Katherine Polk Failla from *Mark Osmond*. Document filed by Kristi Noem, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States of America..(Osmond, Mark) (Entered: 11/03/2025) |
| 11/04/2025 | 38 | MEMO ENDORSEMENT on re: 37 Response in Opposition to Motion,, filed by Kristi Noem, United States Citizenship and Immigration Services, United States of America, United States Department of Homeland Security. ENDORSEMENT: The Court has reviewed Plaintiffs' letter motion to compel production of the Certified Administrative Record (Dkt. #35), as well as Defendants' above response (Dkt. #37). Given that Defendants did not file a declaration in their opposition brief (Dkt. #36; see also Dkt. #35-2 (emails indicating that the immediacy of Plaintiffs' request in part stemmed from Defendants' plan to rely on declarations)), the Court will defer consideration of Plaintiffs' motion to compel until the upcoming November 14, 2025 conference. (Signed by Judge Katherine Polk Failla on 11/4/2025) (rro) (Entered: 11/04/2025) |
| 11/04/2025 | 39 | MOTION for Marc Van Der Hout to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-31945481. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Affidavit of Marc Van Der Hout, # 2 Exhibit Certificate of Good Standing, # 3 Proposed Order Proposed Order).(Van Der Hout, Marc) (Entered: 11/04/2025) |
| 11/04/2025 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 39 MOTION for Marc Van Der Hout to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-31945481. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (rju)** (Entered: 11/04/2025) |
| 11/05/2025 | 40 | ORDER FOR ADMISSION PRO HAC VICE granting 39 Motion for Marc Van Der Hout to Appear Pro Hac Vice. The Clerk of Court is directed to terminate the pending motion at docket entry 39. (Signed by Judge Katherine Polk Failla on 11/5/2025) (rro) (Entered: 11/05/2025) |
| 11/06/2025 | 41 | REPLY MEMORANDUM OF LAW in Support re: 19 MOTION for Preliminary Injunction . *Motion to Postpone Effective Date of Agency Action*. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe.. (Aguirre, Guadalupe) (Entered: 11/06/2025) |
| 11/06/2025 | 42 | DECLARATION of Megan Hauptman in Support re: 19 MOTION for Preliminary Injunction .. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Exhibit #1, # 2 Exhibit #2, # 3 Exhibit #3). (Aguirre, Guadalupe) (Entered: 11/06/2025) |
| 11/06/2025 | 43 | ORDER: The hearing currently scheduled for November 14, 2025, is hereby ADJOURNED to November 17, 2025, at 12:00 p.m. in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York. ( Show Cause Hearing set for 11/17/2025 at 12:00 PM in Courtroom 618, 40 Centre Street, New York, NY 10007 before Judge Katherine Polk Failla.) (Signed by Judge Katherine Polk Failla on 11/6/2025) (rro) (Entered: 11/07/2025) |

| | | |
|---|---|---|
| 11/07/2025 | 44 | ORDER: The hearing scheduled for November 17, 2025 in the above matter has been moved to a different courtroom. It will now be held at 12:00 p.m. in Courtroom 318 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York. SO ORDERED. (Signed by Judge Katherine Polk Failla on 11/7/2025) (Show Cause Hearing set for 11/17/2025 at 12:00 PM in Courtroom 318, 40 Centre Street, New York, NY 10007 before Judge Katherine Polk Failla.) (ar) (Entered: 11/07/2025) |
| 11/07/2025 | 45 | NOTICE OF APPEARANCE by Rebecca Sol Tinio on behalf of Kristi Noem, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States of America..(Tinio, Rebecca) (Entered: 11/07/2025) |
| 11/07/2025 | 46 | NOTICE OF APPEARANCE by Mark Osmond on behalf of Kristi Noem, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States of America..(Osmond, Mark) (Entered: 11/07/2025) |
| 11/10/2025 | 47 | LETTER MOTION for Oral Argument *To Have a Public Access Line* addressed to Judge Katherine Polk Failla from Ghita Schwarz dated November 10, 2025. Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe.. (Schwarz, Ghita) (Entered: 11/10/2025) |
| 11/11/2025 | 48 | LETTER addressed to Judge Katherine Polk Failla from Plaintiffs dated 11/11/2025 re: Notice of Errata - Correction to Plaintiffs' Reply Brief (ECF 41). Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Errata Ex. 1 - Corrected Reply Brief, # 2 Errata Ex. 2 - Corrected Reply Brief with Track Changes).(Hauptman, Megan) (Entered: 11/11/2025) |
| 11/12/2025 | 49 | ORDER granting 47 Letter Motion for Oral Argument. The Court has reviewed Plaintiffs' request that the Court provide a public access line for the November 17, 2025 preliminary relief hearing. The Court understands that the Government takes no position on the request. Plaintiffs' request is GRANTED. The proceeding will take place at 12:00 p.m. in Courtroom 318 of the Thurgood Marshall Courthouse, but there will also be a public access line available. The dial-in telephone number is (855) 244-8681, and the access code 2315 780 7370. The rebroadcasting and recording of the conference is not permitted. SO ORDERED. (Signed by Judge Katherine Polk Failla on 11/12/2025) (ar) (Entered: 11/12/2025) |
| 11/13/2025 | 50 | AFFIDAVIT OF SERVICE of Summons and Complaint, served. All Defendants. Service was made by Electronic Mail on Consent. Document filed by Mustafa Doe, Nesma Doe, Ahmad Doe, Sara Doe, Dahlia Doe, Laila Doe, Waleed Doe..(Aguirre, Guadalupe) (Entered: 11/13/2025) |
| 11/14/2025 | 51 | MOTION for Sadaf Hasan to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Affidavit Notarized Affidavit, # 2 Exhibit Certificate of Good Standing, # 3 Proposed Order Proposed Order). (Hasan, Sadaf) Modified on 11/17/2025 (rju). Modified on 11/18/2025 (bc). (Entered: 11/14/2025) |
| 11/17/2025 | | Minute Entry for proceedings held before Judge Katherine Polk Failla: Show Cause Hearing held on 11/17/2025. Attorneys Guadalupe V. Aguirre, Megan McLaughlin Hauptman, Ghita Schwarz, Golnaz Fakhimi, and Sadaf Hasan representing Plaintiffs present. AUSAs Mark Osmond and Rebecca Sol Tinio representing Defendants present. The Court defers ruling on the motion, and will schedule a conference for its oral decision in due course. (Court Reporter Sharonda Jones) (tn) (Entered: 11/17/2025) |
| 11/17/2025 | | Pro Hac Vice Fee Payment: for 51 MOTION for Sadaf Hasan to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff..** Filing fee $ |

2/21/26, 1:13 PM                                          SDNY CM/ECF NextGen Version 1.8.5

| | | |
|---|---|---|
| | | 200.00, receipt number ANYSDC-32007351..(Hasan, Sadaf) (Entered: 11/17/2025) |
| 11/18/2025 | 52 | NOTICE of Hearing: The Court will issue its oral decision on Wednesday, November 19, 2025 at 3:00 p.m., via video conference with public audio-only access at (855) 244-8681, access code 2315 780 7370. Instructions to video participants will be sent separately in advance of the conference. **THE RECORDING AND/OR REBROADCASTING OF THIS CONFERENCE IS NOT PERMITTED.** (Telephone Conference set for 11/19/2025 at 03:00 PM in telephone or video conference before Judge Katherine Polk Failla.) ***No PDF is attached to this entry.(tn) (Entered: 11/18/2025) |
| 11/18/2025 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 51 MOTION for Sadaf Hasan to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bc)** (Entered: 11/18/2025) |
| 11/18/2025 | 53 | ORDER FOR ADMISSION PRO HAC VICE granting 51 Motion for Sadaf Hasan to Appear Pro Hac Vice. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. The Clerk of Court is directed to terminate the pending motion at docket entry 51. SO ORDERED. (Signed by Judge Katherine Polk Failla on 11/18/2025) (ar) (Entered: 11/18/2025) |
| 11/19/2025 | | Minute Entry for proceedings held before Judge Katherine Polk Failla: Motion Hearing held on 11/19/2025 re: 19 MOTION for Preliminary Injunction filed by Dahlia Doe, Waleed Doe, Mustafa Doe, Nesma Doe, Ahmad Doe, Laila Doe, Sara Doe. Attorneys Guadalupe V. Aguirre, Megan McLaughlin Hauptman, Ghita Schwarz, and Marc Van Der Hout representing Plaintiffs present. AUSAs Mark Osmond and Rebecca Sol Tinio representing Defendants present. For the reasons set forth on the record, the Court GRANTS Plaintiffs' motion in part. (See transcript.) (Court Reporter Andrew Walker) (tn) (Entered: 11/19/2025) |
| 11/19/2025 | 54 | ORDER granting in part 19 Motion for Preliminary Injunction; denying without prejudice to renewal 35 Motion to Compel. For the reasons set forth on the record at the November 19, 2025 conference, Plaintiffs' motion for a preliminary injunction (Dkt. #19) is GRANTED in part. Defendants' termination of Temporary Protective Status for Syrians in the United States is hereby POSTPONED, pending further order from this Court or a reviewing court, pursuant to 5 U.S.C. § 705. Given the anticipated appeal in this matter, Plaintiffs' motion to compel production of the Certified Administrative Record (Dkt. #35) is DENIED without prejudice as to its renewal at a later date. The Clerk of Court is directed to terminate the pending motions at docket entries 19 and 35. SO ORDERED. (Signed by Judge Katherine Polk Failla on 11/19/2025) (ar) (Entered: 11/19/2025) |
| 11/24/2025 | 55 | **FILING ERROR - NO ORDER SELECTED FOR APPEAL -** NOTICE OF INTERLOCUTORY APPEAL. Document filed by Kristi Noem, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States of America. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Osmond, Mark) Modified on 11/25/2025 (nd). (Entered: 11/24/2025) |
| 11/25/2025 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Mark Osmond to RE-FILE Document No. 55 Notice of Interlocutory Appeal,.. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re-file the appeal using the event type Notice of** |

| | | |
|---|---|---|
| | | **Interlocutory Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (nd)** (Entered: 11/25/2025) |
| 11/25/2025 | 56 | NOTICE OF INTERLOCUTORY APPEAL from 54 Order on Motion for Preliminary Injunction,,,, Order on Motion to Compel,,,. Document filed by Kristi Noem, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States of America. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Osmond, Mark) (Entered: 11/25/2025) |
| 11/25/2025 | | Appeal Fee Not Required for 56 Notice of Interlocutory Appeal,. Appeal filed by U.S. Government..(nd) (Entered: 11/25/2025) |
| 11/25/2025 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 56 Notice of Interlocutory Appeal,..(nd) (Entered: 11/25/2025) |
| 11/25/2025 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 56 Notice of Interlocutory Appeal, filed by Kristi Noem, United States Citizenship and Immigration Services, United States of America, United States Department of Homeland Security were transmitted to the U.S. Court of Appeals..(nd) (Entered: 11/25/2025) |
| 12/05/2025 | 57 | TRANSCRIPT of Proceedings re: ORAL ARGUMENT held on 11/17/2025 before Judge Katherine Polk Failla. Court Reporter/Transcriber: Sharonda Jones, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/26/2025. Redacted Transcript Deadline set for 1/5/2026. Release of Transcript Restriction set for 3/5/2026.. (Moya, Goretti) (Entered: 12/05/2025) |
| 12/05/2025 | 58 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a ORAL ARGUMENT proceeding held on 11/17/2025 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 12/05/2025) |
| 12/09/2025 | 59 | TRANSCRIPT of Proceedings re: CONFERENCE held on 11/19/2025 before Judge Katherine Polk Failla. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/30/2025. Redacted Transcript Deadline set for 1/9/2026. Release of Transcript Restriction set for 3/9/2026.. (Moya, Goretti) (Entered: 12/09/2025) |
| 12/09/2025 | 60 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 11/19/2025 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 12/09/2025) |
| 12/15/2025 | 61 | MOTION for Nargis Akbary Aslami to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-32134693. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Ahmad Doe, Dahlia Doe, Laila Doe, Mustafa Doe, Nesma Doe, Sara Doe, Waleed Doe. (Attachments: # 1 Affidavit Notarized affidavit in support of |

# JA 17

| | | |
|---|---|---|
| | | Motion, # 2 Supplement Certificate of good standing for Massachusetts state bar, # 3 Supplement Certificate of good standing for Washington, D.C. bar, # 4 Proposed Order Proposed order for admission pro hac vice).(Aslami, Nargis) (Entered: 12/15/2025) |
| 12/15/2025 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 61 MOTION for Nargis Akbary Aslami to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-32134693. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bc)** (Entered: 12/15/2025) |
| 12/16/2025 | 62 | ORDER FOR ADMISSION PRO HAC VICE granting 61 Motion for Nargis A. Aslami to Appear Pro Hac Vice. The Clerk of Court is directed to terminate the pending motion at docketentry 61. (ks) (Entered: 12/16/2025) |
| 12/29/2025 | 63 | LETTER MOTION for Conference *to Discuss Government's Anticipated Dispositive Motion and to Defer Briefing on Motion* addressed to Judge Katherine Polk Failla from Mark Osmond dated 12/29/2025. Document filed by Kristi Noem, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States of America..(Osmond, Mark) (Entered: 12/29/2025) |
| 01/07/2026 | 64 | ORDER granting 63 Letter Motion for Conference. Application GRANTED. The parties shall file the contemplated status letter within ten days after the resolution of the Government's appeal. The Clerk of Court is directed to terminate the pending motion at docket entry 63. (Signed by Judge Katherine Polk Failla on 1/7/2026) (rro) (Entered: 01/07/2026) |
| 01/21/2026 | 65 | LETTER addressed to Judge Katherine Polk Failla from Rebecca S. Tinio dated January 21, 2026 re: Motion to Withdraw as Counsel. Document filed by Kristi Noem, United States Citizenship and Immigration Services, United States Department of Homeland Security, United States of America..(Tinio, Rebecca) (Entered: 01/21/2026) |
| 01/22/2026 | 66 | MEMO ENDORSEMENT on re: 65 Letter, filed by Kristi Noem, United States Citizenship and Immigration Services, United States of America, United States Department of Homeland Security. ENDORSEMENT: Application GRANTED. The Court wishes Ms. Tinio well in her future endeavors. Attorney Rebecca Sol Tinio terminated. (Signed by Judge Katherine Polk Failla on 1/22/2026) (rro) (Entered: 01/22/2026) |
| 02/19/2026 | 67 | ORDER of USCA (Certified Copy) as to 56 Notice of Interlocutory Appeal, filed by Kristi Noem, United States Citizenship and Immigration Services, United States of America, United States Department of Homeland Security USCA Case Number 25-2995. For the foregoing reasons, it is hereby ORDERED that the Government's motion for a stay pending appeal is DENIED. The current time frame by which this matter will advance to a merits panel for resolution of the appeal reflects the Government's choice to proceed on a non-expedited basis. Its opening brief is currently due on the date it requested: March 11, 2026. If the Government wishes to file its brief sooner, it may move to expedite the briefing schedule. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 2/17/2026. (tp) (Entered: 02/20/2026) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/21/2026 13:13:11 | | |
| **PACER Login:** MOsmond01 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** 1:25-cv-08686-KPF | |

**JA 18**

SDNY CM/ECF NextGen Version 1.8.5

| Billable Pages: | 19 | Cost: | 1.90 |
|---|---|---|---|

Case 1:25-cv-08686-KPF   Document 1   Filed 10/20/25   Page 1 of 63

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DAHLIA DOE; SARA DOE; NESMA DOE; LAILA DOE; WALEED DOE; MUSTAFA DOE; and AHMAD DOE, on their own behalf and on behalf of others similarly situated,<br><br>*Plaintiffs*,<br><br>– *versus* –<br><br>Kristi NOEM, Secretary, United States Department of Homeland Security, in her official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | **Case No. 1:25-cv-08686**<br><br>**COMPLAINT**<br>**CLASS ACTION** |

## INTRODUCTION

1.      Syria is a country in humanitarian crisis. In recognition of a brutal civil war that began in 2011, the United States has repeatedly granted Syrian nationals a form of statutory and humanitarian protection called Temporary Protected Status ("TPS"), which protects certain individuals from removal to countries designated unsafe on account of dire country conditions like armed conflict, natural disaster, or other extraordinary circumstances. TPS provides eligible beneficiaries with the right to live and work legally in the United States during a period when it is unsafe for them to return to their countries of origin. Over 6,100 Syrian nationals currently have TPS and, as a result, find refuge in the United States; and over 800 Syrian nationals have pending applications hoping for that same protection.

2.      Plaintiffs are seven Syrian nationals with TPS or pending applications for TPS, who have lived in the United States for years and have deep ties to this country and their communities. They bring this class action to challenge Defendants' remarkable and unlawful decision to terminate Syria's TPS designation, effective November 21, 2025. Defendants' actions put Plaintiffs with existing TPS at imminent risk of losing the critical humanitarian protection that TPS provides and rob Plaintiffs with pending applications of the opportunity to have their applications adjudicated. Should TPS for Syria be terminated, all Plaintiffs will face impossible choices: to uproot their lives yet again in search of a pathway to safety in a third country; to remain in the United States without lawful immigration status, at risk of imminent immigration detention and removal; or to relocate—some for the first time—to Syria, a country plagued by violent conflict, including air strikes, civil unrest, humanitarian crisis, and volatile country conditions.

3.      Department of Homeland Security ("DHS") Secretary Kristi Noem's decision to terminate TPS for Syria—giving TPS-holders merely 60 days to plan for life without TPS—is

1

the latest in a series of premeditated terminations[1] of TPS for several non-white, non-European countries. The decisions to terminate TPS for these countries, including Syria, were made as part of the Trump Administration's ongoing effort to effectively eliminate the Congressionally-authorized TPS program and significantly reduce the number of non-white immigrants in the United States.

4.      Specifically, here, Defendants' decision to terminate TPS for Syria—made prior to consulting appropriate executive agencies, without regard to Syria's dire country conditions, and by relying on impermissible factors—violates the TPS program's statutory requirements and the Administrative Procedure Act ("APA"). Defendants' unexplained decision to provide only 60 days' notice before the termination takes effect is a stark departure from past practice of providing an orderly transition period and separately violates the APA. And because these decisions were motivated, at least in part, by racial, ethnic, and national-origin-based animus, they also violate the Constitution. Although it has become alarmingly normalized, Secretary Noem, President Trump, and members of the Trump presidential campaign and Administration have consistently used racist invective to describe and justify their TPS decisions involving immigrants from non-white, non-European countries, including Syria.

5.      For these reasons, this Court should set aside DHS's illegal decision terminating TPS for Syrian nationals.

---

[1] To date, the current Trump Administration has terminated TPS for eight of nine countries whose designations have been up for review. The countries subject to termination are: Syria, Nicaragua, Honduras, Nepal, Cameroon, Afghanistan, Haiti, and Venezuela. Only South Sudan's TPS designation was extended.

2

**THE PARTIES**

**Plaintiffs**

6.       **Plaintiff Dahlia Doe** is a Syrian national and TPS holder who has lived in the United States since 2015 and currently resides in Bronx, New York. She works as a research director and is the primary caregiver for her elderly U.S. citizen father, who suffers from Parkinson's disease. Unless her pending application for alternative relief is granted before November 21, she will lose her protection from deportation if TPS for Syria is terminated. Losing TPS will force her to relocate to Syria where she has never lived, has no immediate family ties, and fears she will be targeted as a Syrian Christian religious minority. Dahlia will also be forcibly separated from her immediate U.S. citizen and lawful permanent resident family members.

7.       **Plaintiff Sara Doe** is a Syrian national and TPS holder who has lived in the United States since 2014 and currently resides in New York State. Sara moved to the United States after her brothers were killed during the civil war in Syria, and she herself was targeted by the government as a volunteer providing medical services. Sara is a medical practitioner and a highly sought-after pediatrician. She will lose her work authorization, employer-based health insurance, and protection from deportation if TPS is terminated. Losing TPS will mean Sara will be unable to continue working as a highly-specialized pediatrician, a career she has spent decades training for, and will not be able to provide crucial care to children across New York. Sara no longer has a home or anyone to return to in Syria.

8.       **Plaintiff Nesma Doe** is a Syrian national and TPS holder who has lived in the United States since 2013 and currently resides in Florida. Nesma is in her late 70s and suffers from various health issues. Members of her close family—including two nieces who serve as her

caregivers—all reside in the United States and most are U.S. citizens. She will lose her protection from deportation and be forcibly separated from her only family in the United States. Losing TPS will force her to relocate to Syria without any family ties and where elderly people have increasingly been targets of crime and armed robberies due to the dire economic instability in the country. She also faces uncertainty over whether she could receive and afford the medical care she requires.

9.      **Plaintiff Laila Doe** is a Syrian national and TPS holder who has lived in the United States since 2013 and currently resides in Illinois. She is a full-time special needs teacher and is studying to become a nurse. She is a single mother providing for her minor daughter (also a Syrian TPS holder) and is the primary caregiver for her elderly U.S. citizen mother. She will lose her work authorization and protection from deportation if TPS is terminated. Losing TPS will force Laila and her daughter to return to Syria where she fears for her safety as a divorced single woman, and where her daughter would not be able to pursue her education. She will also be forcibly separated from her U.S. citizen mother and sisters.

10.      **Plaintiff Waleed Doe** is a Syrian national and TPS holder who has lived in the United States since 2011 and currently resides in New Jersey. He is the primary breadwinner for his family and supports his wife, who is also a Syrian TPS holder, and three U.S. citizen children, the youngest of whom is nine months old. He works full-time as a senior manager for a private company and recently started his own business. He will lose his work authorization, employer-based health insurance and protection from deportation if TPS is terminated. Losing TPS will prevent Waleed from providing for his family and force him to make the devastating choice of leaving his U.S. citizen children behind or taking them to a country where they would lack medical care, education and basic necessities.

11.    **Plaintiff Mustafa Doe** is a Syrian national and TPS holder who has lived in the United States since 2021 and currently resides in New York, New York. He recently graduated from college and has temporary status and work authorization as an extension of his student visa. When that status expires, he will be left without work authorization and protection from detention or deportation and could be forcibly returned to a country where he was sexually trafficked as a child and will face persecution for his LGBTQI identity. Mustafa will also be forcibly separated from his parents who are lawful permanent residents.

12.    Plaintiff **Ahmad Doe** is a Syrian citizen with a pending initial application for TPS who has lived in the United States since 2022 and resides in Virginia. Ahmad is a highly sought-after journalist and media producer, but without work authorization cannot accept any of several job offers he has from reputable media companies. Ahmad's only current eligibility for work authorization is through his pending TPS application. If TPS is terminated, Ahmad will lose his protection from deportation as a pending applicant and lose his pathway to obtain work authorization. He fears that, if he is forced to relocate to Syria, he would be killed or targeted due to his criticism of current and past regimes as a journalist. Further, he could be forcibly separated from his non-Syrian national wife.

**Defendants**

13.    **Defendant Kristi Noem** is the Secretary of the Department of Homeland Security. As the highest-ranking officer for DHS, Defendant Noem has ultimate statutory authority over all TPS extension, termination, and designation decisions.[2] She is sued in her official capacity.

---

[2] *See* 8 U.S.C. § 1254a(b); *see also* 6 U.S.C. § 557 (transferring certain functions from the Attorney General).

14.     **Defendant Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). DHS, together with its component agencies, is responsible for administering and enforcing the TPS program.

15.     **Defendant U.S. Citizenship and Immigration Services** is the sub-agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

16.     **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution. The Court also has jurisdiction over Plaintiffs' claim under the Fifth Amendment to the U.S. Constitution. The Court has additional remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the APA, 5 U.S.C. § 701 *et seq.*

18.     The federal government has waived its sovereign immunity and permitted judicial review of agency action under 5 U.S.C. § 702.[3] In addition, sovereign immunity does not bar

---

[3] *See Sharkey v. Quarantillo*, 541 F.3d 75, 91 (2d Cir. 2008).

claims against federal officials seeking to prevent violations of federal law, rather than monetary relief.[4]

19.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, and because at least one named Plaintiff, as well as unnamed members of the putative class, reside in this judicial district.

## THE STATUTORY SCHEME FOR TPS

20.    Congress created TPS in response to unconstrained executive discretion in humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief. *See* Lynda J. Oswald, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157–60 (1986). Between 1960 and 1989, the Attorney General granted extended voluntary departure to approximately sixteen countries, with periods of protection ranging from eight months to 15 years.[5] This practice lacked "any specific … criteria." *Id.* at 178 n.153 (quoting Letter from William F. Smith, Att'y Gen., to Lawrence J. Smith, Rep. (July 19, 1983)). The arbitrary, overtly political decisions surrounding extended voluntary departure resulted in congressional pressure to reform the system, particularly in the wake of the Attorney General's refusal to grant extended voluntary departure for Salvadoran refugees at the time. *See Hotel & Rest. Emps. Union v. Smith*, 846 F.2d 1499, 1510–11 (D.C. Cir. 1988) (discussing termination of extended voluntary departure for El Salvador) (separate opinion of Mikva, J.).

---

[4] *See, e.g.*, *id.*; *Lunney v. United States*, 319 F.3d 550, 557–58 (2d Cir. 2003); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

[5] *See* Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status*, 8 J. of Refugee Stud. 339, 362–63 (1995).

21.     Congress designed TPS to ensure that future nationality-based protections would be based on "identifiable conditions" rather than "the vagaries of our domestic politics." 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute). Congress also sought to replace the "ad hoc, haphazard . . . procedures" that existed before, and provide beneficiaries with certainty about "what [their] rights are, how the Justice Department determines what countries merit [protected] status," and "how long they will be able to stay." *Id.* at 25837 (statement of Rep. Bill Richardson). While establishing criteria to govern blanket humanitarian protection, Congress also overrode the executive branch and statutorily designated El Salvador for TPS. *See* Immigration Act of 1990, Pub. L. 101-649, Title III, §§ 302–303.

22.     Since 1990, the TPS statute has given the executive branch authority to provide nationality-based humanitarian relief to certain citizens of countries stricken by war, natural disaster or other catastrophe, who are already present in the United States. *See* 8 U.S.C. § 1254a. The statute provides that the Secretary of DHS may designate a country for TPS where (1) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (2) "there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state" and it is "unable, temporarily, to handle adequately the return" of nationals; and (3) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)–(C).

23.    Under the statute, the "national interest" provision limits designation only under subsection (C)'s "extraordinary and temporary conditions" ground; it does not apply to designations under subsections (A) (armed conflict) or (B) (natural disasters).

24.    In keeping with its intent to free the process of designating countries for humanitarian protection from domestic politics, Congress established a statutory framework that governs the designations of countries for TPS. The statute first requires the Secretary to consult with "appropriate agencies. 8 U.S.C. § 1254a(b)(1). After that, the Secretary "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective either upon notice in the Federal Register or "such later date as the [Secretary] may specify." *Id.* §1254a(b)(2).

25.    The Secretary thus has substantial discretion over initial TPS designations. So long as she determines certain country conditions exist, she may choose whether and when to designate a country for TPS.

26.    By contrast, Congress limited, in important ways, the Secretary's discretion to review TPS designations after the initial designation is made. *See* U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (2020) ("GAO Report") at 15–18, 27 (differentiating between the discretion afforded before and after an initial designation). The statutory requirements are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

9

27.    The review process typically begins months before the 60-day deadline. *See* GAO Report at 20–21. As part of the process, both USCIS and the State Department generally prepare country conditions memoranda and recommendations for the Secretary. *See id.* 15–16; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process).[6] Generally, USCIS manages and coordinates the TPS review process for the Secretary, soliciting a country conditions report from the Refugee, Asylum, and International Operations (RAIO) unit within USCIS and soliciting a country conditions report and recommendation from the State Department. *See* GAO Report at 15–21; *see also Saget v. Trump*, 375 F. Supp. 3d 280, 299–300 (E.D.N.Y. 2019). After considering the materials provided, USCIS prepares a detailed recommendation, based on country conditions, for the Secretary. *Id.* USCIS's recommendation is called a "Director Memo." *Saget*, 375 F. Supp. 3d at 299–300.

28.    Once the Secretary makes her decision, the statute requires that she "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

29.    Unless the Secretary timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion . . . a period of 12 or 18 months." 8

---

[6] The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case in banc so the panel decision was vacated. *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

U.S.C. § 1254a(b)(3)(C). The statute thus "essentially provides extension as a default." *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 851 (N.D. Cal.), *aff'd*, 150 F.4th 1000 (9th Cir. 2025) ("*NTPSA I* PI Decision").

30.     In contrast, if the Secretary timely "determine[s]" that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal register." 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* The statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation.

31.     The Secretary has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office, the agency provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period. Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago and involved a designation that had been in place for three years or less.

32.     Once the Secretary has designated a particular country for TPS, individuals from that country (and persons without nationality who last habitually resided in that country) may apply for immigration status under the program. To be eligible for TPS, individuals from a designated country must meet stringent requirements. These requirements include, among other things, (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date

designated by the Secretary; (3) satisfaction of the criteria for admissibility as an immigrant or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history such as convictions for a single felony or multiple misdemeanors; and (5) the submission of an application, extensive documentation, and fees. *See* 8 U.S.C. § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9. Further, an individual is not eligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

33.     Congress ensured that people who are ultimately granted TPS would enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the United States; "shall not be detained" by the Secretary of Homeland Security on the basis of immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. *See id*. § 1254a(b)(1).

34.     Individuals who apply for TPS and who are *prima facie* eligible for TPS may receive work authorization and are protected from deportation while the application is pending. *See* 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10(a), (e).

**SYRIA'S PRIOR TPS DESIGNATIONS AND CURRENT COUNTRY CONDITIONS**

35.     Syria is a Muslim-majority country in southwest Asia. Following its independence from the French colonial empire in 1947, Syria went through decades of political instability, internal conflict, and tumult. In 1970, Syria came under the authoritarian rule of Hafez al-Assad, and upon his death in 2000, the rule of al-Assad's son, Bashar al-Assad. The

12

Assad's decades-long rule over Syria was infamous for systemic human rights abuses, war crimes, and repressive policies.

36.     In 2011, in response to pro-democracy protests calling for the end of the Assad regime, the Syrian government began killing protestors. Opposition militias formed in response to the government violence, and by the following year, the conflict expanded into a full-fledged civil war. The Assad regime committed grave human rights atrocities: systemic torture, unlawful killings, sexual violence, forced disappearances, and arbitrary detention. These atrocities are well-documented, including by prominent international human rights organizations[7] and the U.S. Department of State.[8]

37.     The Secretary of DHS first designated Syria for TPS in March 2012, in recognition of the country's escalating civil war, widespread civilian casualties, and mass displacement caused by government and non-state armed forces.[9] The Federal Register notice of designation stated that Syria's armed conflict and humanitarian collapse created "extraordinary and temporary conditions" preventing the safe return of its nationals.[10] In October 2013, DHS extended the initial designation based on "extraordinary and temporary conditions" preventing the safe return of Syrian nationals; in that same Federal Register notice, DHS redesignated Syria for TPS based on its ongoing armed conflict and worsening conditions.[11]

---

[7] *See Syria 2024*, Amnesty Int'l, https://www.amnesty.org/en/location/middle-east-and-north-africa/middle-east/syria/report-syria/ (last visited Oct. 19, 2025).

[8] *See* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *Syria 2024 Human Rights Report* (2024), https://www.state.gov/wp-content/uploads/2025/08/624521_ISYRIA-2024-HUMAN-RIGHTS-REPORT.pdf.

[9] *See* Designation of Syrian Arab Republic for Temporary Protective Status, 77 Fed. Reg. 19,026, 19,026–27 (Mar. 29, 2012).

[10] *Id.*

[11] Extension and Redesignation of Syria for Temporary Protected Status, 78 Fed. Reg. 36,223, 36,224–25 (June 17, 2013).

38.    Successive Secretaries of Homeland Security repeatedly extended and redesignated Syria for TPS, each time citing ongoing armed conflict, human rights abuses, and humanitarian catastrophe.[12]  Each extension and redesignation underscored that conditions of armed conflict and humanitarian collapse in Syria prevent safe return for people in its diaspora.

39.    DHS reviewed Syria's TPS on January 29, 2024, and extended TPS for Syria through September 30, 2025. It did so on two bases: (1) an "ongoing armed conflict" and (2) the continuation of "extraordinary and temporary conditions".[13] As to armed conflict, DHS found that "the ongoing civil war in Syria … has involved large-scale destruction of infrastructure, widespread civilian casualties, and human rights abuses and violations."[14] DHS also found that an earthquake had further destroyed Syrian infrastructure and deepened its economic collapse, and that food insecurity and limited access to healthcare and clean water persisted, leaving Syria incapable of supporting safe returns.[15]

40.    Although the Assad regime fell in December 2024, Syria continues to suffer from armed conflict and humanitarian crisis marked by over a decade of civil war. Throughout 2025, civilians in Syria have been routinely killed and displaced by clashes between forces loyal to the interim government that replaced the Assad regime, sectarian militias, and armed groups from other nations.

---

[12] *See, e.g.*, Extension and Redesignation of Syria for Temporary Protected Status, 89 Fed. Reg. 5,562, 5,565 (Jan. 29, 2024); Extension of the Designation of Syria for Temporary Protected Status, 83 Fed. Reg. 9,329, 9,331–32 (Mar. 5, 2018); Extension and Redesignation of the Syrian Arab Republic for Temporary Protected Status, 80 Fed. Reg. 245, 247–48 (Jan. 5, 2015).
[13] Extension and Redesignation of Syria for Temporary Protective Status, 89 Fed. Reg. 5,562, 5,565 (Jan. 29, 2024).
[14] *Id.*
[15] *See id.* at 5,565-67.

14

41. These conditions are well-documented. For example, the Congressional Research Service reported in September 2025 that "instances of sectarian violence involving members of minority communities, Syrian security forces, nonstate armed groups, and armed vigilantes have threatened Syria's stability since March," with thousands of civilian deaths and more than 200,000 people newly displaced.[16] Indeed, the report makes clear that Syria is not a unified country: the interim government "does not exercise control over all of Syria, with areas of the northeast under the control of ethnic Kurdish-led forces and areas south of the capital, Damascus, controlled by members of [a] religious minority."[17] In addition, "Turkish forces remain in parts of the north, while Israeli forces have moved into formerly demilitarized areas between Syria and Israel and into some Syrian territory near" the two countries' shared border.[18] Israel also launches air strikes, and makes ground incursions, deeper into Syria.[19]

42. In June 2025, the Council of the European Union found that Syria remains in a "continued catastrophic humanitarian situation."[20] Noting its "alarm[]" due to "widespread violence in Syria's coastal region and in other areas around Damascus," it called on the transitional government to "ensure control over armed groups."[21] The Council also warned that conditions in Syria remain dire, with "90 percent of Syrians living below the poverty line, 16.5 million Syrians relying on humanitarian aid, [and] over 7.2 million people internally

---

[16] Christopher M. Blanchard, Cong. Rsch. Serv., RL33487, *Syria: Transition and U.S. Policy* 2, 9 (2025).

[17] *Id.*

[18] *Id.*

[19] *See* Danish Immig. Serv., *Syria – Security Situation* 21–22 (2025), https://us.dk/media/uhxnvfwp/syria-security-situation-final-20062025.pdf.

[20] Gen. Secretariat of the Council, *Council Conclusions on Syria* 9 (June 23, 2025), https://data.consilium.europa.eu/doc/document/ST-10688-2025-INIT/en/pdf.

[21] *Id.* at 3.

displaced."[22] The "food security situation continues to deteriorate, the healthcare system is in ruin, access to basic services remains extremely limited, including due to continued hostilities with attacks on critical infrastructure."[23]

43.    The U.S. Department of State continues to maintain a Level 4 "Do Not Travel" advisory for Syria, which warns that "no part of Syria is safe from violence" and of risks from "terrorism, civil unrest, kidnapping, hostage taking, and *armed conflict.*"[24]

## DEFENDANTS' UNLAWFUL TERMINATION OF SYRIA'S TPS DESIGNATION

44.    On September 19, 2025, Defendant Noem announced the termination of Syria's TPS designation. The termination was published in the Federal Register on September 22, 2025, with a termination date of November 21, 2025—a mere 60 days later and the minimum required by statute. *See* Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. 45,398 (Sep. 22, 2025).

45.    Defendant Noem acknowledged that "the civil war in Syria displaced over half of the country's population, resulted in the deaths of more than 500,000 people, destroyed critical infrastructure, and significantly weakened the Syrian economy."[25] However, she stated that, in large part due to the fall of the Assad regime in December 2024, "the situation [in Syria] no

---

[22] *Id.* at 9.

[23] *Id.*

[24] *Syria Travel Advisory*, U.S. DEP'T OF STATE, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html (last visited Oct. 19, 2025) (emphasis added).

[25] Termination of the Designation of Syria for TPS Status, 90 Fed. Reg. 45,398, 45,400 (Sept. 22, 2025).

longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals."[26]

46.     With respect to Syria's designation due to "extraordinary and temporary conditions," Defendant Noem dismissed the dire security and humanitarian situation, acknowledging that "most Syrians require some form of humanitarian assistance" but nonetheless concluding that "this does not prevent nationals from returning in safety."[27]

47.     Defendant Noem also stated that, "even assuming the relevant conditions in Syria remain both 'extraordinary' and 'temporary,' termination of the Syria [TPS] designation is required because it is contrary to the national interest to permit Syrian nationals . . . to remain temporarily in the United States."[28] To justify this statement, Defendant Noem relied on Syria's placement on the government's list of "state sponsors of terrorism," the lack of U.S. diplomatic presence in Syria, and the purported unavailability of reliable methods by which the U.S. could "meaningful[ly]" vet Syrian nationals.[29] Defendant Noem provided two anecdotes of Syrian nationals—neither one identified as a TPS recipient—who had been indicted, charged, or investigated for crimes related to their alleged roles in the Assad regime or their support for designated terrorist organizations.[30] She also asserted without elaboration that "there are Syrian nationals . . . who are [TPS] beneficiaries or applicants who are or have been the subject of administrative investigations for fraud, public safety, and national security."[31] The same

---

[26] *Id.* ("[W]hile some sporadic and episodic violence occurs in Syria, the situation no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning Syrian nationals.").

[27] *Id.*

[28] *Id.*

[29] *Id.* at 45,401.

[30] *See id.*

[31] *Id.*

17

conclusory statement appears in Defendant Noem's justification for terminating TPS for Afghanistan, Venezuela, and Haiti.

48.     Defendant Noem did not point to any situation in which even one of the more than 6,000 Syrian TPS holders had ever been convicted of a serious crime, implicated in the atrocities perpetrated by the Assad regime, or charged with supporting a terrorist organization.

49.     Finally, Secretary Noem noted both domestic and foreign policy reasons for the termination, citing President Trump's "America First Policy Directive to the Secretary of State," which mandated that, moving forward, "the foreign policy of the United States shall champion core American interests and always put America and American citizens first."[32]

50.     Remarkably, the Trump Administration took a contradictory position regarding Syria's country conditions on September 30, 2025, days *after* DHS announced the termination of TPS for Syria. On that date, President Trump renewed Syria's "national emergency" designation pursuant to the International Emergency Economic Powers Act, finding that the "situation in and in relation to Syria undermines the campaign to defeat . . . ISIS, endangers civilians, and threatens to undermine the peace, security, and stability in the region." Continuation of the National Emergency With Situation in and in Relation to Syria, 90 Fed. Reg. 47,967 (Oct. 2, 2025).

51.     On information and belief, Defendant Noem failed to consult with other federal agencies about the presence of armed conflict in Syria, or other country conditions in Syria, before making her decision to terminate TPS for that country. On information and belief, Defendant Noem's decision also was not based on an objective review of Syria's country conditions. Rather, the decision to terminate TPS for Syria was made as part of a preordained

---

[32] *Id.* (quoting Exec. Order No. 14150, 90 Fed. Reg. 8,837) (Jan. 29, 2025).

18

plan to eliminate existing TPS designations consistent with the Trump Administration's political

goals and campaign promises to curb non-white immigration.[33]

## THE FIRST TRUMP ADMINISTRATION'S EFFORTS TO ELIMINATE TPS PROTECTIONS

52.    The first Trump Administration attempted to end TPS designations for six non-

white, non-European countries. Between 2017 and 2018, DHS announced terminations of TPS

designations for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *See Ramos v.*

*Nielsen*, 709 F. Supp. 3d 871, 877–78 (N.D. Cal. 2023). If the terminations had taken effect, they

would have ended TPS protection for approximately 400,000 people, approximately 98 percent

of all TPS holders at the time.[34] In each case, the Secretary announced either a 12- or 18-month

orderly transition period, which would have delayed the effective date of termination.

53.    Litigation and congressional investigations subsequently revealed that the

termination decisions were not based on an objective review of country conditions as required by

statute—and as had been the past practice over multiple administrations, both Democratic and

Republican—but rather were part of a "predetermined presidential agenda to end TPS." *Ramos v.*

*Nielsen*, 336 F. Supp. 3d 1075, 1094–99 (N.D. Cal. 2018) (vacated and remanded on different

grounds; quoting then-DHS Secretary Duke's assurance to the White House that terminating

Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close").[35]

---

[33] *See, e.g.*, Hannah Fingerhut & Ali Swenson, *At Iowa Rally, Trump Doubles Down on Comments About Immigrants Poisoning the Nation's Blood*, PBS (Dec. 20, 2023), https://www.pbs.org/newshour/politics/at-iowa-rally-trump-doubles-down-on-comments-about-immigrants-poisoning-the-nations-blood.

[34] Marcela Valdes, *Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call*, N.Y. TIMES (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.

[35] *See also* Minority Staff of S. Comm. on Foreign Rels., 116th Cong., *Playing Politics with Humanitarian Protections: How Political Aims Trumped U.S. National Security and the Safety of TPS Recipients* 41 (U.S. Gov't Publ'g Off. Wash. 2019) (finding that termination decision was

54.    Moreover, every district court to consider the question of whether animus was a motivating factor for the agency action found that the terminations were part of a policy "to decrease the presence of non-white immigrants in the United States."[36]

55.    DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual terminations of TPS designations for nearly everyone who held the status. *Ramos*, 336 F. Supp. 3d at 1101. For example, in terminating TPS for Nepal, career officials were instructed not to devote research to crises not directly related to the earthquake, and when drafts did not adequately support the proposal to terminate, career officials omitted or deemphasized ongoing problems in Nepal.

56.    The courts considering challenges to these decisions consistently found that DHS had radically changed the way it approached TPS decisions, justifying the terminations by considering a much narrower range of country conditions than had been considered in the past. *See Saget v. Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019); *Ramos*, 336 F. Supp. 3d at 1097–98; *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 412–14 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 321 (D. Md. 2018).

---

influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).

[36] *Saget*, 375 F. Supp. 3d at 368–372 (also finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti); *see also Ramos*, 336 F. Supp. 3d at 1100 (noting "evidence that President Trump harbors an animus against non-white, non-European [noncitizens] which influenced his (and thereby the Secretary's) decision to end . . . TPS designation[s]"); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras).

57.     To justify the termination of designations, and undermine the TPS program, political appointees during the first Trump Administration sought to paint TPS holders as criminals and manufactured evidence to support this implausible claim. A court in the Eastern District of New York found that Acting Secretary Duke decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute. *Saget*, 375 F. Supp. 3d at 343, 347–48, 359–62. Acting Secretary Duke specifically sought out a rationale to "[s]eparate out Haiti." *Id.* at 348. Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance, despite the fact that virtually any criminal record is disqualifying for TPS. *Id.* at 307-09. Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest." *See id.* at 352; *cf.* 8 U.S.C. § 1254a (b)(1)(C), (c)(2)(B). Another federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – *i.e.*, that non-whites commit crimes and are on the public dole." *Ramos*, 336 F. Supp. 3d at 1105.

58.     After analyzing "a wealth of record evidence" regarding the terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, a federal district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad . . . The evidence . . . suggests this change may have been made in order to implement and justify a pre-ordained result." *Id.* at 1092, 1097–98; *see also Centro Presente v. DHS*, 332 F. Supp. 3d at 416 (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial

21

designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees"). A court in the Eastern District of New York came to the same conclusion after a four-day bench trial regarding Haiti's TPS termination, finding that the termination "was preordained and pretextual" and "was made in part due to political influence," violating the TPS statute's requirement that decisions be based on country conditions. *Saget*, 375 F. Supp. 3d at 346.

59.     Indeed, then-Acting Secretary Duke's writings revealed that "she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS." *Ramos*, 336 F. Supp. 3d at 1099. Specifically, she expressed that her TPS decision-making was based on "an America first view," a term that invoked President Trump's preference for immigration from majority-white European countries. *Id.* at 1099–1100, 1104. Notably, Defendant Noem expressly included the same "America First" objectives in the published Federal Register Notice terminating TPS for Syria and other countries in 2025.

60.     As a result of injunctions issued in these cases and subsequent stipulated orders, the terminations sought by the first Trump Administration did not go into effect. *See, e.g.*, *Ramos*, 709 F. Supp. 3d at 878–79. And in 2023, DHS rescinded the TPS terminations for Honduras, Nicaragua, Nepal, and El Salvador and extended TPS designations for those countries instead. *See id.* DHS issued new extensions for Haiti and Sudan on May 21, 2021, and April 19, 2022, respectively, effectively overturning their TPS terminations.[37] *See id.* In doing so, DHS

---

[37] *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863 (Aug. 3, 2021); Designation of Sudan for Temporary Protected Status, 87 Fed. Reg. 23,202 (Apr. 19, 2022).

extensively criticized the flawed country-conditions analyses in the termination decisions issued under the first Trump Administration.[38]

### THE SECOND TRUMP ADMINISTRATION'S PROMISE TO END TPS

**Secretary Noem, President Trump, and Vice President Vance Publicly Commit to Terminating TPS**

61.     Even before she became Secretary of DHS, Defendant Noem publicly committed to ending TPS for reasons unrelated to the situation in Syria, or any other country. During her confirmation hearing, she claimed that TPS "has been abused and manipulated by the Biden Administration," and suggested that the "extensions" of TPS were impermissible because "[t]he program was intended to be temporary."[39]

62.     Defendant Noem repeatedly insinuated that TPS was an illegal program. In announcing her decision to end TPS for Venezuela, for instance, she said she would not allow Venezuelan TPS holders to "stay here and violate our laws."[40] In her press statement announcing the partial vacatur of TPS for Haiti, Defendant Noem emphasized that "TPS is a type of immigration status available to nationals of certain designated countries that allows aliens, *even*

---

[38]  *See* Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day."); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40294, 40,297 (June 21, 2013) (same for Nicaragua); Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023) (same for Nepal).

[39] *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 15, 2025), https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-governor-kristi-noem-testifies-at-confirmation-hearing/654484 (at approximately 1:50:54);  *see also* NBC News (@NBCNews)*, Meet the Press full broadcast – Feb. 2*, YouTube (Feb. 2, 2025), https://www.youtube.com/watch?v=FpeMXrvxHco (at approximately 16:25).

[40] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad6860 37 (at approximately 1:00).

*if they entered the country illegally*, the ability to reside *temporarily* in the U.S."[41] Defendant

Noem further cited Haiti as an "example" of the "exploit[ation]" of the system because "Haiti

has been designated for TPS since 2010"; and because "more Haitian nationals, even those who

entered the U.S. illegally" have benefited from "each extension."[42]

63.    President Trump, Vice President Vance, and Trump surrogates have likewise

expressed their disagreement with TPS, characterizing designations as illegal, or, in the Vice

President Vance's words, "a magic amnesty wand."[43]

64.    Both the President and the Vice-President made clear their intent to target TPS

and TPS designations for termination before taking office.[44] President Trump, while

campaigning, said that he would "[a]bsolutely … revoke" TPS from Haitians, saying, "You have

to remove the people; you cannot destroy our country . . . In my opinion, it's not legal."[45]

---

[41] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphasis in original).

[42] *Id.* (Here, Defendant Noem presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit from TPS).

[43] Gabe Whisnant, *JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims*, NEWSWEEK (Sept. 16, 2024), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036.

[44] *See* Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), *https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html*; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. Times (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

[45] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,* NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:00); *see also* Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. Times (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

He decried TPS as a "little trick," asserting that Haitian migrants "are illegal immigrants" who were "destroying the town"[46] and that he would "do large deportations" of Haitian TPS holders.[47]

65.     For his part, Vice-President Vance, said that "[w]e're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[48] Given that TPS is, by statute, designed by Congress to be a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief grounded in individualized assessments), this statement can only be understood as an attack on TPS itself. Vice President Vance expressed this view repeatedly while campaigning.[49]

---

[46] Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far As I'm Concernced'*, ROLLINGSTONE (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621/.

[47] Soo Rin Kim et al., *Trump calls US 'garbage can for the world' in latest anti-immigrant rhetoric*, ABC NEWS (Oct. 24, 2024), https://abcnews.go.com/Politics/trump-calls-us-garbage-world-latest-anti-immigrant/story?id=115149893; Alexandra Ulmer et al., *Trump Pledges to Deport Haitians in Ohio City if Elected*, REUTERS, (Sept. 14, 2024), https://www.reuters.com/world/us/biden-says-attacks-haitian-immigrants-have-stop-2024-09-13/.

[48] Timothy Nerozzi, *Trump ends Temporary Protected Status for more than 300,000 Venezuelans in US*, WASH. EXAM'R (Feb. 3, 2025), https://www.washingtonexaminer.com/policy/immigration/3308462/trump-ends-temporary-protected-status-venezuelans/.

[49] *See, e.g.*, CNN-News 18 (@cnnnews18), *CNN's Dana Bash And JD Vance Clash Over Claims About Haitian Immigrants*, YouTube (Sept. 16, 2024), http://youtube.com/watch?v=djpTr5r0zMQ (at approximately 5:10, disputing anchor's characterization of TPS holders as being in the United States legally and calling TPS designations a "magic amnesty wand."); *Senator JD Vance Campaigns in Raleigh, North Carolina*, C-SPAN (Sept. 18, 2024), https://www.c-span.org/program/campaign-2024/senator-jd-vance-campaigns-in-raleigh-north-carolina/649012 (at approximately 41:00, "The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally . . . . if Kamala Harris waves the wand illegally and says these people are now here legally. I'm still going to call them an illegal alien.").

66.    According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of TPS as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[50]

67.    Project 2025, "the 2025 Presidential Transition Project," a product of current and former Trump political appointees, also called for the "[r]epeal [of] TPS designations" without elaboration as to any consideration of individual country conditions or any other statutory requirements.[51]

### DEFENDANTS' RENEWED EFFORTS TO END TPS

68.    Neither the adverse decisions of federal courts nor DHS's 2023 analysis have deterred the second Trump Administration from reinstating its plan to effectively end TPS consistent with campaign promises. To date, the Administration has attempted to terminate eight of nine TPS designations that have come up for review. The termination decisions—including the termination of TPS for Syria—reflect preordained outcomes driven by the very sort of partisan politics the statute is intended to forestall.

69.    On his first day in office, President Trump issued an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14159 § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025) ("Invasion EO"). The supposed "invasion" at issue involved

---

[50] *See* Charlie Savage et al., *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. TIMES (Nov. 11, 2023), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

[51] *Mandate for Leadership: The Conservative Promise* 150 (Paul Dans & Steven Groves eds., 2025) (chapter written by Ken Cuccinelli), https://static.project2025.org/2025_MandateForLeadership_FULL.pdf.

purportedly "unprecedented" levels of irregular entry into the United States. *Id.* § 1. The executive order describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans." *Id.* "Invasion" is a "code word" often used to "express[] that Racial/Ethnic Minorities spread something harmful within communities, institutions, or other societal domains." Deirdre Pfeiffer & Xiaoqian Hu, *Deconstructing Racial Code Words*, 58 L. & Soc'y Rev. 294, 310 (2024).

70.    The Executive Order directs the DHS Secretary to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." Invasion EO § 16(b). Although TPS holders are, by definition, lawfully present in the United States, the Executive Order demanded that TPS designations be "appropriately limited in scope" to restrict the "continued presence of illegal aliens[52] in the United States." *Id.*

71.    Immediately after Defendant Noem was confirmed as Secretary of DHS, Defendants began to implement the Executive Order's mandate and several of Defendant Noem's termination orders rely explicitly on this order. In fact, when publicizing the Venezuela TPS vacatur described below, Defendant Noem explained that the vacatur reflected President

---

[52] "Illegal alien" is widely recognized as a derogatory term used to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such). *See, e.g.*, Kai Wei, et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) Soc. Scis. J. 1, 10–11 (2019), https://www.mdpi.com/2076-0760/8/3/93#B63-socsci-08-00093.

The administration's use of this term "conveys a message of rejection and exclusion" and further evinces its animus against non-white immigrants. *See also infra* ¶¶ 91-113.

27

Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives

a directive, the Department of Homeland Security will follow it."[53]

**Venezuela**

72.      Within days of taking office, Defendant Noem made the unprecedented decision

to *reverse* the prior Administration's extension of Venezuela's 2023 TPS designation.[54] The

termination of Venezuelan TPS followed soon after. A federal court later found that Defendant

Noem's official justification for her unprecedented vacatur was a pretext to cover "the desire to

totally undo" the redesignation signed by then-Secretary Alejandro Mayorkas.[55]

73.      Secretary Noem's decision was not based on the statutorily required country

conditions review. Rather, the limited review the agency conducted was designed to find support

for a termination decision that had already been made. The hasty process Defendants' undertook

for Venezuela illustrates the decision's pretextual nature; "just two days after a draft of the

vacatur decision was prepared and/or circulated . . . a draft of the termination decision was

prepared and/or circulation," indeed the termination notice was prepared "even *before* the

---

[53] Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 6:57 PM),
https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s
(statement appears in posted video clip from CNN interview).

[54] *See NTPSA I* PI Decision at 819–20.

[55] *Id.* at 855. This decision issuing preliminary relief was stayed by the Supreme Court in a non-precedential decision with no analysis. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025). The Ninth Circuit later upheld the district court's preliminary relief decision in a detailed opinion, *Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025), terminating the Supreme Court's stay, 145 S. Ct. at 2729. Meanwhile, the district court issued a decision on summary judgment in the same case, holding that plaintiffs had established that the agency's vacatur and termination decisions were unlawful and/or arbitrary and capricious. *Nat'l TPS All. v. Noem,* No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025) ("*NTPSA I* SJ Decision"). That merits decision was then stayed as to the vacatur by the Supreme Court in another non-precedential decision with no analysis. *Noem v. Nat'l TPS All.,* No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025).

vacatur decision was finalized," and "DHS staff was asked to 'focus on any improvements in Venezuela,' implicitly to advance and support termination of Venezuela's TPS."[56]

74.    A comparison of Venezuela's two competing decision memos—dated only three weeks apart—is illustrative. USCIS's earlier decision memo, dated January 9, 2025, recommended extension, describing Venezuela's country conditions as a "complex, serious and multidimensional humanitarian crisis." In sharp contrast, USCIS's January 31, 2025 memo recommended termination and was terse. In justifying its recommendation, it focused on insignificant positive changes, including a "permit for [a U.S. corporation] to operate in Venezuela," while ignoring relevant country conditions the January 9th memo assessed, including food insecurity, political repression and human rights abuses, and restricted access to certain basic services.

75.    Defendants could not even agree on a justification for terminating Venezuelan TPS. USCIS suggested—despite the absence of supporting evidence—that conditions in Venezuela had improved. Defendant Noem, however, based her decision primarily on national interest grounds, asserting that—because Venezuela was designated for TPS on the grounds of extraordinary and temporary conditions (rather than natural disaster or war)—she did not need to find improved conditions in order to terminate its TPS. Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 ("[E]ven assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United

---

[56] *NTPSA I* SJ Decision at *29 (emphasis added).

States."). The Venezuela termination was the first termination in the history of the TPS program based on national-interest grounds.

**Haiti**

76.    Defendants targeted Haiti next. DHS partially vacated an existing TPS extension for Haiti and purported to retroactively shorten the expiration dates of all documents issued under the prior Secretary's extension by six months. Defendants' hasty and limited review process for Haiti mirrored that of Venezuela and, as a district court has found, similarly reflects Defendants' preordained plan to terminate TPS designations.[57]

77.    Defendant Noem's press statement on Haiti's partial vacatur also underscores the pretextual nature of her decision. The release announced that Secretary Noem "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."[58] The press statement also referenced the recission of Venezuela's TPS extension, explicitly linking the two vacaturs as part of the same project to change "the TPS system."[59]

78.    The justifications provided by Defendant Noem in the Federal Register for the partial vacatur of TPS for Haiti had no basis in the TPS statute and were inconsistent with the history of TPS decision-making. For example, Defendant Noem substantially based the vacatur decision on a critique of former DHS Secretary Mayorkas for purportedly failing to explain why

---

[57] *NTPSA I* SJ Decision at *34.

[58] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status [hereinafter "Haiti Termination Press Release"].

[59] *Id.*

30

he chose an 18-month extension period or why extension and redesignation for Haiti's TPS were not contrary to the national interest. Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511, 10,513–14 (Feb. 24, 2025). But as a federal district court found, "the absence of a specific justification for the length of a [TPS] extension" once that decision has been made, is neither "unusual or impermissible."[60] Similarly, "DHS Secretaries typically have not given explanations as to why allowing TPS holders to remain in the United States is not contrary to the national interest." *Id.* at \*34. The court held that Defendants' decision "was preordained" and made without "any meaning[ful] analysis and review [of country conditions]." *Id.*

79.      On June 27, 2025, Defendants terminated Haiti's TPS designation. Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760 (July 1, 2025). Because Haiti, like Venezuela, was designated for TPS on the grounds of extraordinary and temporary conditions, the Secretary believed she could justify termination based solely on a finding that extension is not in the national interest. And that is what she did—claiming that crisis-level conditions actually *required* termination because continuing TPS for a country facing total societal collapse is contrary to the U.S. national interest. *Id.* at 28,763(terminating Haitian TPS despite acknowledging "[w]idespread gang violence … sustained by the country's lack of functional governmental authority" has "destabilized Haiti," and that "'Haiti in the grip of severe humanitarian and human rights crisis'"). Defendant Noem also identified the actions of one individual convicted of numerous violent crimes as "underscor[ing] the broader risk posed by

---

[60] *NTPSA I* SJ Decision at \*33.

rising Haitian migration." DHS' press release, however, proclaimed that "country conditions have improved to the point where Haitians can return home in safety."[61]

**Afghanistan**

80.    On May 12, 2025, DHS announced the termination of TPS for Afghanistan. Despite an ongoing State Department warning against any travel to the country "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"[62] Defendant Noem claimed that conditions had "notabl[y] improve[d]." She cited the fact that only 23.7 million (rather than 29 million) Afghan nationals relied on humanitarian assistance to support the conclusion that "the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. 20,309, 20,310 (May 13, 2025). She also failed to address entire categories of conditions previously identified as bases for Afghanistan's TPS designation and prior extensions, including human rights abuses and the welfare of women and girls. *Compare* Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,730–33 (Sept. 25, 2023), *with* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,310.

81.    Defendant Noem also asserted that extending TPS would be contrary to the national interest. Her sole explanation for this conclusion was that "DHS records indicate that there are Afghan nationals who are TPS recipients who have been the subject of administrative

---

[61] *See DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status*, U.S. Citizenship & Immigr. Serv., https://www.uscis.gov/newsroom/news-releases/dhs-terminates-haiti-tps-encourages-haitians-to-obtain-lawful-status.

[62] *Travel Advisory*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Afghanistan.html.

investigations for fraud, public safety, and national security." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. at 20,311.

**Cameroon**

82.     Defendants terminated TPS for Cameroon on June 4, 2025. Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697 (June 4, 2025). Cameroon had been designated for TPS because of the existence of armed conflict and extraordinary and temporary conditions. Defendant Noem issued the termination despite acknowledging that "Cameroon is experiencing two major conflicts" that "remain active." *Id*. at 23,698. Defendant Noem again failed to address conditions previously cited as a basis for TPS, including human rights abuses, food insecurity, a cholera epidemic, and ongoing mass displacement. *Compare* Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023), *with* Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,697. As with the other terminations, she insisted that continuing TPS would be "contrary to the national interest." Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,698. In this instance, Defendant Noem reached her conclusion based solely on the executive order directing her to limit TPS and President's Trump's broader "policy imperatives" related to immigration. *Id.*

**Nepal**

83.     On June 6, 2025, Defendants terminated TPS for Nepal. Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025). Repeating the pattern developed in the prior terminations, Defendant Noem claimed that "notable improvements" justified ending Nepal's designation while ignoring entire categories of

33

conditions—such as widespread food insecurity and lack of access to sanitation—that DHS had previously considered. *Compare* Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023), *with* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,151.

**Honduras and Nicaragua**

84.     On July 8, 2025, Defendants announced the termination of TPS for Honduras and Nicaragua. Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,089 (July 8, 2025) ("Honduras Termination Notice"); Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30,087 (July, 8, 2025) ("Nicaragua Termination Notice"). These notices came two days after the expiration of the most recent previous extension for each country and were thus untimely. *See* 8 U.S.C. § 1254a(b)(3)(B).

85.     The Honduras Termination Notice cites to the Invasion E.O., noting that "the Secretary should … ensur[e] that designations of Temporary Protected Status . . . are appropriately limited in scope and made for only so long as may be necessarily to fulfill the textual requirements of that statute."[63]

86.     Repeating the pattern developed in the prior terminations, Secretary Noem identified certain positive indicators—such as increasing tourism and real estate investment—while ignoring major categories of conditions that had previously been considered, including "political violence" and "staggering levels of crime" with "[g]angs that originated in the United States . . . la[ying] siege to communities and . . . plung[ing] the country into a state of crisis." Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304 (June 21, 2023) (internal quotation marks and citations omitted); *see* Honduras Termination

---

[63] Honduras Termination Notice, n.10.

Notice (not addressing political violence or crime). The Nicaragua Termination Notice similarly relies on the Invasion E.O.[64] It recognizes that "certain conditions for the TPS designation of Nicaragua may continue," but nonetheless terminates Nicaragua's designation on the ground that "notable improvements … allow Nicaragua to adequately handle the return of its nationals." Nicaragua Termination Notice, at 30,088. The Termination Notice fails to acknowledge or consider numerous categories of conditions that formed the basis of prior extensions, including "political instability," a "deteriorat[ing]" "human rights situation," and a related "humanitarian crisis."[65]

87.    In finding that Honduras and Nicaragua can "handle adequately the return" of their nationals, *see* 8 U.S.C. § 1254a(b)(1)(B), Secretary Noem adopted a new definition of "adequate," defining the term to mean "[s]atisfactory, but worthy of no stronger praise or recommendation; barely reaching an acceptable standard; just good enough."[66]

88.    Discovery produced in litigation challenging Defendants' termination of TPS for Nepal, Honduras and Nicaragua[67] confirms that USCIS drafted decision memoranda recommending termination for Honduras and Nicaragua *before* drafters had reviewed USCIS country conditions reports—and for Nepal and Nicaragua, without ever receiving any recommendation or contemporaneous conditions report from the State Department. This process violated the statutory directives to engage in interagency consultation and further evidences Defendants' ends-oriented approach.

---

[64] Nicaragua Termination Notice, n.4.

[65] Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40,294, 40,300. *See* Nicaragua Termination Notice (failing to address the political or humanitarian situation).

[66] *See* Honduras Termination Notice at n.23; Nicaraguan Termination Notice at n.14.

[67] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*").

89.    In another break with past practice, Secretary Noem provided that, for every country whose TPS designation was terminated (Venezuela, Haiti, Cameroon, Afghanistan, Nepal, Nicaragua, and Honduras), the TPS termination would take effect in 60 days—the minimum period permitted under the TPS statute. 8 U.S.C. § 1254a(b)(3)(B).

90.    With the exception of Afghanistan, Cameroon, and Venezuela,[68] each terminated country had been designated since at least 2015. Rather than demonstrating awareness of DHS's longstanding practice of providing at least a six-month orderly transition period when ending a TPS designation of substantial length, the Secretary denied that there was any such practice. *See* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,153–54 n.24. While acknowledging "that certain previous TPS terminations allowed for an extended transition," she noted that "certain other TPS designations were terminated without allowing for an extended transition period," indicating her view that the agency had no particular practice. *Id.* That is incorrect. DHS maintained a clear practice over the past twenty years of providing at least a six-month orderly transition period for any TPS termination, and even before that had provided at least a six-month transition for any country designated for TPS for more than three years.

### SECRETARY NOEM AND PRESIDENT TRUMP EXPRESSED DISCRIMINATORY ANIMUS TOWARDS NON-WHITE, NON-EUROPEAN IMMIGRANTS

91.    President Trump, Secretary Noem, and other members of the Trump Administration have built their political platforms and public-facing personas on unabashed animus toward non-white people, particularly non-white immigrants. This animus significantly motivated the Trump Administration's plan to end TPS designations and is evidenced by

---

[68] Afghanistan and Cameroon were initially designated in 2022 and Venezuela was initially designated in 2021.

36

numerous statements made by Defendant Noem, President Trump, and other Administration

officials. A limited number of those statements are described herein.

92.    Members of the Trump Administration have publicly expressed strong biases

against Syrians, communities in the Middle East that encompass Syria, and other Muslim-

majority countries.

93.    At a campaign event in Iowa in October 2023, President Trump boasted of his

successes at excluding non-white migrants, defending his Administration's travel ban for

Muslim-majority countries as:

> [T]otally constitutional because we want to keep bad people out that want to destroy our
> country. . . . I banned refugees from Syria. I banned refugees from Somalia, very
> dangerous places, and from all of the most dangerous places all over the world . . .[I]n my
> second term, we're going to expand each and every one of those bans because we have
> no choice. Some very rough people, some very, very rough people come out of these
> areas. They want to blow up our country. We aren't bringing in anyone from Gaza, Syria,
> Somalia, Yemen, or Libya or anywhere else that threatens our security.[69]

Throughout his campaign, President Trump repeated similar statements, depicting people from

Muslim-majority countries as "dangerous terrorists."[70]

94.    In April 2024, at a speech to law enforcement officials in Grand Rapids,

Michigan, President Trump claimed that immigrants have "wrecked our country," claiming that

other countries were "sending prisoners, murderers, drug dealers, mental patients, and terrorists. .

---

[69] *Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023*, ROLL
CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-
iowa-october-16-2023/#101.

[70] *See also Speech: Donald Trump Holds a Political Rally in Robstown, Texas - October 22,
2022*, ROLL CALL, ("They include Syria, Somalia, Yemen, Russia, China, Iran, all of Africa.
They're storming our country. They're storming our borders. We have no idea who they are,
where they come from.")
https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-robstown-
texas-october-22-2022/#20.

. this isn't just in South America. They're coming from Congo, from Yemen, from Somalia, from Syria."[71]

95.     In his Republican Convention speech in July 2024, President Trump, repeating the invasion talking point, stated: "The greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East. . . . They're coming at levels that we've never seen before. . . . and [the Biden] administration does absolutely nothing to stop them."[72]

96.     At a rally in Arizona in August of 2024, President Trump described immigrants as "mak[ing] our criminals look like the nicest people on earth. That's how tough they are. They come from the Middle East. They come from areas that we're fighting. They come from enemy terrain."[73]

97.     In June 2025, ICE Director Todd Lyons insinuated that Syrians, Iranians, and Somalians as a whole posed threats to national security, warning that the public was "going to see an uptick in Syrian arrests, Somalis, anyone that pose [*sic*] that national security threat."[74]

98.     Stephen Miller has long expressed support for white nationalism, has "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[75] As an

---

[71] *Speech: Donald Trump Addresses Law Enforcement Officials in Grand Rapids - April 2, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-officials-grand-rapids-michigan-april-2-2024/.

[72] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. TIMES (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.

[73] *Speech: Donald Trump Holds a Political Rally in Glendale, Arizona - August 23, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-glendale-arizona-august-23-2024/#90.

[74] Ali Bradley & Jeff Arnaold, *Iranian nationals part of larger ICE enforcement focus: Lyons*, NEWSNATION (June 26, 2025), https://www.newsnationnow.com/us-news/immigration/iranian-nationals-ice-enforcement-lyons/.

[75] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SOTHERN POVERTY LAW CENTER (Nov. 12, 2019).

undergrad student at Duke, Miller was the national coordinator for a "Terrorism Awareness Project" whose mission was to "make our fellow students aware of the Islamic jihad and the terrorist threat, and to mobilize support for the defense of America and the civilization of the West."[76] Miller also lauded historical immigration laws that imposed quotas based on racist assumptions.[77]

99.     Consistent with the support of Miller and other Administration officials for white nationalism, the so-called "replacement theory" is a unifying theme of the Trump Administration's racist statements and immigration policies. This conspiracy theory turns on the idea that non-white immigrants will "replace" the white race, and in doing so undermine the country's perceived white foundation, history, and culture.[78] Secretary Noem has endorsed this core premise, describing irregular immigration across the U.S.-Mexico border as an "invasion happening on purpose … to remake the foundation of this country."[79]

---

https://www.splcenter.org/hatewatch/2019/11/12/stephen-millers-affinity-white-nationalism-revealed-leaked-emails.

[76] Andrew Kaczynski & Chris Massie, *In college, Trump aide Stephen Miller led controversial 'Terrorism Awareness Project' warning of 'Islamofascism'*, CNN (Feb. 15, 2017, 3:40 PM), https://edition.cnn.com/2017/02/15/politics/kfile-stephen-miller-terrorism-awareness; *see also* Nicole Narea, *Stephen Miller Sought to Link Immigrants to Crime and Terrorism in Private Emails to Breitbart,* VOX (Nov. 25, 2019), https://www.vox.com/policy-and-politics/2019/11/12/20961458/stephen-miller-white-supremacist-anti-immigrant-emails-breitbart-southern-poverty-law-center.

[77] Adam Serwer, *Trump's White-Nationalist Vanguard*, THE ATLANTIC (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . show Miller praising racist immigration reactions from a century ago, while bitterly lamenting the law that repealed them.").

[78] *See The 'Great Replacement' Theory, Explained*, National Immigration Forum, https://immigrationforum.org/wp-content/uploads/2021/12/Replacement-Theory-Explainer-1122.pdf.

[79] *South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, CBS NEWS (Mar. 5, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/ (at approximately 4:57).

100.    DHS recently posted a one-word tweet: "Remigrate."[80] This word "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism and has been seen as a euphemism for ethnic cleansing."[81] Consistent with the so-called "replacement" theory, President Trump and members of his Administrations have long expressed animus against non-white immigrants in general and non-white TPS-holders in particular.

101.    On September 23, 2025, President Trump used his platform at the U.N. General Assembly to critique the United Nations' humanitarian aid for migrants as "funding an assault on Western countries and their borders," railing that "immigration and their suicidal energy ideas will be the death of Western Europe."[82]

102.    Secretary Noem has repeatedly described non-white, non-European immigrants as "dirt bags"[83] and TPS holders as criminals.

103.    In many comments between February 2024 through the present, Secretary Noem has "equated Venezuelan immigrants and/or TPS holders with gang members, criminals, mentally unstable persons, and the like." *NTPSA I* PI Decision at *39–45 (finding Plaintiffs likely to succeed on their claim that the Secretary's decision to vacate and terminate Venezuela's

---

[80] Homeland Security (@DHSgov), X (Oct. 14, 2025, 3:06 PM), https://x.com/DHSgov/status/1978175527329358094.

[81] Connor Greene, *Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism*, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate-homeland-security/.

[82] *Trump Speaks at U.N.*, REV, https://www.rev.com/transcripts/trump-speaks-at-un.

[83] Secretary Kristi Noem (@Sec_Noem), X (Jan. 28, 2025, 7:35 AM), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); CBS Mornings (@CBSMornings), *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, YouTube (Jan. 29, 2025), https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Secretary Noem on New York City raids she references reported that nearly half of those arrested had no criminal history.

TPS designation was motivated by animus in violation of the Constitution); *see also*, Homeland

Security (@DHSgov), X (May 19, 2025, 5:18 PM),

https://x.com/DHSgov/status/1924575437344186612 (criticizing the TPS program for allegedly

facilitating the entrance of "half a million poorly vetted migrants into this country—from MS-13

gang members to known terrorists and murderers," even though TPS is available only to

individuals who are already present in the United States and anyone with more than a single

misdemeanor conviction is ineligible for protection).

104.    President Trump has repeatedly conflated immigrants with "criminals, gang

members and terrorists."[84] At a rally one week before the 2024 election, President Trump

described the country as "occupied," and as "invaded and conquered" by criminal immigrants.[85]

105.    While campaigning in 2023, President Trump repeatedly said that non-white, non-

European, and non-Christian immigrants are "poisoning the blood of our country."[86] Similar

phrases pepper discussions of Jewish people in Adolf Hitler's infamous book *Mein Kampf*.[87]

President Trump also has repeatedly "retweeted" avowed white nationalists, such as

---

[84] *See, e.g.*, Donald Trump, *Donald Trump: This Is How I Will End Joe Biden's Border Disaster on Day One*, DES MOINES REGISTER (Jan. 3, 2024),
https://www.desmoinesregister.com/story/opinion/columnists/caucus/2024/01/03/donald-trump-joe-biden-border-disaster/72093156007/; *Read the Full Transcripts of Donald Trump's Interviews with TIME*, TIME (Apr. 2024), https://time.com/6972022/donald-trump-transcript-2024-election/ ("This is an invasion of our country. An invasion like probably no country has ever seen before. They're coming in by the millions.").
[85] *FULL* LiveNOW from FOX (@kivenowfox), *SPEECH: Trump holds MSG rally in NYC*, YouTube(Oct. 27, 2024), https://www.youtube.com/watch?v=bzVT4YEYsuI (Speech by Donald Trump at Madison Square Garden presidential campaign rally, at approximately 16:13).
[86] *Donald Trump on Illegal Immigrants 'Poisoning the Blood of Our Country"*, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15); Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, YouTube (Sept. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45).
[87] *See* ADOLF HITLER, MEIN KEMPF (1943).

@WhiteGenocideTM, and publicly dined with prominent, self-declared white supremacists, thereby endorsing their racist views and amplifying their racist message.[88]

106.    In October 2024, during an interview with conservative radio host Hugh Hewitt, President Trump further emphasized his belief about the genetic inferiority of non-white, non-European immigrants. Speaking about "allowing people to come to an open border," he said, "many of them murdered far more than one person, and they're now happily living in the United States. You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our country right now."[89] By contrast, he told a predominately white crowd at a campaign rally in Minnesota that they have "good genes."[90]

107.    President Trump has used overtly dehumanizing rhetoric to described non-white, non-European immigrants, referring to them as "animals,"[91] including snakes that will bite and kill anyone foolish enough to shelter them.[92] When discussing undocumented immigrants during

---

[88] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC NEWS (Jan. 22, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *OPINION: Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?* USA TODAY (Sept. 23, 2024), https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

[89] Jack Traylor et al., *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC NEWS (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271.

[90] *Id.*

[91] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* POLITIFACT (May 17, 2018), https://www.politifact.com/truth-o-meter/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[92] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMES (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-

a March 2024 rally, he stated, "I don't know if you call them people. In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"[93]

108.    He has also specifically targeted non-white TPS holders. For months, he repeated and amplified the false claim that Haitian TPS holders were "eating the dogs" "eating the cats," and "eating the pets of the people that live" in Springfield, Ohio.[94] President Trump called Haitians in Springfield with lawful TPS status "illegal migrant[s]" who "descended upon a town of 58,000 people, destroying their way of life."[95] Following these statements, there were several bomb threats against hospitals, government buildings, and schools in Springfield.[96]

109.    Vice President Vance has unapologetically repeated these knowing unfounded rumors, stating that if he "ha[s] to create stories" about Haitian migrants "so that the American media actually pays attention to the suffering of the American people, then that's what I'm going

---

trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. . . .  And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.]").

[93] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/.

[94] *See, e.g.*, *Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 (at approximately 29:26).

[95] Sam Levine, *'They've Destroyed the Place': Trump Repeats Racist, Anti-immigrant Lies*, THE GUARDIAN (Sept. 13, 2024), https://www.theguardian.com/us-news/2024/sep/13/trump-repeats-lies-haitian-immigrants; *see also* Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed,'* NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (at approximately 12:45, "Springfield is such a beautiful place. Have you seen what's happened to it? It's been overrun. You can't do that to people. . . . I'd revoke [TPS], and I'd bring [the migrants] back to their country.").

[96] Edward Helmore, *More bomb threats hit Springfield, Ohio, after Trump elevates false claims about Haitians*, THE GUARDIAN (Sept. 14, 2024), https://www.theguardian.com/us-news/2024/sep/14/more-bomb-threats-hit-springfield-ohio-after-trump-elevates-false-claims-about-haitians.

to do."[97] Additionally, Vice President Vance disparaged Haitian TPS holders with longstanding stereotypes[98] of immigrants as dangerous criminals and spreaders of disease. He accused Haitians in Springfield of triggering "a massive rise in communicable diseases, rent prices, car insurance rates, and crime," stating "[t]his is what happens when you drop 20,000 people into a small community."[99] He specifically stated that Haitians caused "TB and HIV" to be "on the rise."[100]

110.    During his First Administration, President Trump repeatedly denigrated immigrants from countries designated for TPS. Most infamously, he referred to countries designated for TPS as "shithole" countries in a conversation with legislators about TPS, saying "Why do we need more Haitians?" He asked officials to "take them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway."[101]

---

[97] Kit Maher & Chris Boyette, *JD Vance Defends Baseless Rumor About Haitian Immigrants Eating Pets*, CNN (Sept. 15, 2024), https://www.cnn.com/2024/09/15/politics/vance-immigrants-pets-springfield-ohio-cnntv/index.html; *see also* Rachel Leingang, *Republicans spread baseless slurs about 'cat-eating migrants' in Ohio city*, THE GUARDIAN (Sept. 9, 2024), https://www.theguardian.com/us-news/article/2024/sep/09/republicans-haitian-migrants-pets-wildlife-ohio.

[98] Expert Declaration of Elliott Young in Support of Plaintiff's Motion to Postpone Effective Date of Agency Action ¶¶ 20, 22, 23, 25, *NTPSA I*, 2025 WL 2578045 (No. 25-CV-01766-EMC) (expert declaration of Professor Elliott Young tracing the historical use of these tropes).

[99] JD Vance (@JDVance), X (Sept. 13, 2024, 9:25 AM), https://x.com/jdvance/status/1834584115825226087?s=46; *see also* WCNC (@WCNC), *JD Vance Has Heated Exchange Over Claims Migrants Are Eating Pets in Ohio*, YouTube (Sept. 11, 2024), https://www.youtube.com/watch?v=LqjLoSNkyDs ("That small migrant community has caused a lot of problems. It's led to higher rates of communicable diseases, that's a verifiable fact. It's led to animals disappearing, many of my constituents have said that has been happening.").

[100] JD Vance (@JDVance), X (Sept. 10, 2024, 9:58 AM), https://x.com/jdvance/status/1833505359513661762?s=46.

[101] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, WASH. POST (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-

111.    During his recent campaign, President Trump doubled down on these remarks, reiterating comparisons between "nice countries, you know like Denmark, Switzerland" and "Norway," and "unbelievable places and countries, countries that are a disaster," when speaking about immigrants.[102]

112.    President Trump has stated that Venezuelans have "destroyed the fabric of our country."[103] In 2024 he asserted that, "[e]very day, Americans . . . are living in fear all because [former Vice President] Kamala Harris decided to empty the slums and prison cells of Caracas [,Venezuela] and many other places . . . . And we have to live with these animals, but we're not going to live with them for long, you watch."[104] He also stated that he was "talking a lot about Venezuela because Aurora[,Colorado] is really *infected* by Venezuela."[105] One analysis by Axios

---

[102] immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

[102] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[103] *See also Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024), https://www.c-span.org/program/campaign-2024/simulcast-abc-news-presidential-debate/648383 (at approximately 33:40, "They allowed people to come in, drug dealers, to come into our country, and they're now in the United States. And told by their countries like Venezuela don't ever come back or we're going to kill you. . . . There's never been anything done like this at all. They've destroyed the fabric of our country. Millions of people let in.").

[104] FOX 4 Dallas-Fort Worth (@fox4news), *Trump rally in Aurora, Colorado: FULL SPEECH*, YouTube (Oct. 12, 2024), https://www.youtube.com/watch?v=_xguaneoZ5A (at approximately 41:05); *see also* NBC News (@NBCNews), *Meet the Press full broadcast — Dec. 8*, YouTube (Dec. 8, 2024), https://www.youtube.com/watch?v=-UsHJWEAj_I (at approximately 8:52, "Did you know that Venezuela their prisons are . . . at the lowest point in terms of emptiness that they've ever been? They're taking their people out of those prisons by the thousands and they're drop—."); Fox News (@FoxNews), *Donald Trump delivers remarks at rally in Reading, PA*, YouTube (Oct. 9, 2024), https://www.youtube.com/live/QuoT6T3fbU0?t=1791s (at approximately 29:55, 30:07, similar).

[105] FOX 4 Dallas-Fort Worth (@fox4news), *Trump rally in Aurora, Colorado: FULL SPEECH*, YouTube (Oct. 12, 2024), https://www.youtube.com/watch?v=_xguaneoZ5A (emphasis added) (at approximately 43:15).

of 109 of President Trump's speeches, debates, and interviews found that he called Venezuelan immigrants "criminals" at least seventy times between September 1, 2023 and October 2, 2024.[106]

113.    In March 2025, the Trump Administration dramatically escalated its rhetoric and actions against Venezuelans, relying on purported Tren de Aragua ("TdA")[107] membership as justification for deporting more than 200 Venezuelans to an infamous Salvadoran terrorist detention center, in apparent violation of a court order.[108] The Administration cited the Alien Enemies Act—a 1798 law that facilitates deportation during wartime—despite the lack of armed conflict between Venezuela and the United States. In a March 15, 2025 "Proclamation"— "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua"—President Trump asserted that TdA members "are conducting irregular warfare and undertaking hostile actions against the United States" and proclaimed them "Alien Enemies" subject to immediate and summary apprehension, detention, and removal if they are not U.S.

---

[106] Russell Contreras et al., *Trump keeps calling Venezuelan and Congolese migrants criminals*, AXIOS (Oct. 5, 2024), https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

[107] Tren de Aragua reportedly is a criminal group with origins in a Venezuelan prison and whose operations extend past the country. *See* John Otis, *Tren de Aragua—all you need to know about the Venezuelan Gang*, NPR (Mar. 16, 2025), https://www.npr.org/2025/03/16/nx-s1-5329777/tren-de-aragua-all-you-need-to-know-about-the-venezuelan-gang.

[108] *President Trump Delivers Justice to Terrorists, Security for Americans*, THE WHITE HOUSE (Mar. 17, 2025), https://www.whitehouse.gov/articles/2025/03/president-trump-delivers-justice-for-terrorists-security-for-americans/#:~:text=America%20First%20Legal%3A%20%E2%80%9CPresident%20Trump,the%20country's%20maximum%2Dsecurity%20prison ("America First Legal: "President Trump has deported 238 criminals in the violent Venezuelan gang Tren de Aragua to El Salvador to be imprisoned in CECOT, the country's maximum-security prison."); Nicholas Riccardi & Regina Garcia Cano, *Trump administration deports hundreds of immigrants even as a judge orders their removals be stopped*, AP (Mar. 17, 2025), https://apnews.com/article/trump-venezuela-el-salvador-immigration-dd4f61999f85c4dd8bcaba7d4fc7c9af.

46

citizens or lawful permanent residents.[109] President Trump applauded the deportations on social

media, using dehumanizing language. He posted a video of deported Venezuelans being roughly

hustled off a plane in El Salvador in the dark of night, bent over, amid a massive security

presence, describing the Venezuelans as "monsters."[110]

114.    In stark contrast, the Trump Administration has shown a strong bias in favor of

immigrant populations perceived as white. On February 7, 2025, President Trump signed

Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*,

which directs Secretary Noem (among others) to:

> [T]ake appropriate steps, consistent with law, to prioritize humanitarian relief,
> including admission and resettlement through the United States Refugee
> Admissions Program, for Afrikaners in South Africa who are victims of unjust
> racial discrimination.[111]

## HARMS CAUSED BY DEFENDANTS' TERMINATION OF TPS FOR SYRIA

**Harms to TPS Holders and Their Families**

115.    Defendants' decision to terminate TPS for Syria would strip TPS status from

more than 6,100 Syrians and prevent over 800 Syrian nationals with pending applications from

securing protection. Many of these individuals have lived in the United States for close to or over

a decade, have children or close relatives who are U.S. citizens or permanent residents, and are

deeply embedded in their communities. Should Defendants' biased and unlawful termination

stand, the harm caused by that action would be massive.

---

[109] Proclamation by the President, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.

[110] Donald J. Trump (@realDonaldTrump), TRUTH (Mar. 16, 2025), https://truthsocial.com/@realDonaldTrump/posts/114173862724361939.

[111] Exec. Order No. 14204, 90 Fed. Reg. 9497, 9497 (Feb. 12, 2025).

116.    With the loss of their legal status, Syrian TPS holders may face imminent detention and/or deportation and must make the impossible choice whether to relocate to a country in dire humanitarian crisis and at the peak of political transition, remain in the United States without lawful immigration status, or uproot themselves once again to find refuge in a third country.

117.    Some TPS holders may currently be seeking other legal avenues to remain in this country (such as asylum, adjustment of status, or employment-based nonimmigrant status). However, due to the years-long asylum backlog, affirmative asylum applications remain long pending and do not guarantee protection from either detention or deportation in the interim. Defendants' actions also threaten detention and deportation for TPS holders who do not presently have alternative paths to legal status, even though TPS was established expressly to serve this population—individuals who cannot safely return to Syria but may not fit the specific legal requirements of asylum. The loss of TPS in some instances also limits the possibility of acquiring an alternative legal status for which an individual would otherwise be eligible, but for which present legal status is a prerequisite.[112] TPS holders who lose their status may also face a years-long statutory bar to re-entry whether they depart on their own or are deported.[113]

118.    TPS holders who may be entitled to a fear-based form of immigration relief— such as withholding of removal or protection pursuant to the Convention Against Torture—face the prospect of deportation to unsafe countries. The government has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under

---

[112] *See Temporary Protected Status: An Overview*, AMERICAN IMMIGRATION COUNCIL (June 2025), Temporary-Protected-Status-An-Overview-0925.pdf (noting some TPS recipients may be eligible to adjust status).
[113] 8 U.S.C. § 1182(a)(9)(A)(ii), (B)(i)(II).

48

the Convention," even if they may be subject to a fear-based form of relief. *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2155 (2025) (Sotomayor, J. dissenting). While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward, including to South Sudan. *Id.*

119.    TPS holders also face the prospect of losing employment authorization. This may result in their summary dismissal from their jobs, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders risk losing their homes or other material assets, leading to further economic harm. Many TPS holders also face the imminent loss of their driver's licenses (or state identification cards) and, with them, their mobility and freedom of movement, because in many states driver's licenses and state-issued identification are limited to those with legal immigration status.[114] In addition, because the Secretary's termination goes into effect so quickly, TPS holders have been afforded almost no time to make alternative arrangements for themselves and their families, including by applying for other forms of immigration relief, employment authorization, or driver's licenses for which they may be eligible.

120.    Compounding the destabilizing harms of loss of legal status, employment authorization, and driver's licenses and state identification cards are the severe risks of family separation, loss of healthcare, psychological harm, and stigma.

121.    The loss of legal status renders TPS holders vulnerable to separation from U.S. citizen children and other loved ones. There are many Syrian TPS holders in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are

---

[114] *See, e.g.*, *REAL ID Checklist*, California DMV, https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

U.S. citizens, lawful permanent residents, or who hold other forms of lawful status. These TPS holders face the risk of being forced to leave their family members behind or bringing their U.S. citizen children (or other family members) to a country that is unsafe and in dire straits, where the children have never lived and, in many cases, have never even visited.

122.    TPS holders and their families will be deprived of employer-sponsored health insurance and in some cases public health care. Despite having paid into Social Security for decades, in many cases, TPS holders also face the loss of this crucial benefit.

123.    Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. Syrian TPS holders have been experiencing tremendous emotional and psychological harm since the challenged decision was announced, resulting in heightened anxiety, trauma, insomnia, and depression. The psychological harms resulting from Defendants' actions will only intensify as the effective date approaches.

124.    TPS holders have also suffered the additional constitutional harm of being subject to an agency action motivated by racial, ethnic, or national-origin discrimination.

**Harms to the Named Plaintiffs**

125.    Dahlia Doe is a Syrian national in her 20s. She has lived in the United States since 2015 and currently lives in Bronx, New York. She has had TPS since 2021. Dahlia grew up outside of Syria and came to the United States to pursue a bachelor's degree in business. All of her immediate family members are U.S. citizens or lawful permanent residents. Dahlia provides crucial financial and emotional support for her elderly U.S. citizen father who suffers from Parkinson's disease.

126.    Dahlia has invested significant time and energy into her career as a market researcher. Over the last 6 years, she has climbed the ranks of her profession and now serves as a

research director at her place of employment, where she manages and mentors several of her colleagues. Without TPS, Dahlia will lose her legal status and fears her job and career will be compromised.

127.    Dahlia also fears separation from her immediate family in the United States and forcible return to Syria. Dahlia has never lived in Syria and has no remaining family connections to Syria. As a Syrian-Christian—a minority in Syria—Dahlia would also be a target for violence against minority communities in the country.[115]

128.    Sara Doe is a Syrian national who has had TPS since 2015. She has lived in the United States since 2014 and currently lives in New York state. Sara came to the United States from Aleppo—one of the cities most devastated by the civil war—after her brothers were killed. Following targeted threats from the Assad regime on account of her work in the medical field, Sara fled Syria to seek safety and rebuild her life in the United States.

129.    Sara is licensed to practice medicine in the United States and is highly sought after in her field. She leads a team of specialists treating children with serious heart issues.

130.    Without TPS, Sara risks losing work authorization and, with it, her ability to practice medicine and treat her patients—work to which she has dedicated her life and for which she was targeted in Syria. Given the short notice of termination, she will not be able to pursue an employment-based change of status applications if TPS ends, which would require her to maintain lawful status until the start date of her new status.

---

[115] *See, e.g.*, *European Parliament resolution of 10 July 2025 on the urgent need to protect religious minorities in Syria following recent terrorist attack on Mar Elias Church in Damascus*, European Parliament, https://www.europarl.europa.eu/doceo/document/TA-10-2025-0163_EN.html.

131.    Sara fears for her safety and well-being if she is forced to return to Syria. Aleppo, where she lived before coming to the United States, continues to be a site of armed conflict and lacks basic infrastructure. Given the destruction of the medical system in Syria, Sara fears she will not be able to find employment in her specialty, or in any medical field, if she is deported. Sara has no close family ties in Syria because her family was killed and her house in Aleppo was destroyed. After losing her immediate family to the civil war, she now faces forcible separation from her extended family in the United States, who are U.S. citizens and have served as her support system as she built a new life.

132.    Nesma Doe is a Syrian national who has had TPS since 2013. She is in her late 70s and has been living in the United States since 2013. She currently lives in Florida. Nesma fled violence in Syria and sought safety in the United States, where her U.S. citizen siblings have been living for decades. Nesma has significant medical issues, including chronic lung disease, thyroid issues, and arthritis, and she has undergone knee-replacement and shoulder-replacement surgeries.

133.    If TPS is terminated, Nesma will lose her status and protection from deportation. Since the announcement of the end of TPS, Nesma has already encountered issues renewing her driver's license, which is her only form of identification. She will also lose her medical insurance and access to necessary medications and medical care.

134.    If forcibly returned to Syria, Nesma will not be able to obtain the medical treatment she requires, as the Syrian health-care system has largely collapsed and services are not readily available. Nesma would also be separated from her family, who all live in the United States, including two nieces who serve as her primary caregivers. She has no family in Syria who

could take care of her. As an elderly woman, she faces increased risk of being targeted for crime in Syria.

135.    Laila Doe is in her 40s and is a Syrian national. She has both lived in the United States and has had TPS since 2013. She currently lives in Illinois and works full time as an educator working with adults and young people with special needs. Laila is the primary and only available caretaker for her elderly U.S. citizen mother.

136.    Laila came to the United States with her minor child fleeing Syria's civil war after her daughter's daycare was bombed. TPS is Laila's (and her child's) only form of protection from confinement and deportation. TPS is also Laila's only form of work authorization. Laila is the only breadwinner in her household and the loss of her work authorization through TPS would jeopardize her ability to provide for her child and mother, including being able to afford her daughter's educational expenses and mother's medical care and medications.

137.    If her TPS is terminated, Laila is terrified that she will be forced to relocate to Syria where she and her daughter would be in danger. And as a single mother and divorced woman living alone, Laila faces increased risk of violence if she were to return to Syria.

138.    Waleed Doe is in his 40s and is a Syrian national. Even though he was born in the United States, Waleed grew up outside of Syria and has no meaningful connections to Syria. Waleed came to the United States in 2011 on a student visa to obtain a master's degree in business and obtained TPS in 2012 due to the increasing violence from Syria's civil war.

139.    Waleed currently lives in New Jersey with his wife (also a Syrian TPS holder) and three U.S. citizen children who are ages seven, four, and nine months. Waleed works as a senior manager at his place of employment and is the primary breadwinner for his family.

140. TPS is Waleed's only form of protection against confinement, deportation, and work authorization. The loss of his TPS would jeopardize his ability to support his family and because his wife also relies on TPS for work authorization they face the loss of any source of income. If Waleed's TPS and work authorization is terminated, his family would also lose their health insurance, which is covered through his employer.

141. The prospect of losing TPS has caused Waleed and his family significant stress and fear. Waleed especially fears being separated from his extended family in the United States and for his and his family's safety if they have to relocate to Syria—a place he's never lived.

142. Mustafa Doe is in his 20s and is a Syrian national. He has had TPS since 2023. Mustafa experienced sexual abuse and trafficking as a minor in Syria, which left him with lasting psychological trauma. He is a member of the LGBTQI community and has found safety and freedom to authentically express his identity in the United States, after he moved in 2021 to pursue his bachelor's degree.

143. Mustafa recently graduated from college and has temporary status and work authorization as an extension of his student visa, which has allowed him to accept a job in philanthropy and social impact at a global corporation. His temporary status expires next summer, at which point he will lose his work authorization and his job, as well as his protection from detention and deportation. Without TPS, Mustafa loses a crucial safety net and is left in limbo, unable to plan for his future in the United States.

144. The possibility of losing TPS and having to return to Syria has caused Mustafa significant anxiety and has triggered his PTSD based on fears of returning to harm and persecution. If returned to Syria, he would face violence from individuals who abused him in the past as well as persecution and prosecution based on his LGBTQI identity. Returning to Syria

54

would also separate Mustafa from his parents, both of whom live in the United States and are lawful permanent residents, along with his extended family, who are all U.S. citizens.

145. Ahmad Doe is a Syrian citizen in his 40s. He came to the United States on an exchange visitor visa to work as a journalist and has lived in the United States since 2022. Even though he is a Syrian citizen, he was born and raised outside of Syria.

146. Due to layoffs at his prior place of employment in April 2025, Ahmad lost his job, his exchange visitor visa, and work authorization. In May 2025 he applied for TPS.

147. Because Ahmad has built a highly respected career in journalism and speaks several languages, several U.S. media companies have sought his services. However, Ahmad is unable to accept any of the many job offers he has received because he lacks work authorization. Currently, TPS is his only pathway to obtaining work authorization and protection from deportation. Ahmad also cannot renew his driver's license without work authorization.

148. Due to Defendants' unlawful termination of Syria's TPS designation, Ahmad's application cannot be adjudicated. Without access to TPS, Ahmad fears and is a risk of imminent confinement and deportation to a country where he fears he could be killed. Because of this, Ahmad suffers from severe stress and feelings of depression.

149. All Plaintiffs have expressed fear and anxiety over forcibly returning to Syria given the widespread shortages of food, fuel, electricity, clean water; in addition to kidnappings, killings, and violence that have persisted across the country after the Assad regime fell in December 2024.

150. Syrian TPS serves the purpose intended by Congress—providing nationality-based humanitarian relief regardless of whether individuals meet the more stringent eligibility requirements for other forms of humanitarian protection, such as asylum. Immigrants, including

TPS holders, are integral to the social and economic fabric of the United States and, as the named Plaintiffs exemplify, contribute to their communities and this country in countless ways. The length of time TPS holders have lived in the United States and the deep ties they have built with families and communities make the loss of legal status especially devastating and, equally important, highlight the real human cost of Defendants' unlawful actions challenged here.

## CLASS ACTION ALLEGATIONS

151.    This case is brought as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of Syrian nationals (or individuals having no nationality who last habitually resided in Syria) who had TPS status on September 19, 2025 (recipient class) and Syrian nationals (or individuals having no nationality who last habitually resided in Syria) with pending TPS applications (applicant class).

152.    The proposed classes are each sufficiently numerous so as to make joinder impracticable. Based on Defendants' own accounting in the Federal Register notice, the recipient class consists of 6,132 TPS holders and the applicant class consists of 833 people with pending applications.

153.    There are common questions of law and fact affecting the members of both classes, including (a) whether Defendants' decision to terminate of Syrian TPS was preordained, without regard to country conditions and prior to consulting with other appropriate agencies in violation of the TPS statute; (b) whether the TPS statute authorizes the Secretary to consider national interest as a sole justification to terminate TPS; (c) whether Defendants' decision to terminate TPS was impermissibly motivated by animus based on race, ethnicity, or national origin; and (d) whether Defendants' failure to provide more than the minimum 60-day notice before terminating Syria's TPS designation violates the APA.

56

154.    The claims of Dahlia Doe, Sara Doe, Nesma Doe, Laila Doe, Waleed Doe, and Mustafa Doe are typical of those of the recipient class with respect to the legality of Defendants' actions. Plaintiffs will fairly and adequately protect the interests of the class. None of the named Plaintiffs are aware of any conflicts that would preclude fair and adequate representation.

155.    Plaintiff Ahmad Doe's claims are typical of those of the applicant class with respect to the legality of Defendants' actions. Ahmad Doe will fairly and adequately protect the interests of the class. Ahmad Doe is unaware of any conflicts that would preclude fair and adequate representation.

156.    Proposed class counsel has substantial experience litigating both cases involving challenges to federal immigration policies and class actions.

157.    Defendants' illegal termination of TPS for Syria applies to the entire class, making class-wide relief appropriate.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### (Administrative Procedure Act)

158.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

159.    The Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, ensures that executive agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. 702.

160.    The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or

immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). The right of review under the APA includes a right to judicial review of actions that "fail[] to meet statutory, procedural, or constitutional requirements."[116]

161. Defendants' termination of the TPS designations for Syria is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

162. Defendants' termination of the TPS designation for Syria violate the APA because, among other things:

   a. Defendants' decision to terminate TPS for Syria occurred prior to the requisite consultation with other appropriate agencies as required by 8 U.S.C. § 1245a(b)(3);

   b. Defendants' decision to terminate was not based on an objective review of country conditions, as required by 8 U.S.C. § 1254a(b)(3). Rather, it was based on a predetermined, political decision to erode the TPS program writ large; a consideration of extra-statutory factors; and a selective review of country conditions designed to identify only improvements and ignore entire categories of conditions that did not support Defendant's preordained end goal to terminate TPS;

   c. The research, consultation, and review process leading up to the termination of Syria's TPS designation deviated dramatically from past practice without explanation;

---

[116] *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 56 (S.D.N.Y. 2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971); *accord FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

d.  To the extent Defendants engaged in any process, it was so deficient as to amount to no process at all, defeating the purpose of the TPS statute;

e.  Defendants' decision to terminate occurred under circumstances and a timeline that reflect that they were pretextual and animated by animus based on the perceived race and ethnicity of Syrian TPS holders;

163.    Plaintiffs will suffer irreparable injury from the unlawful termination.

164.    Defendants' decision to terminate Syria's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

## SECOND CLAIM
### (Administrative Procedure Act)

165.    All the foregoing allegations are repeated and realleged as though fully set forth herein.

166.    To engage in appropriate decision-making, an agency must ordinarily "display awareness that it *is* changing position."[117] Agencies "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."[118] And the APA requires a "more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy."[119]

167.    Defendants' termination of the TPS designation for Syria with only 60-days' notice was arbitrary, capricious, and contrary to law in violation of the APA because it represented an unacknowledged and unexplained departure from decades of decision-making practices and ordinary procedures.

---

[117] *Fox Television Stations, Inc.*, 556 U.S. at 515.
[118] *Id.*
[119] *Id.* at 515–16.

59

168.    Plaintiffs will suffer irreparable injury from the unlawful terminations.

## THIRD CLAIM
### (Fifth Amendment of the U.S. Constitution)

169.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

170.    The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that motivated in part by a racially discriminatory intent or purpose. Classifications based on race, ethnicity, or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race.[120]

171.    Defendants' decision to terminate Syria's TPS designation impermissibly and intentionally discriminates against Plaintiffs because of their race, ethnicity, or national origin.

172.    Plaintiffs will suffer irreparable injury resulting from the unlawful termination.

173.    Defendants' termination of Syria's TPS designation must therefore be held unlawful, set aside, or otherwise vacated as violative of the Fifth Amendment's guarantee of equal protection.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

174.    Declare that Defendants' terminations of TPS for Syria was unlawful under the APA and unconstitutional under the Due Process Clause of the Fifth Amendment;

175.    Declare that the decision to provide only 60 days' notice before the terminations of TPS for Syria take effect was unlawful under the APA;

---

[120] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

176.    Set aside or otherwise vacate the termination of TPS for Syria as beyond Defendants' authority and/or unlawful under the APA;

177.    Postpone or stay the termination of TPS for Syria from taking effect or being put into effect;

178.    Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of TPS for Syria;

179.    Order Defendants to take all steps necessary to ensure that the TPS designation for Syria remains in full force and effect;

180.    Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

181.    Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: October 20, 2025                    Respectfully submitted,

INTERNATIONAL REFUGEE ASSISTANCE
   PROJECT
 /s/ *Guadalupe Aguirre*
Guadalupe Aguirre
Ghita Schwarz
Megan Hauptman*
One Battery Park Plaza, Fl 33
New York, NY 10004
(929) 246-0154
laguirre@refugeerights.org
gschwarz@refugeerights.org
mhauptman@refugeerights.org

MUSLIM ADOVCATES
/s/ *Golnaz Fakhimi*

61

Golnaz Fakhimi
Sadaf Hasan*
1032 15th Street N.W. # 362
Washington, D.C. 20005
(202) 655-2969
golnaz@muslimadvocates.org
sadaf@muslimadvocates.org

VAN DER HOUT LLP
/s/ *Marc Van Der Hout*
Marc Van Der Hout*
Johnny Sinodis*
Oona Cahill*
360 Post Street, Suite 800
San Francisco, CA 94108
Telephone: (415) 981-3000
Facsimile: (415) 981-3003
ndca@vblaw.com

*Counsel for Plaintiffs*

*\*Application for admission Pro Hac Vice
forthcoming*

<u>**UNITED STATES DISTRICT COURT**</u>
<u>**FOR THE SOUTHERN DISTRICT OF NEW YORK**</u>

| | |
|---|---|
| Dahlia DOE, et al., | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-08686-KPF |
| Kristi NOEM, et al., | |
| *Defendants*. | |

<u>**DECLARATION OF GUADALUPE AGUIRRE IN SUPPORT OF PLAINTIFFS'**</u>
<u>**MOTION TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**</u>

I, Guadalupe Aguirre, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am over the age of eighteen and competent to make this declaration. I am an attorney at law licensed to practice in New York State. I am a senior staff attorney with the International Refugee Assistance Project and counsel for Plaintiffs in the above-captioned matter. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently thereto.

2. I submit this declaration to provide the Court with true and correct copies of certain documents submitted in support of Plaintiffs' motion to postpone effective date of agency action:

**Exhibit 1** is a true and correct copy of the document titled "Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions" (Apr. 2020). The document was downloaded at my direction on October 19, 2025, and is available on the Government Accountability Office website at https://www.gao.gov/assets/gao-20-134.pdf.

**Exhibit 2** is a true and correct copy of the document titled "TPS Terminations and Associated Orderly Transition Periods Prior to Current Trump Administration." This document

was initially submitted as an exhibit in the matter *National TPS Alliance v. Noem* and is available on the public docket for said matter. *See* No. 3:25-cv-05687-TLT, Dkt. No. 28 (C.D. Cal. 2025).

**Exhibit 3** is a true and correct copy of a certified transcript of the January 15, 2025, confirmation hearing of Secretary Kristi Noem. This certified transcript was initially submitted as an exhibit in the matter *National TPS Alliance v. Noem* and is available on the public docket for said matter. No. 3:25-cv-05687-TLT, Dkt. No. 18-14 (C.D. Cal. 2025). The video of the hearing is available for viewing at https://www.c-span.org/program/senatecommittee/homeland-security-secretary-nominee-gov-kristi-noem-testifies-at-confirmationhearing/654484. At approximately 1:51:50, Secretary Noem states, "[TPS] has been abused and manipulated by the Biden Administration and that will no longer be allowed . . . and these extensions going forward the way that they are, the program was intended to be temporary[.]"

**Exhibit 4** is a true and correct screen capture of the article titled "Vance Vows an End to Programs for Legal Immigrants" (Oct. 22, 2024). The webpage was captured at my direction on October 16, 2025, and is available on the New York Times website at https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html.

**Exhibit 5** is a true and correct screen capture of the article titled "Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans" (Nov. 11, 2023). The webpage was captured at my direction on October 10, 2025, and is available on the New York Times website at https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html.

**Exhibit 6** is a true and correct screen capture of the article titled "Trump says he would revoke Temporary Protected Status for Haitian migrants in Springfield if elected" (Oct. 3, 2024). The webpage was captured at my direction on October 16, 2025, and is available on the CNN website at https://www.cnn.com/2024/10/03/politics/trump-revoke-status-ohio-haitian-migrants.

**Exhibit 7** is a true and correct declaration of Aaron Reichlin-Melnick, dated October 16, 2025.

**Exhibit 8** is a true and correct screen capture of an X post made by Secretary Kristi Noem on January 29, 2025. The image was captured at my direction on October 16, 2025, and is available on https://x.com/Sec_Noem/status/1884752724194963594.

**Exhibit 9** is a true and correct screen capture of the press release issued by the Department of Homeland Security on February 20, 2025, titled "Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status." The press release was captured at my direction on October 10, 2025, and is available on the DHS website at https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status.

**Exhibit 10** is a true and correct screen capture of the webpage titled "Afghanistan Travel Advisory." The webpage was captured at my direction on October 10, 2025, and is available on the Travel.State.gov website at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/afghanistan-advisory.html.

**Exhibit 11** is a true and correct screen capture of the webpage titled "Cameroon Travel Advisory." The webpage was captured at my direction on October 14, 2025, and is available on the Travel.State.gov website at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/cameroon-travel-advisory.html.

**Exhibit 12** is a true and correct screen capture of the webpage titled "Nepal Travel Advisory." The webpage was captured at my direction on October 14, 2025, and is available on the Travel.State.gov website at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/nepal-travel-advisory.html.

**Exhibit 13** is a true and correct screen capture of the webpage titled "Haiti Travel Advisory." The webpage was captured at my direction on October 16, 2025, and is available on the Travel.State.gov website at

https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html#.

**Exhibit 14** is a true and correct screen capture of the webpage titled "Honduras Travel Advisory." The webpage was captured at my direction on October 14, 2025, and is available on the Travel.State.gov website at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/honduras-travel-advisory.html.

**Exhibit 15** is a true and correct screen capture of the webpage titled "Nicaragua Travel Advisory." The webpage was captured at my direction on October 14, 2025, and is available on the Travel.State.gov website at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/nicaragua-travel-advisory.html.

**Exhibit 16** is a true and correct screen capture of the press release issued by the Department of Homeland Security on September 19, 2025, titled "Secretary Noem Announces the Termination of Temporary Protected Status for Syria." The press release was captured at my direction on October 19 2025, and is available on the DHS website at https://www.uscis.gov/newsroom/news-releases/secretary-noem-announces-the-termination-of-temporary-protected-status-for-syria.

**Exhibit 17** is a true and correct copy of the document titled "Syria: Transition and U.S. Policy" (Sept. 5, 2025). The document was downloaded at my direction on October 10, 2025, and is available on Congress's website at https://www.congress.gov/crs-product/RL33487.

**Exhibit 18** is a true and correct copy of the document titled "Syria – Security Situation" (June 2025). The document was downloaded at my direction on October 19, 2025, and is available on the Danish Government's website at https://us.dk/media/uhxnvfwp/syria-security-situation-final-20062025.pdf.

**Exhibit 19** is a true and correct screen capture of the webpage titled "Syria Travel Advisory." The webpage was captured at my direction on October 14, 2025, and is available on

the Travel.State.gov website at

https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html.

**Exhibit 20** is a true and correct copy of an email thread titled "Nicaragua DM," dated April 10, 2025, produced by Defendants as part of discovery in the matter *National TPS Alliance v. Noem (NTPSA II)* with Bates Number NTSA2_00001670. This document was initially submitted as an exhibit in *NTPSA II* and is available on the public docket for said matter. *See* No. 3:25-cv-05687-TLT, Dkt. No. 145-55 (C.D. Cal. 2025). In this email thread, USCIS Adjudications Officer Kelley K. Miller first shares the Decision Memo for TPS for Nicaragua, and then follows with an email stating that USCIS has a state recommendation for Nicaragua from Department of State from 2024, not 2025, and that USCIS just received country conditions materials that day.

**Exhibit 21** is a true and correct copy of an email thread titled "Honduras and Nicaragua TPS," dated April 7 and 8, 2025, produced by Defendants as part of discovery in the *NTPSA II* with Bates Number NTSA2_00002566. This document was initially submitted as an exhibit in *NTPSA II* and is available on the public docket for said matter. *See* No. 3:25-cv-05687-TLT, Dkt. No. 145-31 (C.D. Cal. 2025). In this email thread, USCIS Chief Sasha Mehra Ridley writes, on April 7, 2025, regarding TPS for Nicaragua and Honduras, "We have DM's [Decision Memos] written for termination."

**Exhibit 22** is a true and correct copy of an email thread titled "Honduras and Nicaragua Recommendations," dated April 8, 2025, produced by Defendants as part of discovery in *NTPSA II* with Bates Number NTSA2_00002463. This document was initially submitted as an exhibit in *NTPSA II* and is available on the public docket for said matter. *See* No. 3:25-cv-05687-TLT, Dkt. No. 145-20 (C.D. Cal. 2025).

**Exhibit 23** is a true and correct copy of an email titled "Relevant Quotes from updated Venezuela COI sources (012825)_positive improvements highlighted," dated January 28, 2025, produced by Defendants as part of discovery in the matter *National TPS Alliance v. Noem*

(*NTPSA I*), No. 3:25-cv-01766 (N.D. Cal. 2025) with Bates Number NTSA2_000933. This document was initially submitted as an exhibit in *NTPSA II* and is available on the public docket for said matter. *See* No. 3:25-cv-05687-TLT, Dkt. No. 18-7 (C.D. Cal. 2025).

**Exhibit 24** is a true and correct screen capture of the webpage titled "Conflict in Syria" by the Center for Preventive Action (last updated Oct. 3, 2025). The webpage was captured at my direction on October 16, 2025, and is available on the Center for Preventive Action's website at https://www.cfr.org/global-conflict-tracker/conflict/conflict-syria.

**Exhibit 25** is a true and correct screen capture of the webpage titled "Syria risks rupturing as armed camps face off across the Euphrates" (Sept. 19, 2025).   The webpage was captured at my direction on October 21, 2025, and is available on the Reuters website at https://www.reuters.com/investigations/syria-risks-rupturing-armed-camps-face-off-across-euphrates-2025-09-19/.

**Exhibit 26** is a true and correct screen capture of the NPR article titled "Israel strikes Syria's capital, Damascus, pledging to defend Druze minorities" (July 16,2025). The article was captured at my direction on October 16, 2025, and is available on the NPR website at https://www.npr.org/2025/07/16/nx-s1-5469794/israel-strikes-damascus-syria.

**Exhibit 27** is a true and correct screen capture of the webpage titled "UNHCR deputy chief calls for support to end displacement for millions of Syrians" by UNHCR. The webpage was captured at my direction on October 16, 2025, and is available on the UNHCR website at https://www.unhcr.org/us/news/press-releases/unhcr-deputy-chief-calls-support-end-displacement-millions-syrians.

**Exhibit 28** is a true and correct screen capture of the webpage titled "Syrian Arab Republic: At a glance | Urgently Prioritized Humanitarian Response Priorities 2025" (July 24, 2025). The webpage was captured at my direction on October 10, 2025, and is available on the ReliefWeb website at https://reliefweb.int/report/syrian-arab-republic/syrian-arab-republic-glance-urgently-prioritized-humanitarian-response-priorities-2025.

**Exhibit 29** is a true and correct download of the document titled "Syrian Arab Republic: Humanitarian Situation Report No. 14" (Oct. 10, 2025). The document was downloaded at my direction on October 19, 202, and is available on the UNICEF website at https://reliefweb.int/report/syrian-arab-republic/unicef-syrian-arab-republic-humanitarian-situation-report-no-14-august-2025.

**Exhibit 30** is a true and correct transcript of an interview with Kristi Noem, Homeland Security Secretary which aired on CNN on January 29, 2025. The transcript was captured at my direction on October 10, 2025, and is available on the CNN website at https://transcripts.cnn.com/show/cnc/date/2025-01-29/segment/12.

**Exhibit 31** is a true and correct copy of a certified transcript of a March 5, 2024, interview of Governor Kristi Noem on CBS News. This certified transcript was initially submitted as an exhibit in the *NTPSA II* and is available on the public docket for said matter. No. 3:25-cv-05687-TLT, Dkt. No. 18-15 (C.D. Cal. 2025).  The video is available for viewing at https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/. At approximately 3:58, Secretary Noem described irregular immigration across the U.S.-Mexico border as an "invasion happening on purpose. . . to remake the foundation of this country."

**Exhibit 32** is a true and correct copy of the report titled "The 'Great Replacement' Theory, Explained." The report was downloaded at my direction on October 16, 2025, and is available on the National Immigration Forum website at https://forumtogether.org/wp-content/uploads/2021/12/Replacement-Theory-Explainer-1122.pdf.

**Exhibit 33** is a true and correct screen capture of an X post made by the Department of Homeland Security on May 19, 2025. The image was captured at my direction on October 16, 2025, and is available on https://x.com/DHSgov/status/1924575437344186612.

**Exhibit 34** is a true and correct screen capture of the article titled "Trump Doubles Down on Migrants 'Poisoning' the Country" (Mar. 17, 2024). This article was captured at my direction

on October 19, 2025 and is available on the New York Times website at

https://www.nytimes.com/2024/03/17/us/politics/trump-fox-interview-migrants.html.

**Exhibit 35** is a true and correct screen capture of the webpage titled "Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023." The webpage was captured at my direction on October 16, 2025, and is available on the Roll Call website at https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/#101.

**Exhibit 36** is a true and correct screen capture of the article titled "Exclusive: US diplomats asked if non-whites qualify for Trump refugee program for South Africans" (July 26, 2025). The webpage was captured at my direction on October 16, 2025, and is available on the Reuters website at https://www.reuters.com/world/africa/us-diplomats-asked-if-non-whites-qualify-trump-refugee-program-south-africans-2025-07-25/.

**Exhibit 37** is a true and correct screen capture of the article titled "Trump Administration Is Said to Plan to Cut Refugee Admissions to a Record Low" (Oct. 3, 2025). The webpage was captured at my direction on October 16, 2025, and is available on the New York Times website at https://www.nytimes.com/2025/10/03/us/politics/trump-refugee-admissions-south-africa.html.

**Exhibit 38** is a true and correct screen capture of the article titled "Trump administration apologizes for telling Ukrainian refugees to leave US" (Apr. 5, 2024). The webpage was captured at my direction on October 19, 2025, and is available on The Guardian's website at https://www.theguardian.com/us-news/2025/apr/05/trump-administration-apologizes-ukrainian-refugees.

**Exhibit 39** is a true and correct copy of the declaration of Plaintiff Dahlia Doe, dated October 19, 2025.

**Exhibit 40** is a true and correct copy of the declaration of Plaintiff Sara Doe, dated October 17, 2025.

**Exhibit 41** is a true and correct copy of the declaration of Plaintiff Nesma Doe, dated October 18, 2025.

**Exhibit 42** is a true and correct copy of the declaration of Plaintiff Laila Doe, dated October 19, 2025.

**Exhibit 43** is a true and correct copy of the declaration of Plaintiff Waleed Doe, dated October 19, 2025.

**Exhibit 44** is a true and correct copy of the declaration of Plaintiff Mustafa Doe, dated October 19, 2025.

**Exhibit 45** is a true and correct copy of the declaration of Plaintiff Ahmad Doe, dated October 19, 2025.

**Exhibit 46** is a true and correct copy of the declaration of Stacy Tolchin, dated October 16, 2025.

**Exhibit 47** is a true and correct screen capture of the webpage titled "Syrian crisis. After 14 years of conflict and crisis, children continue to pay the heaviest price." The webpage was captured at my direction on October 16, 2025, and is available on the UNICEF website at https://www.unicef.org/emergencies/syrian-crisis.

**Exhibit 48** is a true and correct copy of the document titled "The Contributions of Temporary Protected Status Holders to the U.S. Economy" (Sep. 2023). The document was downloaded at my direction on October 19, 2025 and is available on the American Immigration Council's website at https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/01/contributionstemporaryprotectedstatus_0923.pdf.

**Exhibit 49** is true and correct screenshot of an X post made by the Department of Homeland Security on October 14, 2025. The image was captured at my direction on October 20, 2025, and is available on X at https://x.com/DHSgov/status/1978175527329358094.

**Exhibit 50** is a true and correct copy of an article titled "Trump's Department of Homeland Security Embraces a Word With Ties to White Nationalism" (Oct. 16, 2025). The article was

captured at my direction on October 20, 2025, and is available on Time's website at https://time.com/7326233/trump-remigrate-homeland-security/.

\*        \*        \*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED on October 21, 2025.

/s/ *Guadalupe Aguirre*
Guadalupe Aguirre

Case 1:25-cv-08686-KPF    Document 20-1    Filed 10/21/25    Page 1 of 65

# Exhibit 1

United States Government Accountability Office



# Report to Congressional Requesters

**April 2020**

# TEMPORARY PROTECTED STATUS

# Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions

GAO-20-134

# GAO Highlights

Highlights of GAO-20-134, a report to congressional requesters

**April 2020**

# TEMPORARY PROTECTED STATUS

## Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions

## Why GAO Did This Study

The INA includes provisions for eligible foreign nationals residing in the United States to obtain temporary humanitarian protection from removal, as well as work authorization, when their country of origin is designated for TPS. Since 1990, nationals of 22 countries have received TPS. The Secretary of Homeland Security may designate a country for TPS after consulting with other agencies and determining that the country meets statutory criteria related to armed conflict, environmental disaster, or extraordinary or temporary conditions that prevent its nationals from returning in safety. The Secretary may designate a country for TPS for periods of 6 to 18 months and can extend a TPS designation if deemed appropriate.

GAO was asked to review the TPS decision process. This report, among other things, (1) describes the approach DHS takes to inform the Secretary of Homeland Security's TPS reviews and (2) examines DHS's communication to the public regarding TPS decisions and related information, including employment authorization. GAO reviewed documentation and data related to TPS decisions, including a nongeneralizable sample of 26 decisions for eight countries in fiscal years 2014 through 2018. GAO selected the countries to reflect various types of TPS decisions, among other factors. GAO also interviewed agency officials.

## What GAO Recommends

GAO recommends USCIS consistently identify in published guidance the mechanisms used to communicate automatic extensions of TPS employment authorization documents. DHS concurred with GAO's recommendation.

View GAO-20-134. For more information, contact Chelsa Gurkin at (202) 512-2964 or GurkinC@gao.gov, or Rebecca Gambler at (202) 512-6912 or GamblerR@gao.gov.

## What GAO Found

The Department of Homeland Security's (DHS) reviews of countries for Temporary Protected Status (TPS) include three main steps, according to DHS and other agencies' documents and officials. First, the Secretary of Homeland Security may initiate a review of a country for TPS designation in response to various triggering factors, such as a request from a foreign government, on the basis of one or more statutory conditions. The Immigration and Nationality Act (INA) requires subsequent reviews after an initial designation. Second, U.S. Citizenship and Immigration Services (USCIS)—which manages and coordinates the TPS review process for DHS—and the Department of State (State) compile country conditions reports and recommendations to inform the Secretary's decision. Although the INA does not prescribe the other agencies that must be consulted for a TPS review, State generally has a role in providing input for the Secretary of Homeland Security's consideration. GAO found DHS collected country conditions reports and recommendations from USCIS and State for all eight of the countries GAO selected for its review. Other DHS components and non-DHS entities may also provide information. Third, under the INA, the Secretary of Homeland Security exercises discretion in deciding whether to initially designate a country for TPS. For an existing designation, the Secretary determines whether country conditions warrant an extension or termination of TPS. DHS provides official notice of decisions in the Federal Register.

**Three Primary Steps in the Secretary of Homeland Security's Temporary Protected Status (TPS) Reviews**



Source: GAO analysis of documentary and testimonial information from the Department of Homeland Security and the Department of State. | GAO-20-134

DHS has communicated TPS decisions to the public through required Federal Register notices as well as other mechanisms. However, DHS has not provided consistent guidance regarding mechanisms it uses to communicate automatic extensions of TPS employment authorization documents. USCIS officials stated that the agency has typically communicated these extensions of documents for TPS beneficiaries through Federal Register notices. However, for five recent automatic extensions, USCIS instead mailed individual notifications to thousands of beneficiaries. USCIS guidance on its website identifies the individual notifications as a mechanism for communicating automatic extensions, but an employers' handbook and related guidance do not. As a result, some employers reportedly terminated TPS beneficiaries' employment because the employers did not understand or accept the notifications as proof of employment authorization. Consistent guidance about the mechanisms USCIS uses could help reduce the risk that TPS beneficiaries will lose their jobs because of confusion about their authorization to work in the United States.

_____ **United States Government Accountability Office**

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 4 |
| | Foreign Nationals from 22 Countries Have Received TPS, Totaling About 430,000 Beneficiaries in Fiscal Years 2000-2018 | 9 |
| | DHS's Approach to Inform the Secretary's TPS Reviews Includes Three Primary Steps | 15 |
| | DHS Has Communicated TPS Decisions through Required Federal Register Notices but Provided Inconsistent Guidance on Employment Authorizations | 29 |
| | Conclusions | 39 |
| | Recommendation for Executive Action | 40 |
| | Agency Comments | 40 |
| Appendix I | Objectives, Scope, and Methodology | 43 |
| Appendix II | Numbers and Characteristics of Temporary Protected Status Beneficiaries, Fiscal Years 2000-2018 | 49 |
| Appendix III | Comments from Department of Homeland Security | 54 |
| Appendix IV | Comments from U.S. Agency for International Development | 57 |
| Appendix V | GAO Contacts and Staff Acknowledgments | 58 |

Tables

| | Table 1: Key Department of Homeland Security (DHS) and Department of State (State) Components Involved in Temporary Protected Status (TPS) Decision Process | 8 |
|---|---|---|
| | Table 2: Department of Homeland Security's Public Communication of Temporary Protected Status (TPS) Extension for Honduras in 2016 | 31 |
| | Table 3: Judgmental Sample of Temporary Protected Status (TPS) Decisions | 46 |

Table 4: Temporary Protected Status (TPS) Beneficiaries, by Country of Citizenship, Fiscal Years 2000-2018    50

Figures

Figure 1: Example of Employment Authorization Document Issued by U.S. Citizenship and Immigration Services    8

Figure 2: Effective Dates, Designation Bases, and Types of Temporary Protected Status (TPS) Decisions, Fiscal Years 1990-2019    11

Figure 3: Temporary Protected Status Beneficiaries, by Country of Citizenship, Fiscal Year 2018    15

Figure 4: Three Primary Steps in Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)    16

Figure 5: Initiation of Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)    17

Figure 6: Information Collected for the Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)    20

Figure 7: Secretary of Homeland Security's Decision on Temporary Protected Status (TPS)    28

Figure 8: Numbers of Federal Register Notices of Extensions, Terminations, or Redesignations of Temporary Protected Status (TPS) Designations Published before and after End Dates of Previous Designation Periods, Fiscal Years 1990-2019    33

Figure 9: Age and Gender of Temporary Protected Status (TPS) Beneficiaries, Fiscal Year 2018    51

Figure 10: Temporary Protected Status (TPS) Beneficiaries, by State of Residency, Fiscal Year 2018    52

**Abbreviations**

| | |
|---|---|
| DHS | Department of Homeland Security |
| INA | Immigration and Nationality Act |
| OMB | Office of Management and Budget |
| PRM | Bureau of Population, Refugees, and Migration |
| RAIO | Refugee, Asylum and International Operations Directorate |
| State | Department of State |
| TPS | Temporary Protected Status |
| USAID | U.S. Agency for International Development |
| USCIS | U.S. Citizenship and Immigration Services |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

 U.S. GOVERNMENT ACCOUNTABILITY OFFICE

**441 G St. N.W.**
**Washington, DC 20548**

April 3, 2020

Congressional Requesters

Temporary Protected Status (TPS) is a form of humanitarian protection that provides a temporary benefit to eligible foreign nationals from designated countries who are residing in the United States. TPS protects beneficiaries from removal and permits work authorization.[1] Countries may be designated for TPS on the basis of statutory criteria related to armed conflict, such as civil war; an environmental disaster, such as an earthquake or hurricane; or extraordinary and temporary conditions in the country that prevent nationals from returning in safety.[2] Under the Immigration and Nationality Act (INA),[3] the Secretary of Homeland

---

[1]Pub. L. No. 82-414, title II, ch. 5, § 244, 66 Stat. 163 (1952), as added by the Immigration Act of 1990, Pub. L. No. 101-649, title III, § 302(a), 104 Stat. 4978, 5030-5036 (classified, as amended by the Immigration Act of 1990 and subsequent acts, at 8 U.S.C. § 1254a).

[2]Under 8 U.S.C. § 1254a, the Secretary of Homeland Security may designate a country (or a part of a country) for TPS, after consultation with appropriate agencies of the government, when the Secretary finds that conditions in a country meet certain statutory criteria related to ongoing armed conflict, an environmental disaster, or extraordinary and temporary conditions that prevent nationals from returning in safety. Specifically, regarding armed conflict, the Secretary may designate a country for TPS if the Secretary finds that there is an ongoing armed conflict within the foreign country and that, because of the conflict, requiring the return of foreign nationals to that country would pose a serious threat to their personal safety. Regarding environmental disaster, the Secretary may designate a country for TPS if the Secretary finds that there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the foreign country resulting in a substantial, but temporary, disruption in living conditions; the foreign country is temporarily unable to adequately handle the return of foreign nationals to the country; and the foreign country has officially requested TPS designation. Regarding extraordinary and temporary conditions, the Secretary may designate a country for TPS if the Secretary finds that there are extraordinary and temporary conditions in the foreign country that prevent foreign nationals from returning to the country safely, unless the Secretary finds that permitting foreign nationals to remain temporarily in the United States is contrary to the national interests of the United States.

[3]Unless specified otherwise, all references to the INA in this report refer to section 244 of the act.

Security,[4] after consultation with other agencies, may grant TPS to eligible foreign nationals in the United States from foreign countries that the Secretary has designated for TPS.[5] Although the INA does not prescribe the other agencies that must be consulted, the Department of State (State) generally has a role in providing input for the Secretary of Homeland Security's TPS reviews.[6]

Since TPS was established in 1990, 22 countries have received TPS designations.[7] In fiscal year 2018, more than 400,000 TPS beneficiaries were living in the United States, according to data from DHS's U.S. Citizenship and Immigration Services (USCIS). These beneficiaries were from 10 countries—El Salvador, Haiti, Honduras, Nepal, Nicaragua, Somalia, South Sudan, Sudan, Syria, and Yemen—with the majority from El Salvador, Honduras, and Haiti.[8] Since the beginning of fiscal year 2018, the Secretary of Homeland Security has announced decisions to terminate TPS for six countries—El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan; these decisions are currently the subject of litigation.

You asked us to review the decision-making process for TPS designations. This report (1) describes TPS determinations and numbers

---

[4]The authority to designate countries for TPS was transferred from the Attorney General to the Secretary of Homeland Security in 2003, after the Department of Justice's Immigration and Naturalization Service was abolished and its immigration services and enforcement functions were transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002. Pub. L. No. 107-296, title I & IV, §§ 101, 102, 456, 471, 478, 116 Stat. 2135, 2142, 2143-44, 2200-01, 2205, 2211-12 (2002) (classified, as amended, at 6 U.S.C. §§ 111, 112, 275, 291, 298). See also 8 U.S.C. § 1103(a) (powers and duties of the Secretary of Homeland Security).

[5]According to 8 U.S.C. § 1254a(a)(1), the Secretary of Homeland Security may grant TPS to nationals of a foreign state designated for TPS by the Secretary or to stateless individuals whose last habitual residence was in a foreign state designated for TPS.

[6]The Secretary of Homeland Security is required to consult with appropriate agencies of the government before making a designation according to 8 U.S.C. § 1254a(b)(1), and prior to periodic reviews of existing designations, according to 8 U.S.C. § 1254a(b)(3). The statute does not prescribe the other agencies that must be consulted.

[7]Deferred Enforcement Departure is another example of discretionary humanitarian protection from removal that allows eligible foreign nationals from designated countries to remain in the United States on a temporary basis. Deferred Enforcement Departure is not within the scope of this review.

[8]TPS designations for the remaining 12 countries had been terminated as of the beginning of fiscal year 2018.

of beneficiaries since TPS was established; (2) describes the approach that DHS, in consultation with State and other relevant agencies, uses to inform the Secretary of Homeland Security's TPS reviews; and (3) examines DHS's public communication regarding TPS decisions and related information, including work authorization.

To describe TPS determinations and numbers of beneficiaries since TPS was established, we reviewed information and data in Federal Register notices for TPS designations for fiscal years 1990 through 2019 and analyzed USCIS data on numbers of TPS beneficiaries for fiscal years 1990 through 2018.[9] To assess the reliability of the USCIS data, we reviewed related documentation and interviewed USCIS officials to identify any missing or erroneous data and resolve any discrepancies. We determined that the data for fiscal years 2000 through 2018 were sufficiently reliable to provide general information about the size and characteristics of TPS beneficiaries.

To describe the approach that DHS uses to inform TPS reviews, we reviewed provisions in the INA related to TPS as well as DHS and State documentation related to the processes they have used since fiscal year 2014 to collect information for these reviews. This documentation included information that DHS and State provided for a judgmental, nongeneralizable sample of eight countries (El Salvador, Haiti, Honduras, Nepal, Nicaragua, Syria, and Yemen), representing 26 TPS decisions in fiscal years 2014 through 2018.[10] We selected this sample to represent a range of decision types and designation reasons, among other factors. While this sample cannot be generalized to the countries or decisions we did not review, it provided information about the approach DHS uses for TPS reviews. Additionally, we reviewed examples of information that other agencies—for example, the Department of Defense, the Department of Health and Human Services Centers for Disease Control and Prevention, and the U.S. Agency for International Development—and entities such as members of Congress or nongovernmental organizations

---

[9]Fiscal year 1990 is the year when TPS was established under the INA, and fiscal year 2018 is the most recent year for which data on TPS beneficiaries were available.

[10]We selected a judgmental, nongeneralizable sample of eight countries with initial or existing TPS designations in fiscal years 2014 through 2018, representing 26 of a total of 42 TPS decisions for eight of 13 countries in that period, to incorporate a range of decision types and reasons in recent years, among other factors. Because of ongoing litigation related to TPS, certain information had been redacted from some of the documentation that we reviewed. See appendix I for additional details of our objectives, scope, and methodology.

provided to DHS to inform TPS reviews. We also interviewed officials from DHS, State, the Department of Defense, the Department of Health and Human Services Centers for Disease Control and Prevention, and the U.S. Agency for International Development.

To examine DHS's public communication regarding TPS decisions and related information, we reviewed information that DHS published in Federal Register notices from November 29, 1990, through October 1, 2019. We also examined DHS guidance published on its website and DHS procedures as of fiscal year 2019 for communicating TPS work authorization. We compared DHS's guidance and procedures with relevant federal internal control standards.[11] Additionally, we reviewed information from the Department of Justice Civil Rights Division's website related to automatic extensions of employment authorization documents for TPS beneficiaries.[12] We also interviewed DHS officials.

We conducted this performance audit from September 2018 to March 2020 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that our evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Immigration and Nationality Act Provisions for Temporary Protected Status

The INA provides for the Secretary of Homeland Security, after consultation with other agencies, to designate a foreign country for TPS if the conditions in that country fall into one or more of three statutory categories. These categories are generally described as consisting of (1) ongoing armed conflict, (2) environmental disaster, and (3) extraordinary

---

[11]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

[12]Department of Justice Civil Rights Division, "Telephone Interventions," accessed June 27, 2019, https://www.justice.gov/crt/telephone-interventions-2.

and temporary conditions.[13] The Secretary may designate a country for a period of at least 6 months but no more than 18 months.

At least 60 days before the end of the designation period, the Secretary is required, after consulting with other appropriate agencies, to undertake a review of the conditions in the foreign country for which a designation is in effect and to determine whether the conditions for such designation continue to be met. The Secretary must subsequently take one of the following actions:

- Extend the country's TPS designation for a period of 6, 12, or 18 months, if the Secretary determines that country conditions warrant an extension of TPS.[14] This provides TPS beneficiaries with an extended period of protection from removal.
- Terminate the country's TPS designation, if the Secretary determines that the country no longer meets the statutory criteria. This results in an expiration of the period of protection for foreign nationals who were granted TPS under a country's designation.[15]

In addition, the Secretary may exercise his or her discretion, on the basis of this review, to redesignate the country for TPS.[16] With a redesignation, the Secretary allows eligible nationals from the designated foreign country who have arrived in the United States since the initial designation, or another date established by the Secretary, to apply for TPS.

---

[13]See 8 U.S.C. § 1254a(b), which provides that the Secretary of Homeland Security may designate a country for TPS if nationals are unable to return safely to the country because of armed conflict or extraordinary and temporary conditions or if an environmental disaster in the country temporarily prevents a country from adequately handling the return of its nationals. In addition, 8 U.S.C. § 1254a(b)(1)(B)(3) requires that a designation based on environmental disaster must be officially requested by a foreign state. According to USCIS officials, such a request is generally submitted in writing and may be provided to DHS through State. USCIS officials stated that this request is required only for an initial designation based on environmental disaster and that official requests from the foreign government are not required for any subsequent TPS extensions.

[14]See 8 U.S.C. § 1254a(b)(3)(C). Under this section of the INA, a designation period is automatically extended for 6 months if the Secretary does not make a determination to terminate a country's TPS designation before the end date of the current designation.

[15]See 8 U.S.C. § 1254a(b)(3)(B).

[16]See 8 U.S.C. § 1254a(b). According to USCIS officials, from 1997 through 2017, DHS used the term "redesignate" for instances in which the Secretary of Homeland Security newly designated a country for TPS after an initial designation or extension period. Beginning in 2018, DHS began using the term "newly designate" for these decisions.

TPS provides temporary humanitarian protection to eligible foreign nationals in the United States who, for various reasons, may not have otherwise lawful status and therefore, in the absence of TPS, would be subject to enforcement and removal under the INA. Foreign nationals may be present in the United States without valid status and potentially removable for various reasons, such as having entered without inspection and admission at a port of entry or having remained in the country beyond the expiration of previous temporary status (e.g., tourist, foreign student). Eligible foreign nationals may also seek TPS when they currently have another lawful status, according to USCIS officials. USCIS officials noted that this may occur, for example, when a foreign national has a temporary nonimmigrant status nearing its end date when TPS is designated for his or her country and applies for TPS before the existing status expires.

Under the INA, applicants for TPS must apply during the registration period established by the Secretary of Homeland Security for a particular country designation. To be eligible for TPS, an applicant from a designated country must have been physically present in the United States continuously since the most recent designation's effective date and must have resided in the United States continuously since the date established by the Secretary of Homeland Security.[17] The INA also specifies that an individual is ineligible for TPS if he or she has been convicted of any felony or of two or more misdemeanors committed in the United States; if any of the statutory bars to asylum apply, such as involvement in persecution of others; or if he or she is reasonably regarded as a danger to the security of the United States, among other bases.[18]

---

[17]See 8 U.S.C. § 1254a(c). In accordance with the statute, applicants must have been continuously physically present since the effective date of the most recent TPS designation of their country of origin. The Secretary of Homeland Security sets the continuous physical presence date as either the publication date of the Federal Register notice or such later date as the Secretary determines. In addition, applicants must have been living, or continuously residing, in the United States as of the date prescribed by the Secretary of Homeland Security. For example, Yemen's initial TPS designation had an effective date and continuous physical presence date of September 3, 2015; the Secretary of Homeland Security prescribed the same date for continuous residence. See 80 Fed. Reg. 53319 (Sept. 3, 2015). For Yemen's 2017 redesignation, with an effective date and continuous physical presence date of March 4, 2017, the Secretary of Homeland Security prescribed January 4, 2017, as the continuous residence date. See 82 Fed. Reg. 859 (Jan. 4, 2017).

[18]See 8 U.S.C. §1254a(c)(2).

In addition to protecting beneficiaries from removal, TPS authorizes them to work in the United States for the designation period.[19] To receive evidence of work authorization, TPS beneficiaries generally apply to USCIS for an employment authorization document, Form I-766. USCIS provides this document as a plastic card that shows proof of the individual's authorization to work in the United States and includes a photograph of the individual.[20] Although USCIS does not require beneficiaries to apply for an employment authorization document, according to USCIS officials, beneficiaries typically apply to obtain these cards as evidence of their authorization to work in the United States. Figure 1 shows an example of an employment authorization document issued by USCIS.

---

[19]TPS allows beneficiaries to work in the United States and protects them from removal for the designation period, provided that they continue to meet TPS eligibility criteria and are not otherwise subject to removal proceedings or withdrawal of their status. See INA § 244(c)(3)(A-B); 8 C.F.R. § 244.14 regarding withdrawal of TPS.

[20]A TPS beneficiary continues to be authorized to work for as long as he or she has TPS. See INA § 244(a)(1)(B). TPS beneficiaries, like all employees, must provide a document or combination of documents to their employers evidencing their identity and employment authorization from a list of acceptable documents. An employment authorization document (Form I-766) is one of the acceptable documents that may be used to establish both identity and authorization to work in the United States. However, TPS beneficiaries may present any document from the list of acceptable documents that are available to demonstrate identity and eligibility to work in the United States. To apply for an employment authorization document, TPS beneficiaries must submit a completed Form I–765, "Application for Employment Authorization" (OMB Control No. 1615–0040), to USCIS, which has jurisdiction over the form, within the current TPS designation period. According to USCIS officials, applicants do not have to submit Form I-765 concurrently with an application to reregister for TPS.

**Figure 1: Example of Employment Authorization Document Issued by U.S. Citizenship and Immigration Services**



Source: U.S. Citizenship and Immigration Services.  |  GAO-20-134

## Key DHS and State Components That May Be Involved in TPS Reviews

Several key DHS and State components may be involved in the TPS decision process, as table 1 shows. Additionally, other DHS offices and components, as well as agencies such as the Department of Defense or U.S. Agency for International Development, may provide information about country conditions to help inform the Secretary of Homeland Security's decisions.

**Table 1: Key Department of Homeland Security (DHS) and Department of State (State) Components Involved in Temporary Protected Status (TPS) Decision Process**

| Agency | Component or official | Role |
|---|---|---|
| **DHS** | Secretary of Homeland Security | Responsible for determining whether to initially designate, extend, terminate, or redesignate TPS for a country. |
| | U.S. Citizenship and Immigration Services | Administers the United States' immigration services function by adjudicating requests for immigration benefits, including TPS. |
| **State**[a] | Secretary of State | Provides input for the Secretary of Homeland Security's consideration for TPS decisions. |
| | Bureau of Population, Refugees, and Migration | Responsible for humanitarian policy and diplomacy, and also provides humanitarian assistance. Has a role in supporting efforts to protect and assist refugees and vulnerable migrants around the world. |
| | Regional bureaus[b] | Serve as the liaison between the overseas posts and State's headquarters bureaus and offices. |
| | Overseas posts[c] | Typically provide information about country conditions for a TPS review. |

Source: GAO analysis of DHS and State documentary and testimonial information. | GAO-20-134

[a]The Secretary of Homeland Security is required to consult with appropriate agencies of the government before making a TPS designation, according to 8 U.S.C. § 1254a(b)(1), and prior to periodic reviews of existing designations, according to 8 U.S.C. § 1254a(b)(3). Although the INA does not prescribe the other agencies that must be consulted, State generally has a role in providing input for the Secretary of Homeland Security's TPS reviews.

bState has six regional bureaus that support the department's mission in specific global regions: the Bureau of African Affairs, the Bureau of European and Eurasian Affairs, the Bureau of East Asian and Pacific Affairs, the Bureau of Near Eastern Affairs, the Bureau of South and Central Asian Affairs, and the Bureau of Western Hemisphere Affairs.

cOverseas posts include U.S. embassies and other posts in many countries.

# Foreign Nationals from 22 Countries Have Received TPS, Totaling About 430,000 Beneficiaries in Fiscal Years 2000-2018

## TPS Has Been Granted to Foreign Nationals from 22 Countries since It Was Established

Since TPS was established in 1990, foreign nationals in the United States from 22 countries[21] have been granted TPS.[22] Our review of Federal Register notices published in fiscal years 1990 through 2019 found varying bases for the 22 countries' TPS designations. We also found that designations for 20 of these countries were subsequently extended or the countries were redesignated one or more times.[23] Somalia, first designated for TPS in September 1991, had the longest overall designation period since TPS was established. As of the end of fiscal

[21]The 22 countries designated for TPS in fiscal years 1990 through 2019 included El Salvador, Kuwait, Lebanon, Liberia, Somalia, Bosnia-Herzegovina, Rwanda, Montserrat, Burundi, Sierra Leone, Sudan, Kosovo, Honduras, Nicaragua, Guinea-Bissau, Angola, Haiti, South Sudan, Syria, Guinea, Nepal, and Yemen. When Kosovo was designated for TPS in 1998, it was a province of Serbia. In February 2008, the Kosovo Parliament declared Kosovo independent and the United States recognized Kosovo as an independent state.

[22]The authority to designate countries for TPS was transferred from the Attorney General to the Secretary of Homeland Security in 2003, after the Department of Justice's Immigration and Naturalization Service was abolished and its immigration services and enforcement functions were transferred to DHS pursuant to the Homeland Security Act of 2002. Pub. L. No. 107-296, title I & IV, §§ 101, 102, 456, 471, 478, 116 Stat. 2135, 2142, 2143-44, 2200-01, 2205, 2211-12 (2002) (classified, as amended, at 6 U.S.C. §§ 111, 112, 275, 291, 298). See also 8 U.S.C. § 1103(a) (powers and duties of the Secretary of Homeland Security).

[23]A redesignation of TPS may allow eligible nationals from the designated foreign country who have arrived in the United States since the date of the initial designation to apply for TPS, whereas an extension allows existing beneficiaries to retain TPS as long as they continue to meet eligibility requirements.

year 2019, Somalia's designation had been extended 21 times and the country had been redesignated twice;[24] its most recent extension was set to expire in March 2020. Designations for only two countries were terminated without any extensions or redesignations—Kuwait, designated in 1991, and Guinea-Bissau, designated in 1999. Figure 2 shows all effective dates of TPS designations and subsequent decisions, including extensions, terminations, and redesignations, as well as the bases for the designations for each of the 22 countries in fiscal years 1990 through 2019.

[24]Somalia's redesignations were coupled with simultaneous extensions of TPS.

**Figure 2: Effective Dates, Designation Bases, and Types of Temporary Protected Status (TPS) Decisions, Fiscal Years 1990-2019**



Source: GAO analysis of information provided in Department of Homeland Security Federal Register notices.  |  GAO-20-134

[a]El Salvador was first designated for TPS in the Immigration Act of 1990. When the original 18-month designation expired in 1992, it was not extended and the country was not redesignated.

[b]One redesignation of Liberia followed a prior termination of the previous designation (1998), and another redesignation of the country was coupled with a simultaneous termination of the previous

designation (2004). Section 7611 of the National Defense Authorization Act for Fiscal Year 2020 allows Liberian nationals who meet all applicable eligibility criteria—including continuous presence in the United States from November 20, 2014, until the date an application is timely filed—and their qualifying family members to become lawful permanent residents (i.e., Green Card holders). See Pub. L. No. 116-92, div. F, title LXXVI, subtitle B, § 7611, 133 Stat. 1198 (2019).

[c]When Kosovo was designated for TPS in 1998, it was a province of Serbia. In February 2008, the Kosovo Parliament declared Kosovo independent and the United States recognized Kosovo as an independent state.

[d]The listed designation bases represent statutorily defined categories of conditions on which a TPS designation—either an initial designation or any subsequent redesignation—may be based. When more than one designation basis is shown for a country, the bases shown do not distinguish between the category for the initial designation and categories that were added or removed at the time of any redesignations or subsequent designations.

[e]According to USCIS officials, from 1997 through 2017, "redesignation" was used to describe the Secretary of Homeland Security's designation of a country for TPS after an initial designation or extension period. Officials stated that in 2018, the Department of Homeland Security began using the term "newly designate" for these decisions. From fiscal year 1990, when TPS was established, through fiscal year 2019, all TPS redesignations except two for Liberia were coupled with a simultaneous extension of TPS. Extensions or terminations that occurred with a redesignation are not marked as such in the graphic.

As figure 2 shows, 26 TPS designations occurred in fiscal years 1990 through 2019, and 22 designations were extended at least once. As of September 30, 2019, the designations for all but four countries had been terminated and the termination of six countries' designations since fiscal year 2018 had been temporarily halted because of ongoing litigation. Redesignations occurred 20 times. [25]

- **Designations.** Of the 26 TPS designations, three were for one country, Liberia, and four were for two countries, El Salvador and Sierra Leone, that were each designated twice.

- **Extensions.** The majority of TPS designations (17 of 26 designations) were extended up to eight times. Designations for five countries—El Salvador, Honduras, Nicaragua, Somalia, and Sudan—were extended more than 10 times each. Three of the 22 countries' designations were not extended before termination.

- **Terminations**. The TPS designations for all countries except Somalia, South Sudan, Syria, and Yemen had been terminated as of September 30, 2019. The termination of six countries' designations

[25]Since fiscal year 1990, when TPS was established, through fiscal year 2019, all redesignations except two for Liberia were coupled with a simultaneous extension of TPS. One redesignation for Liberia followed a prior termination of the previous designation, and another redesignation for Liberia was coupled with a simultaneous termination of the previous designation. For the purposes of our review, in counting any extensions or terminations for each country, we did not include an extension or termination that occurred simultaneously with a redesignation.

since fiscal year 2018 had been temporarily halted because of ongoing litigation. Several lawsuits had been filed regarding the Secretary of Homeland Security's decisions to terminate TPS for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan.[26] In October 2018, a U.S. district judge in California issued a preliminary injunction for one of the lawsuits, temporarily blocking DHS from enforcing the Secretary's TPS termination decisions for El Salvador, Haiti, Nicaragua, and Sudan. The U.S. government filed an appeal in response to the preliminary injunction. According to USCIS officials, DHS has regularly published notices of its continued compliance with the court's injunction and has stated that it will continue to publish such notices pending resolution of the case In April 2019, a district court judge in New York issued a second preliminary injunction covering Haiti, which the U.S. government appealed in June 2019. Additionally, under an agreement to stay the proceedings in response to a lawsuit filed in California in February 2019, the government stipulated that it would temporarily halt terminations for Honduras and Nepal until the appeal of the October 2018 injunction had been resolved.

- **Redesignations.** Of the 20 TPS redesignations, six were for countries that were redesignated once, two were for one country that was redesignated twice, and twelve were for four countries that each were redesignated thrice—the largest number of TPS redesignations.[27]

## About 430,000 Eligible Foreign Nationals Received TPS in Fiscal Years 2000-2018

USCIS data show that applications for TPS were approved for a total of 431,848 foreign nationals in fiscal years 2000 through 2018 and that the number of TPS beneficiaries each year[28] grew from about 70,000 in fiscal

---

[26]We previously reported on issues related to the reintegration of migrants in Central America, including potential returnees affected by recent terminations of TPS designations for El Salvador and Honduras. See GAO, *Central America: USAID Assists Migrants Returning to their Home Countries, but Effectiveness of Reintegration Efforts Remains to Be Determined*, GAO-19-62 (Washington, D.C.: Nov. 8, 2018).

[27]All but two of these redesignations were coupled with a simultaneous extension of TPS.

[28]The data on TPS beneficiaries in a given fiscal year include individuals who had been granted TPS as of September 30 of each fiscal year, including beneficiaries who were granted TPS in prior years and whose status was not withdrawn.

year 2000 to about 420,000 in fiscal year 2018.[29] The number of TPS beneficiaries increased most rapidly in fiscal years 2000 through 2005, particularly after the designation of Honduras in 1999 and El Salvador in 2001. According to USCIS officials, because adjudicating all TPS applications can take years, depending on the number of applicants from a country, the number of TPS beneficiaries for a designated country may continue rising after the established registration period for the specific designation. For example, although Honduras was initially designated for TPS in 1999, with an applicant registration period that ended on July 5, 1999, USCIS data show that the number of beneficiaries from Honduras who were granted TPS peaked in 2007 at 85,759 foreign nationals. See appendix II for additional information on the numbers of TPS beneficiaries in fiscal years 2000 through 2018, by country.

Data on the number of TPS beneficiaries for fiscal year 2018—the most recent available—show that the majority of TPS beneficiaries were from three countries (El Salvador, Honduras, and Haiti), as figure 3 shows.[30] About 98 percent of beneficiaries from six countries (Sudan, Honduras, Nicaragua, El Salvador, Haiti, and Nepal) in fiscal year 2018—408,773 foreign nationals—held TPS because the termination of their country's TPS designation was temporarily halted because of ongoing litigation. In addition, about 2 percent of beneficiaries from four countries (Somalia, South Sudan, Syria, and Yemen) in fiscal year 2018—9,019 foreign

---

[29]According to USCIS officials, USCIS data on TPS beneficiaries during this period may include some individuals who adjusted to another immigration status as well as some who left the United States or died. We determined that USCIS data for fiscal years 2000 through 2018 were sufficiently reliable to provide general information on numbers of TPS beneficiaries. USCIS was not able to provide reliable data on numbers of TPS beneficiaries before fiscal year 2000 because, according to USCIS officials, these data were not consistently entered electronically in USCIS information systems before fiscal year 2000. Some of the individuals may have later had their TPS withdrawn because of individual ineligibility or because they became naturalized U.S. citizens. According to USCIS officials, TPS beneficiaries who become U.S. citizens or whose status has been withdrawn, either because they no longer meet eligibility requirements or because they requested that USCIS withdraw their status, are removed from USCIS data in the fiscal year that their status changes.

[30]El Salvador was designated for TPS in 1990, in the statute that created TPS, and was designated again in 2001 after two major earthquakes in the country. Haiti was initially designated for TPS in 2010, after a major earthquake; the Secretary of Homeland Security redesignated Haiti in 2011 to allow eligible Haitians who arrived in the United States up to 1 year after the earthquake to apply for TPS. Honduras was initially designated for TPS after Hurricane Mitch struck the country in 1999. Ongoing insecurity due to violence and criminal activity, lack of economic opportunity, weak governance, and recurrent natural disasters have contributed to continual flows of migrants from Central American countries, including El Salvador and Honduras, as well as from Haiti, to the United States in recent years.

nationals—held TPS because their country's designation was extended. See appendix II for additional information about beneficiary characteristics in fiscal year 2018, including age, gender, and location.

**Figure 3: Temporary Protected Status Beneficiaries, by Country of Citizenship, Fiscal Year 2018**



Source: GAO analysis of U.S. Citizenship and Immigration Services data.  |  GAO-20-134

Note: The data shown reflect eligible foreign nationals who had been granted Temporary Protected Status as of September 30, 2018. According to USCIS officials, these data may include some foreign nationals who had an additional immigration status, as well as some who had left the United States or died, since receiving TPS.

## DHS's Approach to Inform the Secretary's TPS Reviews Includes Three Primary Steps

Our review of documentation for selected TPS decisions in fiscal years 2014 through 2018 and our interviews with DHS, USCIS, and State officials indicated that DHS's approach for initial or subsequent reviews of countries for TPS consists of three primary steps:

1. The Secretary of Homeland Security initiates a review of a country for TPS. For an initial TPS designation, the Secretary may initiate consideration of a country in response to various triggering factors. Such factors may include, for example, a request from a U.S. government entity or a foreign government for a TPS designation based on the statutory conditions for TPS (i.e., armed conflict, environmental disaster, or extraordinary and temporary conditions). For an existing designation approaching its end date, a statutory deadline requires the Secretary to undertake a review.

2. DHS collects information on country conditions and recommendations from USCIS and State and provides this information to the Secretary of Homeland Security to inform his or her decision regarding an initial or existing TPS designation. Other DHS components and non-DHS entities, including other agencies and nongovernmental organizations, may also provide information to the Secretary or USCIS.

3. The Secretary of Homeland Security receives the information and recommendations and makes a decision about TPS for the country. The Secretary exercises discretion in determining whether to initially designate a country for TPS. For an existing designation, under the INA, the Secretary is required to determine whether country conditions warrant an extension of TPS or whether the country no longer meets the statutory criteria and TPS must be terminated. Also, the Secretary exercises discretion in determining whether to redesignate a country that was previously designated for TPS.

Figure 4 illustrates these three steps.

**Figure 4: Three Primary Steps in Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)**



Source: GAO analysis of documentary and testimonial information from the Department of Homeland Security and the Department of State.   |  GAO-20-134

Note: For an initial TPS designation, the Secretary of Homeland Security may initiate consideration of a country for TPS in response to various triggering factors. For an existing designation, a statutory deadline requires the Secretary to undertake a review. See 8 U.S.C. §1254a (b).

## Secretary of Homeland Security May Consider a Country for Initial TPS Designation in Response to Various Factors, and Statute Requires Subsequent Reviews

Various factors may trigger consideration of a country for an initial TPS designation, according to USCIS officials. Officials stated that the Secretary of Homeland Security's consideration of a country for an initial designation is discretionary. However, subsequent reviews of existing designations are required by statute. See figure 5.

**Figure 5: Initiation of Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)**



Legend: INA = Immigration and Nationality Act.

Source: GAO analysis of documentary and testimonial information from Department of Homeland Security and Department of State. | GAO-20-134

Note: For an initial TPS designation, the Secretary of Homeland Security may initiate consideration of a country for TPS in response to various triggering factors, such as a request from a U.S. government entity or a foreign government. For an existing TPS designation, the Secretary is required, after consulting with appropriate agencies, to undertake a review of the conditions in the designated country at least 60 days before the designation's end date. 8 U.S.C. § 1254a(b)(3).

USCIS and State officials stated that for initial TPS designations, a request from DHS, State, the White House, members of Congress, or foreign governments may trigger consideration of whether to designate a country on the basis of one or more of the three statutory categories (i.e., armed conflict, environmental disaster, or extraordinary and temporary conditions).[31] USCIS officials added that, under the INA, the Secretary of Homeland Security has the sole authority to determine whether and when to consider a country for an initial TPS designation. Further, they noted that a request does not automatically result in a formal review of a country for TPS even if the country has experienced country conditions specified in one or more of the statutory categories, such as an armed conflict or environmental disaster.

For subsequent reviews of existing TPS designations, at least 60 days before the end of the designation period, the Secretary is required, after

---

[31]USCIS officials noted that a request from a foreign government is not required for DHS to consider a country for an initial TPS designation. They added that in some cases, DHS does not receive a request from any entity before the Secretary makes a determination to consider a country for an initial TPS designation.

consulting with other appropriate agencies, to undertake a review of the conditions in the foreign country for which a designation is in effect.[32]

## DHS Collects Country Conditions Reports and Recommendations to Inform the Secretary's TPS Decision

DHS collects similar information for each review of a country for TPS, according to DHS officials and our review of selected decisions. DHS officials identified four primary sources of information that the department collects to inform the Secretary of Homeland Security's TPS decisions: country conditions reports compiled by USCIS and State and recommendations from USCIS and State leadership. According to DHS and State officials, DHS generally consults with State on TPS decisions, although it is not specifically required to do so under the statute.[33] Our review of 26 TPS decisions for the eight selected countries found that DHS collected the following documents to inform each decision:

1. a country conditions report compiled by USCIS,

2. a memo with a recommendation from the USCIS Director to the Secretary of Homeland Security,

3. a country conditions report compiled by State, and

4. a letter with a recommendation from the Secretary of State to the Secretary of Homeland Security.[34]

USCIS manages and coordinates the TPS information-gathering process for the Secretary of Homeland Security. While State formally provides its input through the Secretary of State's letter and recommendation to the

---

[32]8 U.S.C. § 1254a(b)(3).

[33]The Secretary of Homeland Security is required to consult with appropriate agencies of the government before making a designation according to 8 U.S.C. § 1254a(b)(1), and prior to periodic reviews of existing designations, according to 8 U.S.C. § 1254a(b)(3). The statute does not prescribe the other agencies that must be consulted.

[34]Although the INA does not prescribe the type of input that must be provided by any agencies that the Secretary of Homeland Security consults with for a TPS review, we found that State generally has a role in providing input, including a country conditions report and recommendation, for the Secretary of Homeland Security's TPS reviews. We reviewed documentation that DHS collected to inform the Secretary's decisions for a judgmental, nongeneralizable sample of eight of the 13 countries for which TPS decisions were rendered in fiscal years 2014 through 2018. Our sample included 26 TPS decisions (specifically, two initial designation decisions, three redesignation decisions, 15 extension decisions, and six termination decisions) from a total of 42 decisions during that period. Because of ongoing litigation, certain information had been redacted from documents for 13 of the 26 TPS decisions in our judgmental sample. See appendix I for additional details of our objectives, scope, and methodology.

Secretary of Homeland Security, USCIS officials said that USCIS generally incorporates the input from State into USCIS's country conditions report and recommendation on TPS.[35] DHS officials noted that other internal DHS components, government agencies, and other entities may also provide information about country conditions or other factors to inform the Secretary of Homeland Security's decisions. Figure 6 shows the information collected to support the Secretary of Homeland Security's TPS reviews.

[35]According to USCIS officials, the Secretary of State's letter and recommendation to the Secretary of Homeland Security, as well as State's country conditions report, are generally attached to USCIS's country conditions report and recommendation to inform the Secretary of Homeland Security's review.

**Figure 6: Information Collected for the Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)**



Legend: DHS = Department of Homeland Security; INA = Immigration and Nationality Act; State = Department of State; USCIS = U.S. Citizenship and Immigration Services.

Source: GAO analysis of documentary and testimonial information from DHS and State.  |  GAO-20-134

Note: The Secretary of Homeland Security is required to consult with appropriate agencies of the government before making a TPS designation, according to 8 U.S.C. § 1254a(b)(1), and prior to periodic reviews of existing designations, according to 8 U.S.C. § 1254a(b)(3). Although the INA does not prescribe the other agencies that must be consulted, State generally has a role in providing input for the Secretary of Homeland Security's TPS reviews, based on our review of documentation for selected TPS decisions in fiscal years 2014 through 2018 and our interviews with DHS, USCIS, and State officials.

USCIS officials indicated that the time frames for conducting TPS reviews may vary. They noted that a review for an initial designation may have a shorter time frame than a review for an existing designation, depending on the situation. In addition, the officials noted that USCIS generally starts the review process for an existing TPS designation about 6 months to a year before the end date of the country's current designation. They added

that they generally start the review process within this timeframe, given the INA requirement that the Secretary of Homeland Security either undertake a review and make a determination regarding country conditions at least 60 days in advance of the prior designation's end date or automatically extend the designation for 6 months.[36] According to USCIS officials, at the start of a review for an initial or existing designation, USCIS's Office of Policy & Strategy generally reaches out to USCIS's Refugee, Asylum and International Operations Directorate (RAIO) to request input on country conditions. USCIS officials also said that the office coordinates with State's Bureau of Population, Refugees, and Migration regarding the target time frame for receiving State's input. In general, once USCIS receives the input from RAIO and State, USCIS finalizes its country conditions report and recommendation memo for the Secretary of Homeland Security.

Our review of documentation for the eight countries in our nongeneralizable sample of 26 TPS decisions found variation in the time frames for USCIS's recommendation memos and for State's recommendation letters. For the 24 reviews of existing TPS designations, USCIS provided recommendation memos to the Secretary of Homeland Security about 2 to 7 months before the end date of the prior

---

[36]According to 8 U.S.C. § 1254a(b)(1)(C), after the Secretary of Homeland Security makes a decision regarding an initial TPS designation, the designation shall not become effective unless notice of the designation is published in the Federal Register. With regard to decisions to terminate or extend a designation after a required periodic review of an existing designation, the Secretary of Homeland Security is required to provide for the publication of notice of the determination in the Federal Register on a timely basis. Under the law, terminations may not take effect earlier than 60 days after the date of publication of the Federal Register notice announcing the termination decision or, if later, the expiration of the most recent previous extension. See 8 U.S.C. § 1254a(b)(3).

designations.[37] Most of State's 26 recommendation letters were dated about 2 days to 6 months before the USCIS recommendation memos.[38]

RAIO officials noted that they use an internal template as informal guidance for the draft country conditions reports that they compile for USCIS's Office of Policy & Strategy for reviews for initial or existing TPS designations. We reviewed the RAIO template and found, for example, that for reporting on a country being considered for a TPS designation on the basis of an environmental disaster, the template includes sections (e.g., several paragraphs) about the population harmed, damage to infrastructure, disruption in services, and status of disaster response and reconstruction. Officials added that country conditions reports may deviate from the template, because its use is not required; instead, it serves as general, informal guidance. RAIO officials also noted that information in the country conditions reports they compile is generally based on publicly available information or data related to country conditions. According to the officials, sources for such information may include U.S. agencies, foreign governments, international organizations, nongovernmental organizations, and news articles.

According to State officials, after State initiates its internal process for compiling information for the Secretary of Homeland Security's TPS

---

[37]Specifically, of the 24 TPS decisions for existing designations in our sample, nine of the USCIS recommendation memos were dated about 2 to 2.5 months in advance of the prior designation end date; six were dated about 3 to 4.5 months in advance of the prior designation end date; and eight were dated about 5 to 7 months in advance of the prior designation end date. One of the 24 USCIS recommendation memos provided to us was not dated, although USCIS provided an earlier draft memo for that TPS decision to us that was dated about 1.5 months in advance of the prior designation end date. Our sample also included two TPS decisions for initial designations (for a total of 26 decisions); because those designations did not have a prior end date, we did not include them in our analysis.

[38]Specifically, State's recommendation letters for 23 of the 26 TPS decisions were dated in advance of the USCIS recommendation memos for those reviews. Six State letters were dated 2 days to 2 weeks in advance of the USCIS recommendation memo, six were dated 1 to 2 months in advance, seven were dated 2.5 to 4 months in advance, and four were dated 4.5 to 6 months in advance. Three of the 26 State recommendation letters were dated about 1 to 2 weeks after the USCIS recommendation memo. For those three instances, USCIS officials indicated that USCIS officials had communicated with State officials at the working level about the ongoing TPS reviews; however, USCIS did not receive State's final letters in time to incorporate the input into USCIS's memos for the Secretary of Homeland Security. They added that, because State formally provides its input directly to the Secretary of Homeland Security, the Secretary has always received State's input in advance of a TPS decision. State officials indicated that although State strives to adhere to USCIS timelines, complex TPS cases with significant foreign policy considerations may require additional time for internal review.

review, the Bureau of Population, Refugees, and Migration generally requests input internally from the relevant regional bureau and post before compiling information for the Secretary of State's consideration. See the text box for more details of State's internal process for developing country conditions reports and recommendation letters to inform the Secretary of Homeland Security's TPS reviews.

---

**State Department's Internal Process for Compiling Information for the Secretary of Homeland Security's Temporary Protected Status Reviews**

The Department of State's (State) internal process for developing input for the Secretary of Homeland Security's Temporary Protected Status (TPS) reviews generally includes compiling information on country conditions as well as proposed recommendations from the relevant regional bureau and overseas post, according to documentation for selected TPS decisions in fiscal years 2014 through 2018 and our interviews with DHS, USCIS, and State officials. State's Bureau of Population, Refugees and Migration (PRM) facilitates and coordinates State's internal process for developing this input, according to informal guidance, which State officials said the bureau has used at the working level since 2012, as well as our interviews with State officials.

After DHS initiates a TPS review, PRM generally directs the relevant regional bureau to reach out to overseas posts for information about country conditions, according to State officials. State officials noted that in some cases, the regional bureau's country desk officer takes the lead in drafting the country conditions report, depending on the country context. Officials stated that the regional bureau generally uses a questionnaire on country conditions to request information from the post for a TPS review and that the post generally also provides a recommendation, in addition to the questionnaire responses, via cable or email to the regional bureau. For example, for a country that had an existing TPS designation based on ongoing armed conflict in the country, a country conditions cable provided, among other things, information about the status of the armed conflict, an assessment of whether the return of foreign nationals would pose a serious threat to their personal safety and whether the country was unable to handle the return of nationals, and information about the impact of the conflict on economic and humanitarian conditions. State and U.S. Agency for International Development (USAID) officials noted that other agencies represented at the overseas posts, such as USAID, may provide information for a post's input on country conditions, including information gathered "on the ground" as well as from publicly available sources.

Once the regional bureau receives any input from post, the bureau desk officer prepares a draft country conditions report and recommendation, and the regional bureau works with PRM to compile a joint action memo. PRM generally provides the joint action memo, which includes a country conditions report, to the Secretary of State, according to State officials. The memo may include a joint recommendation or varying recommendations (e.g., from PRM and the regional bureau) for the Secretary's consideration. After the Secretary determines what the department will recommend, State provides a final country conditions report and recommendation letter to the Secretary of Homeland Security as well as to U.S. Citizenship and Immigration Services' Office of Policy & Strategy.

Source: GAO summary of documentary and testimonial information provided by State and USAID. | GAO-20-134

---

We found that the USCIS and State country conditions reports and recommendation memos or letters that DHS and State provided for our nongeneralizable sample of 26 TPS decisions included information such as background on the cause (or reason for consideration) of the initial

TPS designation and a summary of the country's recovery from, or the status of, the situation to date. In addition, documentation provided to us for some of the TPS decisions included other information, such as certain economic indicators or broader country context. Specifically:

- **Cause and recovery or status.** USCIS and State documentation for each of the 26 TPS decisions in our review generally included (1) information related to the cause (or reason for consideration) of the initial TPS designation and (2) a summary of the country's recovery from, or the status of, the situation to date. For example, documentation for a country designated on the basis of armed conflict described the status of the conflict and ceasefire agreements; provided information about violence against civilians and recruitment of child soldiers; provided an update on civilian casualties since the prior review; and described humanitarian challenges stemming from the conflict, such as the risk of famine. For a country designated on the basis of environmental disaster, documentation described the status of investments in recovery and efforts to rebuild after the disaster, including the number of houses and schools that had been rebuilt or repaired. This documentation also included assessments of disruption in living conditions and the extent to which economic activity and basic services had been restored.

- **Economic indicators.** USCIS documentation for 16 TPS decisions and State documentation for 12 TPS decisions in our review included information about economic indicators. Examples of such information included an estimate of damages from an environmental disaster as a percentage of a country's gross domestic product, a summary of growth in a country's gross domestic product in recent years, and data on the increase in food prices as a result of armed conflict in a country.[39]

- **Broader country context.** USCIS documentation for 23 TPS decisions in our review and State documentation for 20 TPS decisions provided information about broader country context. For example, documentation for a country designated on the basis of armed conflict included broader context regarding topics such as recent natural disasters and the country's geography. As another example, documentation for a country designated on the basis of environmental

---

[39]We determined that USCIS and State documentation (e.g., country conditions reports and recommendation memos or letters) for a TPS decision included information about economic indicators if the documentation provided information about one or more indicators, such as gross domestic product, consumer prices, or unemployment statistics.

disaster provided information about subsequent natural disasters as well as violence, criminal activity, and corruption in the country.

In addition to USCIS and State, other DHS offices and components and non-DHS entities may provide information to inform the Secretary's decision. DHS officials noted that such information varies, may be solicited or unsolicited, and may be provided directly to the Secretary of Homeland Security or to USCIS. We reviewed examples of such information for several of the TPS decisions in our nongeneralizable sample.[40] This information included items such as

- immigration data or intelligence analyses from other DHS offices and components—for example, the Office of Immigration Statistics, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement;

- updates from the Department of Defense on the security situation in a country;

- technical input from the Centers for Disease Control and Prevention regarding the status of an epidemic; and

- input from other entities, including letters from members of Congress, foreign government officials, and nongovernmental organizations.[41]

In addition, DHS officials stated that the Secretary of Homeland Security may hold briefings or meetings on TPS reviews both internally and with

---

[40]DHS and State provided examples of other information compiled for each of the eight countries in our nongeneralizable sample, representing 15 of 26 TPS decisions.

[41]For example, a senior official from DHS's Office of Immigration Statistics provided us with several examples of immigration data that the office provided to DHS and USCIS officials for recent TPS reviews. The official noted that the office routinely provides immigration data—in particular, estimates of unauthorized individuals residing in the United States who would be eligible for an initial designation or redesignation—to both DHS and USCIS for TPS reviews. In addition, DHS's Office of Intelligence and Analysis developed an intelligence assessment that provided an overview of implications, including homeland security considerations and operational considerations for law enforcement, if TPS were to expire for certain countries. According to officials from the Office of Intelligence and Analysis, the office developed the assessment on its own initiative, and it was provided to the Secretary of Homeland Security as part of a daily briefing book as well as posted to an internal dissemination portal for cleared users. As another example, DHS's Office of the Military Advisor requested and received information from the Commander of a Department of Defense combatant command about the security situation, humanitarian challenges, and implications of terminating TPS for a country. Department of Defense officials stated that the department has not provided formal input for TPS reviews.

external entities, such as White House officials, foreign government officials, and nongovernmental organizations or advocacy groups.[42]

According to DHS officials, after USCIS and State compile their country conditions reports and recommendations for the Secretary of Homeland Security's consideration, other DHS components—including the Office of Strategy, Policy, and Plans; the Office of the General Counsel; and the Management Directorate—review the documents as part of the standard departmental clearance process before providing them to the Secretary. Officials from these DHS components noted that the purpose of their review is generally to provide relevant technical comments and ensure that complete information has been gathered for the Secretary's review.

## Secretary of Homeland Security Makes a TPS Decision

According to USCIS officials, after receiving the information and recommendations from USCIS and State, as well as information from any other sources, the Secretary of Homeland Security makes a decision regarding a country's initial or existing TPS designation.[43] USCIS officials indicated that the Secretary's decisions may not always follow the recommendations of the USCIS Director or the Secretary of State. For example, among the 26 TPS decisions from 2014 through 2018 that we reviewed, the Secretary of Homeland Security's decision was the same as State's recommendation in 21 cases and differed from State's recommendation in five cases.[44]

- **Initial designation.** USCIS officials stated that if the Secretary of Homeland Security determines a country meets the statutory criteria

---

[42]For example, we reviewed an agenda and materials for a briefing related to a TPS review for a country. Participants included officials from the White House, DHS, State, and the Department of Justice. The agenda included an overview of TPS and discussion of decision options. Attached materials included background on TPS and the statutory authorities governing TPS, as well as a summary of country conditions and decision options.

[43]Although we reviewed the steps that DHS takes to inform the Secretary of Homeland Security's TPS decisions, we did not review the Secretary's decision-making for specific TPS decisions for the countries we selected for our review. See appendix I for additional details of our objectives, scope, and methodology.

[44]The Secretary of State's recommendations in the five cases varied. These cases included instances when State recommended terminating a designation that DHS decided to extend or when State recommended extending a designation that DHS decided to terminate. Because of redactions that had been made in the information we received, we were unable to discern whether any of the Secretary of Homeland Security's TPS decisions differed from USCIS's recommendations.

for designation, the Secretary may then exercise discretion in deciding whether to initially designate the country for TPS.

- **Existing designation.** According to USCIS officials, the Secretary of Homeland Security exercises discretion in determining whether the conditions in a country satisfy statutory conditions for retaining an existing designation. However, the officials indicated that if the Secretary determines that the conditions for TPS designation continue to be met, the Secretary is required under the INA to extend the designation.[45] Additionally, USCIS officials stated that if the Secretary determines a country no longer meets conditions for TPS designation, the Secretary is required under the INA to terminate the designation. Finally, USCIS officials stated that the Secretary may exercise discretion in deciding to redesignate a country with an existing designation and that factors such as a significant deterioration in country conditions may weigh in favor of a redesignation.[46]

Once the Secretary of Homeland Security decides whether to designate a country or to extend or terminate TPS, the decision may be documented through a signed memorandum or communicated orally to USCIS, according to USCIS officials. DHS provided memorandums or notices documenting the Secretary's TPS decisions for all 26 decisions in our nongeneralizable sample.[47] After the Secretary makes a TPS decision, DHS typically communicates the decision to State before announcing it to the general public. Either DHS or State then communicates the decision to the foreign embassy in Washington, D.C., and State may communicate it to the foreign government overseas. Finally, under INA provisions

---

[45]8 U.S.C. § 1254a(b)(3).

[46]USCIS officials noted that, while factors such as a significant deterioration in country conditions may weigh in favor of a redesignation, there is no single factor that the Secretary of Homeland Security has generally considered in exercising discretion to redesignate a country for TPS.

[47]Specifically, DHS provided a completed signature page from a USCIS recommendation memo as documentation of the Secretary of Homeland Security's decisions in six cases. DHS provided a separate memorandum from the Secretary to the Director of USCIS documenting the TPS decision in two cases, a completed signature page for a memorandum from DHS's Office of the General Counsel documenting the Secretary's decision in another case, and completed signature pages for draft Federal Register notices documenting the Secretary's decisions in 17 cases.

related to TPS, the Secretary's decision is published in the Federal Register (see fig. 7).[48]

**Figure 7: Secretary of Homeland Security's Decision on Temporary Protected Status (TPS)**



Legend: INA = Immigration and Nationality Act; State = Department of State; USCIS = U.S. Citizenship and Immigration Services.

Source: GAO analysis of documentary and testimonial information from the Department of Homeland Security and from State. | GAO-20-134

Note: The Secretary of Homeland Security exercises discretion in determining whether to initially designate or redesignate a country for TPS. For an existing designation, under the INA, the Secretary of Homeland Security is required to determine whether country conditions warrant an extension of TPS or whether the country no longer meets the statutory criteria and TPS must be terminated. The INA requires DHS to provide official notice of TPS decisions through the Federal Register. A decision to designate a country for TPS is effective once published in the Federal Register or on a later date specified by the Secretary of Homeland Security. For subsequent TPS reviews of existing designations, DHS is required to provide timely notice of the Secretary of Homeland Security's decision in the Federal Register, and the effective date is generally the day after the end date of the current designation period. The INA provides that a termination shall not be effective earlier than 60 days after the date that a Federal Register notice is published or, if later, the expiration of the most recent previous extension. 8 U.S.C. § 1254a(b).

---

[48]According to 8 U.S.C. §1254A (b)(1), after the Secretary of Homeland Security makes a decision regarding an initial TPS designation, the designation shall not become effective unless notice of the designation is published in the Federal Register. With regard to decisions to extend or terminate a designation after a required periodic review of an existing designation, the Secretary of Homeland Security is required to provide for the publication of notice of the determination in the Federal Register on a timely basis. Under the law, terminations may not take effect earlier than 60 days after the date of publication of the Federal Register notice announcing the termination decision or, if later, the expiration of the most recent previous extension. See 8 U.S.C. § 1254a(b)(3).

# DHS Has Communicated TPS Decisions through Required Federal Register Notices but Provided Inconsistent Guidance on Employment Authorizations

## DHS Has Communicated TPS Decisions to the Public through Required Federal Register Notices and Other Mechanisms

Since 1990, all TPS decisions have been communicated to the public through statutorily required notices in the Federal Register.[49] DHS has also used other mechanisms, including press releases and its website, to help disseminate TPS-related information to the public.

We found that a Federal Register notice was published for all TPS decisions, as required under the INA, from November 1990 to September 2019.[50] In addition, DHS frequently used Federal Register notices as a mechanism for communicating other related information, such as effective dates for TPS designation periods, applicant registration periods, TPS beneficiary eligibility requirements, and information about employment authorization for beneficiaries. For example, the Federal Register notice

---

[49]The authority to designate countries for TPS was transferred from the Attorney General to the Secretary of Homeland Security in 2003, after the Department of Justice's Immigration and Naturalization Service was abolished and its immigration services and enforcement functions were transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002. Pub. L. No. 107-296, title I & IV, §§ 101, 102, 456, 471, 478, 116 Stat. 2135, 2142, 2143-44, 2200-01, 2205, 2211-12 (2002) (classified, as amended, at 6 U.S.C. §§ 111, 112, 275, 291, 298). See also 8 U.S.C. § 1103(a) (powers and duties of the Secretary of Homeland Security).

[50]INA provisions related to TPS state that TPS decisions, including designations, extensions, and terminations, shall be published in the Federal Register. The effective dates of TPS decisions may vary, in accordance with the statute. See 8 U.S.C. § 1254a(b).

extending the TPS designation of El Salvador, published on July 8, 2016, included the following[51]:

- summary information about the extension, such as the period of extension and the start and end date of the extension;

- procedures and eligibility information for beneficiaries to register or reregister for TPS and to apply for renewal of employment authorization documents, including required forms and fees to register or reregister;[52]

- directions for obtaining additional information and help with questions by accessing the USCIS website or by contacting an identified USCIS official or a USCIS customer contact center; and

- general information about TPS as well as information about El Salvador's initial TPS designation and about the Secretary's authority and reason for extending TPS for El Salvador.

For a Federal Register notice of a TPS decision, according to USCIS officials, USCIS generally takes about 2 weeks to draft the notice. DHS then completes an internal review before submitting the notice to the Office of Management and Budget (OMB) for interagency review, according to officials. OMB's Office of Information and Regulatory Affairs coordinates the notice review process, including gathering comments or proposed revisions from relevant executive branch agencies. For example, we reviewed examples of technical comments from the Centers for Disease Control and Prevention regarding draft notices of TPS decisions for the Ebola-affected countries that included information and data on the status of the epidemic and an assessment of health care infrastructure. According to USCIS officials, OMB comments are returned to DHS without identifying the agency that made each comment, and additional interagency review and comment may occur before DHS publishes the notice in the Federal Register. USCIS officials also noted that, under regulation, OMB can take up to 90 days to complete the

---

[51]See 81 Fed. Reg. 44645 (July 8, 2016).

[52]Once granted TPS, an individual must reregister during each reregistration period, in the case of an extension or redesignation, to maintain TPS benefits. TPS beneficiaries generally have 60 days to reregister. However, late reregistration is permitted if good cause is met and USCIS officials are instructed to give beneficiaries the benefit of any doubt, according to USCIS officials. According to USCIS officials, because of ongoing TPS litigation, eligible beneficiaries from six countries (Haiti, El Salvador, Sudan, Nicaragua, Honduras, and Nepal) are allowed to maintain their TPS, provided they have reregistered during at least one or more of the reregistration periods specified in footnote 1 of the Federal Register notice published at 84 Fed. Reg. 59403 (Nov. 4, 2019).

interagency review, although the officials added that OMB aims to complete the process in a timely manner for TPS notices and generally takes about a month.

According to USCIS officials, to help raise awareness of TPS decisions, USCIS has generally also issued press releases announcing all TPS decisions and published them on its website in addition to publishing Federal Register notices. Table 2 summarizes information from DHS's publication of a press release and Federal Register notice for a 2016 TPS decision.

**Table 2: Department of Homeland Security's Public Communication of Temporary Protected Status (TPS) Extension for Honduras in 2016**

| Type of communication | Publication date | Description |
|---|---|---|
| Press release | May 16, 2016 | The prior extension of Honduras's TPS designation was set to end on July 5, 2016. In May, the Department of Homeland Security (DHS) published a press release on its website announcing that the Secretary of Homeland Security had extended TPS for eligible nationals of Honduras for an additional 18 months, effective July 6, 2016, through Jan. 5, 2018. The press release included guidance for TPS beneficiaries regarding TPS reregistration requirements. In addition, the press release stated that, for eligible foreign nationals who reregistered for TPS, U.S. Citizenship and Immigration Services would issue new employment authorization documents with a Jan. 5, 2018, expiration date. |
| Federal Register notice | May 16, 2016 | DHS published a Federal Register notice of the decision to extend the designation of Honduras for TPS. The notice included additional details of the decision as well as guidance for TPS beneficiaries regarding reregistration requirements. |

Source: GAO analysis of DHS documentation and information provided in Federal Register notices. | GAO-20-134

USCIS has also taken other steps to communicate TPS decisions and related information to the public. USCIS has updated its TPS country-specific webpages with alerts about the latest TPS decisions and registration periods, among other information. Further, according to USCIS officials, the Office of Public Affairs hosted periodic national TPS teleconferences for stakeholders and conducted outreach meetings to respond to questions and discuss TPS information in communities where there might be a large number of TPS beneficiaries. For example, a teleconference invitation from USCIS to stakeholders to discuss the extension of Haiti's TPS designation in May 2017 indicated that USCIS officials would share information about the TPS reregistration period and procedures for eligible Haitian nationals and would respond to stakeholder questions. Officials from USCIS's Office of Public Affairs also stated that the office has drafted guidance for communicating most TPS decisions. We reviewed examples of the guidance, which included planned time lines for publishing the press releases and information to

USCIS's website as well as for conducting outreach to Congress, stakeholder groups, and TPS beneficiaries.

## DHS Published Most Federal Register Notices of Decisions on Existing TPS Designations before Previous Designations' End Date

USCIS officials noted that once the Secretary of Homeland Security makes a TPS decision, time frames for publishing the Federal Register notice may vary.[53] USCIS officials stated that, in an effort to ensure public awareness of the decisions as soon as possible, USCIS has in some cases published a press release before the Federal Register notice of a decision was finalized and published.

In reviewing TPS decisions for existing designations (i.e., extensions, terminations, and redesignations) in fiscal years 1990 through 2019, we found the following:

- About two-thirds of Federal Register notices announcing TPS decisions for these existing designations were published at least 30 days before the end date of the previous designation period (100 of 158 total notices).

- In fiscal years 1990 through 2005, 21 Federal Register notices announcing TPS decisions for existing designations were published after the end of the previous designation period.[54]

- In fiscal years 2006 through 2019, all 71 Federal Register notices announcing TPS decisions for existing designations were published 4 to 159 days before the end date of the previous designation period.

See figure 8 for more details.

---

[53]The INA requires the Secretary of Homeland Security to undertake a review of country conditions for an existing TPS designation at least 60 days before the end of the current designation period. Under the INA, DHS must publish decisions to extend or terminate a country's TPS designation in the Federal Register on a "timely basis." 8 U.S.C. § 1254a(b)(3). USCIS officials noted that they aim to publish a Federal Register notice as expeditiously as possible after the Secretary makes a TPS decision. However, the officials said that timeframes for publishing the Federal Register notice of a TPS decision may vary, depending on the OMB interagency review process, among other factors.

[54]Under 8 U.S.C. § 1254a, a TPS country designation shall remain in effect until the effective date of the termination of the designation. Therefore, in instances in which the publication of a notice in the Federal Register occurred after the end date of the previous TPS designation, such TPS designation would continue unless and until terminated by the Secretary of Homeland Security.

**Figure 8: Numbers of Federal Register Notices of Extensions, Terminations, or Redesignations of Temporary Protected Status (TPS) Designations Published before and after End Dates of Previous Designation Periods, Fiscal Years 1990-2019**



Source: GAO analysis of information provided in Department of Homeland Security Federal Register notices.   |   GAO-20-134

Note: Under 8 U.S.C. § 1254a, DHS must publish decisions to extend or terminate a country's TPS designation in the Federal Register on a timely basis. A TPS country designation remains in effect until the effective date of the termination of the designation. Therefore, while publication of a notice in the Federal Register may occur after the previous period of TPS designation has lapsed, the TPS designation will continue unless and until terminated by the Secretary of Homeland Security.

## USCIS Published Guidance Has Not Consistently Identified All Mechanisms Used to Communicate Automatic Extensions of TPS Employment Authorization Documents

Since 1990, two mechanisms—Federal Register notices and individually mailed notifications, which TPS beneficiaries may use as evidence of their eligibility for employment—have been used to communicate automatic extensions of employment authorization documents. However, USCIS's published guidance has not consistently identified each of these as official mechanisms to verify eligibility, resulting in confusion among employers about TPS beneficiaries' employment eligibility. The INA states that DHS shall provide TPS beneficiaries with "an 'employment authorized' endorsement or other appropriate work permit" but does not specify the mechanisms that DHS should use to communicate TPS employment authorization. To receive documentation of work authorization, TPS beneficiaries generally apply for an employment authorization document after an initial TPS designation and also after any

subsequent extensions or redesignations of TPS.[55] See the text box for a description of the process that TPS beneficiaries and employers must follow to verify beneficiaries' employment eligibility.

---

[55]According to USCIS officials, TPS registrants and reregistrants are not required to apply for an employment authorization document; however, TPS beneficiaries typically apply for the document to obtain evidence of authorization to work in the United States.

**Employment Eligibility Verification (Form I-9) Process**

Form I-9 lays out a process for verifying that an employee is authorized to work in the United States. First, Form I-9 requires the employee to attest to his or her citizenship or immigration status and provide acceptable documentation of identity and employment authorization. Such documents may establish both identity and employment eligibility (e.g., an employment authorization document—Form I-766—that contains a photograph) or may establish identity only (e.g., a driver's license) or employment eligibility only (e.g., a Social Security card).

Next, Form I-9 requires the employer to attest that he or she has examined the documents presented by the employee; that the documents appear to be genuine and relate to the employee; and that, to the best of the employer's knowledge, the employee is authorized to work in the United States. In examining the documents, the employer must reject any that do not reasonably appear to be genuine and to relate to the individual presenting them or that are not on the list of acceptable documents; the employer must then ask for other documents that satisfy the requirements of Form I-9.

Source: GAO summary of U.S. Citizenship and Immigration Services documents and guidance. | GAO-20-134

According to USCIS officials, USCIS aims to adjudicate both initial employment authorization applications and renewal applications within 90 days after receiving an application. When it is unable to process the adjudications in this time frame, USCIS issues automatic extensions of expiring employment authorization documents for TPS beneficiaries from

a specific country, to allow time for USCIS to process the volume of applications associated with a TPS reregistration period.[56] In some instances, USCIS may issue additional automatic extensions of employment authorization documents for specific countries if it has been unable to process all pending applications within the initial automatic extension period, according to USCIS officials.

When employment authorization documents are automatically extended for eligible TPS beneficiaries, the documents may appear to have expired even though they remain valid. According to USCIS officials, DHS has used the Federal Register notices announcing TPS decisions to communicate most automatic extensions of TPS employment authorization documents. For example, on January 17, 2017, DHS published a Federal Register notice extending the TPS designation of Somalia for 18 months and, in the same notice, automatically extended for 6 months the validity of employment authorization documents issued under Somalia's TPS designation.[57] DHS has also communicated automatic extensions of TPS employment authorization documents through Federal Register notices independent of a TPS decision. Generally, Federal Register notices announcing automatic extensions of TPS employment authorization documents include instructions for employers for completing the Form I-9, among other things. Additionally, some notices state that, to reduce employer confusion regarding automatic extensions of TPS employment authorization documents, beneficiaries should explain the extension to their employer and may also provide their employer with a copy of the relevant Federal Register notice.

---

[56]According to USCIS guidance, automatic extensions of employment authorization documents for TPS beneficiaries may be valid for up to 180 days. USCIS officials told us that beneficiaries must generally reregister during the reregistration period for an extension of their status and that reregistration is required for beneficiaries to obtain a new employment authorization document with the validity dates of the new TPS designation period. Individual TPS beneficiaries may also receive an automatic extension of their expiring employment authorization document on the basis of timely filing of a renewal application. According to USCIS officials, these extensions are issued on an individual basis. See 8 CFR 274a.13(d).

[57]According to USCIS officials, the majority of Federal Register notices announcing TPS decisions have included an automatic extension of employment authorization documents. However, some automatic extensions have been announced through Federal Register notices independent of TPS decisions. For example, on July 7, 2005, DHS published a Federal Register notice solely to announce an automatic extension of employment authorization documentation for Honduran and Nicaraguan TPS beneficiaries. See 70 Fed. Reg. 39325 (July 7, 2005).

In five cases, beginning in fiscal year 2018, USCIS mailed notifications of automatic extensions of employment authorization documents to thousands of TPS beneficiaries from Haiti, El Salvador, Syria, and Honduras as an alternative or a supplement to posting the information in Federal Register notices.[58] USCIS officials told us that in these cases, they mailed individual notifications of the automatic extensions to ensure that the beneficiaries would not experience any gaps in employment authorization. According to the officials, they began this practice because of the large number of affected beneficiaries. Our examination of USCIS documents found that in four of these five cases, USCIS mailed individual notifications to the TPS beneficiaries without also posting a Federal Register notice communicating the automatic extension.

In all five cases, USCIS published guidance on its website to inform TPS beneficiaries and employers about the use of individually mailed notifications to communicate employment authorization document extensions. USCIS's website states that TPS beneficiaries may present the Federal Register notice or individually mailed notification to their employer along with their expired employment authorization documents to show proof of continued employment authorization. The individual notifications also state that beneficiaries may show the notifications, along with the expired employment authorization document, to any U.S. employer as proof of continued employment authorization.[59]

However, a USCIS handbook for employers and related guidance do not specifically identify the individually mailed notifications as an official means of communicating these extensions.

- USCIS's *Handbook for Employers: Guidance for Completing Form I-9 (M-274)* provides guidance for employers on how to properly complete Form I-9, which helps employers verify that individuals are authorized to work in the United States. The handbook contains a section about

[58]Specifically, USCIS mailed notifications of automatic extensions of employment authorization documents for Haiti on January 22, 2018, and on July 18, 2018; for El Salvador on August 23, 2018; for Syria on September 11, 2018; and for Honduras on December 6, 2018. USCIS communicated an automatic extension of employment authorization documents for TPS beneficiaries from Haiti through the individually mailed notification, sent on January 22, 2018, as well as through a Federal Register notice published on January 18, 2018.

[59]USCIS officials noted that USCIS also provides information about automatic extensions of TPS employment authorization documents in E-Verify, a voluntary web-based system that allows employers to confirm the eligibility of their employees to work in the United States.

automatic employment authorization document extensions for TPS beneficiaries that references USCIS's use of Federal Register notices to inform the public of these extensions. However, the handbook for employers does not mention USCIS's use of individually mailed notifications to communicate the automatic extensions.

- USCIS's *Instructions for Form I-9, Employment Eligibility Verification* notes that certain employees, including TPS beneficiaries, may present an expired employment authorization document, which may be considered unexpired if the document has been extended by USCIS. The guidance also notes that employees should enter the expiration date of an automatic extension on Form I-9. However, the instructions for Form I-9 do not detail USCIS's mechanisms for communicating these extensions, including its use of individually mailed notifications.

Some employers have reportedly refused to accept expired employment authorization documents as proof of work authorization when the documents had been automatically extended. For example, the Department of Justice's Civil Rights Division telephone interventions website indicates that on approximately 50 occasions from September 2017 through May 2019, the Immigrant and Employee Rights Section intervened to deter employers or medical licensing boards from rejecting valid work authorization documents and, in some cases, from terminating employment for TPS beneficiaries whose employment authorization documents had been automatically extended.[60] Also, a letter to USCIS signed by 70 law professors and scholars states that some legal service providers have reported instances of employers' terminating TPS beneficiaries' employment because the employer did not understand or accept the individually mailed notifications.[61] Further, USCIS has received feedback from certain stakeholders concerned that beneficiaries might not be receiving the individual notifications in time to avoid any potential gaps in work authorization, according to USCIS officials.

USCIS officials told us that the Federal Register process may be beneficial for communicating employment authorization in some cases but that they may also continue to use the individually mailed notifications

---

[60]Department of Justice Civil Rights Division, "Telephone Interventions," accessed June 27, 2019, https://www.justice.gov/crt/telephone-interventions-2.

[61]Catholic Legal Immigration Network, letter to Secretary of Homeland Security and Director of U.S. Citizenship and Immigration Services, November 28, 2018, accessed March 27, 2019, https://cliniclegal.org/resources/humanitarian-relief/letter-70-law-professors-and-scholars-uscis-and-dhs-regarding-work.

as a mechanism to communicate future extensions, depending on the circumstances. USCIS has acknowledged the potential benefits of updating external guidance regarding automatic extensions of TPS employment authorization documents. However, as of December 2019, USCIS had not taken action to do so. Replying to a letter of concern from an advocacy group, USCIS stated that it could consider updating the handbook for employers to add additional guidance regarding individually mailed notifications.[62]

Effective information and communication are vital for an entity to achieve its objectives. According to *Standards for Internal Control in the Federal Government*, management should document policies in the appropriate level of detail and externally communicate the necessary quality information to achieve an entity's objectives.[63] Updating external guidance, such as the employer handbook, to clearly identify each of the official mechanisms that USCIS may use to communicate automatic extensions of TPS employment authorization documents could help USCIS ensure that employers understand and accept each of its official mechanisms for communicating these automatic extensions. This, in turn, would help to reduce the risk of employers' terminating beneficiaries from their jobs as a result of confusion caused by unclear or inconsistent guidance.

## Conclusions

The Secretary of Homeland Security has granted TPS, providing work authorization and protection from removal, to foreign nationals from 22 countries since TPS was established in 1990. DHS has generally communicated information about employment authorization for TPS beneficiaries in a Federal Register notice, although in some cases USCIS used individually mailed notifications to communicate automatic extensions of employment authorization documents. However, USCIS's published guidance has not consistently identified individually mailed notifications as a mechanism that may be used, leading to confusion about beneficiaries' employment eligibility and reportedly resulting in termination of some beneficiaries' employment. Consistent published guidance that clearly identifies each of the mechanisms used to communicate automatic extensions of TPS employment authorization

---

[62]U.S. Citizenship and Immigration Services, letter to Director of Advocacy at the Catholic Legal Immigration Network, December 6, 2018, accessed June 27, 2019, https://www.uscis.gov/sites/default/files/files/nativedocuments/Work_Authorization_extensi ons_for_individuals_with_TPS_from_Haiti_El_Salvador_and_Syria_-_Bussey.pdf.

[63]GAO-14-704G.

documents could help USCIS ensure that employers understand and accept the evidence USCIS provides for employment authorization, reducing the risk of erroneous termination of beneficiaries' employment.

# Recommendation for Executive Action

The Director of USCIS should update published guidance, such as *Handbook for Employers: Guidance for Completing Form I-9 (M-274)*, to consistently identify each of the official mechanisms that USCIS may use to communicate automatic extensions of TPS employment authorization documents.

(Recommendation 1)

# Agency Comments

We provided a draft of this report to DHS, State, the Department of Defense, the Department of Health and Human Services, and the U.S. Agency for International Development for review and comment. In its written comments, reproduced in appendix III, DHS agreed with our recommendation and noted planned actions to implement it, including updating guidance in DHS's M-274 handbook. DHS's planned actions will address the intent of our recommendation if they include updating guidance regarding each of the official mechanisms that USCIS may use to communicate automatic extensions of TPS employment authorization documents, including the use of individually mailed notifications. The U.S. Agency for International Development also provided written comments, which are reproduced in appendix IV. In addition, DHS and State provided technical comments that we incorporated as appropriate. The Department of Defense and the Department of Health and Human Services did not provide comments.

We are sending copies of this report to the appropriate congressional committees, and the Acting Secretary of Homeland Security and Secretary of State, as well as the Secretary of Defense, the Secretary of Health and Human Services, the Director of the Centers for Disease Control and Prevention, and the Administrator of the U.S. Agency for International Development.

If you or your staff have any questions about this report, please contact Chelsa Gurkin at (202) 512-2964 or GurkinC@gao.gov, or Rebecca Gambler at (202) 512-6912 or GamblerR@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this reports are listed in appendix V.

Chelsa Gurkin
Director, International Affairs and Trade

Rebecca Gambler
Director, Homeland Security and Justice

*List of Requesters*

The Honorable Benjamin L. Cardin
Ranking Member
Subcommittee on Western Hemisphere, Transnational Crime, Civilian
Security, Democracy, Human Rights, and Global Women's Issues
Committee on Foreign Relations
United States Senate

The Honorable Richard Blumenthal
United States Senate

The Honorable Cory A. Booker
United States Senate

The Honorable Richard J. Durbin
United States Senate

The Honorable Kirsten Gillibrand
United States Senate

The Honorable Edward J. Markey
United States Senate

The Honorable Jeffrey A. Merkley
United States Senate

The Honorable Gary C. Peters
United States Senate

# Appendix I: Objectives, Scope, and Methodology

Our objectives were to (1) describe Temporary Protected Status (TPS) determinations and numbers of beneficiaries since TPS was established in 1990; (2) describe the approach that the Department of Homeland Security (DHS), in consultation with the Department of State (State) and other relevant agencies, takes to inform the Secretary of Homeland Security's TPS reviews; and (3) examine DHS's public communication regarding TPS decisions and related information, including work authorization.

To describe TPS determinations since TPS was established in 1990, we reviewed information and data in Federal Register notices for all TPS designations in fiscal years 1990 through 2019. Specifically, we reviewed the designation time frames and bases (i.e., ongoing armed conflict, environmental disaster, or extraordinary and temporary conditions) for each designation since TPS was established. We also analyzed U.S. Citizenship and Immigration Services (USCIS) data on numbers of TPS beneficiaries for fiscal years 1990 through 2018. In addition, we analyzed USCIS data on TPS beneficiaries' characteristics, such as numbers, location, age, and gender of foreign nationals granted TPS, for fiscal year 2018.[1]

To assess the reliability of USCIS data on TPS beneficiaries, we reviewed documentation and interviewed USCIS officials to identify and rectify any missing or erroneous data. According to USCIS officials, USCIS removes from its data on TPS beneficiaries any who become U.S. citizens or whose status is withdrawn, either because they no longer meet eligibility requirements or because they requested that USCIS withdraw their status. However, according to officials, the data may include foreign nationals who have since died, moved out of the country, or have an additional immigration status. Additionally, because the data comprise information provided by TPS applicants, the data may include a small number of applicant errors, according to officials. We determined that the data for fiscal years 2000 through 2018 were sufficiently reliable to provide general information about the size and characteristics of TPS

---

[1]We selected this time period to include data on beneficiaries from the fiscal year when TPS was established through the most recent fiscal year for which data were available.

**Appendix I: Objectives, Scope, and
Methodology**

beneficiaries.[2] USCIS was not able to provide reliable data on numbers of TPS beneficiaries before fiscal year 2000 because, according to USCIS officials, these data were not consistently entered electronically in USCIS information systems.

To describe the approach that DHS, in consultation with State and other relevant agencies, takes to inform the Secretary of Homeland Security's TPS reviews, we reviewed provisions in the Immigration and Nationality Act (INA) related to TPS as well as DHS and State documentation, such as informal guidance documents used since fiscal year 2014 or earlier regarding steps taken for a TPS review.[3] We also conducted interviews with DHS and State officials related to the processes they have used to collect information for TPS reviews since fiscal year 2014. Specifically, we interviewed DHS officials from U.S. Customs and Border Protection; the U.S. Coast Guard; U.S. Immigration and Customs Enforcement; the Management Directorate; the Office of the Executive Secretary; the Office of Intelligence and Analysis; the Office of Legislative Affairs; the Office of Partnership and Engagement; the Office of Public Affairs; the Office of Strategy, Policy, and Plans, including the Office of Immigration Statistics; and USCIS—in particular, USCIS's Office of Policy and Strategy and USCIS's Refugees, Asylum, and International Operations Directorate. We interviewed State officials from the Bureau of Population, Refugees, and Migration and several regional bureaus, including desk officers from the Bureaus of African Affairs, Near Eastern Affairs, South and Central Asian Affairs, and Western Hemisphere Affairs. We also interviewed State

[2]USCIS also compiles estimates of expected TPS reregistrants based on reregistration trends; according to USCIS officials, these estimates help USCIS to forecast its budget. According to officials, USCIS recently stopped including expected TPS reregistration numbers in the Federal Register notices because the public found the data confusing. The officials added that the estimates could also be misleading depending on the circumstances, because, although the estimates are based largely on numbers of prior reregistrants, additional individuals from a country that is redesignated for TPS may be able to newly register for TPS. Therefore, we have not included USCIS data on expected TPS reregistrants in this report.

[3]We reviewed an internal template that USCIS's Refugee, Asylum and International Operations Directorate (RAIO) officials told us that they use as informal guidance for the draft country conditions reports that they compile for USCIS's Office of Policy & Strategy for reviews for initial or existing TPS designations. We did not assess the extent to which the RAIO country condition reports in our judgmental sample aligned with RAIO's internal template for these reports; rather, our methodology consisted of reviewing the reports in our sample to provide a general overview of the content and types of information included in each report.

**Appendix I: Objectives, Scope, and Methodology**

officials from overseas posts for countries that we selected for our review, including El Salvador, Haiti, Honduras, Nepal, Sudan, and Yemen.[4]

We reviewed documentation that DHS and State provided for a judgmental, nongeneralizable sample of eight countries for which DHS rendered TPS decisions in fiscal years 2014 through 2018 (El Salvador, Haiti, Honduras, Nepal, Nicaragua, Sudan, Syria, and Yemen); the TPS decisions for these eight countries represented 26 of a total of 42 TPS decisions for 13 countries in that period.[5] We selected this sample to represent a range of decision types and designation reasons, among other factors. While this sample cannot be generalized to the countries or decisions we did not review, it provided valuable information about the approach that DHS uses for TPS reviews. The primary documents that we reviewed for each decision included information about country conditions that USCIS and State had compiled and recommendations that USCIS and State leadership had provided to the Secretary of Homeland Security. Some of the documents that we received had been redacted because of ongoing litigation related to TPS. Table 3 provides additional details of the decisions in our judgmental sample.

---

[4]We were not able to interview officials from the post in Nicaragua, because the mission had been evacuated after the latest TPS review and State officials informed us that those present at the post at the time of our review would not be able to respond to our questions. However, we were able to interview the regional bureau desk officer for Nicaragua, who was previously posted in Nicaragua during the latest TPS review for Nicaragua. In addition, regional bureau officials told us that State did not obtain country conditions information directly from the post for TPS reviews for Syria, because the embassy was closed due to hostilities in the country.

[5]Although we reviewed the approach that DHS takes to inform the Secretary of Homeland Security's TPS reviews, we did not review the Secretary of Homeland Security's decision-making for specific TPS decisions for the eight countries in our sample.

**Appendix I: Objectives, Scope, and Methodology**

**Table 3: Judgmental Sample of Temporary Protected Status (TPS) Decisions**

| No. | Country | Decision type | Designation basis | Federal Register notice date |
|---|---|---|---|---|
| 1 | El Salvador | Extension | Environmental disaster | Jan. 7, 2015 |
| 2 | El Salvador | Extension | Environmental disaster | July 8, 2016 |
| 3 | El Salvador | Termination | Environmental disaster | Jan. 18, 2018 |
| 4 | Haiti | Extension | Extraordinary and temporary conditions | Mar. 3, 2014 |
| 5 | Haiti | Extension | Extraordinary and temporary conditions | Aug. 25, 2015 |
| 6 | Haiti | Extension | Extraordinary and temporary conditions | May 24. 2017 |
| 7 | Haiti | Termination | Extraordinary and temporary conditions | Jan. 18, 2018 |
| 8 | Honduras | Extension | Environmental disaster | Oct. 16, 2014 |
| 9 | Honduras | Extension | Environmental disaster | May 16, 2016 |
| 10 | Honduras | Extension | Environmental disaster | Dec. 15, 2017 |
| 11 | Honduras | Termination | Environmental disaster | June 5, 2018 |
| 12 | Nepal | Designation | Environmental disaster | June 24. 2015 |
| 13 | Nepal | Extension | Environmental disaster | Oct. 26, 2016 |
| 14 | Nepal | Termination | Environmental disaster | May 22, 2018 |
| 15 | Nicaragua | Extension | Environmental disaster | Oct. 16, 2014 |
| 16 | Nicaragua | Extension | Environmental disaster | May 16, 2016 |
| 17 | Nicaragua | Termination | Environmental disaster | Dec. 15, 2017 |
| 18 | Sudan | Extension | Armed conflict; extraordinary and temporary conditions | Sept. 2, 2014 |
| 19 | Sudan | Extension | Armed conflict; extraordinary and temporary conditions | Jan. 25, 2016 |
| 20 | Sudan | Termination | Armed conflict; extraordinary and temporary conditions | Oct. 11, 2017 |
| 21 | Syria | Extension, redesignation[a] | Armed conflict; extraordinary and temporary conditions | Jan. 5, 2015 |
| 22 | Syria | Extension, redesignation | Armed conflict; extraordinary and temporary conditions | Aug. 1, 2016 |
| 23 | Syria | Extension | Armed conflict; extraordinary and temporary conditions | Mar. 5, 2018 |
| 24 | Yemen | Designation | Armed conflict | Sept. 3, 2015 |
| 25 | Yemen | Extension, redesignation | Armed conflict; extraordinary and temporary conditions | Jan. 4, 2017 |
| 26 | Yemen | Extension | Armed conflict; extraordinary and temporary conditions | Aug. 14, 2018 |

Source: GAO summary of information about our judgmental sample of TPS decisions. | GAO-20-134

[a]According to USCIS officials, from 1997 through 2017, DHS used the term "'redesignate"' for instances in which the Secretary of Homeland Security newly designated a country for TPS after an initial designation or extension period. Beginning in 2018, DHS began using the term "'newly designate"' for these decisions. See 8 U.S.C. §1254a(b).

**Appendix I: Objectives, Scope, and Methodology**

In addition, we reviewed examples of other information that may be provided for a TPS review, including examples of input from other DHS components, other U.S. agencies, the White House, members of Congress, foreign governments, and nongovernmental organizations. Specifically, we received examples of this type of information for each of the eight countries in our judgmental, nongeneralizable sample, representing 15 of the 26 TPS decisions. For example, this information included immigration data and internal intelligence analyses compiled by DHS's Office of Immigration Statistics, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and Office of Intelligence and Analysis. We also reviewed examples of updates provided by senior Department of Defense officials for the Secretary of Homeland Security regarding the security situation in a country; technical input from the Department of Health and Human Services Centers for Disease Control and Prevention about the status of an epidemic in a country; and information from the U.S. Agency for International Development about country conditions on the ground. In addition, we interviewed officials from these three agencies regarding the types of information that they may provide for TPS reviews. Further, we reviewed examples of letters from members of Congress, foreign government officials, and nongovernmental organizations related to TPS reviews. Moreover, we reviewed examples of briefing or meeting agendas and related materials for internal and external briefings, including external briefings with White House officials, foreign government officials, and nongovernmental organizations.

To examine DHS's public communication regarding TPS decisions and related information, including work authorization, we reviewed DHS's public communications related to TPS, including Federal Register notices, press releases, and USCIS's website, among other information. We analyzed information in Federal Register notices published from November 29, 1990, through October 1, 2019 (the most recent available at the time of our review), to determine the timing of notices for TPS decisions and the types of information included in the notices. We reviewed examples of USCIS's Office of Public Affairs guidance for public communication of TPS decisions. We also interviewed USCIS officials regarding the mechanisms that DHS used to communicate TPS decisions and related information, including DHS's process for drafting and publishing Federal Register notices.

Further, we examined DHS's guidance and procedures as of fiscal year 2019 for communicating TPS employment authorization, including automatic extensions of employment authorization. We reviewed USCIS's

**Appendix I: Objectives, Scope, and Methodology**

public communications related to automatic extensions of TPS employment authorization for both beneficiaries and employers in Federal Register notices, individually mailed notifications, an employer handbook, and information published on USCIS's website. We interviewed USCIS officials regarding USCIS's approach to communicating TPS employment authorization, including automatic extensions. We also reviewed information from the Department of Justice Civil Rights Division's website related to confusion over automatic extensions of employment authorization documents for TPS beneficiaries.[6] Additionally, we reviewed a letter to USCIS signed by 70 law professors and scholars related to instances of employers terminating TPS beneficiaries.[7] Finally, we compared DHS's guidance and procedures with federal internal control standards related to documenting policies and externally communicating information.[8]

We conducted this performance audit from September 2018 to March 2020 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[6]Department of Justice Civil Rights Division, "Telephone Interventions," accessed June 27, 2019, https://www.justice.gov/crt/telephone-interventions-2.

[7]Catholic Legal Immigration Network, letter to Secretary of DHS and Director of USCIS, November 18, 2018, accessed March 27, 2019, https://cliniclegal.org/resources/humanitarian-relief/letter-70-law-professors-and-scholars-uscis-and-dhs-regarding-work. We did not independently verify the issues cited in this letter.

[8]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

# Appendix II: Numbers and Characteristics of Temporary Protected Status Beneficiaries, Fiscal Years 2000-2018

Table 4 lists the numbers of TPS beneficiaries, by country of citizenship, in fiscal years 2000 through 2018. During this period, the country with the largest number of TPS beneficiaries in any given fiscal year was El Salvador, with 262,262 in fiscal year 2010; followed by Honduras, with 85,759 in fiscal year 2007; and Haiti, with 58,294 in fiscal year 2014. In contrast, during the same period, Montserrat had the smallest maximum number of TPS beneficiaries in any given fiscal year, with a maximum of 21 in fiscal year 2004; followed by Angola, with a maximum of 47 in fiscal year 2002; and Burundi, with a maximum of 50 in fiscal year 2007.

**Appendix II: Numbers and Characteristics of Temporary Protected Status Beneficiaries, Fiscal Years 2000-2018**

**Table 4: Temporary Protected Status (TPS) Beneficiaries, by Country of Citizenship, Fiscal Years 2000-2018**

| Year | Somalia | Monserrat | Burundi | Sierra Leone | Sudan | Honduras | Nicaragua[a] | Angola | El Salvador | Haiti | South Sudan | Syria | Guinea | Liberia | Nepal | Yemen |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 10 | 15 | 19 | 961 | 179 | 65,874 | 3,581 | 22 | – | – | – | – | – | – | – | – |
| 2001 | 10 | 20 | 25 | 1,048 | 191 | 69,573 | 3,751 | 39 | 21,890 | – | – | – | – | – | – | – |
| 2002 | 37 | 20 | 25 | 1,082 | 193 | 72,812 | 4,013 | 47 | 98,364 | – | – | – | – | – | – | – |
| 2003 | 156 | 20 | 29 | 1,113 | 193 | 75,467 | 4,209 | – | 166,654 | – | – | – | – | 1,596 | – | – |
| 2004 | 167 | 21 | 29 | – | 192 | 78,183 | 4,433 | – | 225,301 | – | – | – | – | 1,959 | – | – |
| 2005 | 173 | – | 31 | – | 222 | 83,874 | 4,734 | – | 242,713 | – | – | – | – | 2,081 | – | – |
| 2006 | 385 | – | 49 | – | 603 | 85,414 | 4,850 | – | 252,786 | – | – | – | – | 4,474 | – | – |
| 2007 | 408 | – | 50 | – | 637 | 85,759 | 4,910 | – | 257,345 | – | – | – | – | 4,508 | – | – |
| 2008 | 414 | – | 49 | – | 645 | 85,461 | 4,935 | – | 261,181 | – | – | – | – | – | – | – |
| 2009 | 421 | – | – | – | 658 | 85,101 | 4,970 | – | 262,006 | – | – | – | – | – | – | – |
| 2010 | 440 | – | – | – | 668 | 85,150 | 4,966 | – | 262,262 | 42,132 | – | – | – | – | – | – |
| 2011 | 440 | – | – | – | 659 | 84,498 | 4,925 | – | 261,227 | 48,695 | – | – | – | – | – | – |
| 2012 | 436 | – | – | – | 659 | 84,005 | 4,891 | – | 260,476 | 58,031 | 1 | 177 | – | – | – | – |
| 2013 | 461 | – | – | – | 682 | 83,747 | 4,850 | – | 259,926 | 58,232 | 3 | 2,036 | – | – | – | – |
| 2014 | 479 | – | – | - | 829 | 83,049 | 4,790 | – | 258,071 | 58,294 | 20 | 4,471 | – | – | – | – |
| 2015 | 476 | – | – | 840 | 834 | 82,515 | 4,730 | – | 256,631 | 57,987 | 26 | 4,830 | 542 | 1,612 | 1,085 | – |
| 2016 | 480 | – | – | 1,256 | 830 | 81,635 | 4,657 | – | 253,619 | 57,638 | 42 | 6,008 | 1,013 | 2,303 | 12,139 | 780 |
| 2017 | 477 | – | – | – | 829 | 80,637 | 4,567 | – | 250,932 | 57,152 | 74 | 6,831 | – | – | 14,516 | 1,090 |
| 2018 | 463 | – | – | – | 804 | 80,748 | 4,524 | – | 251,664 | 56,455 | 83 | 7,009 | – | – | 14,578 | 1,464 |

Legend: – = no TPS beneficiaries.

Source: GAO analysis of U.S. Citizenship and Immigration Services data. | GAO-20-134

Notes: The data shown for each fiscal year represent eligible foreign nationals who were granted TPS and whose status was valid as of September 30 of that fiscal year. According to U.S. Citizenship and Immigration Services officials, foreign nationals granted TPS may be included in the data for multiple fiscal years as long as they maintain valid status. Officials noted that, depending on the population size, it may take USCIS years to adjudicate all applications for TPS from nationals of a given country. Therefore, numbers of TPS beneficiaries may continue to increase after the established registration period for a specific designation. The data shown may also include some eligible foreign nationals who have an additional immigration status as well as some who have left the United States or died, according to USCIS officials. USCIS officials noted that TPS beneficiaries who become U.S. citizens or whose status is withdrawn, either because they no longer meet eligibility requirements or because they requested that USCIS withdraw their status, are removed from the data in the fiscal year that their status changes. According to USCIS officials, data for TPS beneficiaries were not consistently entered electronically in USCIS's information system before fiscal year 2000. As a result, we determined that USCIS data on numbers of TPS beneficiaries before fiscal year 2000 were not sufficiently reliable for our purposes.

Case: 25-2995, 03/11/2026, DktEntry: 39.1, Page 152 of 303

**Appendix II: Numbers and Characteristics of Temporary
Protected Status Beneficiaries, Fiscal Years 2000-2018**

Figure 9 presents the ages and genders of Temporary Protected Status
(TPS) beneficiaries in fiscal year 2018, based on U.S. Citizenship and
Immigration Services information and data. The majority of TPS
beneficiaries in fiscal year 2018 were 31 to 50 years of age (62 percent)
and male (55 percent).

**Figure 9: Age and Gender of Temporary Protected Status (TPS) Beneficiaries, Fiscal
Year 2018**



Source: GAO analysis of U.S. Citizenship and Immigration Services data.  |  GAO-20-134

Note: The data shown represent foreign nationals who were granted TPS as of September 30, 2018.
According to U.S. Citizenship and Immigration Services (USCIS), data are self-reported by
Temporary Protected Status beneficiaries and may therefore include a small number of records with
applicant error. As a result, the data shown do not sum precisely to the total number of TPS
beneficiaries in fiscal year 2018 (417,792). According to USCIS officials, data may include some
eligible foreign nationals who have an additional immigration status as well as some who have left the
United States or died.

Figure 10 shows the location, by state of residency, of TPS beneficiaries
in fiscal year 2018. TPS beneficiaries resided in all 50 states and the
District of Columbia in fiscal year 2018, with the highest populations in
California, Florida, Texas, and New York.

**Appendix II: Numbers and Characteristics of Temporary Protected Status Beneficiaries, Fiscal Years 2000-2018**

**Figure 10: Temporary Protected Status (TPS) Beneficiaries, by State of Residency, Fiscal Year 2018**



Source: GAO analysis of U.S. Citizenship and Immigration Services data.  |  GAO-20-134

Note: The data shown reflect addresses in U.S. Citizenship and Immigration Services' (USCIS) information system at the time of the most recently approved TPS applications for eligible foreign nationals who were granted TPS as of September 30, 2018. According to USCIS officials, the data do not reflect any address changes after the most recently approved application. The data shown are

**Appendix II: Numbers and Characteristics of Temporary Protected Status Beneficiaries, Fiscal Years 2000-2018**

self-reported by TPS beneficiaries and therefore may include a small number of records with applicant error, according to USCIS officials. Additionally, the data do not reflect TPS beneficiaries residing in U.S. territories or serving in the U.S. armed forces. As a result, the data shown do not sum precisely to the total number of TPS beneficiaries in fiscal year 2018 (417,792). According to officials, the data may include some eligible foreign nationals who have an additional immigration status as well as some who have left the United States or died.

# Appendix III: Comments from Department of Homeland Security



U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

March 6, 2020

Chelsa Gurkin
Director, International Affairs and Trade
U.S. Government Accountability Office
441 G Street, NW
Washington, DC  20548

Rebecca Gambler
Director, Homeland Security and Justice
U.S. Government Accountability Office
441 G Street, NW
Washington, DC  20548

Re:     Management Response to Draft Report GAO-20-134, "TEMPORARY
        PROTECTED STATUS:  Steps Taken to Inform and Communicate Secretary of
        Homeland Security's Decisions"

Dear Ms. Gurkin and Ms. Gambler:

Thank you for the opportunity to comment on this draft report.  The U.S. Department of
Homeland Security (DHS) appreciates the U.S. Government Accountability Office's
(GAO) work in planning and conducting its review and issuing this report.

The Department is pleased to note GAO's (1) reporting of DHS's decision-making
process for determining whether to designate, extend, or terminate a foreign state's
designation for Temporary Protected Status (TPS), and (2) recognition that DHS
communicates all TPS decisions to the public through required Federal Register notices
and other mechanisms, such as website postings.  DHS remains committed to making all
TPS determinations in full compliance with the law.

The draft report contained one recommendation with which the Department concurs.
Attached find our detailed response to the recommendation.  DHS previously submitted
technical comments under a separate cover for GAO's consideration.

**Appendix III: Comments from Department of
Homeland Security**

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions. We look forward to working with you again in the future.

Sincerely,

JIM H. CRUMPACKER, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

Attachment

2

**Appendix III: Comments from Department of Homeland Security**

### Attachment: Management Response to Recommendation Contained in GAO-20-134

GAO recommended that the Director of U.S. Citizenship and Immigration Services (USCIS):

**Recommendation 1:** Update published guidance, such as Handbook for Employers: Guidance for Completing Form I-9 (M-274), to consistently identify each of the official mechanisms that USCIS may use to communicate automatic extensions of TPS employment authorization documents.

**Response:** Concur. USCIS's Immigration Records and Identity Services Directorate (IRIS)-Verification Division is currently revising the M-274. The revised M-274 will provide additional information on completing the Employment Eligibility Verification (Form I-9) for TPS beneficiaries. Specifically, these revisions will include additional subsections of instructions for completing Form I-9 when a TPS beneficiary's Employment Authorization Document (EAD) is automatically extended by a Federal Register notice and/or a TPS beneficiary receives a Notice of Action, Form I-797C, automatically extending their expired EAD after applying for a new EAD. Also, the IRIS-Verification Division will revise TPS guidance on I-9 Central, the online Form I-9 resource center, to reflect the information added to the M-274. Estimated Completion Date: April 30, 2020.

3

# Appendix IV: Comments from U.S. Agency for International Development



MAR 1 0 2020

Thomas Melito
Managing Director, International Affairs and Trade
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20226

Re:     TEMPORARY PROTECTED STATUS – Steps Taken to Inform and Communicate
        Secretary of Homeland Security's Decisions (GAO-20-134)

Dear Mr. Melito:

Thank you for providing the U.S. Agency for International Development (USAID) with an opportunity to review and comment on the draft report produced by the U.S. Government Accountability Office (GAO) titled, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (GAO-20-134). USAID does not have any comments on the draft report.

In this engagement, the GAO reviewed the internal decision-making process at the U.S. Department of State for designating and/or extending Temporary Protected Status (TPS) for select nationalities. The GAO also reviewed the State Department's process for seeking input for the review of TPS by the Secretary for Homeland Security. USAID is not involved in the decision-making process for TPS designations; however, the State Department might ask the Agency to provide information gathered "on the ground" or from publicly available sources.

Thank you for the opportunity to respond to the draft report.

Sincerely,

Frederick M. Nutt
Assistant Administrator,
Bureau for Management

Enclosure: a/s

# Appendix V: GAO Contacts and Staff Acknowledgments

| | |
|---|---|
| **GAO Contacts** | Chelsa Gurkin, (202) 512-2964 or GurkinC@gao.gov |
| | Rebecca Gambler, (202) 512-6912 or GamblerR@gao.gov |
| **Staff Acknowledgments** | In addition to the contacts named above, Miriam Carroll Fenton and Taylor Matheson (Assistant Directors), Elisabeth Helmer, Cristina Norland, Ben DeYoung, Martin De Alteriis, Neil Doherty, Jenny Grover, Reid Lowe, Mary Moutsos, Jan Montgomery, Jon Najmi, Nicole Willems, and Bailey Wong made key contributions to this report. Alana Miller and Danielle Rudstein provided technical assistance. |

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube.<br>Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts.<br>Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact FraudNet:<br><br>Website: https://www.gao.gov/fraudnet/fraudnet.htm<br><br>Automated answering system: (800) 424-5454 or (202) 512-7700 |
| Congressional Relations | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| Strategic Planning and External Liaison | James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

# Exhibit 2

**<u>TPS Terminations and Associated Orderly Transition Periods Prior to Current Trump Administration</u>**

| | Country | Date of Initial Designation | Date of Publication of Termination Notice | Effective Date of Termination | Orderly Transition Period | Federal Register Citation |
|---|---|---|---|---|---|---|
| 1. | Kuwait | March 27, 1991 | Jan. 24, 1992 | March 27, 1992 | *None* | 57 Fed. Reg. 2930 (Jan. 24, 1992) |
| 2. | Lebanon | March 21, 1991 | Feb. 8, 1993 | April 9, 1993 | *None* | 58 Fed. Reg. 7582 (Feb. 8, 1993) |
| 3. | Rwanda | June 7, 1994 | June 19, 1997 | Dec. 6, 1997 | 6 months | 62 Fed. Reg. 33442 (June 19, 1997) |
| 4. | Liberia | March 27, 1991 | March 31, 1998 | Sept. 28, 1998 | 6 months | 63 Fed. Reg. 15437 (March 31, 1998) |
| 5. | Liberia | Sept. 29, 1998 | July 30, 1999 | Sept. 28, 1999 | *None* | 64 Fed. Reg. 41463 (July 30, 1999) |
| 6. | Guinea-Bissau | March 11, 1999 | March 20, 2000 | September 10, 2000 | 6 months (default extension under 8 U.S.C. § 1254a(b)(3)(C)) | 65 Fed. Reg. 15016 (Mar. 20, 2000) |
| 7. | Kosovo | June 8, 1999 | May 23, 2000 | December 8, 2000 | 6 months (default extension under 8 U.S.C. § 1254a(b)(3)(C)) | 65 Fed. Reg. 33356 (May 23, 2000) |
| 8. | Bosnia-Herzegovina | August 10, 1992 | August 30, 2000 | Feb. 10, 2001 | 6 months (default | 65 Fed. Reg. 52789 |

|   |   |   |   |   | extension under 8 U.S.C. § 1254a(b)(3)(C)) | (Aug. 30, 2000) |
|---|---|---|---|---|---|---|
| 9. | Angola | March 29, 2000 | Jan. 27, 2003 | March 29, 2003 | *None* | 68 Fed. Reg. 3896 (Jan. 27, 2003) |
| 10. | Sierra Leone | Nov. 4, 1997 | Sept. 3, 2003 | May 3, 2004 | 6 months | 68 Fed. Reg. 52407 (Sept. 3, 2003) |
| 11. | Monserrat | August 28, 1997 | July 6, 2004 | Feb. 27, 2005 | 6 months | 69 Fed. Reg. 40642 (July 6, 2004) |
| 12. | Liberia | Oct. 1, 2002 | Sept. 20, 2006 | Oct. 1, 2007 | 12 months | 71 Fed. Reg. 55000 (Sept. 20, 2006) |
| 13. | Burundi | Nov. 4, 1997 | Oct. 29, 2007 | May 2, 2009 | 18 months | 72 Fed. Reg. 61172 (Oct. 29, 2007) |
| 14. | Guinea | Nov. 21, 2014 | Sept. 26, 2016 | May 21, 2017 | 6 months | 81 Fed. Reg. 66064 (Sept. 26, 2016) |
| 15. | Liberia | Nov. 21, 2014 | Sept. 26, 2016 | May 21, 2017 | 6 months | 81 Fed. Reg. 66059 (Sept. 26, 2016) |
| 16. | Sierra Leone | Nov. 21, 2014 | Sept. 26, 2016 | May 21, 2017 | 6 months | 81 Fed. Reg. 66054 (Sept. 26, 2016) |
| 17. | Sudan* | Nov. 4, 1997 | Oct. 11, 2017 | Nov. 2, 2018 | 12 months | 82 Fed. Reg. 47228 (Oct. 11, 2017) |
| 18. | Nicaragua* | Jan. 5, 1999 | Dec. 15, 2017 | Jan. 5, 2019 | 12 months | 82 Fed. Reg. 59636 (Dec. 15, 2017) |

| 19. | El Salvador* | March 9, 2001 | Jan. 18, 2018 | Sept. 9, 2019 | 18 months | 83 Fed. Reg. 2654 (Jan. 18, 2018) |
| 20. | Haiti* | Jan. 21, 2010 | Jan. 18, 2018 | July 22, 2019 | 18 months | 83 Fed. Reg. 2648 (July 18, 2018) |
| 21. | Nepal* | June 24, 2015 | May 22, 2018 | June 24, 2019 | 12 months | 83 Fed. Reg. 23705 (May 22, 2018) |
| 22. | Honduras* | Jan. 5, 1999 | June 5, 2018 | Jan. 5, 2020 | 18 months | 83 Fed. Reg. 26074 (June 5, 2018) |

* Termination did not go into effect due to litigation. *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 876-80 (N.D. Cal. 2023) (describing procedural history).

# Exhibit 3

January 15, 2025

Confirmation Hearing of Homeland Security

Secretary Nominee Gov. Kristi Noem

Page 1

SENATOR PAUL: ... that the department and its components engage in. In other words, we do so much stuff and we're so big we can't describe it for you. But if we can't describe what we have, we got a problem. In plain language, the DHS had really no idea. Think about it. An agency commanding over $110 billion annually can't account for its own activities. This is not just bureaucratic incompetence, it's emblematic of a deeper issue, an agency unsure of its own boundaries and commitments. How can an agency fulfill its mission or earn the American people's trust if it doesn't even know the extent of its own operations?

But the problems don't stop there. Instead of focusing on critical threats like securing the southwest border, DHS has shifted its gaze inward, targeting law-abiding Americans. DHS, under the Biden administration, has often used its vast powers to target Americans exercising their constitutional rights. It's become an agency more focused on policing speech, monitoring social media, and labeling political dissent as "domestic terrorism" than addressing genuine security threats. While cartels traffic

Page 2

people and fentanyl across an unguarded border, DHS has spent its time and resources creating partisan disinformation boards, spying on Americans through invasive surveillance technologies. The mission drift is dangerous. Every dollar spent monitoring law-abiding citizens is a dollar not spent securing the homeland. Every moment spent targeting political opponents is a moment not addressing real threats like border security, cyber-attacks, or the rising influence of adversarial nation states. The priorities of DHS have been deeply distorted, and the American people are paying the price.

And what about DHS's response to COVID-19, arguably one of the greatest threats to homeland security? The answer is clear: nothing. They knew nothing of the origins, they didn't study the issue, and they had no information about gain-of-function research. We've seen firsthand how unchecked government overreach leads to waste, fraud, and abuse. We cannot let DHS become yet another agency that operates behind a veil of secrecy. The American people deserve transparency, accountability, and leadership that puts national security and

Page 3

liberty hand in hand, not at odds with each other.

Today we gather to consider the nomination of Governor Kristi Noem to serve as the Secretary of Department of Homeland Security. I hope this hearing will set the tone for this committee's work in the new Congress to restore transparency and accountability to an executive branch that has grown unchecked. Governor Noem, if confirmed, you will lead an agency that has lost its way. Your record as governor of South Dakota and a former member of Congress demonstrates your willingness to make difficult decisions in the face of significant political pressure, and to put the interest of American people first. You have the opportunity today to address how your background and vision will translate to leading one of the most critical and scrutinized departments in the federal government.

This is the first of many consequential moments for this committee as we renew our commitment to the constitutional oversight role that Congress must assert. I have no doubt that the nominee we'll consider in the coming weeks

Page 4

and months that you will be up for the challenge. Governor Noem, thank you for your willingness to serve, and I yield to the Ranking Member for his opening remarks.

SENATOR PETERS: Thank you, Chairman Paul. Governor Noem, it's great to see you here today, and I want to first thank you for making yourself available not only to the entire committee, but to the discussions that we had in my office. Going perhaps a little more in-depth on the issues than is possible in a hearing like this and having that open and frank conversation is something that I appreciate. Also appreciate your willingness to spend time with committee staff as we conduct our due diligence and review of your qualifications and the background to serve as secretary of the Department of Homeland Security.

As our third-largest federal agency, with more than 240,000 employees and an operating budget of more than $100 billion, the Department of Homeland Security requires strong, stable, and principled leadership. Our nation faces serious threats and security challenges, from securing our borders and combating terrorism to preventing

Page 5

2 (Pages 2 - 5)

cyber-attacks and responding to our nation's increasing number of natural disasters, and DHS is the first line of defense in all of those areas. I appreciated the conversations we had at today's hearing, where we discussed the importance of ensuring that our nation's borders are safe and secure. And while we must address the significant challenges we face on the southern border, we also need to ensure that there are sufficient resources to secure our northern border, something I know you're very familiar with as the governor of your state, including building out our Northern Border Mission Center.

This is especially important in my home state of Michigan, which has two of the nation's busiest border crossings, and we're going to be adding another span shortly, the Gordie Howe International Bridge, which will open later this year. To facilitate the lawful trade and travel out those ports of entry that are absolutely critical to our economy, I've worked on legislation to hire additional U.S. Customs and Border Protection officers to meet increased staffing demands. We must secure our borders,

Page 6

but we also know it is well time passed to streamline our immigration and our asylum process as well.

In addition to border security, DHS is responsible for addressing many threats that face our nation. Just a few weeks ago, unfortunately, Americans were shocked to see two horrific incidents in New Orleans and Las Vegas, a deadly reminder that terrorism and radicalization remain very real and ongoing threats to our homeland. In my role on this committee, I've made combating foreign and domestic terrorism, as well as extremism, a top priority. In this complex environment, it is essential that DHS continue to focus on all terrorism threats, track, and report data to Congress and to the American people, and coordinate between all components to ensure the department is effectively addressing all types of terrorist threats.

We've also seen that persistent cyber-attacks are still a very serious threat. In fact, an increasing threat. A recent attack from Chinese-based hackers infiltrated the Treasury Department, on top of ongoing Salt Typhoon hack that comprised numerous U.S. telecommunications

Page 7

companies. There's no question that DHS must continue to lead the way in protecting our networks from foreign adversaries, cyber criminals, and so-called "hacktivists" to prevent cyber-attacks from becoming increasingly devastating to our security as well as to our economy.

And finally, the Department of Federal Emergency Management Agency must continue to work hard to address the increasing number of natural disasters affecting our communities as a result of climate change. From violent storms like hurricanes that brought destruction to states across the South, to the devastating wildfires in California, and countless other severe storms and flooding events all across our country, we need leadership at the department that will ensure our nation effectively responds to communities when disaster strikes them.

The safety and security of our nation and the American people depend on the department's ability to effectively address these wide-ranging threats. So, Governor Noem, thank you again for your willingness to serve in this incredibly important position, and thank you for

Page 8

being here today. I look forward to having a comprehensive discussion about how you intend to lead this critical department through a series of national security challenges, if indeed you are confirmed.

SENATOR PAUL: This morning, Governor Noem will be introduced by Majority Leader John Thune and Senator Kevin Cramer. Senator Thune, you're recognized.

SENATOR THUNE: Thank you, Mr. Chairman, and Ranking Member Peters, and members of the committee. I'm very pleased to be able to be here today to introduce South Dakota's outstanding governor who has been nominated by President Trump to serve as the Secretary of the Department of Homeland Security. I've known Kristi Noem for a long time. She has a very compelling personal and family story, which inspired her entrance into the public arena, and I'm sure you'll hear a little bit more about that from her. But I've observed as she has gone through the state legislature as a leader there, state House of Representatives, the U.S. House of Representatives, where she was our only member from South Dakota representing our state's

Page 9

3 (Pages 6 - 9)

interests there for eight years, and now currently as South Dakota's governor, and I think she brings to this job a number of things that are going to be really essential.

And one is obviously a skill set when it comes to managing hard problems. She led our state through the pandemic, managed what were extraordinary circumstances all across this country in a way that made South Dakota, frankly, a magnet for people from other states who were trying to flee or get away from some of the heavy-handed requirements that were imposed in other states around the country. Our state stayed open, stayed free, and that was largely due to her leadership.

And I would say too, as we tackle what is an enormously complicated and hard issue, which is our southern border, it's going to require a skill set which I believe she possesses, it's going to require a tremendous amount of persistence and determination, which I think she has, an enormous amount of energy, which she has in abundance. And frankly, what I would say is just absolute toughness. It's going to take some tough and hard leadership to get

Page 10

things back in order.

And I want to refer to something she said in her state of the state address earlier this week to South Dakotans, and that is that "Over the past four years, we've seen a complete disregard for the security of our borders and the safety of the American people, to say nothing for the rule of law. Chaos at our southern border and the Biden administration has left our country vulnerable to a whole host of security concerns, from terrorist entries to cross-border criminal activity like drug trafficking." I think it's well documented, and I think it's high time that it gets fixed, and we have somebody nominated by the President that I believe has the capabilities, the qualities, the experience, and again, frankly, the determination and toughness to solve what is a very, very tough issue, and one which is desperately in need of solutions.

So, I'm pleased to be able to be here today to introduce our great governor and to thank you for your consideration. I look forward to this committee acting on her nomination, and I look forward to voting for her on the floor of the United States Senate to be the next Secretary

Page 11

of the Department of Homeland Security. Thank you, Mr. Chairman.

SENATOR PAUL: Senator Cramer?

SENATOR CRAMER: Thank you, Chairman Paul, Ranking Member Peters, colleagues. Once again, I find myself in full agreement with the majority leader. It's a good place to be in our business.

So, this is a very special opportunity for me, and first thing I want to do is thank nearly all of you. I got into almost every one of your offices with Kristi as her very amateurish sitting Senator Sherpa. And the blessing for me was not only to be with my good friend and former colleague, but to learn a lot about this committee that I'm not on and to get an inside view. And Gary, especially learning how we can work together at the northern border and how similar, although very different, Michigan and North Dakota are. So, thank you for your hospitality, you were all very kind to Kristi and to me.

But Kristi is a former colleague. When you're the only member of a body of 435 from an entire state, it's really important to have

Page 12

friends. So, together, Kristi and I were two, two out of 435, and if we could get Montana, Wyoming, and Alaska, there'd be five of us that could take on the fight. But I know this. I remember our very first year, my first year, it was not hers, my first year in the House, the unthinkable happened, and the House of Representatives failed to pass a farm bill. And all I can tell you was the least secure homeland person in America was the Speaker of the House and the Majority Leader the next day, when Kristi and I doubled up, and eventually we got a farm bill done.

I say that because we are living at a time, and Senator Peters, you used the words "strong, stable, and principled". I can't think of three better words to describe Kristi Noem than those three words. I would add this. I'm not surprised that President Trump turned to Governor Noem. Securing the homeland is the number one priority, our number one priority, our number one constitutional priority, as a Congress. And it is for sure the number one priority of the voters in the last election. And it is the number one priority for President

Page 13

4 (Pages 10 - 13)

Donald Trump. So, naturally he would say, "Hmm, who is the toughest, smartest, most capable protector that I know? I think I'd like to find a ranch woman, mom, grandmother, who knows how to protect her own." And when you grow up on a ranch in the prairies or the West, nobody else is going to look out for your critters. No one else is protecting your family. You do it.

And she brings this skill set, as Senator Thune said, as a leader, as a legislator, as a member of Congress, as a governor, a very important... By the way, when I get into the room with other governors, Senator Hassan, I might as well have just left, because I was not part of a club where I don't belong. But anyway, it was very, very rich, because there's an alliance there that's really, really important. And so, for me, it's just a really special opportunity to be able to be here with her and to have had this time in your offices introducing her to you.

But I want to wrap up with this, because last night I received a very touching letter, unsolicited by either Kristi or me, from the tribal chairwoman from the Standing Rock Sioux Tribe, which straddles North Dakota and

Page 14

South Dakota. They don't really care who wins the South Dakota State/North Dakota State football game, but they do care about their reservation. And Chairwoman Alkire sent me this letter. Standing Rock is the home of Sitting Bull in case you were wondering about the credentials of their ability to protect the homeland.

I'll just read a few words. "On multiple occasions, Governor Noem has invited the Standing Rock Sioux Tribe to her table at the South Dakota State Capitol to enter into meaningful discussions." That's what I witnessed when she came to your offices. And Janet writes, "It is of great excitement and enthusiasm that our North Dakota Governor Doug Burgum will be at the helm of the Department of Interior, and my hopes remain high that you will feel the same about Governor Kristi Noem at the helm of the Department of Homeland Security. These two governors understand the needs in Indian country, and what words like tribal sovereignty, jurisdiction, and consultation mean to the Indigenous people." Speaks volumes to her leadership and to her character. It's my honor

Page 15

to support her and turn it over to her.

SENATOR PAUL: Thank you for those great introductions. The committee has also received several statements in support of Governor Noem's nomination, including a letter from 22 fellow governors, the International Association of Firefighters, and six other organizations. Without objection, these letters of support will be made part of the hearing record. And I know our Senators are going to have to go but thank you for coming and doing those introductions.

It's the practice of this committee to swear in the witnesses. Governor Noem, please stand and raise your right hand. Do you swear that the testimony you will give before this committee will be the truth, the whole truth, and nothing but the truth, so help you God?

GOVERNOR NOEM: I will.

SENATOR PAUL: Governor Noem, you are now recognized for your opening statement.

GOVERNOR NOEM: Thank you, and good morning, Chairman Paul, Ranking Member Peters, and the distinguished members of this committee. I'm honored to appear before all of you today as

Page 16

the nominee for the Secretary of Homeland Security. I want to thank President-elect Donald J. Trump for his confidence in my leadership, and the people of South Dakota for their fantastic support throughout my time in public service. I would also like to express my sincere gratitude to Senator Cramer. He has been an invaluable resource to me throughout this process, and given me much wisdom, as well as insight, into the thoughts and the procedures of the Senate and this body. And I'd also like to express my gratitude to Senator Thune, the Majority Leader of this esteemed body. He's been an advisor to me for many years, as well as a friend, and I'm so grateful for the generous support of these two men and their willingness to be here this morning to speak on my behalf, and to introduce me to this committee.

Now, I'm a wife and a mother and a grandmother; a farmer, rancher, businessperson. I've served in our state legislature, in Congress for eight years, and also a governor. I've spent my entire life in rural America. I understand what it means to work hard every single day, and to build a better future for your kids and for

Page 17

5 (Pages 14 - 17)

all of our communities. I come before you today with a deep sense of responsibility and a humility, as the nominee, to lead the Department of Homeland Security, and also a commitment to the more than 330 Americans who we will work together to help serve and to keep safe and secure in their homes and in their communities.

Now, before I proceed, I want to introduce to you my husband, Bryon, who's here with me today. He is my constant 24/7 reminder of our dedication to public service, and that it's not a solo effort or done alone. He has been a rock by my side, and I appreciate all of his love over so many years. I'm grateful that he's here with me today.

Now, securing our homeland is a serious, sacred trust that must be relentlessly pursued, and can never be taken for granted. Being safe within our borders here in America is critical, and yet Americans feel less safe than they have felt in decades. For the first time in 30 years, more than 40 percent of Americans are afraid to walk alone at night within a mile of their homes. President-elect Trump is going to change that. I've seen firsthand the challenges

Page 18

and the opportunities facing our great nation. In the 20 years since the Department of Homeland Security was formed, the nature of the threats to our homeland has grown and they've evolved. This department was created in response to the failures of the government that led to the September 11th 2001 terrorist attacks, and that reality is not lost on me, especially in the wake of the recent terrorist attacks over New Year's.

Now, I've led South Dakota for the last six years, with a focus every day on making our state safer, stronger, and freer. I've focused every day on making the best decisions, not just for right now, but for generations to come. I've overseen a state budget of over $7 billion, and a state employee workforce of more than 13,000, including more than 7,000 that report directly to the governor. I've addressed important issues like cyber security, human trafficking, drug interdiction, and also natural disasters, the same challenges that are facing so many of you and the people that you represent back home. I've secured our state and supported the rule of law, and if confirmed as the eighth secretary, that is the same approach that I will take to

Page 19

leading the Department of Homeland Security.

As we face the evolving threats of the 21st century, the mission and the success of DHS is more critical than ever. We must be vigilant and proactive and innovative to protect the homeland. The challenges in front of us are extremely significant, and we must secure our borders against illegal trafficking and immigration. We must safeguard our critical infrastructure to make sure that we're protected against cyber-attacks, respond to natural disasters, and also terrorism. I firmly believe that we can meet those challenges head on with resolve. Innovation, we can use collaboration with federal and with state partners. And Senators, I want your input. Border security must remain a top priority. As a nation, we have the right and the responsibility to secure our borders against those who would do us harm, and we must create a fair and a lawful immigration system that is efficient, and is effective, and that reflects our values.

President Trump was elected with a clear mandate. He needs to achieve this mission, because two-thirds of Americans support his

Page 20

immigration and border policies, including the majority of Hispanic Americans. I was the first governor to send National Guard troops to our southern border when Texas asked for help and when they were being overwhelmed by an unprecedented border crisis. If confirmed as secretary, I'll ensure that our exceptional, extraordinary Border Patrol agents have all the tools and resources and support that they need to carry out their mission effectively. The same is true of my commitment to the outstanding men and women of the U.S. Immigration and Customs Enforcement. They are responsible for apprehending, detaining, and deporting illegal immigrants, and getting criminal aliens off of our streets and out of the country will help American communities be safer again. The bravery and the dedication of the Border Patrol and ICE are unmatched, and I will restore dignity to their work. The rising threat of cyberattacks also demands our utmost attention, and our critical infrastructure, from energy grids to financial institutions, is under constant attack by foreign adversaries and criminal actors. As secretary, I will prioritize a comprehensive,

Page 21

6 (Pages 18 - 21)

whole-of-government approach to cybersecurity. In fact, in the coming days, we have to plan bigger and think faster and smarter. I fully acknowledge that people in Washington D.C. do not have all of the answers, and therefore, I will leverage private-public partnerships, I'll advance cutting-edge, state-of-the-art technologies to protect our nation's digital landscape, and I will have a proven track record of doing this in South Dakota to back me up. I've helped make Dakota State University a global leader in cybersecurity education, because we recognize the need to address this emerging threat. And I will take a proactive approach if given the opportunity to serve as secretary. Now, President-elect Trump has been a tremendous friend to law enforcement over the years, and I will do the same in my role as secretary. As governor, I've worked closely with law enforcement to make South Dakota safer. I've overseen hundreds of state troopers in the South Dakota Highway Patrol, and on several occasions, I've convened groups of law enforcement from across our state to address policies that will make our people safer. In fact, while some in

Page 22

this country were attacking law enforcement and defunding them, we took the opposite approach in South Dakota. We recruited law enforcement officers to move to South Dakota, a state that respects their service and their sacrifice, and we revamped our law enforcement training to provide the first ever state-led tribal-focused law enforcement training academy. I'm very proud of the work that we've done in cooperation with our tribes to help make their communities more safe.

And we must remain vigilant against terrorism and against others who wish to do us harm to our country and to our great people. I'll ensure that our intelligence and our law enforcement agencies are working together hand-in-hand, that they're fully equipped to detect, prevent, and respond to threats from radical ideologies and foreign adversaries. This requires resources, coordination, and collaboration across all levels of government. And once again, I will seek your wisdom, and I will seek your input into the months ahead. For the sake of the people that we both represent, we have to get this right. Now, I recognize that

Page 23

homeland security isn't just about prevention, but it's also about resilience. When disasters strike, as we know they will, the Department of Homeland Security must be ready to respond swiftly, efficiently, and effectively to protect the lives and the property of Americans. As governor, I've worked with FEMA in response to a dozen natural disasters in South Dakota. These have included historic floods, tornadoes, blizzards, wildfires, a derecho, and even a global pandemic. As secretary, I will enhance our emergency preparedness and strengthen FEMA's capabilities, and we will ensure that no community is left behind, and that life-saving services, like electricity and water, are quickly restored.

As secretary, I will oversee the Secret Service, an agency that is in serious need of reforms. We all saw the threats to President-elect Trump last year and the consequences of failure. Now, that should never happen again, and I've worked closely with my own gubernatorial protective detail, and I'm familiar with what works and what doesn't work, and I'll bring that experience towards strengthening the Secret

Page 24

Service once again.

I'm committed to working with this committee, with Congress, and with the dedicated men and women of the Department of Homeland Security to fulfill our mission. And together, we can ensure that the United States remains a beacon of freedom, safety, and security for generations to come. So, thank you for the opportunity and the honor to appear before you today. Thank you for the meetings and the time that you took in your office to discuss the department and what we can do in the future to make the American homeland much more secure. I look forward to your questions, and I hope to earn your trust, and hopefully also your vote, as we embark on this critical work together. With that, Mr. Chairman, I yield back.

SENATOR PAUL: Thank you, Governor Noem. We will now proceed to questions. Each member will have seven minutes. We will have a vote that will start at 10:00 a.m., but we're going to continue the hearing and keep people in line; as you come and go to vote, we'll keep the hearing moving. I want to be clear from the outset that we will not tolerate any disruptions.

Page 25

7 (Pages 22 - 25)

The Capitol Police have been asked to escort anyone immediately from the room if they disrupt the hearing.

This is a standard question, Governor Noem, that we ask of all nominees. Governor Noem, do you agree without reservation to comply with any request or summons to appear and testify before any duly constituted Committee of Congress if you are confirmed?

GOVERNOR NOEM: Yes, Mr. Chairman,

SENATOR PAUL: I'm going to reserve the rest of my time for my questions and go to Senator Peters.

SENATOR PETERS: Thank you, Mr. Chairman. Governor Noem, the DHS Secretary, has many competing priorities, as you well know, and you outlined, certainly, in your opening comments, from our borders to wildfires to cyber-attacks. But as you and I discussed at length, and I appreciate you bringing it up in your opening comments as well, we do have a northern border in addition to a southern border, that's absolutely essential that the DHS has the resources necessary at the northern border to carry out its mission, both between ports of

*Page 26*

entry and all along the border. In fact, we've seen an increase in unauthorized crossings in recent years at the northern border.

So, my question for you is, if confirmed, do you commit to ensuring, along with the southern border, that the northern border is sufficiently staffed to maintain its security and robust trade between the U.S. and its neighbors, including at the Gordie Howe International Bridge in my home state of Michigan, have the resources they need to facilitate trade, while keeping Americans safe?

GOVERNOR NOEM: Yes, Senator Peters, you and I talked about this in your office, and also with Senator Slotkin as well, how important it is to continue to remain focused on our northern border, and all borders and ports of entry that the United States has. I think there's been some universal concern from some of the committee members that as we focus on the southern border and what we're seeing, as far as the invasion there and the amount of people crossing, that the northern border would lose focus. But that will not happen, and we will ensure that our borders are secure, and we're

*Page 27*

addressing all threats that may come in from any direction. And also, with the bridge as well and staffing up on that, that as well, and I've assured Senator Slotkin as well that our focus is there to make sure that it is staffed appropriately.

SENATOR PETERS: Very good. And as we discussed, the department is diligently working to stand up the Northern Border Mission Center at Selfridge Air National Guard Base in Michigan, following the authorization and funding that I was able to secure in the last Congress. This center is critical to supporting the Department's northern border security missions and addressing evolving threats. So, quick question: if confirmed, do you commit to working with me to fully build out the Northern Border Mission Center?

GOVERNOR NOEM: Yes, Senator, we will look forward, and I look forward, to working with you to ensure that that is a priority, and that it's adequately resourced, and working with Congress and Senators to make sure that we have what we need to make sure that that mission for that base is fully fulfilled.

*Page 28*

SENATOR PETERS: Great. Thank you. On New Year's, we witnessed two incidents that reminded us that terrorism and extremism remain serious threats to all Americans. Both DHS and the FBI have consistently said that the most persistent threat to the homeland is from U.S.-based individuals or small groups radicalized by a variety of ideologies, from white supremacy to ISIS to al-Qaeda. We must certainly continue to focus on people who are radicalized here in the United States with the intent of terrorizing our communities. So, my question for you, ma'am, is how do you plan to address this threat of U.S.-based terrorists?

GOVERNOR NOEM: Senator, this is a grave concern for our country, as we all agree that the number one threat to our homeland security is the southern border. In fact, since Joe Biden has been president, we've seen 382 individuals that have come over that border that are on the terrorist watch list. I, behind me, have the governor of Louisiana with me, and he and his state and people in this country went through a horrific event on New Year's Day, and one that we never want to see repeated again.

*Page 29*

8 (Pages 26 - 29)

But this governor behind me is concerned also about an upcoming event, which is the Super Bowl, coming shortly, which we need to do all that we can to work together, that he has the reassurance that the federal government, that the Department of Homeland Security, is prepared to help him protect that event, and to keep people safe while they are there.

Those 382 terrorists are known terrorists that have come over our border. We don't know necessarily where they are because of what has been happening under Joe Biden's policies. Now, President Trump obviously won the last election with a clear mandate, and that mandate is for the American people to secure that border. But also, we need to focus on domestic terrorism and homegrown terrorism, which you just referenced in your question. Homegrown

GOVERNOR NOEM: Homegrown terrorism is on the rise. We see more and more incidents of people that are U.S. citizens that have become radicalized. And knowing when people are leaving the country and coming back and changes to their behaviors and what their actions are is critically important.

Page 30

So, the resources that the Department of Homeland Security has needs to be utilized as far as identifying those threats and being proactive to prevent them but also protecting civil rights and liberties in that process and making sure that the department is on mission to do what it was called to do, why it was created, and what authorities that Congress and the Senate has given them.

My hope is that Governor Landry and his staff and his people and the people that attend the Super Bowl know that the Department of Homeland Security is their partner, is on watch to protect them and to keep that event safe. I hope all Americans know that leadership has consequences. I hope that we can get through and get your support for this nomination and get confirmed quickly so that we can address the threats that we currently face and make sure we don't have any repeats of the day that we saw just starting this year on New Year's Day.

SENATOR PETERS: In the last two years, we have seen increasingly aggressive and expansive cyber-attacks against our federal agencies. Just last month, Chinese hackers

Page 31

infiltrated the Department of Treasury and stole potentially thousands of unclassified documents. So, given these concerning trends by the PRC to hold our federal networks' hostage, do you believe that federal agencies should be required to implement cybersecurity upgrades and maintain the highest cybersecurity standards to protect sensitive or classified data and U.S. citizen information as well?

GOVERNOR NOEM: Well, Senator, the mission of CISA, which is the Cybersecurity and Infrastructure Agency, the mission of it is to hunt and harden. It's to find those bad actors and help work with local and state infrastructure, critical infrastructure entities so that they can help them be prepared for such cyber-attacks and that they can make sure that they're hardening their systems to protect them in the future, recognizing the vulnerabilities that they have.

CISA has gotten far off mission. They're using their resources in ways that was never intended. The misinformation and disinformation that they have stuck their toe into and meddled with should be refocused back

Page 32

onto what their job is, and that is to support critical infrastructure and to help our local and small businesses and critical infrastructure at the state level to have the resources and be prepared for those cyber-attacks that they will face.

Salt Typhoon was a campaign of espionage by the PRC in China against our telecoms where large amount of data was stolen and taken, and people's private information was taken as well. And we've also seen China and the PRC go after our critical infrastructure with the Volt Typhoon hack, and that was extremely dangerous because there was no reason for them to do that, just to steal people's data and information.

The reason for them to go after that was to control our critical infrastructure for the ability to see if they could shut down a water plant, a utility company. And that was to cripple our country. So, these threats are real. CISA needs to be much more effective, smaller, more nimble to really fulfill their mission, which is to hunt and to help harden our nation's critical infrastructure.

Page 33

9 (Pages 30 - 33)

SENATOR PETERS:  Thank you.

GOVERNOR NOEM:  Thank you.

SENATOR JOHNSON:  Senator Scott.

SENATOR SCOTT:  Governor, congratulations on your nomination.

GOVERNOR NOEM:  Thank you.

SENATOR SCOTT:  I think you're going to do a great job.

GOVERNOR NOEM:  Thank you.

SENATOR SCOTT:  I think it's great that you're a governor and you bring that expertise to the table.  So, I just went through the campaign to get reelected, and it was after the Butler shooting.  I had asked people at all my events.  I say, "Raise your hand if you think the acting director of the Secret Service is going to tell us what happened."  Not one person.  I said, "What about Mayorkas?  He's running HHS, what do you think, or Homeland Security.  What do you think?"  I said, "How about Christopher Wray, head of the FBI?"  Not one person.  Can you just talk about the importance of transparency and accountability in government and how you're going to bring that to the table?

GOVERNOR NOEM:  Yeah.  Senator, Scott,

Page 34

thank you for that question because that's what I have found across the country as well, and I know it's certainly true in my home state of South Dakota, is that people don't trust the federal government.  They don't trust our leadership and this current administration that's in the White House right now to tell them the truth, to tell them the truth about what the threats really are about our agencies and departments when there are failures, addressing them and fixing it.

The Secret Service is one of those perfect examples.  They need leadership that understands why that Secret Service was created and what it needs to do.  There's two elements really that the Secret Service is tasked with, and that is protective detail and then also investigations.  Yet we see investigators within the Secret Service out there investigating antiquities and other things that are off mission when they should be focused on making sure we're addressing national security events with the protocols that are necessary and protecting the individuals that they're charged with and getting that skill set and training that are necessary.  That's been compromised by not having enough

Page 35

people there and being adequately staffed and resourced.

But frankly, the leadership hasn't been honest about talking about it.  We saw this with the drones over New Jersey as well, the federal government not answering the questions from the public.  And when they finally got a straight answer out of President Trump, they felt reassured that somebody recognized that this was something they were questioning and that they deserved answers.

My goal and my mission is to build trust.  We will undertake a large job and a large duty that we have to fulfill, that the American people expect us to do by securing our border to make sure that our nation is a nation with borders or we're no nation at all, and that we are making sure that those criminal actors that are perpetuating violence in our communities and in our cities and towns and states are removed from this country, that there's consequences for breaking the law in our country again.

There has to be consequences because when Americans break the law, there's consequences.  And why would we ever allow

Page 36

someone to come in from another country and not have consequences or allow them to continue to go forward and to commit rape and murders and other break other laws that endanger our society?  So, we've had over 13,000 murders that are loose in this country that have come over that border.  We've had almost 16,000 rapists and sexual assault perpetuators that are loose in this country right now.  425,000 plus people have criminal convictions that are here illegally in this country that our current administration's doing nothing to round them up and get them out of our country.

We will be doing that immediately, and that will be the priority, and that is one of the reasons that today the American people have lost their trust.  President Trump will build it back and know that their federal government is accountable to them and is working to put America first again.

SENATOR SCOTT:  So, Joe Biden completely opened on our southern border and dismantled our entire immigration system.  As a former governor, I know that when the federal government policies are broken and failing

Page 37

10 (Pages 34 - 37)

Americans, you see the impacts in your state just like I did when I was a governor, and you take the steps necessary to protect the families in your state. I know you've done that.

One thing you did is you talked about before you sent troops, our National Guard, to the southern border. Can you talk more about how Biden's open border policy has affected your state and communities and the role your state resources placed in helping secure the border?

GOVERNOR NOEM: We certainly have seen the effects in South Dakota that many of your states did. And I would say every state has seen the effects of an open border in the policies that have been under the Biden administration. We saw increased crime, but we also saw increased drug activity. We saw cartel in their affiliates moving into our state to proliferate trafficking, and we saw people being victimized and a lack of accountability with the federal government.

So, when Texas was addressing the situation and asked other governors for help, we sent help. I know many of the other governors at the time were sending law enforcement, but I made the decision that at that time that it was more

Page 38

appropriate to send the National Guard that our National Guard could be activated under Title 32 and sent to assist another state from the invasion that was happening and because the National Guard is trained for just such a mission.

Because of this invasion, that it is a war zone down there with what they are going to see, the threats that they would see and that they are trained specifically to interact with other agencies, the National Guard is used to falling in with other agencies and cooperating with them and could do that seamlessly, and their families and their communities are normalized to them being deployed.

So, we have in South Dakota deployed our National Guard to the southern border eight different times. Two of them were federal deployments that the Biden administration sent them down there. One was to send our Lakota helicopters, which were used for surveillance in the drug interdiction that was going on down there. But six other times, I sent them under state activation to partner with Texas and other states in securing our southern border. They did

Page 39

security operations. They also did building of the wall and partnered with Texas recognizing the failures of the federal government.

The failures of the federal government are significant, and we've seen our families and communities devastated by those effects, by the drug epidemic, by the trafficking that's going on. They increased crime. And we recognize that just because the federal government wasn't doing their job, we could not fail our state. And I needed to protect the people of South Dakota. And the people of South Dakota were overwhelmingly supportive of these deployments and very proud of our National Guard.

SENATOR SCOTT: When I was governor of Florida, there was a terrorist hack in Paris by Syrian refugees. So, President Obama was president, and I said, "I'd like to know if you're going to send refugees to my state that you give us some background on them." I assume you vetted them and tell us what's going on. You have to tell me, but you ought to tell our state law enforcement and our local law enforcement that they said, "Go jump in the lake." (Indiscernible) meaner than that, but they said,

Page 40

"You have no rights as a governor," which had made no sense. We had over 70,000 people come here after Afghanistan on planes into this country completely unvetted. They've never given our governors any information. So, would you change that?

GOVERNOR NOEM: Yes. The communication between states and the federal government has been absolutely broken, and that's what I love about this committee, is you do have governors sitting on this committee that have been in that role as a commander in chief and have the responsibility for being the CEOs of their state.

It's a different perspective than serving. I served in Congress too, and both are extremely important, and they're just different in that responsibility that weighs on your shoulder. I often told folks that that is the thing that most times if something was going to keep me up at night, it was the responsibility that I had being commander in chief, recognizing the decisions that I made. And I'm sure you had this feeling as well, Senator Scott, as governor, that impacted those families, those soldiers. And it impacted their communities when we pulled

Page 41

11 (Pages 38 - 41)

them out and the importance of that.

And when they were bringing refugees into the country, I as well communicated that to the federal government. They were bringing refugees, and I asked how they were vetted, how we were working with their home countries to find out who they really were, what their intentions were and why they were coming to the United States and received no information from this administration that that vetting process was being done, that we knew where they're going.

In fact, they kept us in the dark and didn't communicate to us even what states and where those refugees were being placed. So, that is something that we need to change when we have programs that fall under the purview of the Department of Homeland Security. There needs to be communication, especially with the governor, so that we can coordinate to ensure that it's the right thing for that state.

SENATOR SCOTT: Thank you.

SENATOR JOHNSON: Senator Hassan.

SENATOR HASSAN: Thank you, Mr. Chair. And welcome, Governor Noem. I really appreciate you being here. Welcome to your family as well.

Page 42

GOVERNOR NOEM: Thank you.

SENATOR HASSAN: And families do share in this kind of public service, and we appreciate them very much. As we discussed at our meeting last month, as a former governor, I appreciate the important responsibilities that governors have to ensure the safety and security of their communities, including by managing public safety and emergency agencies.

And I will say that, in many ways, I agree with some of the things that Senator Scott just said about improving communication between the Department of Homeland Security and governors around who is being sent to states. It's a critical issue and something that I was frustrated by when I was governor. So, I look forward to hearing more today about your priorities if confirmed about how your experience as governor would help you run the Department of Homeland Security.

Let me just start by following up with a question that Senator Peters had also touched on. We have recently, in New Hampshire, seen a dramatic increase in unauthorized border crossings at the northern border. And when I was

Page 43

at the northern border recently, law enforcement told me about the need for more personnel and resources. We still don't have cell phone coverage in a lot of the stretch of our northern border. I've worked with Senator Kramer on bipartisan legislation to strengthen our northern border strategy because it's clear more support is needed. So, Governor, if you're confirmed, would you deploy additional full-time personnel and upgrade equipment along the northern border?

GOVERNOR NOEM: Senator, I enjoyed our meeting that we had and you identifying the northern border issues that are going on, the lack of security and the lack of technologies that you really need to cover, some of the landscapes that are there very different than the southern border, some just as equally challenging but all need to be addressed.

So, I definitely will be working with you to ensure that our northern border is adequately resourced as well, and we do have to have the resources in order to be successful.

SENATOR HASSAN: Right.

GOVERNOR NOEM: That's something I want to work with Congress, with the Senate and the

Page 44

House on to ensure that the resources are there to meet the challenges that we have. We have not fully utilized the technologies that are available that are necessary to really secure this country and to compete with those bad actors which wish to infiltrate our country and having the ability to utilize them will make us much more safe. So, I'll work with you most definitely ensuring the northern border is protected.

SENATOR HASSAN: Well, I appreciate that, and I just note too that at the same time, there's real concern in New Hampshire and all along the northern border that we strengthen the border and have the resources we need. We also have a really strong economic relationship with our friends to the north and a lot of family relationships.

So, I think it's important that we're smart in the deployment of technology. We don't want to impede that flow of economy and people that's lawful, but we do want to make sure that we have the resources we need. I want to turn to the southern border now.

Page 45

12 (Pages 42 - 45)

At the southern border, we need significant technological investments to support law enforcement personnel in their efforts to catch fentanyl smugglers to stop human traffickers and seize the cash and illegal guns that criminals traffic southward to the cartels. And we talked about this a little bit.

There's bipartisan support for these investments, and I've worked with colleagues including Senators Lankford and Cornyn on legislation around these issues. Governor Noem, could you identify specific technological investments that you would make at the southern border and are you willing to work with me on increasing southbound inspections if you're confirmed?

GOVERNOR NOEM: Yes. Certainly, Senator. You've heard President Trump talk about the need to build a wall. And the wall and infrastructure is critically important. But also, at our 382 legal ports of entry, we need to have technology so that flow can happen north and south, and it can happen in a legal manner to ensure that our commerce can continue to operate, and that we can continue to make sure that we're

Page 46

also secure.

I think de minimis shipments are a concern and the need to look at those and how traffickers and fentanyl distributors are using that. I think we also need to use scanners surveillance operations. There's new technologies out there to cooperate with satellites in some area where the topography does not necessarily facilitate having actual infrastructure and then also the ability to make sure that we're utilizing that technology that allows us to know what is going south that might be fueling some of the violence that ends up coming back north and ensuring that we're stopping that before it has the chance to supply those cartel and bad actors that would come in.

SENATOR HASSAN: Yeah. I really appreciate that because the southbound flow, particularly of cash and weapons, fuels the cartels and strengthens them.

GOVERNOR NOEM: Absolutely.

SENATOR HASSAN: And it's something that we really have to focus on. I also want to follow up on the issue of cyber security. Recently, criminals launched a successful cyber-

Page 47

attack on power school, a cloud-based record management system that contains personal information about tens of millions of kindergartners through high school seniors, including many students and teachers in New Hampshire.

This cyber-attack on power school comes as schools and local governments across the country have seen a surge in cyber-attacks on their systems. And when a small of maybe a thousand students or so has to pay $2 million in ransom, I want you to think about what that does to one of our small communities. Right? So, Governor Noem, if you're confirmed, how will you empower the cybersecurity and infrastructure security agency to improve the cybersecurity of state and local governments in the United States?

GOVERNOR NOEM: Well, thank you, Senator. If I am confirmed and have the opportunity to serve as secretary of this department, I'll be following the constitution and the rule of law and then getting these departments back on mission to why they were created and why they are existing.

What CISA should be doing is helping

Page 48

those small entities, those schools, those local city governments, the state governments, and the small businesses that are critical infrastructure that don't have the resources to stay on top of the critical protections that they need to enact.

SENATOR HASSAN: Well, let me follow up just quickly on that one point. It's something we discussed when we had our meeting. I worked with Senator Cornyn on a bipartisan bill. It became law that created a cybersecurity grant program for state and local governments. This is an addition to each state getting a cyber coordinator to help on the ground.

We discussed this program, and I know you as governor had some reservations about the structure of the program, but if confirmed, will you commit to working with Congress to adjust it? I'd love your input about what gave you pause as governor. I think there were only two governors who didn't participate in the program. And I hope that as we work on the concerns you have, you'd work with me to adjust and reauthorize the program.

GOVERNOR NOEM: Yes. All grants within the department will be evaluated when I come in

Page 49

13 (Pages 46 - 49)

and be looked at to see what we can do to make sure that they're actually fulfilling the mission to which they were established.  What I would say about the cybersecurity grants in South Dakota, when I came in as governor, one of my main priorities was to bring the next industry into the state.  And I determined that that would be technology and cybersecurity.

In fact, we have Dakota State University in our state, which is a cybersecurity national leader in training those cyber warriors that we need to protect us and keep us safe.  I've since then partnered to grow and double the size of that school.  We train a lot of NSA employees in South Dakota.  And so, understanding cybersecurity and my experience and that I think is critically important to the department and bringing it to the table to do this.

You talked about why we didn't take that cybersecurity grant in South Dakota, and it's because the requirements of that grant would've caused me to grow my state government.  The administration costs of it would've been much more than what it been able to facilitate at the local level.  And our state was already

Page 50

proactively helping these individuals that needed the resources to secure their systems.

SENATOR HASSAN:  Well, I appreciate that.  I'm way over time.  There were very few requirements purposely in that grant program other than to make sure the money was being spent the way we authorized.  But let's continue to talk about that.

GOVERNOR NOEM:  Thank you.

SENATOR HASSAN:  Thank you.

SENATOR JOHNSON:  Senator Hawley.

SENATOR HAWLEY:  Thank you, Mr. Chairman.  Governor Noem, welcome. Congratulations on your nomination.  I'm delighted to see you here.  I do notice the Chairman of the Ways and Means Committee is over your shoulder there.  I have to question your judgment about who your friends are based on that through the great Chairman from the state of Missouri.  It's fantastic to have you here.

The Department of Homeland Security is not particularly old, but you already have the, what I hope, will soon be the distinction of succeeding the worst secretary in the history of the Department of Homeland Security.  Alejandro

Page 51

Mayorkas has been an absolute disgrace to that department and frankly to this country.  And I'm delighted to see you willing to step up and serve.  Let me just ask you something.  I repeatedly asked your predecessor when he sat where you're sitting, whether the southern border was secure.  And he repeatedly told me under oath, "It is secure, Senator."  And he repeatedly said under oath, "Our policies are working, Senator," meaning the Biden administration policies that, of course, gave us this devastating open border.  So, let me just ask you, is the southern border secure as we find it today?

GOVERNOR NOEM:  Senator, no.  The southern border is not secure today.  But in just three days, we will have a new president in this country, President Donald J. Trump.  And he will secure our border.

SENATOR HAWLEY:  That is refreshing candor.  I'm glad to hear it.  Let me ask you about a young man from my state.  This is Travis Wolfe who's 12 years old when he was killed just over a year ago by an illegal migrant who mowed him down, and I choose my words carefully, mowed

Page 52

him down in a motor vehicle, hit him head on doing 75 and a 40, killed him.  Others were severely injured.  Just yesterday, a witness sitting where you are sitting today told this committee that migrant crime is and I quote, "Not an actual concern."  Not an actual concern.

In a hearing before this committee advising us to drop the Laken Riley act and not focus on migrant crime.  In my state with the death of people like Travis Wolfe and Officer David Lee who was assaulted and killed in St. Louis and officers in Kansas City who have been assaulted by illegal migrants and others who have been carjacked and stabbed, would you agree with me that migrant crime sure as heck is an actual concern and that you intend to do something about it?

GOVERNOR NOEM:  Yes, Senator. Absolutely.  And I'm so sorry about Travis.  My prayers go out to his family.  I can't even imagine what that is like, and thank you for telling his story because there's so many families in this country that have that same story, and they don't understand why the federal government is allowing people to come into this

Page 53

14 (Pages 50 - 53)

country illegally and then perpetuate crimes against their people, and then give them resources and shelter and food and debit cards to go take care of their families when they go to work every single day to make sure that they're providing for their families and are held accountable to when they break our laws.

SENATOR HAWLEY: Let me ask you this, will you work with President Trump to reinstate the Remain in Mexico program that the President had in place in his first term, which does so much to ensure that those who would seek to abuse our asylum system are not allowed into the country and those who have legitimate asylum claims, their claims are processed in due order and in due course, but they wait in Mexico until those claims are fully processed. Will you work to reinstate that program?

GOVERNOR NOEM: Yes, Senator. The president and I have talked extensively about this, and we'll 100 percent partner with him to reinstate the Remain in Mexico policy and make sure that it's in place.

SENATOR HAWLEY: Fantastic. I think Travis might be alive today if that policy had

Page 54

been in place. Let me ask you about CBP One, the phone app, that I've called concierge service for illegal Immigrants. I'm sure you're familiar with it. This was the Biden administration's effort to allow asylum seekers to apply ahead of time using their phones but not actually to provide any evidence that they needed asylum. There is a newspaper report, a press report that said the only problem with the app is it never asks users are you seeking asylum? They don't ask for any asylum evidence. They simply release these so-called asylum seekers who use the app into the country on parole.

Sometimes, they're never given a hearing. The Inspector General actually did a report, a full investigation report on CBP One and found that, frequently, users of this app were claiming the same addresses in the United States as their intended destination, even though they didn't know each other, they weren't family connections. In other words, it has been completely abused. And the idea that the federal government would pay for this kind of concierge service for Illegals, I think, is outrageous. Will you end the use of the CBP One app?

Page 55

GOVERNOR NOEM: Yes, Senator. If confirmed, and I have the opportunity to be secretary on day one, CBP One will be shut down. There's data and information in there that we will preserve so that we can ensure we know who's coming into this country and who's already here that we need to go find. But also, we make sure that there's another program, CHNV, which I'm sure you're very familiar with, where our federal government actually paid to fly people into this country directly from other countries without any vetting or knowing who they are. So, there's several of these programs that need to be eliminated, and we need to ensure that we're following legal immigration laws.

SENATOR HAWLEY: I'm glad you just mentioned CHNV. This is a mass parole program. Of course, as you know, our law allows parole in only very limited circumstances. There are two circumstances, and it requires case by case evaluation. The present administration soon to be gone has granted mass parole in direct defiance of the law, not case by case evaluation. The CHNV program is one of those instances. Will you put a stop to this abuse of our parole law

Page 56

and our asylum system?

GOVERNOR NOEM: Yes, we will go back to case by case evaluation of these parole cases and ensure that we have more resources, if you will partner with us to make sure that our legal immigration system is fully utilized, that we have more judges, more immigration courts so that we can process people legally and make sure that they are going through that process rather than like Joe Biden has done, use this an excuse to allow people to come into our country with no consequences.

SENATOR HAWLEY: Let me ask you about another low light, not a highlight, but a low light of this last administration and DHS. Your predecessor, the current secretary of DHS, established a disinformation board using taxpayer resources to police speech on the internet and elsewhere to tag American citizens' viewpoints as either legitimate or not legitimate and use the power of the state to censor them, including having them removed and perhaps penalized.

This has got to be the darkest chapter, I think, in DHS's short history. He eventually withdrew the board under intense criticism but

Page 57

15 (Pages 54 - 57)

has never fully repudiated it and never promised not to do it again. Will you pledge to us here today that, under your leadership, there will never be a disinformation board or anything like it at DHS, and you will be a champion for the free speech and first amendment rights of all Americans?

GOVERNOR NOEM: Senator, there will not be a board such as that under my leadership at the Department of Homeland Security.

SENATOR HAWLEY: Fantastic. Let me ask you my remaining seconds, just one more thing about the Secret Service. You've mentioned this, and I'm so glad that you did this committee. And it has been bipartisan. This committee has done bipartisan work on the attempted assassinations or the assassination attempts, I should perhaps say, of the former president, the future president, soon to be the president, President Trump. We were stymied at every turn, and I should use the present tense. We are currently being stymied at every turn by the current Secret Service leadership and, frankly, by the leadership of DHS who have refused to turn over documents who refused to make people available

Page 58

for interviews.

We finally had to pass my own law in this committee, which we unanimously adopted a law statute, mind you, which would require DHS and Secret Service to turn over relevant information to us about the assassination attempts. It's unbelievable. When you come to office to this office, I hope very soon will you pledge to us that you will open the books on all of the facts associated and around these assassination attempts that you will make available to us and to the public, most importantly, all the facts so that we can ensure that this never happens again and that the needed reforms in the Secret Service are put into effect.

GOVERNOR NOEM: Yeah. Senator, if I am the Secretary of Homeland Security, I will certainly work with you to build transparency and make sure the facts are shared with you and your committee. I know that you've been very frustrated by the lack of transparency from the department. And I want to thank those of you that have worked on that report that was put together on these assassination attempts. I know

Page 59

it was a bipartisan report, an investigation that this committee conducted. And I appreciate you focusing on that, and I'll work with you to get the information so that you have the truth of really what happened there in the failures so they can be fixed.

SENATOR HAWLEY: Thank you. That's a great place to end in a high note as I see my friend, Senator Blumenthal, who did fantastic work on this effort, and it will be an incredible new day and incredibly refreshing day to have a DHA secretary who will tell us the truth, who will be honest with us about the facts, honest with the American people and who will enforce our law. And I know you'll do that. Governor Noem, I look forward to supporting your nomination. Congratulations.

GOVERNOR NOEM: Thank you.

SENATOR JOHNSON: Senator Blumenthal.

SENATOR BLUMENTHAL: Thanks, Senator Johnson. Welcome, Governor Noem. And thank you for being here. Thank you for visiting with me and thank you to your family for their service as well. Let me begin on a high note thanking Senator Hawley for his leadership on the effort

Page 60

that I led with him to essentially get some basic facts out of the Secret Service when we were investigating Senator Johnson and I as leaders of the permanent subcommittee on investigation, helping you lead it with the Chairman and ranking member here.

And I'm hoping that you've read our report and that you will agree to begin implementing its recommendations, which call for major reforms, in my view, a house cleaning top to bottom in the Secret Service and greater transparency with this committee and with the American public.

GOVERNOR NOEM: Yes, sir. I will certainly work with you to do that and to work to make sure that we have that transparency, and the committee has the information that it needs to do due diligence of its oversight.

SENATOR BLUMENTHAL: Our investigation is continuing, Senator Johnson, and I have discussed it. And we will be making more requests to pursue the fact-finding that is so important. I want to ask you about disaster relief. California is on fire. The fire's raging. There are going to leave destruction and

Page 61

16 (Pages 58 - 61)

devastation that is heartbreaking.

I am really disappointed with some of the statements that President-elect Trump has made, for example, saying that quote, "We won't give him," referring to Governor Newsom, "money to put out all his fires. And if we don't give him money to put out fires, he's got.

SENATOR BLUMENTHAL: ... a problem. The specter is there of potential discrimination based on politics, withholding money from California or other states. It's not an unfounded fear. In the last administration, there were public reports about President Trump withholding money from the State of Washington because of his disagreements with Governor Inslee. Connecticut, like the rest of the nation, suffers from these natural disasters. Most recently in August, we were hit by major flooding, and these natural disasters are going to become more frequent, as will be the need for the federal government to meet the requests for declarations of natural disaster. I assume you will agree with me that withholding disaster relief by President Trump or any other chief executive of the United States is a violation of

Page 62

his duty and of law.

GOVERNOR NOEM: Well, Senator leadership has consequences and looking at the tragedy that's happening in California is --

SENATOR BLUMENTHAL: I want to ask you yes or no, with all due respect, it's an easy --

GOVERNOR NOEM: What's happening in California is the ramification of many decisions over many years. But under my leadership at the Department of Homeland Security, there will be no political bias to how disaster relief is delivered to the American people.

SENATOR BLUMENTHAL: So, if President Trump were to say to you, "We're going to withhold money from Connecticut or Michigan or any of the states, Iowa, because we don't like the governor or we don't like the politics of the state," you would stand up to him and say, "Mr. president, we need to allocate that money."

GOVERNOR NOEM: Senator, in three days, President Trump will take an oath to uphold the Constitution and the rule of law in this country, and he will do that, and I'll be glad to have him back.

SENATOR BLUMENTHAL: And I assume

Page 63

that's a yes.

GOVERNOR NOEM: I don't speak to hypotheticals, which is what you're asking me to do. But what I will tell you is that as secretary, I will do the same. I will deliver the programs as the laws dictate.

SENATOR BLUMENTHAL: Well, it's more than a hypothetical, with all due respect, and I apologize for interrupting you, but my time is limited, as you know, as a veteran of these hearings. It's more than a hypothetical. It's based on experience with President Trump withholding money from Washington State and elsewhere. I need to know from you, will you stand up to the President and say, "No, the Constitution and the Impoundment Act requires us, for example, to allocate the 100 billion dollars that we have just appropriated in the last session to states like Connecticut $3 million, Texas, $10 million, almost every one of the states represented here." Will you say no to the President if he withholds that money?

GOVERNOR NOEM: Sir, I don't know about the scenarios that you're referencing with President Trump, but what I will tell you is that

Page 64

if given the chance to be Secretary of Homeland Security, that I will deliver the programs according to the law and that it will be done with no political bias, and if the programs change or if you decide to change the rule of law, then I will follow that while adhering to the Constitution.

SENATOR BLUMENTHAL: So, you pledge to allocate and distribute that 100 billion dollars?

GOVERNOR NOEM: According to how the program is written with no political bias.

SENATOR BLUMENTHAL: Thank you.

GOVERNOR NOEM: Every American deserves to be there and have disaster relief the same as their neighbors.

SENATOR BLUMENTHAL: Basically, following the law.

GOVERNOR NOEM: Yes.

SENATOR BLUMENTHAL: Let me ask you, Senator Peters asked you about homegrown terrorists. The New Orleans tragedy was the result of a homegrown terrorist born in this country radicalized by ISIS and it reflects the reason why the intelligence community, the FBI, almost all of our law enforcement has said

Page 65

17 (Pages 62 - 65)

repeatedly, domestic violent extremism is the most lethal and persistent threat to our security. That terrorist was radicalized by ISIS. The investigation is underway, we don't know all the facts, but we do know that he was a military veteran, and ISIS was responsible for radicalizing him. Shouldn't we focus on ISIS as a threat to this country's security?

GOVERNOR NOEM: Senator, certainly we should be focused on all threats to this nation's security. That's the mission of the Department of Homeland Security and homegrown terrorism is growing. We have more and more incidences. The tragedy we saw and the terrorist attack in New Orleans was --

SENATOR BLUMENTHAL: What will you do to combat it? What will you do to stop ISIS and other extremist organization from radicalizing people in this country?

GOVERNOR NOEM: Well, certainly Senator, I'll continue to work with the administration and our partners and the Department of Defense, the intelligence agencies also within Secretary of State and the other branches and cabinet officials to make sure we're

Page 66

bringing all resources to bear to identify and to stop these types of terrorist activities. What I would say is the cybersecurity and intelligence elements that we have within the Department of Homeland Security have been incredibly siloed. They have not communicated with other intelligence agencies like they should and partnered. INA has some interaction but not enough and we also need to have CISA have interaction with the FBI, CIA to make sure they're working together to stop these types of threats and identify when they're growing among our citizens and how they become radicalized.

SENATOR BLUMENTHAL: My time has expired. This area of questioning I think is supremely important. I know there's a lot of focus on the border. We all want more border security. We want to stop migrant crime, but let's not take our eye off the ball. The governor of Louisiana for the Super Bowl ought to be really riveted on the potential for homegrown terrorism as a threat, and I hope that you will help him and other governors to do their duty to protect the people of the United States from that homegrown terrorist threat. Thank you.

Page 67

GOVERNOR NOEM: Yeah, I look forward to working with you.

SENATOR PAUL: Senator Ernst.

SENATOR ERNST: Thank you, Senator Johnson. Governor Noem, thank you so much for being here today and I want to thank you for your continuing service, the service that you had as a member of Congress, the service that you have displayed as a governor of the great State of South Dakota, our neighbor to the northwest, and for being willing to step up and take on this immense responsibility. So, thank you so very much.

We had such a good discussion when you came to my office in the last several weeks, and we talked about the importance of securing our border and fixing our broken immigration system. And I'd like to start today by sharing a story about one of my constituents from Council Bluffs, Iowa. And what we have seen through this broken border is tragedy that strikes so many families across the United States. So, very similar to the story that was shared by my colleague from Missouri with his constituent Mr. Wolf. I have a young woman by the name of Sarah Root who

Page 68

encountered tragedy on January 31st, 9 years ago. So, Sarah Root was struck and killed by an illegal immigrant who was drunk driving. He was driving at three times the legal limit of alcohol, and Sarah's killer was bonded out, bonded out before the Roots laid her to rest. He fled the country and has not been seen or heard from since. The Root family has not seen justice. So, Governor, how do you plan to prioritize the detention and deportation of illegal immigrants like Sarah's killer?

GOVERNOR NOEM: Well, yes, Senator, thank you for telling Sarah's story. I remember when this happened because it was so close to home and so devastating for her and her family and the entire State of Iowa and our country. President Trump is focused on making sure that these types of situations don't happen again, that we don't continue to lose our children and our family members to illegal immigrants that come in and perpetuate crime with no accountability and then are released with no consequences. So, the number one priority of the president is to secure the border and to deport these criminal actors immediately and as soon as

Page 69

18 (Pages 66 - 69)

possible. They will be the number one priority to make our communities safer and so that we don't have this kind of situation going forward.

In fact, people, I think when they first heard my name being mentioned and nominated for the Department of Homeland Security, maybe thought it was a little bit of a surprise, like, "Oh, I didn't think about Kristi doing that job." But I tell people the reason that I asked for it is because I knew it was the President's number one priority. I knew that it needed to have someone in the position that would do what the President promised the American people, would be strong enough to do it and follow through to make sure that we're protecting our communities and America. But that also came at it from a perspective of how these families feel, that was a wife and a mom and a grandmother and would be able to stand up and communicate to the American people what we were doing and why we were, because it's what they asked us to do.

I have three grandchildren and one more on the way, and when I look at Little Miss Addie every day, I just think, "What kind of a country is she going to grow up in? What kind of a

Page 70

country will we leave her and her brother and a sister?" And I don't want them to think that their grandma sat on the sidelines and didn't do all that she could. So, I will enforce the Constitution and the law, and I will make sure that when people enact horrific things like this that happened to Sarah and her family, that there will be consequences for it.

SENATOR ERNST: Yeah, absolutely. And as a fellow grandma, I know that you are perfectly positioned to enforce this.

I do want to move on to another topic that we visited about in my office. So, I'm the founder and the chair of the DOGE Senate Caucus, and so we do need greater government efficiency, and I do believe in order to do that, we need less of our employees teleworking and more of those government workers back in the office working for our constituents. And to that end, it ties together then too. We just found out that the Treasury Department had a cyber-attack on December 8th from China, and no surprise here, they access servers through work from home software. So, it all ties together.

We need more people back in the offices

Page 71

making sure that any communications are secured, any work is secured. And to that, I know the Biden Administration has put a huge emphasis on the cyber bureaucracy, but they haven't really done anything about it, and they haven't given any authority to those that are enforcing the standards. So, we need to enforce the standards that are set forth to make sure the cyber security is truly there, but what can DHS do one, with telework how do we get the employees back, and then two, how do we make sure that our systems are secure from these cyber-attacks?

GOVERNOR NOEM: Well, Senator, thank you for focusing on remote work and the need to get people back in their offices and accountable to the work that they do. In fact, I've heard since being nominated for this position that many of the agencies within the department are not showing up. They're not doing their jobs. But even FEMA, who is responsible for disaster response, that they have the alternative, some of these employees do not even respond to a disaster, which might explain the horrific results that we saw in North Carolina when they had such a terrible disaster that impacted

Page 72

families and communities, and FEMA failed them so miserably. If It's not even responsibility of them to show up when terrible things happen, what other day-to-day activities are not getting done because they're working from home or not doing their job at all?

You talked about cyber security and the need to ensure that our systems are safe and secure. One of the things that disturbs me the most is that we don't necessarily even know how some of these espionage attacks that have infiltrated our systems have happened. We don't know how to stop them yet. We don't have the knowledge and that our departments and intelligence agencies and cybersecurity agencies have become siloed and aren't working together to stay in front of these bad actors. But many times, our most vulnerable area happens at the state and local level. Some of these smaller entities that feeds information into our systems is where they choose to infiltrate and get our data and to really hold for ransom many of these companies and then impact our federal systems as well.

So, one of the first meetings I had

Page 73

19 (Pages 70 - 73)

when I was elected governor with the former governor during the transition was, he said, "The number one priority you're going to have as governor is to secure our systems."

SENATOR ERNST: Yes.

GOVERNOR NOEM: He said, "Our systems are so antiquated, and we've had over 16,000 hacking attempts in just the last month. You need to secure our systems to get it done." So, that was a priority for me and to do that, and we fully funded it and got it done in South Dakota and it's being implemented today. I look forward to doing that at the federal level to make sure that people's data and information is safe, but also our country is safe from these bad actors that have a plan to take us out.

SENATOR ERNST: Well, thank you. My time has expired, but I do want to end on a note that another thing that I do truly appreciate about you and your nomination is that as a governor, you have worked with those local constituencies as well and those local governments, and I know that this will be an incredible strength that will ensure continued success for you within the department. So, thank

Page 74

that he's in charge of our nation's borders. So, I guess, again, I'd just like to go back to you. How are you going to work with Mr. Homan? What is the division there? I'm trying to get a better sense of who's in charge.

GOVERNOR NOEM: Yeah. Tom Homan is an incredible human being who has over 30 years of experience at the border and the insight and wisdom and he --

SENATOR KIM: Incredible experience, I get that. I'm just trying to think through decision-making process when it comes to your work. For instance, will he be giving orders directly to CBP, ICE, USCIS?

GOVERNOR NOEM: Tom Homan has a direct line to the President. He is an advisor to the President, the border Czar. I, obviously, will be if nominated and confirmed and put into the position of being the Department of Homeland Security Secretary and responsible for the authorities that we have and the actions that we take.

SENATOR KIM: I say this because I actually want to make sure that we're empowering the next Secretary of Homeland Security.

Page 76

you, Governor, very much. Thank you, Mr. Chair.

SENATOR PAUL: Senator Kim.

SENATOR KIM: Thank you, Chairman. Governor, it's good to see you.

GOVERNOR NOEM: Good to see you again too.

SENATOR KIM: Thanks for coming before our committee. I wanted to just ask you not just about your work, but how it's going to fit into the broader incoming Trump Administration and particular, I guess, I'm uncertain about roles and responsibilities regarding your position and Tom Homan's. I guess, I just want to ask you just point-blank who's going to be in charge of the border?

GOVERNOR NOEM: Well, the president will be in charge of the border. It's a national security issue, and the president is in charge of this country and has made a promise to the American people, and we will fulfill his agenda.

SENATOR KIM: Well, that was a good answer, it's the answer I would've given as well, but I guess I got confused. When Trump made the announcement about Tom Homan, he said, "I'm pleased to announce that Tom Homan," and said

Page 75

GOVERNOR NOEM: Yes.

SENATOR KIM: In the legislation that was codified by Congress and moved forward that started this after September 11th, said "All functions of all offices, employees and organizational units of the department are vested in the secretary." So, I guess the reason why I mentioned this is I've just seen some quotes from Mr. Homan where he said, "I'll be making decisions on border security and deportation." He was asked in another interview about the stronger role that he'll play, and he said, "Absolutely, I'll be making decisions on how we do the border."

So, I just raise that as a concern of mine because not only is that about the function of our executive branch, but also the capabilities of this committee to be able to properly do our constitutional duties for oversight. The ability for us to be able to have that conversation. We can talk to you, engage with you, that is the direct way, but if he is going to be making decisions, then he should come before this committee as well. And I know that that's something where, as far as I know, his

Page 77

20 (Pages 74 - 77)

role will be directly at the White House, is not something that will be under the purview directly of this committee. So, I just wanted to raise those concerns.

GOVERNOR NOEM: Yeah, yeah. Tom and I work very well together and talk and communicate all the time, and we'll be working together on a daily basis when we're in our positions under the new administration. And I would say there's no authorities being planned to be taken away from the department or myself if I'm in the role, and we'll continue to oversee CPP --

SENATOR KIM: But it sends some mixed signals. You can understand how people in my home state, maybe around the country, when they hear Mr. Homan saying, "I'm making the decisions." When they hear President-elect Trump say he's in charge of our border. So, I urge that we're going to try to do our best to try to make sure we're empowering the department, empowering the next secretary because that's where our laws are invested in our decision-making.

GOVERNOR NOEM: Yeah. Well, thank you Senator, and we'll make sure you have all the

Page 78

information that you need. And Tom working directly with the president and I working directly with the president, hope to help you get all that you need to reassured that the authorities will stay the same as they currently are, but we will continue to work to secure that border and make sure that we're working together in that way.

SENATOR KIM: I want to just switch gears about you raised the concerns about terrorism, especially foreign terrorist groups. I guess I just want to ask you, what are the major foreign terrorist groups that are... Well, first of all, what are the major foreign terrorist groups that are out there that we're tracking, which are the ones that are concerns to us in terms of potentially trying to inspire or coordinate an attack upon us? And if you can, just give me a sense of what their current capabilities are to try to enact that.

GOVERNOR NOEM: Well, I think we face a lot of threats, Senator, and since I'm not in the role today, I shouldn't get into specifics with you, but I think over years the --

SENATOR KIM: Well, you can at least

Page 79

get into specifics about what organizations that are out there. So, I just wanted to get a sense of your knowledge of the organizations.

GOVERNOR NOEM: Yes, sir. You have all the traditional terrorist organizations that have always threatened the United States, but I would also say --

SENATOR KIM: Such as?

GOVERNOR NOEM: I would say Hamas, ISIS, continuing down that path of those terrorist organizations. But we'll continue to also focus though not just on those, but also the cartels, their partnership with the Chinese and what they are doing. Listen, I've told people for years, for over 30 years, I've worked on national policy, on food policy, on agriculture policy, and I've seen the Chinese agenda to infiltrate our country, control our food supply chain, but also their manipulation of their currency and stealing our IP. And now I believe that this fentanyl crisis that they have flooded our country with is geared and the purpose of it is to kill our next generation of Americans. It is to control us.

SENATOR KIM: No, I don't discount the

Page 80

importance of those --

GOVERNOR NOEM: So, when you focus on one or two groups, I think it takes your eye off the ball as to where all the threats could come from. We just spent a significant amount of time talking about homegrown terrorism as well and about --

SENATOR KIM: Correct. And I'm glad we're having that conversation. But the reason why I mentioned it, I was not trying to quiz you or anything of that nature. It's just that when the Department of Homeland Security, when their threat assessment for 2025 lists three organizations, lists Al Qaeda, lists ISIS, in particular ISIS Khorasan, and the IRGC, and the threat from Iran, I just want to make sure that I get it. You're talking about the importance of the border. We all understand that we want to work with the incoming administration to try to have an orderly process with that. But I just want to make sure in particular with DHS, the primary mission, if we look at the founding legislation, the primary mission, the very first mission is prevent terrorist attacks within the United States and do everything we can to

Page 81

21 (Pages 78 - 81)

minimize that type of threat.

So, yes, I do think it's important for us to focus in on one, two, or three or just wherever these terrorist groups are at. Yes, yes, I know that part of that effort to try to minimize terrorist attacks is through the work that we try to do to secure our borders, all of them: air, sea, and land. But the primary mission still is about preventing terrorism, not just the border security. That's a tool to be able to accomplish that. So, I just raised that with you. I want to make sure that the next Homeland Security Secretary has a very detailed knowledge and understanding about the terrorist groups, their capabilities, and is tracking that on a absolute daily basis, and that they understand that is their top mission. And with that, I'll yield back to the Chairman.

SENATOR PAUL: Senator Johnson.

SENATOR JOHNSON: Governor Noem, welcome and thank you --

GOVERNOR NOEM: Thank you.

SENATOR JOHNSON: ... for your willingness to serve. You'll be taking over a massive federal government agency, 240,000

Page 82

employees. It's probably too massive. I think had I been there back then, I don't think I would've assembled these 22 different agencies in this massive department, but that's what we've got. It's a department that the previous administration, I think, has completely misused. Instead of using customs and border protection to do that, to protect our border and secure it, they've utilized those resources to incentivize a massive influx of illegal immigration. Instead of using the Cybersecurity Infrastructure Security Agency to do that, they instead engage in mission creep and utilized it to censor Americans with the misinformation board. I am concerned about disaster relief, just federal disaster relief in general, creating greater and greater and increasing levels of moral hazard resulting in higher costs of these disasters. So, let's cover each one of those kind of in order. How do you gain control over a massive agency whose resources and personnel have been misused? I mean, how do you root out those individuals who instead of securing our border opened it up and facilitated this?

GOVERNOR NOEM: Well, Senator, this has

Page 83

been a big topic of conversation in most of the meetings that I've had with the members of this committee was how do we fix this agency which the reputation is that it's broken and dysfunctional. I think that was the question I get asked the most is why would you want to head up such a dysfunctional department? And I would say that because the mission of the department is to secure the homeland and our people, it's our biggest vulnerability right now, and we have a president that's not enforcing the law, and I don't believe the law should be unequally applied. Everyone should be subject to our laws, and a nation without laws and without borders is not a nation at all. So, I will work by ensuring one of the things that Senator Ernst talked about, people have to show up for work.

I think there's going to be a majority of people who don't have their primary mission to secure the homeland, that if they don't want to show up for work, then maybe they're just not truly passionate about protecting America. I think they need to do that, and they need to recognize what their job is. The morale in DHS is very low. I'm going to let people do their

Page 84

jobs. I'm going to remind them what their jobs are. Some of these border patrol agents haven't been able to do their jobs for a very long time. They've been processing paperwork and facilitating an invasion when they should be back securing our border, which is why they were recruited and wanted to serve there to begin with.

We're going to build partnerships with local law enforcement, with ICE and task forces. So, we're communicating again with local sheriffs and mayors and law enforcement to partner together. When you talk about the fact that this is such a broken agency that needs so much improvement, a lot of it goes back to why we're recreated and are we fulfilling that mission and making sure that these individuals are getting back on task.

SENATOR JOHNSON: So, under my Chairmanship and under the Trump Administration, we did rename a part of DHS, so the Cybersecurity Information Security Agency. I in no way, shape or form ever contemplated that the sub-agency within DHS that was really focused on securing us against the cyber threats and other threats to

Page 85

22 (Pages 82 - 85)

**JA 184**

our infrastructure would ever be used to violate the Constitution the way it was used to violate the Constitution under the Biden Administration. This administration's been completely opaque. We do not have the information to know and the communication in terms of what all happened here. So, my question is relates to how they misused CISA. Will you commit to providing the transparency, providing the information, investigate it yourself, but provide this committee, my subcommittee, the information to expose the truth of the American public, but even more importantly, propose a piece of legislation based on our investigation, based on those results to fix it so that no administration can ever misuse the language of the law to commit that kind of unconstitutional act and violate people's First Amendment rights?

GOVERNOR NOEM: Yeah, Senator, I look forward to working with you on that. And I think what we saw during the COVID pandemic, the actions of CISA, their misinformation and disinformation campaign, the materials they were putting out was shocking. Shocking at what they were doing to decide what was truth, what wasn't,

Page 86

and how they were trying to manipulate the American people. We saw it in elections and Russia influence as well, and so ensuring that they can't do that in the future under any administration would be a priority, that they stay doing what they're supposed to do and hardening our systems and working with local officials to do that is a priority, and I'd look forward to working with you on legislation should you wish to rein them in.

SENATOR JOHNSON: So, the first step in that process is to expose the truth to find out who these backed actors were, expose who they were, hold them accountable.

GOVERNOR NOEM: Yes.

SENATOR JOHNSON: I mean, that is crucial that we take that first step. So, again, look forward to working with you on that. The tragedy of the California fires, the more we learn, the more we understand that not only was it predictable, it was predicted, which means it was preventable. Again, you can't prevent the initiation of those fires, but you certainly prevent them from raging into the tragedy that they became, the dozens of people who've lost

Page 87

their lives, the hundreds of billions of dollars' worth of property damage. It's not just California though. I mean, again, that was grotesque mismanagement, that could have been prevented. You can't prevent a hurricane, you can't prevent floods, but you certainly can try and start reducing the moral hazard that we've allowed to explode, quite honestly, by the federal government rushing in immediately, no questions asked, just tell us how big a check you want. What can you do in your new role to try and start reducing over time the moral hazard that we have created in this country with federal disaster relief?

GOVERNOR NOEM: Well, Senator emergencies and disasters are always locally led. They're led by the local communities and leaders, and that's because they're much more responsive and much better informed on how to bring relief and to get those emergency services there to meet the need. Then it's state supported and federally resourced, which means that when we come in that we're supporting what the mission is, what those emergency operations and plans are, that the local city and county, and then

Page 88

also the state has implemented and do what we can to fulfill the mission of our programs.

One of the things that FEMA's not doing today that I think we should be doing is streamlining communications. We saw this in New Orleans, we saw it in other terrorist attacks in the country, and you just referenced it as well about the American people not getting the truth, Senators not getting the truth and the transparency that we need is that I believe FEMA can always put out a blueprint for what a response would be should something terrible happen.

And when we look at the Secret Service, what happened in Butler, we saw that communication was an issue, that the Secret Service wasn't communicating, and balls were getting dropped with local authorities, local law enforcement, and we can put forward a blueprint for how communication can happen and be streamlined between the federal government, the state, and the local entities. So, that should something happen, this is how we talk to each other, to make sure that the public has the facts, they're not getting misinformation, which

Page 89

23 (Pages 86 - 89)

happened with the New Orleans terror attack just recently, but also up in Pennsylvania as well.

That blueprint is what we do at the state level that FEMA has failed to do, to proactively educate the public on what everybody's roles are, what we do should something happen, whether it be a natural disaster or a terrorist attack or an emergency response is needed, that we can put out those blueprints ahead of time, educate people, train those local entities, which they currently do to a certain extent today, but not good enough to really know that not only can the resources be pre-deployed in many of these situations so that they're more readily accessible, but also how are we going to communicate and make sure everybody's on the same page so that we can be much more efficient.

I wish that we would've had different leadership and a different governor in California, or we might have a different result there. But in the Department of Homeland Security, we can do all that we can to make sure that the people that live in California know that they're going to get a response from the federal

Page 90

government that's appropriate, and we did all that we could to make sure that they had the information ahead of time so they could protect themselves when they do have a failure in leadership like we've seen.

SENATOR JOHNSON:  Thank you and good luck.

GOVERNOR NOEM:  You bet.

SENATOR PAUL:  Since Senator Johnson brought up California fires, I have to interject here. We talked about burn policies, these are local policies, how we try to not have so much brush and things like that. They're also next to the largest body of water in the world, the Pacific Ocean. So, I see these homes all burning on the beach in Malibu, and I'm like, "Wow, if they just had a generator and a hose, you start sucking the water out of the Pacific Ocean." But you could do more than that. You could pump it and put it in cisterns up in the hills a mile or two in. It doesn't rain very much there, but why don't they take the ocean water, put it in cisterns and have a bunch of water ready when a wildfire shows up, but it's like once again, bad local government. Senator Gallego.

Page 91

SENATOR GALLEGO:  Thank you, Chairman. Thank you, Governor, for your attendance and I appreciate us meeting last week and our frank conversation. So, following up to our conversation, in recent years, I've been in very close contact with our Arizona border communities, which are unlike other border communities and about the funding needs to address migrant influxes through the shelter and services program or SSP. Without this funding border communities must bear all the financial burden for national immigration challenges and the broken border in general. So, that means police, fire, hospital systems in general, anything of that. And at the same time, they'll also face the potential challenges of street releases. And again, these are very small towns on the border, so having thousands of people being released becomes both burdensome security issues and just not fair to them. And we get lumped in with places like New York and Chicago about how they do their shelter programs.

Our shelter programs are not the same as New York and Chicago. We do not permanently put people in apartments or anything of that

Page 92

nature. We are trying to move people away from the border so that way they don't become a burden on these very, very small communities. So, I'm very highly concerned, as I told you in our meeting when the SSP program becomes politicized and to the point where we get lumped in with those programs, I don't think are effective and are actually counterproductive and it ends up depriving our small Arizona borders of these very, very vital funds that they need. So, as DHS Secretary, how would you ensure that border communities are not left to respond to and pay for these immigration influxes, the broken border system on their own? And when you commit to helping really not politicize or just join the SSP program to the point where places that are doing things correctly like Yuma, Arizona, like Pima County, like Cochise County, aren't lumped in with the people that are doing things incorrectly like New York State and Chicago.

GOVERNOR NOEM:  Well, Senator, thank you for the conversation in your office about the program, FEMA, the southern border, and the challenges and then also the difference between your state and how you utilize funds versus other

Page 93

24 (Pages 90 - 93)

states.  I would say that, my hope is that if given the opportunity to serve as secretary, that the federal government would no longer, and I believe as President Trump has promised the American people facilitate an illegal alien invasion and that your communities in Arizona would no longer have the issue with having people in your small towns and communities that you need to figure out how to take care of and get them to where they want to go in other places of the country.

The President has promised he will secure the border that we will uphold our nation's laws and that he will do that to the benefit and be putting America first again.  So, I know we talked extensively about the SSP program and how you've utilized it, but getting these programs back to what they were intended is important to FEMA as a disaster response agency, and some of the facilities that have been utilizing these types of funds and dollars need to be reevaluated and to make sure that it's truly doing the service that is upholding our nation's laws.

SENATOR GALLEGO:  And certainly, I

Page 94

understand reevaluating especially how some of these states have been using it and in an ideal world, we don't have to have a program like that because we don't have this mass of humanity that's coming towards our borders, but even under the first Trump administration, we actually still needed it also.  So, this is why my concern is to not get rid of this program because again, these small communities, I'm talking communities of maybe 10,000 people, maybe only six or seven cops are going to end up really bearing the brunt and we are not a big state.  We can't really compensate for these types of losses.  These small communities are also largely, you come from a rural state, counties that are largely rural and with a lot of federal land so that actually don't even have a tax base.

So, when the broken immigration system sends people to these borders and these communities don't have enough money to pay for cops, firefighters over time for hospital systems, it's that type of program that keeps these small communities afloat.  So, just want to make sure that again, this doesn't not become politicized and that we are kept separate from I

Page 95

think the mistakes that other states have taken on.  Moving on, in Arizona, we have large parts of the board, they run through tribal lands.  We have 22 federally recognized tribes.  We have great relationships with these tribes.  They want to be collaborative partners when it comes to border security.  And then we have some great programs that have worked in the past.  For example, the Shadow Wolves Program with the Tohono O'odham Nation is a really good example, collaborative program of tribal law enforcement that worked with DHS to make sure they stop human smuggling and cartels going through the borders.  But as DHS Secretary, what is your plan to consult with our border tribes and work together to balance both national security but also their sovereignty?

GOVERNOR NOEM:  Yeah.  Well, Senator, I believe that my experience as governor and my relationship with working with our tribes is going to be an incredible powerful tool for me to bring to bear at the Department of Homeland Security to work on how we secure our southern border but still respect their sovereignty and still be able to work with them.  This year, when

Page 96

looking at public safety issues that we had in South Dakota and their lack of ability to hire tribal officers on our reservations in South Dakota, I offered to train federal law enforcement officers, BIA officers, but also their tribal police in South Dakota at no cost to our tribes.  And it's been an incredible powerful tool that we've had to build relationships.  Those tribal police had the chance to go through academy with the local maybe deputies from the counties and the state highway patrol troopers that were coming on board, and those relationships have built partnerships in our state that we didn't have before.

The Shadow Wolf training opportunity is incredible.  That was down in Arizona that you spoke of too, and in looking into that program, I'd like to continue to build on that and perpetuate in the future so that our tribes have an opportunity to have a secure border but also have it reflect their values and their culture and have their own people be a part of the solution and then even when it comes to the infrastructure of the wall that we're respecting that and their landscapes and their land as well.

Page 97

25 (Pages 94 - 97)

So, I look forward to working with you as we move into this next administration to be able to protect our country and then work and respect our tribes as we do so.

SENATOR GALLEGO: Thank you. And the President Trump and some of his other potential staff and advisors have been very vocal about implementing a mass deportation strategy, talking to my agricultural community, my dairy community, they have concerns that this approach will lead to workforce shortages that will further drive up the costs of everything and something that we have really been working hard to cross, I think a bipartisan and a bipartisan manner to bring down the costs of everything and unfortunately this would reignite inflation. What is your plan to ensure safe and legal immigration processes for agricultural workers while protecting local agricultural operations, including those both of our home states?

GOVERNOR NOEM: Well, Senator, the President and President Trump has been very clear that his priority is going to be deporting criminals, those who have broken our laws and perpetuated violence in our communities. That'll

Page 98

be the priority. And as I spoke earlier with our statistics, having over 425,000 of those with criminal convictions in our country, that will be a focus that we need to tackle right away, and it'll be a big one. Beyond that, his next priority is going to be those with final removal orders and focus on those individuals who have long overstayed and that there is a consequence for ignoring our federal laws. Beyond that, we'll continue conversations. As you know, I'm a farmer and a rancher and come from an agricultural state and we'll work together to make sure that laws are followed. It is the Senate and the house that puts forward the laws. I as secretary uphold the law, so you determine what that is and debate and discussion. I'll be transparent and share as much information and insight as I have with my background and experience and continue to work with you.

SENATOR GALLEGO: (Indiscernible).

SENATOR PAUL: Senator Moreno.

SENATOR MORENO: First of all, thank you, Governor, for being here for testifying before this committee and for your service, not just to your state but to America. Nine years

Page 99

ago today, we met in probably the coldest day I've ever been in my life in Iowa --

GOVERNOR NOEM: Yeah, that's true.

SENATOR MORENO: ... as you and I were making phone calls and whipping up votes for Republicans in Iowa, my wife Bridget, who's here, got a chance to meet you and we left Iowa saying, "That person's really going to go far," and here we are nine years later, you've been an amazing governor, amazing Congresswoman, and now you're going to make an even better Secretary of the Department of Homeland Security. So, I think sometimes in D.C. we tend to complicate things. There is a current Secretary of Homeland Security, so why don't we take this opportunity to do a little job review and compare and contrast him to you. So, if you don't mind, I'll ask you some questions and you can give me an answer. Secretary Mayorkas allowed about, you said it, just about 400 people on the terror watch list to come into this country legally. If you were confirmed as Secretary of Homeland Security, how many people on the terror watch list would you allow into this country?

GOVERNOR NOEM: Well, Senator, we would

Page 100

work every single day until that number was zero. And if you look at the previous Trump administration over his entire four years in comparison to Joe Biden's number President Trump, it was 11 that were then removed from the country and faced consequences. When you look at the 382 that Joe Biden has let in and the policies continue, is shocking and needs to be changed immediately.

SENATOR MORENO: Mayorkas let in about 12,000 murderers, how many would you target to let into this country?

GOVERNOR NOEM: My goal every day would be to have no murderers allowed into this country and our communities.

SENATOR MORENO: Mayorkas allowed 16,000 rapists, how many would you target to let in?

GOVERNOR NOEM: Every day I'd work to make sure that there was none let into this country.

SENATOR MORENO: He let 600,000 -- Mayorkas, 600,000, people with criminal convictions, how many would you allow in?

GOVERNOR NOEM: We would work every day

Page 101

26 (Pages 98 - 101)

to make sure people are safe and that those with criminal convictions are immediately removed.

SENATOR MORENO: How many private jets would you have the United States taxpayers have fly into foreign countries to pick up people to bring them here.

GOVERNOR NOEM: Yeah. Senator, we will no longer be undertaking that mission at the Department of Homeland Security.

SENATOR MORENO: So, not 700,000 individuals on private jets over the last four years, you would not have any?

GOVERNOR NOEM: No. I'll be working with President Trump to put in place his agenda and adherence to our federal laws.

SENATOR MORENO: And how many illegals will you plan to house in luxury hotel rooms in Manhattan at a cost of $6,000 per month?

GOVERNOR NOEM: Sir, clearly, Senator, during this election, the American people said they did not support that and that that would not be a part of this new administration.

SENATOR MORENO: How about sex change operations for illegals, how many of those would you suspect you would fund?

Page 102

GOVERNOR NOEM: Senator, I believe that the Department of Homeland Security will be reevaluating its mission in this country to not allow that going forward under President Trump's goals.

SENATOR MORENO: And if you had any legal migrant that was in this country and they committed a crime, would you offer them airfare from one state to another to evade law enforcement?

GOVERNOR NOEM: Sir, I will be following this nation's laws and the Constitution and make sure that all laws are adhered to.

SENATOR MORENO: And if you had been the head of the Department of Homeland Security a year or so ago, would you have closed a detention center in Georgia that would've allowed the release of somebody charged with a crime?

GOVERNOR NOEM: Sir, I don't have the specifics to that situation, but certainly that would not be something that I would want to have under my watch.

SENATOR MORENO: So, just to be clear, Laken Riley would be alive today if you had been the Secretary of Homeland Security?

Page 103

GOVERNOR NOEM: Oh, Senator, my hope is that that would be true. Yes.

SENATOR MORENO: Let's switch to another part of the disgraceful immigration laws that Biden and Mayorkas, who objectively, by the way, objectively, has been the worst cabinet member ever in the history of the United States of America. Let's talk about temporary protective status. Temporary being the operative word. Mayorkas and Biden just extended temporary protective status again through 2027. Will you continue to corrupt TPS to allow some sort of open borders agenda and will you use hot weather of 80 degrees and sunny beaches in El Salvador as a reason why people have to stay in America and not safely return?

GOVERNOR NOEM: Yeah, Senator, this program has been abused and manipulated by the Biden administration and that will no longer be allowed to allow that and these extensions going forward the way that they are, the program was intended to be temporary and this extension of over 600,000 Venezuelans as well is alarming when you look at what we've seen in different states, including Colorado with gangs doing damage and

Page 104

harming the individuals and the people that live there.

SENATOR MORENO: And in terms of our border, like the physical border, I've been there many times. You've been there many times. Who should be in charge? Who should have operational control of our border? The United States government or the Mexican drug cartels?

GOVERNOR NOEM: Oh, Senator, the United States needs to control our borders and secure them.

SENATOR MORENO: So, if this were a job interview in the private sector and you had somebody like Alejandro Mayorkas in charge and we had the opportunity to upgrade to you, this would be the greatest upgrade in history of the United States of America. But I'm going to end my time with a startling statistic and actually a challenge to the Democrat party. When Mayorkas was confirmed, every single Democrat voted to confirm him, and six Republicans joined all 50 Democrats in that confirmation. If we get to the vote, and hopefully Chairman, we could do that Monday, because we cannot wait one single day without you being in charge of that department.

Page 105

27 (Pages 102 - 105)

We should have 100 percent; 100 Senators vote for your confirmation.

This will be the litmus test in my mind as to whether we have a Democrat party that's actually serious about doing bipartisan things like securing this country and protecting our citizens. Any Democrat that voted for Mayorkas that does not vote for you should be in front of their voters and removed from office. Thank you for serving, Brian. Thank you for being here, for putting up with the nonsense that you guys have had to put up with over the years. You are going to make an amazing Secretary of Homeland Security. Thank you for being here.

GOVERNOR NOEM: Thank you, Senator.

SENATOR PAUL: Senator Slotkin.

SENATOR SLOTKIN: Thanks for being here and thanks for our time in my office, Governor. I'm a former CIA officer, joined right after 9/11 and served three tours in Iraq alongside the military. I'm actually the first CIA officer in the Senate and to me the most important thing again as a Democrat from a state that Trump won, right, on the same ballot we both won. I understand we're going to have different policy

Page 106

opinions. I certainly understand that the President or incoming President has the right to nominate whoever he wants. Those are not the issues for me that I'm going to spend my time on. The ones that I care about the most relate to the mission of the organization when it was founded, protecting the homeland, and I think to me, it's one thing when there's campaign rhetoric or political politicization of things, everyone does that on both sides of the aisle in this committee and in our line of work, but when it comes to actually protecting the country, you do have to be clear and honest about facts and not conflate things.

So, it's just important to me that I know, particularly since you do have one of the intelligence agencies within the Department of Homeland Security, that you're going to call a spade a spade, right? The most recent acts of domestic terrorism in New Orleans, horrible incident in Nevada had nothing to do with migrants. Correct?

GOVERNOR NOEM: Correct.

SENATOR SLOTKIN: They were homegrown American citizens. One of them was actually in a

Page 107

very elite military unit. I mean, it's horrible. It's one of the hardest things to catch the sort of lone wolf, radicalized American citizen, but I want to protect ourselves. Our most recent examples of domestic terrorism we're not what we've spent the majority talking about today, crime from a migrant, and I don't dispute there is crime, but I just want to know and I want to hear from you as an intelligence officer that you're going to speak about real threats and not blow something up, politicize something, make something more exciting because that's maybe what the President wants to hear, but your mission to protect and defend the Constitution means calling honestly what the threats are to the country. Can you just give me a yes or no, please?

GOVERNOR NOEM: Yes, Senator. I will be as transparent and factual every day with you and the American people as possible based on the information that I have. I don't know if the investigations are closed in New Orleans and in Nevada, but what we know so far and needs to be relayed to the American people, needs to be the truth and facts.

SENATOR SLOTKIN: Yeah, I'd ask that.

Page 108

We've talked a lot about border security. As a CIA officer, I think one of the only people on this committee who's actually worked on protecting the homeland. I'm a Middle East terrorism and militia expert by training, so I believe deeply in it and every country of the world gets to decide who comes inside its borders. That's not a radical concept, but I think I've been open with this committee that it is also on us to fix the deeply broken legal immigration system. I'm glad to hear that you're going to carry out the laws on the immigration system. Democrats and Republicans are to blame that we haven't fixed this system, but I also believe you can't fully control the border unless you give people that we need for our companies, for our economy a legal vetted way to come here. So, do you believe in legal vetted immigration and that we need more of it in the United States?

GOVERNOR NOEM: I do believe we need to follow our legal immigration laws and that it needs to be vetted. We need more resources, I believe in some of the elements of this to ensure that we're --

SENATOR SLOTKIN: Do you believe that

Page 109

28 (Pages 106 - 109)

our economy depends and needs some level, just like your family came from Norway and on economic drive and wanted a better life --

GOVERNOR NOEM: Well, immigration's always been a part of our history and will be a part of our future. We just need to make sure that we're adhering to our nation's laws, which this body has the ability to --

SENATOR SLOTKIN: I'm with you, I'm with you.

GOVERNOR NOEM: ... continue to change and to put in place.

SENATOR SLOTKIN: Again, going back to the fact that you will pledge an oath to the Constitution, not to President Trump. Just like every other nominee, President Trump said in November that he's willing to use law enforcement, National Guard, or even active-duty military to go after the threat from within the United States. I don't know exactly what he was talking about, but we have recent examples from your predecessors at DHS where federal law enforcement were sent into a state, in this case Oregon without coordination with the governor. Those federal law enforcement officers at the

Page 110

time were putting down threats to federal buildings and they were legitimate threats. I don't dispute, there was destruction of property going on during a bunch of protests and riots, so I don't dispute that. But they weren't wearing insignia. We talked about this. They weren't wearing any markings, so people were arrested by folks in fatigues with no names, no idea who they were, like right out of a bad Hollywood movie. Okay. If the President asks you to send in federal law enforcement to a state without coordination of that, Governor, would you support that action?

GOVERNOR NOEM: Senator, my job, if nominated, and sworn in as Secretary of Homeland Security, is to uphold the Constitution and to uphold --

SENATOR SLOTKIN: So, you will push back --

GOVERNOR NOEM: ... the rules of this country. Yes, that will be the oath and the pledge that I will be making. And my goal also is to work with you to ensure that we have situations that are always appropriate, that we are well-defined on who we are --

Page 111

SENATOR SLOTKIN: I just to know you're a former governor, you can imagine that if Joe Biden sent in 700 federal law enforcement under Secretary Mayorkas without coordinating with you, I think we can agree you'd be a little upset. So, I just ask that you give the same respect for coordination and that we are very sensitive. People are worried about politicizing of law enforcement and the uniformed military. That's a bad thing. I hope we can agree. Lastly, I will just say, look forward to looking at the northern border, the Gordie Howe Bridge, your help staffing that. We know you are right now across many administrations, we haven't met our staffing goals at DHS and that's a problem, so we really want to make sure that opens on time.

But I also want your assurances. You received FEMA assistance from Joe Biden's administration, right? You had historic floods. You asked and requested of the administration, and you were given millions of dollars to help with that. I understand you don't like Gavin Newsom, but can you say in front of the American people that you will open the books to this committee who does have oversight over FEMA, that

Page 112

you will open the books in a bipartisan way to ensure whether it's North Carolina or California or anywhere in between, that the American people can know that you are not playing politics with disaster assistance?

GOVERNOR NOEM: Yes. Senator, I'll work with you in this committee to make sure I'm following the federal law and ensuring that you have information and transparency from us and from DHS and FEMA.

SENATOR SLOTKIN: Thank you. Appreciate it. Yield back.

SENATOR PAUL: Senator Lankford.

SENATOR LANKFORD: Governor Noem, great to see you.

GOVERNOR NOEM: Great to see you too.

SENATOR LANKFORD: Thanks for being here. Thanks for accepting this nod that the President has given you. For, Brian, thanks. Both of you, you've walked through a lot. I have had the privilege of knowing you for a very long time since we served together in the House of Representatives, so I have the benefit of knowing your qualifications and how strong you are in all these background issues and how hard you work on

Page 113

29 (Pages 110 - 113)

these things because I've seen it firsthand. So, I appreciate you stepping into this because a lot of attention across the country will be focused on this. You know that full well and you've stepped into it. For Governor Landry, my state and many folks in my state are praying for you and for your state. You've done a great job in leadership at this moment in a very, very tough time for Louisiana, and we don't want to see acts of terrorism anywhere in our country and it's incredibly difficult days for a governor, so thanks for your leadership on that as well. I also have to tell you, Kristi, I've whined to my wife occasionally about the temperature that's coming on Monday. I'm very excited about Trump's inaugural, but we're all going to be sitting outside in about 12 degrees. And I thought just for fun, I would check South Dakota on Monday, it's one, for a high, for a high.

GOVERNOR NOEM: Yeah, for a high.

SENATOR LANKFORD: And so, I'm going to stop whining about the temperature Monday here in Washington, D.C. on it. Look, I'm going to run through a couple of things here because I know you, not everybody in Oklahoma knows you. The

Page 114

questions that I get from people though in Oklahoma, I want to be able to run past you because they want to be able to know the answer to these things, so I'm just going to blitz through a whole bunch of them. Will you use the legal authority that DHS already has to be able to close our border?

GOVERNOR NOEM: Yes, Senator. I will work with President Trump to ensure that we're securing our border.

SENATOR LANKFORD: Thank you. There's a lot of things that this Congress needs to do, has already been mentioned by Senator Slotkin as well, that we need you to be able to close loopholes to be able to give you additional authority, but there's a tremendous amount of authority currently not being used in Oklahoma, as you're saying, is that about to be used? And they'll be grateful to be able to hear that. No other President has ever created a phone app to be able to facilitate a faster processing of aliens in, called the CBP One app. It's been mentioned several times here. Will you use your authority to stop facilitating faster processing of illegal aliens into our country with the CBP

Page 115

One app?

GOVERNOR NOEM: Yes, Senator. We will eliminate the CBP One app, maintain some of the data that's in it that's critical to knowing who's in our country, but that app will no longer be in use.

SENATOR LANKFORD: Thank you. No other President has ever used the parole authority, just in general, humanitarian parole to facilitate faster processing of aliens into our country, which leads to the catch and release we've all heard about. So, the Oklahomans that I talked to say, "Are we about to end the abuse of parole and end catch and release? Is that about to stop?"

GOVERNOR NOEM: Senator, President Trump's been very clear that he will end catch and release.

SENATOR LANKFORD: Terrific. Folks want to know, will you use your authority with the funds that are given to you by Congress to actually build more wall rather than use the funding that's given to you as the Biden administration did to do environmental remediation around the border rather than actual

Page 116

border wall and border structure?

GOVERNOR NOEM: Yeah. Senator, President Trump has been clear that he wants to build the wall.

SENATOR LANKFORD: So, do we. So, will you use your authority to be able to scan more vehicles and obviously we've got to get you the funding to be able to do this, to be able to scan more vehicles and individuals that are carrying Fentanyl into our country through our ports of entry.

GOVERNOR NOEM: Yes, Senator. We will continue to use technologies but hopefully be able to use more with the resources that were granted to scan those vehicles and know what's coming in and out of this country.

SENATOR LANKFORD: Last year, FEMA employees during disaster relief were instructed by one of their supervisors that if they see a Trump sign or a Trump flag flying to skip that house, to not stop by there and tell them what their federal government can do for them. Will you allow FEMA employees or any within DHS to politicize their role and to pick and choose who gets help and who doesn't as an American?

Page 117

30 (Pages 114 - 117)

GOVERNOR NOEM: Senator, under President Trump's administration, disaster and emergency relief will not be handed out with political bias. Every American will be responded to and treated equally.

SENATOR LANKFORD: That's what folks want to know. Will you review the Secret Service responsibilities to be able to go back through it and to say, are they focused on their primary mission or is there something you could distract? Secret Service still chases down financial crimes, they're still chasing down child exploitation. Those are serious things for Treasury or for FBI to do, but there's a question is if that's the first priority for Secret Service?

GOVERNOR NOEM: Senator, the Secret Service is in need of dramatic reforms. They do have a protective detail element that is their priority and also an investigation side. My understanding is that that investigation side is often used to train the protective detailed officers, but clearly, they are not focusing on what their true duty is, and it needs to get back onto what they were created for and that was the

Page 118

protective detail, mission, and emergency situations that they need to help plan and prepare for and defend.

SENATOR LANKFORD: Thank you. This committee made a request to the Secretary of Homeland Security last year, and by the way, also the head of the FBI to be able to come before this committee and to do what every Secretary of Homeland Security has done for the last 20 years, every single year, unbroken until last year. And then the secretary refused to come before this committee in an open session and talk about national threats. Now, the former Chairman protested strongly to the Biden administration and DHS, they weren't coming, but they still refused to be able to come. Will you come before this committee and talk about the threats openly so the American people can hear them in a public forum?

GOVERNOR NOEM: Yes. Senator, Senator Peters, and I discussed this quite a bit in our meeting as well, and I have committed to come and give that briefing to this committee and to the American people.

SENATOR LANKFORD: Thank you. We need

Page 119

that. Let me tell you another challenge we've had with Homeland Security in the past four years. When we ask for data and for information, we get, "I'll get back to you on that." When we ask again and again and again and again, we get the same statement, "I'll get back to you on that." Now, I can go down the street to the command center, where they actually get the data in live, and they have it up on big screens and they're tracking exactly what's happening on the southern border to the minute, but if I ask for what happened last month, they'll say, "We're still gathering that data." We're not asking for anything other than what Congress is supposed to get. That's the ability to be able to see data and to have real oversight over DHS and that has been a failure of this DHS along with multiple other issues on that. When we request the data for basic things like, how many special interest aliens were allowed across the border.

If it was last year, we had to find out on our own. It was 70,000 people that were targeted by this administration as a potential national security risk that were not just found at the border that were released when they were

Page 120

found at the border. 70,000 people just from last year in the country right now that this administration declared at the border, they're a potential national security risk. Now, I know you're not going to do that, but when we ask for the data and for the information, when we say, "How's the National Vetting Center working?" Do you have the connection to be able to screen individuals there? We're just doing our oversight responsibility. You've served in Congress before and did a great job on that and did oversight. We want to still be able to do the same thing. Will you provide data to this committee so that we can cooperate with you to help?

GOVERNOR NOEM: Senator, I will follow the law and be transparent with you and allow you to do the due diligence towards oversight that you're tasked with.

SENATOR LANKFORD: I have absolutely no doubt about that, Governor. I have absolutely no doubt, looking forward to you serving in that role.

GOVERNOR NOEM: Thank you.

SENATOR LANKFORD: Thank you.

Page 121

31 (Pages 118 - 121)

GOVERNOR NOEM:  Thank you.

SENATOR PAUL:  Well, congratulations, Governor Noem.  You are almost done.

GOVERNOR NOEM:  Okay.

SENATOR PAUL:  We've been through a lot of questions.  I think you've handled the questions very well and I'm ask a couple of questions, and I think the ranking member has a few and I think we'll be done very shortly.  I think a lot of Americans, including some conservatives misunderstand the First Amendment.  They think the First Amendment says that "Facebook has to publish my opinion," or, "The Wall Street Journal has to publish my opinion," or "We need to force them to be fair."  That's not what the First Amendment's about at all.

The First Amendment really doesn't apply to telling private companies what we can or cannot say.  YouTube censored me and I despise their policy.  They actually took down speeches I made on the floor, but really, I don't have a legal recourse other than I can complain about YouTube being unfair and not hosting both sides of an issue.  However, with the government though, there is a rule.  The First Amendment

Page 122

specifically says, "Congress shall pass no law banning or abridging speech," and this is what really got us worried about what, not only the FBI was doing, but the Department of Homeland Security actually meeting with these companies.

SENATOR PAUL:  ... on a weekly basis.  And imagine the chilling effect of this, imagine that there are cameras here, that they're going to end their filming of this interview and then decide, "Well, what she said or what he said really was misinformation, and we should edit that out."  Can you imagine?  It's just hard for me to imagine that the media has not, which once defended the First Amendment, hasn't been in more of an uproar over the government meeting with the media to decide things.  Some of this we didn't know, and then Elon Musk bought Twitter.  People asked him, they said, "Well, you've paid $44 billion for Twitter.  Isn't that too much?"  And he said, "I paid $44 billion to defend free speech."

And it's been an amazing service, not only to open up the forum to more viewpoints, but to point out what the government was doing.  In this last week, we heard from Mark Zuckerberg,

Page 123

who said that the pushiness, the coerciveness of government meeting with them was unprecedented and that they pushed back.  But he also said worse than them just sort of telling him he should restrict speech; they also threatened him.  They threatened to come after him through antitrust law, they threatened to remove parts of Section 230 of the liability protection.

Just to imagine this bully nature of government, and I know you're opposed to that, but if you're confirmed and you're in a position of saying, "We're just no longer sending people to meet with media," and the way I describe it is to talk about constitutionally protected speech.  Because some will say, "Oh, well, what about pornography or what about child trafficking?"  Those are illegal.  Those are not constitutionally protected speech.  You have every ability to meet with that.  But for constitutionally protected speech, will you tell us in America that you will no longer be sending government agents to meet with the media?

GOVERNOR NOEM:  Yes, Senator.  I'll work with you to ensure that civil rights and liberties are protected and that we are not in

Page 124

the misinformation and disinformation space like the current DHS is.

SENATOR PAUL:  The only other thing I would ask on this basis is we will send requests, we sent requests previously, sometimes, and often bipartisan requests, for information.  The Twitter files, Michael Schellenberger, Matt Taibbi, Bari Weiss did a great job of showing what was happening in Twitter and how they were cooperating with government.  I think the other investigation that needs to occur is who are the people in government they were talking to?  Do they still work at DHS, and can we make sure that they're not in a position of authority?

And this is not something I'm going to tell you to do.  It's just a request that you have your own investigation, that you have people who work for DHS to say, "We are going to look for people who are bringing their political bias to work and trying to influence speech and restrict speech based on their bias and help us in rooting that out and making sure that these people never again have that responsibility."  Because I don't think there's ever been anything like this as far as the restriction of speech,

Page 125

32 (Pages 122 - 125)

and I think the election is largely going to stop and tilt things the other way. But will you help us by looking internally for those who are trying to restrict speech?

GOVERNOR NOEM: Senator, I look forward to working with you on that mission.

SENATOR PAUL: I don't have any other questions now, but I think Senator Peters and Senator Blumenthal, and we'll see how it goes. We're going to start with Senator Peters with one more five-minute round.

SENATOR PETERS: Yeah, I'll be fairly brief. We've had opportunity to talk at length about many issues, and again, I appreciate that, Governor. I just want to stress going forward, and we've heard a lot of comments here, I think there's been a fair amount of political theater. Not as much as I know exist in other committees, and I've always strived, and I know ranking member or now Chairman Paul share the notion that we want to be a fact-based committee and try to find tangible solutions to the tough problems that we face, and data is important. We've heard a lot of numbers being thrown around here, and I don't have time to go through and challenge those

Page 126

numbers. Some of them we don't even know where they came from. I don't think that's helpful to the very important mission of confirm that you're going to be dealing with. So, I hope in the future, that we're actually dealing with facts.

You've mentioned many times that you do want to deal with facts and real data. And again, we heard a lot here that's not real data, and we should not operate that way. And if confirmed when we move forward, I'm going to look forward to working with you based on the facts and understand where the real threats are, how we need to appropriate resources to make sure we're meeting those threats.

And let's take this hyper-partisanship out of such an important issue of homeland security. We have way too much partisanship in this country, and it's resulted in a polarization of people here. We've got to come together as this country, we've got to lock arms and understand that we're all proud Americans, we all want to do what's best for the American people and solve the issues that are before us.

So, in that spirit, and certainly you've communicated that spirit to me, but in

Page 127

that spirit, I hope if confirmed that is exactly what you will be bringing to this office, and let's move away from this toxic political environment that we have in the country and celebrate what's great about our country in the spirit of bringing the American people together.

So, I have one question before we turn it over to other members. As a member of this committee, as well as the Armed Services Committee, I've focused a great deal on the safe integration of drones in our airspace while addressing the growing threats that drones possess. We certainly see what drones are doing in changing the face of warfare, whether it's in Ukraine and other battlefields around the world. We are very concerned about the weaponization of those drones and what it could mean to the security here in the United States. I've proposed comprehensive legislation to extend authorities beyond just the FBI and DOJ and Homeland Security to local law enforcement.

You mentioned in your comments about security for the Super Bowl, which is incredibly important, but we have to remember that that threat exists for all games. In fact, one of the

Page 128

biggest supporters of my legislation is the NFL. In fact, we just had a recent playoff game that was delayed because of drones that flew into that playoff game. We are very concerned that you could have a drone with a grenade or an explosive device, which would be absolutely catastrophic. It's absolutely essential that we address this threat. What we're seeing around the world and what we're seeing in daily activities should be a concern. I think this is just a matter of time. It's not if, it's when, and we need to be on the front end of that.

And with that in mind, I want to remind folks that Congress just recently extended critical counter-UAS authority, counter-drone authority only for a short-time basis for the 12th time. We only do these little, tiny short-term extensions, and we aren't dealing with the problem comprehensively as we should, and those are going to expire on March 14th, a very short time from now. And so, my question for you, Governor, is if confirmed as DHS Secretary, will you commit to working with me and my colleagues to pass durable, long-term authorities that will protect this country from what is a real threat,

Page 129

33 (Pages 126 - 129)

and it's just a matter of time? And I don't want to have a horrible incident occur, and people wonder why we didn't take action beforehand. So, please address that.

GOVERNOR NOEM: Senator, I look forward to working with you and this committee to address the threats we may face and the usage of drones in this country in relation to our national security interests and our homeland security interests. So, thank you for bringing up the conversation today, because it is one of the areas within DHS that we have a responsibility to address in cooperation with Congress.

SENATOR PETERS: And my first comments on bringing people together, please comment on that.

GOVERNOR NOEM: Oh, well, thank you, sir. Yes, no.

SENATOR PETERS: I didn't ask that question, but in my 24 seconds left.

GOVERNOR NOEM: I'm looking forward to working with everyone, Republicans and Democrats and everyone else in between, that in this country that is focused on keeping America safe and secure for our future. I would just point,

Page 130

Senator, to my background and my history. When I came to Congress, I worked with Republicans and Democrats on both sides of the aisle on many pieces of legislation and was very happy to do so and focus on priorities on where we could agreement, knowing we may disagree on some issues, but there was areas where we could keep the federal government accountable and do due diligence by the people that pay their taxes and get up and go to work every single day. As governor, as well. I was governor for every single person in the state of South Dakota, and they were my number one priority, and everyone knew there that it didn't matter if you were Republican or Democrat, that my focus was on them and keeping our state thriving and free.

So, I look forward to continuing the work that I always have to be coming up with solutions and in a bipartisan manner, and hopefully, my visits to your office and conversations reflected that and my intention on how I would conduct the role as the Department of Homeland Security Secretary.

SENATOR PETERS: Got a brief follow up to that.

Page 131

GOVERNOR NOEM: Sure.

SENATOR PETERS: So, it's data and facts that we can all agree on that drive our policy and not political theater. Would you agree?

GOVERNOR NOEM: Well, certainly, sir. We need to be addressing facts and information rather than political theater. We also need to speak truth to facts. So, I think it's important that we're willing to confront our challenges head on and have those conversations. And you'll see me back at your office door very soon to continue our work together.

SENATOR PETERS: Very good. Thank you.

SENATOR PAUL: And I want to second basically what Senator Peters has said. On records requests, I've told him, and I plan on it, it's going to be administration of my party, that if he wants records and there are legitimate records, we're going to sign requests together, and we'd like to get the records. It also helps, though, and I think Senator Lankford mentioned this, is you ask a question, not you, but to the administration or any administration, they're like, "Oh, yeah. We'll get back to you on it."

Page 132

Many times, I've even asked in advance, and I would suggest that we ask you in advance together, we ask in advance, "If you're coming in a month, we say we want this data. Be prepared to talk about it." And if you are, you'll have many more friends on both sides because what usually happens, and that's why I don't like springing the question. If it's a technical question that needs data, we're going to tell you in advance, at least I will, and we want you to come prepared with that.

And that goes a long way, because really what happens is we get stiff-armed. They say, "We'll get back to you," and we have no way to force you, really, other than we could cut the money off, and nobody ever does that. But you'll have 200,000 people working for you. By goodness, send your experts out, scour the records. And it is true, facts are difficult, and sometimes, there's different spins on the same set of facts, but I think that will help.

On the drones, I think we need more facts. So, I'm more than willing to work with the ranking member on doing something on drones, but I don't want every sheriff out there shooting

Page 133

34 (Pages 130 - 133)

up in the sky at stuff. We got to figure out and we got to get the truth about do we really have drones everywhere flying all the time? How many of them are planes? How many of them are drones? And let's go through this, and then let's figure out, and then let's talk about how we bring drones down. If we interrupt and collect a lot of cellular signal through that, are we doing it with a warrant? What are we going to do with all the Americans' data that we've collected to take down drones? If we have to take a whole cell towers worth of data, there's a lot of innocent people's data is going to be collected in that. Is that being gotten rid of? So, I think there are ways we can get to the right place. Everybody, obviously nobody wants drones coming down.

The only other thing I'd add on drones before I turn it over to Senator Lankford is look, I'm all for the NFL being protected and the Super Bowl being protected. They need to pay. They are a very rich organization. They want drones flying over in New Orleans. I'm all for it. The NFL ought to pay the government if the government's doing it, or we ought to have

Page 134

private contractors doing it, but they shouldn't just get it for free. Senator Lankford.

SENATOR LANKFORD: Thank you. Thanks, again. As Senator Paul will remember on this, there used to be a public facing website that all Americans could actually get the data, what's happening on the border, what's actually moving, and then when the numbers got bad, that seemed to disappear, and then we couldn't even get the data anymore. So, I look forward to actually finding ways to be able to have everybody has the ability to be able to see some of this data as well on it.

There's a reason that the DHS Secretary is the very first week of nominations. This is a really important role, and it is a non-partisan role. It is a national security role, and we're grateful that you've stepped into this, but it is important that we actually get you on the task to be able to make sure that it's out there.

You mentioned earlier in your testimony that we do have a morale problem at DHS right now, and I think a lot of that is because people that signed up to be federal law enforcement to be able to protect the United States of America

Page 135

have felt like they've been sidelined, and they've not been able to do their job that they really signed up for. And what I'm hearing from you is you're going to allow them to do their job again, what has been historically true for a long time, that federal law enforcement is there to actually help protect the country and the citizens and those communities, that you're going to allow them to do that, and that's helpful.

So, I have two quick things that I want to be able to mention on this. One is right now, just in the structure of this, and we can talk about this a different time, but CBP facilities that are along the border are really run by a different entity called GSA, and they're not allowed to be able to do updates on their facilities or to design their facilities. Somebody who lives 3,000 miles away and who doesn't actually do border patrol work, they actually design and oversee their facilities. That's a problem that we've got to be able to fix.

So, we've worked to be able to give more flexibility to CBP that when they have difficulty and challenges there, they have the

Page 136

ability to be able to make those changes. But I'm not going to ask you to make a commitment to this, because this is just one of those detail areas, but will you commit in the future to working with us, that this committee and you can work together to be able to figure out how the folks that are on the field can actually make decisions about the facilities they work in?

GOVERNOR NOEM: Yeah. Senator, I commit to working with you on that issue.

SENATOR LANKFORD: Terrific. And then I had a constituent in Oklahoma that is a hunter, like you are, like I am. He had a bag that he had some additional rounds that were in his bag that were left over from a hunting trip months before. He packed his bag, went on a vacation trip overseas, went through security with his bag. When he got overseas and then left and came back, they scanned his bag and said, "You have bullets, you have rounds in your bag," and he had I think five that were in his bag, that he didn't even remember were left over in an outside pocket from a hunting trip before.

Well, they promptly put him in jail and held him there and detained him there. Now, we

Page 137

35 (Pages 134 - 137)

worked through all the process to be able to get him back. My question is that same bag went through TSA security in my state before it went through security overseas. And so, one of the questions that I've asked is why were those rounds picked up there and not here?

Now, we don't have the full answer to that yet, but that's just one of those TSA questions that we need to have. Americans right now are on planes all over the country, and they count on a certain level of security when they go through that process. So, in the days ahead, will you work with me to be able to identify what are the challenges that we still face with the screening process and to be able to correct those for the security of all Americans?

GOVERNOR NOEM: Yes, Senator, I will work with you on that.

SENATOR LANKFORD: Thank you.

GOVERNOR NOEM: I was surprised TSA didn't come up more today, but that is an area in need of reform as well, and I look forward to working with you there.

SENATOR LANKFORD: Look forward to that. Thank you. I yield back.

Page 138

SENATOR PAUL: Government needs a healthy dose of common sense. Bullets in your bag. I had a guy with bullets in the back of his pickup truck coming back from Mexico. We arrested him and took his truck, and only because the Institute of Justice fought for him for three years that he get his truck back. That's crazy, the things we do. Let's have some common sense, and hopefully, someone overseeing it will allow that. Senator Blumenthal, you're going to finish us up.

SENATOR BLUMENTHAL: Thank you, Chairman Paul. I'm the last of your questioners, so that means I get unlimited amounts of time.

GOVERNOR NOEM: Okay.

SENATOR BLUMENTHAL: Not really. Not even close. I want to sort of continue the emphasis on bipartisanship and most especially on immigration reform. What this nation needs is comprehensive immigration reform. We know about the need for more H-1B visas and other kinds of extensions of the visa program that enable the United States to have more workers that are desperately needed in certain areas of our country. We know that there has to be better

Page 139

border security, generally. We know we need to provide some kind of path to earn citizenship for a lot of the undocumented people in this country, and we know it's possible, because we did it in 2013.

The United States Senate, as you will recall, passed a comprehensive immigration reform measure. Overwhelmingly, it was bipartisan. I was proud to be a part of it, going through the Judiciary Committee, but obviously it will involve Homeland Security, and I hope that we can continue, as Senator Lankford was a part of the effort in the last session to expand on those efforts and move forward on a bipartisan basis toward bipartisan comprehensive immigration reform.

I want to talk to you a little bit about domestic terrorism, which we discussed during my previous round, and I know you've discussed it afterward, including not just migrant crime and radicalization by ISIS, which are real and present problems, I also want to ask you about domestic terrorism events unrelated to groups outside our borders. We've seen a rise in antisemitism in this country. It has spiked

Page 140

beyond any prediction, and I want to know of your concern with antisemitist, racist events, Charlottesville, Buffalo, Pittsburgh, there's a shorthand for these violent terrorist acts against people in the United States.

GOVERNOR NOEM: Yes, Senator, I'm very concerned about what we've seen in this country as far as antisemitic violence that has happened. In fact, last year during our legislative session, I brought legislation to more clearly define it so that we could fight it in our home state. And I'm hopeful I can work with you to continue to do what we can to make sure that we are addressing this rising threat and not facilitating it in this country.

SENATOR BLUMENTHAL: And I just want to make sure that when you say we're protecting Americans against terrorism, that we're protecting all Americans, including people in mosques, in churches, in synagogues, people regardless of their worship, their race, their background. We need to protect all Americans from antisemitism, racism, Islamophobia. I hope you'll commit to that effort.

GOVERNOR NOEM: Yes, correct. Thank

Page 141

36 (Pages 138 - 141)

you, Senator, and I look forward to working with you to do that.

SENATOR BLUMENTHAL: In my closing minute-and-a-half, I just want to call your attention to an effort that I've led to help reunite children with their parents, children who were separated as a result of the so-called family separation policy. In the last administration, I have introduced a measure called Keep Families Together, not only to limit separation of families at or near ports of entry, but also the Families Belong Together Act for several Congresses to help bring the children, the kids who were victims of this policy and who still are not back with their parents. I hope that you will support that kind of effort.

GOVERNOR NOEM: Senator, the Trump administration never had a family separation policy. They had a zero-tolerance policy, which said that our laws would be followed. What I'm alarmed by is the over 300,000 children that went missing during the Biden administration. And when we talk about children and what they're potentially facing as far as victimization in this country and the trafficking that's going on,

Page 142

to keep families together. We will uphold our law, and we'll make sure that we're doing everything we can to keep our children safe from the trafficking and the drug epidemic that's hit this country.

SENATOR BLUMENTHAL: I'm going to end on an optimistic note and say I take that as a yes.

GOVERNOR NOEM: Yeah.

SENATOR BLUMENTHAL: Thank you, Mr. Chairman.

SENATOR PAUL: Thank you for your testimony. The nominee has filed responses to biographical and financial questionnaires, answered prehearing questions submitted by the committee, and had their financial statements reviewed by the Office of Government Ethics. Without objection, this information will be part of the hearing record with the exception of the financial data, which are on file and available for public inspection in the committee offices. The hearing will remain open until 5:00 p.m. today, Friday, January 17th for the submission of statements and questions.

For the record, this hearing is

Page 144

this administration's lack of desire to find out where those children are or what they may be going through is alarming to me. So, I want to stop that.

SENATOR BLUMENTHAL: Well, because my time is expiring, I'm just going to interrupt again with apologies to say let's put aside ...

GOVERNOR NOEM: Well, I can't put aside 340,000 children.

SENATOR BLUMENTHAL: Let's put aside the labels, let's put aside what happened in the past. There are still a thousand children who are separated and waiting to be reunited. I'd like your commitment that you're going to continue the effort to reunite them with their parents.

GOVERNOR NOEM: Senator, keeping families together is critically important to me and to this country. I'm concerned about Laken Riley's family, that they no longer have her. I'm concerned about the fact that we have people in this country that don't know where their children are or people in other countries who sent their children here and they've been lost by this administration. So, yes, my focus will be

Page 143

adjourned.

Page 145

37 (Pages 142 - 145)

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certify that the foregoing transcript is a true and accurate record of the proceedings.

_Sonya V. Ledanski Hyde_

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date:  February 17, 2025

Page 146

38 (Page 146)

**[000 - academy]**

| 0 |
|---|
| **000** 102:18 |

| 1 |
|---|
| **10** 64:20 |
| **10,000** 95:10 |
| **100** 5:21 54:21 64:17 65:9 106:1,1 |
| **10:00** 25:21 |
| **11** 101:5 |
| **110** 2:7 |
| **11501** 146:13 |
| **11th** 19:7 77:4 |
| **12** 52:23 114:17 |
| **12,000** 101:11 |
| **12151** 146:6 |
| **12th** 129:17 |
| **13,000** 19:16 37:5 |
| **14th** 129:20 |
| **15** 1:12 |
| **16,000** 37:7 74:7 101:17 |
| **17** 146:15 |
| **17th** 144:23 |
| **19** 3:15 |
| **1b** 139:21 |

| 2 |
|---|
| **2** 48:11 |
| **20** 19:2 119:9 |
| **200,000** 133:17 |
| **2001** 19:7 |
| **2013** 140:5 |

**2025** 1:12 81:13 146:15
**2027** 104:11
**21st** 20:3
**22** 16:6 83:3 96:4
**230** 124:8
**24** 130:20
**24/7** 18:10
**240,000** 5:20 82:25

| 3 |
|---|
| **3** 64:19 |
| **3,000** 136:18 |
| **30** 18:22 76:7 80:15 |
| **300** 146:12 |
| **300,000** 142:21 |
| **31st** 69:1 |
| **32** 39:2 |
| **330** 18:5 146:11 |
| **340,000** 143:9 |
| **382** 29:19 30:9 46:21 101:6 |

| 4 |
|---|
| **40** 18:22 53:2 |
| **400** 100:20 |
| **425,000** 37:9 99:2 |
| **435** 12:24 13:2 |
| **44** 123:18,20 |

| 5 |
|---|
| **50** 105:21 |
| **5:00** 144:22 |

| 6 |
|---|
| **6** 102:18 |
| **600,000** 101:22 101:23 104:23 |

| 7 |
|---|
| **7** 19:15 |
| **7,000** 19:17 |
| **70,000** 41:2 120:22 121:1 |
| **700** 112:3 |
| **700,000** 102:10 |
| **75** 53:2 |

| 8 |
|---|
| **80** 104:14 |
| **8th** 71:22 |

| 9 |
|---|
| **9** 69:1 |
| **9/11** 106:19 |

| a |
|---|
| **a.m.** 25:21 |
| **abiding** 2:18 3:6 |
| **ability** 8:22 15:7 33:19 45:7 47:10 77:20 97:2 110:8 120:15 124:19 135:11 137:1 |

**able** 9:12 11:20 14:19 28:12 50:24 70:19 77:18,20 82:11 85:3 96:25 98:2 115:2,3,6 115:14,15,19 115:21 117:6,8 117:8,14 118:8 119:7,16 120:15 121:8 121:12 135:11 135:12,20,25 136:2,11,16,21 136:23 137:1,6 138:1,13,15
**abridging** 123:2
**absolute** 10:24 52:1 82:16
**absolutely** 6:21 26:23 41:9 47:21 53:19 71:9 77:13 121:20,21 129:6,7
**abundance** 10:23
**abuse** 3:21 54:12 56:25 116:13
**abused** 55:22 104:18
**academy** 23:8 97:10

Page 1

**[accepting - afterward]**

| | | | |
|---|---|---|---|
| **accepting** 113:18 | **activity** 11:12 38:17 | 11:3 22:13,24 29:13 31:18 | 87:5 95:6 98:2 101:3 102:22 |
| **access** 71:23 | **actors** 21:24 | 92:9 129:7 | 104:19 112:19 |
| **accessible** 90:15 | 32:13 36:18 45:5 47:16 | 130:4,6,13 | 112:20 116:24 |
| **accomplish** 82:11 | 69:25 73:17 74:15 87:13 | **addressed** 19:18 44:18 | 118:2 119:14 120:23 121:3 |
| **account** 2:8 | **acts** 107:19 | **addresses** 55:18 | 132:18,24,24 142:9,18,22 |
| **accountability** 3:24 4:8 34:23 | 114:9 141:4 | **addressing** 2:24 3:9 7:5,18 | 143:25 |
| 38:20 69:22 | **actual** 47:9 53:6,6,15 | 28:1,14 35:10 | **administratio...** 37:11 55:4 |
| **accountable** 37:19 54:7 | 116:25 | 35:21 38:21 128:12 132:7 | 86:4 143:1 |
| 72:15 87:14 | **actually** 50:2 55:6,15 56:10 | 141:14 | **administrations** 112:14 |
| 131:8 | 76:24 93:8 | **adequately** 28:22 36:1 | **adopted** 59:3 |
| **accurate** 146:3 | 95:6,16 105:18 | 44:21 | **advance** 22:7 |
| **achieve** 20:24 | 106:5,21 | **adhered** 103:13 | 133:1,2,3,10 |
| **acknowledge** 22:4 | 107:12,25 109:3 116:22 | **adherence** 102:15 | **adversarial** 3:11 |
| **act** 53:8 64:16 | 120:8 122:20 123:5 127:5 | **adhering** 65:6 110:7 | **adversaries** 8:3 21:24 23:19 |
| 86:17 142:12 | 135:6,7,10,19 | **adjourned** 145:1 | **advising** 53:8 |
| **acting** 11:23 34:15 | 136:7,19,20 137:7 | **adjust** 49:17,22 | **advisor** 17:13 76:16 |
| **action** 111:13 130:3 | **add** 13:18 134:18 | **administration** 2:19 11:9 35:6 | **advisors** 98:7 |
| **actions** 30:24 | **addie** 70:23 | 38:15 39:19 | **affected** 38:8 |
| 76:21 86:22 | **adding** 6:18 | 42:10 50:23 | **affecting** 8:11 |
| **activated** 39:2 | **addition** 7:4 | 52:10 56:21 | **affiliates** 38:17 |
| **activation** 39:24 | 26:22 49:12 | 57:15 62:12 66:22 72:3 | **afghanistan** 41:3 |
| **active** 110:18 | **additional** 6:23 44:9 115:15 | 75:10 78:9 | **afloat** 95:23 |
| **activities** 2:8 67:2 73:4 | 137:14 | 81:19 83:6 | **afraid** 18:23 |
| 129:9 | **address** 4:17 6:7 8:10,22 | 85:20 86:3,15 | **afterward** 140:20 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[agencies - announcement]**

agencies  23:16
  31:25 32:5
  35:9 39:11,12
  43:9 66:23
  67:7 72:18
  73:15,15 83:3
  107:17
agency  2:7,10
  2:12,22 3:22
  4:10 5:19 8:9
  24:18 32:12
  48:16 82:25
  83:12,21 84:3
  85:14,22,23
  94:19
agenda  75:20
  80:17 102:14
  104:13
agents  21:8
  85:2 124:22
aggressive
  31:23
ago  7:6 52:24
  69:1 100:1
  103:16
agree  26:6
  29:16 43:11
  53:14 61:8
  62:23 112:5,10
  132:3,5
agreement  12:6
  131:6
agricultural
  98:9,18,19
  99:12

agriculture
  80:16
ahead  23:23
  55:5 90:10
  91:3 138:12
air  28:10 82:8
airfare  103:8
airspace  128:11
aisle  107:10
  131:3
al  29:9 81:14
alarmed  142:21
alarming
  104:23 143:3
alaska  13:3
alcohol  69:5
alejandro
  51:25 105:14
alien  94:5
aliens  21:15
  115:22,25
  116:10 120:20
alive  54:25
  103:24
alkire  15:4
alliance  14:16
allocate  63:19
  64:17 65:9
allow  36:25
  37:2 55:5
  57:11 100:24
  101:24 103:4
  104:12,20
  117:23 121:17
  136:4,9 139:9

allowed  54:13
  88:8 100:19
  101:14,16
  103:17 104:20
  120:20 136:16
allowing  53:25
allows  47:12
  56:18
alongside
  106:20
alternative
  72:21
amateurish
  12:13
amazing  100:9
  100:10 106:13
  123:22
amendment
  58:6 86:18
  122:11,12,17
  122:25 123:14
amendment's
  122:16
america  13:10
  17:23 18:19
  37:19 70:16
  84:22 94:15
  99:25 104:8,15
  105:17 124:21
  130:24 135:25
american  2:12
  3:13,23 4:15
  7:16 8:21 11:7
  21:17 25:13
  30:15 36:14

37:16 57:19
  60:14 61:13
  63:12 65:13
  70:13,19 75:20
  86:12 87:2
  89:8 94:5
  102:20 107:25
  108:3,19,23
  112:23 113:3
  117:25 118:4
  119:18,24
  127:22 128:6
americans  2:18
  2:20 3:4 7:7
  18:5,20,22
  20:25 21:2
  24:6 27:12
  29:4 31:15
  36:24 38:1
  58:7 80:23
  83:14 122:10
  127:21 134:10
  135:6 138:9,16
  141:18,19,22
amount  10:21
  10:22 27:22
  33:9 81:5
  115:16 126:17
amounts
  139:14
announce
  75:25
announcement
  75:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[annually - attention]

| | | | |
|---|---|---|---|
| **annually** 2:8 | **applied** 84:13 | **armed** 128:9 | **associated** |
| **answer** 3:16 | **apply** 55:5 | 133:13 | 59:10 |
| 36:8 75:22,22 | 122:18 | **arms** 127:20 | **association** |
| 100:19 115:3 | **appreciate** 5:13 | **arrested** 111:7 | 16:7 |
| 138:7 | 5:13 18:13 | 139:5 | **assume** 40:20 |
| **answered** | 26:20 42:24 | **art** 22:7 | 62:22 63:25 |
| 144:15 | 43:3,5 45:11 | **aside** 143:7,8 | **assurances** |
| **answering** 36:6 | 47:18 51:3 | 143:10,11 | 112:17 |
| **answers** 22:5 | 60:2 74:19 | **asked** 21:4 26:1 | **assured** 28:4 |
| 36:11 | 92:3 113:12 | 34:14 38:22 | **asylum** 7:2 |
| **antiquated** | 114:2 126:14 | 42:5 52:5 | 54:13,14 55:5,7 |
| 74:7 | **appreciated** 6:4 | 65:20 70:9,21 | 55:10,11,12 |
| **antiquities** | **apprehending** | 77:11 84:5 | 57:1 |
| 35:19 | 21:14 | 88:10 112:20 | **attack** 7:22 |
| **antisemitic** | **approach** | 123:18 133:1 | 21:23 48:1,7 |
| 141:8 | 19:25 22:1,14 | 138:5 | 66:14 71:21 |
| **antisemitism** | 23:2 98:10 | **asking** 64:3 | 79:18 90:1,8 |
| 140:25 141:23 | **appropriate** | 120:13 | **attacking** 23:1 |
| **antisemitist** | 39:1 91:1 | **asks** 55:10 | **attacks** 3:10 |
| 141:2 | 111:24 127:13 | 111:10 | 6:1 7:21 8:5 |
| **antitrust** 124:7 | **appropriated** | **assassination** | 19:7,9 20:11 |
| **anymore** | 64:18 | 58:17 59:6,11 | 26:19 31:24 |
| 135:10 | **appropriately** | 59:25 | 32:17 33:5 |
| **anyway** 14:15 | 28:6 | **assassinations** | 48:9 72:12 |
| **apartments** | **area** 47:8 67:15 | 58:16 | 73:11 81:24 |
| 92:25 | 73:18 138:21 | **assault** 37:8 | 82:6 89:6 |
| **apologies** 143:7 | **areas** 6:4 | **assaulted** 53:11 | **attempted** |
| **apologize** 64:9 | 130:12 131:7 | 53:13 | 58:16 |
| **app** 55:2,9,12 | 137:4 139:24 | **assembled** 83:3 | **attempts** 58:17 |
| 55:17,25 | **arena** 9:19 | **assert** 4:24 | 59:7,11,25 74:8 |
| 115:20,22 | **arguably** 3:15 | **assessment** | **attend** 31:11 |
| 116:1,3,5 | **arizona** 92:6 | 81:13 | **attendance** |
| **appear** 16:25 | 93:9,17 94:6 | **assist** 39:3 | 92:2 |
| 25:9 26:7 | 96:2 97:16 | **assistance** | **attention** 21:21 |
| | | 112:18 113:5 | 114:3 142:5 |

Page 4

**[august - bipartisan]**

**august** 62:18
**authorities**
  31:8 76:21
  78:10 79:5
  89:18 128:20
  129:24
**authority** 72:6
  115:6,16,17,24
  116:8,20 117:6
  125:14 129:15
  129:16
**authorization**
  28:11
**authorized**
  51:7
**available** 5:8
  45:4 58:25
  59:12 144:20

**b**

**back** 11:1
  19:22 22:10
  25:17 30:23
  32:25 37:17
  47:14 48:23
  57:2 63:24
  71:18,25 72:10
  72:15 76:2
  82:18 83:2
  85:5,15,18
  94:18 110:13
  111:19 113:12
  118:8,24 120:4
  120:6 124:3
  132:12,25
  133:14 137:19

138:2,25 139:3
  139:4,7 142:15
**backed** 87:13
**background**
  4:17 5:16
  40:20 99:18
  113:25 131:1
  141:22
**bad** 32:13 45:5
  47:16 73:17
  74:15 91:24
  111:9 112:10
  135:8
**bag** 137:13,14
  137:16,18,19
  137:20,21
  138:2 139:3
**balance** 96:16
**ball** 67:19 81:4
**ballot** 106:24
**balls** 89:17
**banning** 123:2
**bari** 125:8
**base** 28:10,25
  95:17
**based** 7:23 29:7
  29:14 48:1
  51:18 62:10
  64:12 86:14,14
  108:19 125:21
  126:21 127:11
**basic** 61:1
  120:19
**basically** 65:16
  132:16

**basis** 78:8
  82:16 123:6
  125:4 129:16
  140:14
**battlefields**
  128:15
**beach** 91:16
**beaches** 104:14
**beacon** 25:7
**bear** 67:1 92:11
  96:22
**bearing** 95:11
**becoming** 8:5
**behalf** 17:17
**behaviors**
  30:24
**believe** 10:19
  11:15 20:12
  32:5 71:16
  80:20 84:12
  89:10 94:4
  96:19 103:1
  109:6,15,18,20
  109:23,25
**belong** 14:15
  142:12
**benefit** 94:15
  113:23
**best** 19:13
  78:19 127:22
**bet** 91:8
**better** 13:17
  17:25 76:5
  88:19 100:11
  110:3 139:25

**beyond** 99:5,9
  128:20 141:1
**bia** 97:5
**bias** 63:11 65:4
  65:11 118:4
  125:19,21
**biden** 2:19 11:9
  29:19 37:21
  38:15 39:19
  52:10 55:4
  57:10 72:3
  86:3 101:7
  104:5,10,19
  112:3 116:23
  119:14 142:22
**biden's** 30:12
  38:8 101:4
  112:18
**big** 2:3 84:1
  88:10 95:12
  99:5 120:9
**bigger** 22:3
**biggest** 84:10
  129:1
**bill** 13:8,13
  49:9
**billion** 2:7 5:21
  19:15 64:17
  65:9 123:19,20
**billions** 88:1
**biographical**
  144:14
**bipartisan** 44:6
  46:8 49:9
  58:15,16 60:1

Page 5

**[bipartisan - brush]**

98:14,14 106:5
113:1 125:6
131:19 140:8
140:14,15
**bipartisanship**
139:18
**bit** 9:20 46:7
70:7 119:21
140:17
**blame** 109:13
**blank** 75:14
**blessing** 12:14
**blitz** 115:4
**blizzards** 24:10
**blow** 108:11
**blueprint** 89:11
89:19 90:3
**blueprints**
90:10
**bluffs** 68:19
**blumenthal**
60:9,19,20
61:19 62:8
63:5,13,25 64:7
65:8,12,16,19
66:16 67:14
126:9 139:10
139:12,16
141:16 142:3
143:5,10 144:6
144:10
**board** 57:17,25
58:4,9 83:14
96:3 97:12

**boards** 3:3
**body** 12:24
17:11,13 91:14
110:8
**bonded** 69:5,6
**books** 59:9
112:24 113:1
**border** 2:17 3:1
3:10 6:9,11,13
6:17,24 7:4
10:18 11:8,11
12:18 20:16
21:1,4,6,8,18
26:22,22,24
27:1,3,6,6,17
27:21,23 28:9
28:14,17 29:18
29:20 30:10,16
36:15 37:6,22
38:7,8,10,14
39:17,25 43:24
43:25 44:1,5,7
44:10,13,17,20
45:9,14,15,24
46:1,14 52:6,12
52:13,16,19
67:17,17 68:17
68:21 69:24
75:15,17 76:8
76:17 77:10,14
78:18 79:7
81:18 82:10
83:7,8,23 85:2
85:6 92:6,7,11
92:13,18 93:2

93:11,13,23
94:13 96:7,15
96:24 97:20
105:4,4,7 109:1
109:15 112:12
115:7,10
116:25 117:1,1
120:11,20,25
121:1,3 135:7
136:14,19
140:1
**borders** 5:25
6:6,25 11:6
18:19 20:8,19
26:18 27:17,25
36:17 76:1
82:7 84:14
93:9 95:5,19
96:13 104:13
105:10 109:8
140:24
**born** 65:22
**bottom** 61:11
**bought** 123:17
**boundaries**
2:11
**bowl** 30:2
31:12 67:20
128:23 134:21
**branch** 4:9
77:17
**branches** 66:25
**bravery** 21:17
**break** 36:24
37:4 54:7

**breaking** 36:22
**brian** 106:10
113:19
**bridge** 6:19
27:9 28:2
112:12
**bridget** 100:6
**brief** 126:13
131:24
**briefing** 119:23
**bring** 24:24
34:11,24 50:6
88:19 96:22
98:14 102:6
134:6 142:13
**bringing** 26:20
42:2,4 50:18
67:1 125:19
128:2,6 130:10
130:15
**brings** 10:3
14:9
**broader** 75:10
**broken** 37:25
41:9 68:17,20
84:4 85:14
92:13 93:13
95:18 98:24
109:10
**brother** 71:1
**brought** 8:13
91:10 141:10
**brunt** 95:11
**brush** 91:13

Page 6

[bryon - chairman]

| | | | |
|---|---|---|---|
| **bryon** 18:9 | **businessperson** 17:20 | **care** 15:1,3 54:4 94:9 107:5 | **celebrate** 128:5 |
| **budget** 5:21 19:15 | **butler** 34:13 89:15 | **carefully** 52:25 | **cell** 44:3 134:11 |
| **buffalo** 141:3 | | **carjacked** 53:14 | **cellular** 134:8 |
| **build** 17:25 28:17 36:12 37:17 46:19 59:19 85:9 97:8,18 116:22 117:4 | **c** | **carolina** 72:24 113:2 | **censor** 57:21 83:13 |
| | **c** 146:1,1 | **carry** 21:10 26:25 109:12 | **censored** 122:19 |
| | **cabinet** 66:25 104:6 | **carrying** 117:9 | **center** 6:14 28:9,13,18 103:17 120:8 121:7 |
| **building** 6:13 40:1 | **california** 8:15 61:24 62:11 63:4,8 87:19 88:3 90:21,24 91:10 113:2 | **cartel** 38:17 47:16 | **century** 20:3 |
| **buildings** 111:2 | | **cartels** 2:25 46:6 47:20 80:13 96:13 105:8 | **ceos** 41:13 |
| **built** 97:13 | | | **certain** 90:12 138:11 139:24 |
| **bull** 15:6 | **call** 61:9 107:18 142:4 | **case** 15:6 56:20 56:20,23,23 57:3,3 110:23 | **certainly** 26:17 29:9 35:3 38:11 46:17 59:19 61:15 66:9,20 87:23 88:6 94:25 103:20 107:1 127:24 128:13 132:6 |
| **bullets** 137:20 139:2,3 | **called** 8:4 31:7 55:2,12 115:22 136:15 142:7 142:10 | | |
| **bully** 124:9 | | **cases** 57:3 | |
| **bunch** 91:23 111:4 115:5 | | **cash** 46:5 47:19 | |
| **burden** 92:12 93:2 | **calling** 108:14 | **catastrophic** 129:6 | |
| | **calls** 100:5 | | |
| **burdensome** 92:19 | **cameras** 123:8 | **catch** 46:4 108:2 116:11 116:14,17 | **certify** 146:2 |
| **bureaucracy** 72:4 | **campaign** 33:7 34:12 86:23 107:8 | | **chain** 80:19 |
| | | **caucus** 71:14 | **chair** 42:23 71:14 75:1 |
| **bureaucratic** 2:9 | **candor** 52:21 | **caused** 50:22 | |
| **burgum** 15:16 | **capabilities** 11:16 24:13 77:18 79:20 82:15 | **cbp** 55:1,16,25 56:3 76:14 115:22,25 116:3 136:13 136:24 | **chairman** 5:5 9:11 12:2,4 16:23 25:17 26:10,15 51:13 51:16,19 61:5 75:3 82:18 92:1 105:23 |
| **burn** 91:11 | | | |
| **burning** 91:15 | **capable** 14:2 | | |
| **busiest** 6:17 | **capitol** 15:12 26:1 | | |
| **business** 12:8 | | | |
| **businesses** 33:3 49:3 | **cards** 54:3 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[chairman - combating]

119:13 126:20 139:13 144:11
**chairmanship** 85:20
**chairwoman** 14:24 15:4
**challenge** 5:1 105:19 120:1 126:25
**challenges** 5:24 6:8 9:4 18:25 19:21 20:6,13 45:2 92:12,16 93:24 132:10 136:25 138:14
**challenging** 44:17
**champion** 58:5
**chance** 47:15 65:1 97:9 100:7
**change** 8:12 18:25 41:6 42:15 65:5,5 102:23 110:11
**changed** 101:8
**changes** 30:23 137:1
**changing** 128:14
**chaos** 11:8
**chapter** 57:23
**character** 15:25

**charge** 75:14 75:17,18 76:1,5 78:18 105:6,14 105:25
**charged** 35:23 103:18
**charlottesville** 141:3
**chases** 118:11
**chasing** 118:12
**check** 88:10 114:18
**chicago** 92:21 92:24 93:20
**chief** 41:12,21 62:24
**child** 118:12 124:16
**children** 69:19 142:6,6,13,21 142:23 143:2,9 143:12,23,24 144:3
**chilling** 123:7
**china** 33:8,11 71:22
**chinese** 7:23 31:25 80:13,17
**chnv** 56:8,17 56:24
**choose** 52:25 73:21 117:24
**christopher** 34:20

**churches** 141:20
**cia** 67:10 106:19,21 109:2
**circumstances** 10:8 56:19,20
**cisa** 32:11,21 33:22 48:25 67:9 86:8,22
**cisterns** 91:20 91:23
**cities** 36:20
**citizen** 32:8 108:3
**citizens** 3:7 30:21 57:19 67:13 106:7 107:25 136:8
**citizenship** 140:2
**city** 49:2 53:12 88:25
**civil** 31:5 124:24
**claiming** 55:18
**claims** 54:15,15 54:17
**classified** 32:8
**cleaning** 61:10
**clear** 3:16 20:24 25:24 30:14 44:7 98:22 103:23 107:13 116:17

117:3
**clearly** 102:19 118:23 141:10
**climate** 8:12
**close** 69:14 92:6 115:7,14 139:17
**closed** 103:16 108:21
**closely** 22:19 24:22
**closing** 142:3
**cloud** 48:1
**club** 14:15
**cochise** 93:18
**codified** 77:3
**coerciveness** 124:1
**coldest** 100:1
**collaboration** 20:14 23:21
**collaborative** 96:6,11
**colleague** 12:15 12:23 68:23
**colleagues** 12:5 46:9 129:23
**collect** 134:7
**collected** 134:10,13
**colorado** 104:25
**combat** 66:17
**combating** 5:25 7:11

Page 8

**[come - complicate]**

come   18:1
19:14 25:8,23
28:1 29:20
30:10 37:1,6
41:2 47:16
49:25 53:25
57:11 59:7
69:21 77:23
81:4 88:23
95:14 99:11
100:21 109:17
119:7,11,16,16
119:22 124:6
127:19 133:11
138:21
comes   10:6
48:7 76:12
96:6 97:23
107:11 109:7
coming   4:25
16:11 22:2
30:3,23 42:8
47:14 56:6
75:7 95:5
97:12 114:15
117:16 119:15
131:18 133:3
134:16 139:4
command
120:8
commander
41:12,21
commanding
2:7

comment
130:15
comments
26:18,21
126:16 128:22
130:14
commerce
46:24
commit   27:5
28:16 37:3
49:17 86:8,16
93:14 129:23
137:4,10
141:24
commitment
4:23 18:4
21:11 137:2
143:14
commitments
2:11
committed   25:2
103:8 119:22
committee   4:22
5:9,14 7:11
9:12 11:23
12:16 16:3,13
16:17,24 17:18
25:3 26:8
27:20 41:10,11
51:16 53:5,7
58:14,15 59:3
59:21 60:2
61:12,17 75:8
77:18,24 78:3
84:3 86:11

99:24 107:10
109:3,9 112:25
113:7 119:5,8
119:12,17,23
121:14 126:21
128:9,10 130:6
137:5 140:10
144:16,21
committee's
4:7
committees
126:18
common   139:2
139:8
communicate
42:13 70:19
78:6 90:16
communicated
42:3 67:6
127:25
communicating
85:11 89:17
communication
41:7 42:18
43:12 86:6
89:16,20
communicati...
72:1 89:5
communities
8:11,18 18:1,7
21:17 23:10
29:12 36:19
38:9 39:14
40:6 41:25
43:8 48:13

70:2,15 73:1
88:17 92:7,8,11
93:3,12 94:6,8
95:9,9,14,20,23
98:25 101:15
136:8
community
24:14 65:24
98:9,9
companies   8:1
73:23 109:16
122:18 123:5
company   33:20
compare
100:16
comparison
101:4
compelling
9:18
compensate
95:13
compete   45:5
competing
26:16
complain
122:22
complete   11:5
completely
37:22 41:4
55:22 83:6
86:4
complex   7:13
complicate
100:13

**[complicated - continue]**

| | | | |
|---|---|---|---|
| **complicated** 10:17 | **conducted** 60:2 | 123:1 129:14 130:13 131:2 | **constituent** 68:24 137:12 |
| **comply** 26:6 | **confidence** 17:3 | **congresses** 142:13 | **constituents** 68:19 71:19 |
| **components** 2:2 7:17 | **confirm** 105:21 127:3 | **congresswo...** 100:10 | **constituted** 26:8 |
| **comprehensive** 9:2 21:25 128:19 139:20 140:7,15 | **confirmation** 1:13 105:22 106:2 | **connecticut** 62:16 63:15 64:19 | **constitution** 48:21 63:22 64:16 65:7 71:5 86:2,3 103:12 108:14 110:15 111:16 |
| **comprehensi...** 129:19 | **confirmed** 4:10 9:5 19:24 21:6 26:9 27:5 28:16 31:18 43:18 44:8 46:16 48:14,19 49:16 56:2 76:18 100:22 105:20 124:11 127:10 128:1 129:22 | **connection** 121:8 | **constitutional** 2:21 4:23 13:22 77:19 |
| **comprised** 7:25 | | **connections** 55:21 | **constitutionally** 124:14,18,20 |
| **compromised** 35:25 | | **consequence** 99:8 | **consult** 96:15 |
| **concept** 109:8 | | **consequences** 24:20 31:16 36:21,23,25 37:2 57:12 63:3 69:23 71:8 101:6 | **consultation** 15:23 |
| **concern** 27:19 29:16 45:13 47:3 53:6,6,16 77:15 95:7 129:10 141:2 | | | **contact** 92:6 |
| | **conflate** 107:13 | | **contains** 48:2 |
| | **confront** 132:10 | | **contemplated** 85:23 |
| **concerned** 30:1 83:15 93:4 128:16 129:4 141:7 143:19 143:21 | **confused** 75:23 | **consequential** 4:21 | **continue** 7:14 8:2,9 25:22 27:16 29:9 37:2 46:24,25 51:7 66:21 69:19 78:12 79:6 80:11 97:18 99:10,19 101:8 104:12 110:11 117:13 132:13 139:17 |
| | **congratulations** 34:5 51:14 60:17 122:2 | **conservatives** 122:11 | |
| **concerning** 32:3 | **congress** 4:7,12 4:24 7:16 13:23 14:11 17:21 25:3 26:8 28:12,23 31:8 41:15 44:25 49:17 68:8 77:3 115:12 116:21 120:14 121:11 | **consider** 4:3,25 | |
| | | **consideration** 11:22 | |
| **concerns** 11:10 49:21 78:4 79:10,16 98:10 | | **consistently** 29:5 | |
| | | **constant** 18:10 21:23 | |
| **concierge** 55:2 55:23 | | **constituencies** 74:22 | |
| **conduct** 5:15 131:22 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[continue - crimes]**

140:12 141:13
143:15
**continued**
74:24
**continuing**
61:20 68:7
80:10 131:17
**contractors**
135:1
**contrast** 100:17
**control** 33:18
80:18,24 83:20
105:7,10
109:15
**convened** 22:23
**conversation**
5:12 77:21
81:9 84:1 92:4
92:5 93:22
130:11
**conversations**
6:4 99:10
131:21 132:11
**convictions**
37:10 99:3
101:24 102:2
**cooperate** 47:7
121:14
**cooperating**
39:12 125:10
**cooperation**
23:9 130:13
**coordinate** 7:17
42:19 79:18

**coordinating**
112:4
**coordination**
23:20 110:24
111:12 112:7
**coordinator**
49:13
**cops** 95:10,21
**cornyn** 46:10
49:9
**correct** 81:8
107:22,23
138:15 141:25
**correctly** 93:17
**corrupt** 104:12
**cost** 97:6
102:18
**costs** 50:23
83:18 98:12,15
**council** 68:19
**count** 138:11
**counter** 129:15
129:15
**counterprodu...**
93:8
**counties** 95:15
97:11
**countless** 8:15
**countries** 42:6
56:11 102:5
143:23
**country** 8:16
10:9,13 11:9
15:21 21:16
23:1,14 29:16

29:23 30:23
33:21 35:2
36:21,22 37:1,6
37:9,11,13 41:4
42:3 45:5,6
48:9 52:2,18
53:23 54:1,14
55:13 56:6,11
57:11 63:22
65:23 66:19
69:7,16 70:24
71:1 74:15
75:19 78:15
80:18,22 88:13
89:7 94:11
98:3 99:3
100:21,24
101:5,12,14,21
103:3,7 106:6
107:12 108:15
109:6 111:21
114:3,10
115:25 116:5
116:11 117:10
117:16 121:2
127:18,20
128:4,5 129:25
130:8,24 136:7
138:10 139:25
140:3,25 141:7
141:15 142:25
143:19,22
144:5 146:11
**country's** 66:8

**county** 88:25
93:18,18
**couple** 114:24
122:7
**course** 52:11
54:16 56:18
**courts** 57:7
**cover** 44:15
83:19
**coverage** 44:4
**covid** 3:14
86:21
**cpp** 78:12
**cramer** 9:8
12:3,4 17:7
**crazy** 139:7
**create** 20:20
**created** 19:5
31:7 35:13
48:24 49:10
88:13 115:20
118:25
**creating** 3:2
83:16
**credentials**
15:7
**creep** 83:13
**crime** 38:16
40:8 53:5,9,15
67:18 69:21
103:8,18 108:7
108:8 140:21
**crimes** 54:1
118:12

Page 11

[criminal - decisions]

**criminal**  11:11
  21:15,24 36:18
  37:10 69:25
  99:3 101:23
  102:2
**criminals**  8:4
  46:6 47:25
  98:24
**cripple**  33:21
**crisis**  21:6
  80:21
**critical**  2:16
  4:18 6:22 9:3
  18:20 20:4,9
  21:22 25:16
  28:13 32:15
  33:2,3,12,18,25
  43:15 49:3,5
  116:4 129:15
**critically**  30:25
  46:20 50:17
  143:18
**criticism**  57:25
**critters**  14:7
**cross**  11:11
  98:13
**crossing**  27:23
**crossings**  6:17
  27:2 43:25
**crucial**  87:17
**culture**  97:21
**currency**  80:20
**current**  35:6
  37:11 57:16
  58:22 79:19

100:14 125:2
**currently**  10:2
  31:19 58:21
  79:5 90:11
  115:17
**customs**  6:23
  21:12 83:7
**cut**  133:15
**cutting**  22:7
**cyber**  3:10 6:1
  7:20 8:3,5
  19:19 20:11
  26:18 31:24
  32:17 33:5
  47:24,25 48:7,9
  49:12 50:11
  71:21 72:4,8,12
  73:7 85:25
**cyberattacks**
  21:20
**cybersecurity**
  22:1,12 32:6,7
  32:11 48:15,16
  49:10 50:4,8,10
  50:16,20 67:3
  73:15 83:11
  85:21
**czar**  76:17

**d**

**d.c.**  22:4 100:13
  114:23
**daily**  78:8
  82:16 129:9
**dairy**  98:9

**dakota**  4:12
  9:25 10:9
  12:20 14:25
  15:1,2,2,12,16
  17:4 19:10
  22:10,11,20,22
  23:3,4 24:8
  35:4 38:12
  39:16 40:11,12
  50:4,9,15,20
  68:10 74:11
  97:2,4,6 114:18
  131:12
**dakota's**  9:13
  10:2
**dakotans**  11:4
**damage**  88:2
  104:25
**dangerous**  3:5
  33:14
**dark**  42:12
**darkest**  57:23
**data**  7:16 32:8
  33:9,15 56:4
  73:22 74:14
  116:4 120:3,8
  120:13,15,18
  121:6,13
  126:23 127:7,8
  132:2 133:4,9
  134:10,12,13
  135:6,9,12
  144:20
**date**  146:15

**david**  53:11
**day**  13:11
  17:24 19:11,13
  29:24 31:20,21
  54:5 56:3
  60:11,11 70:24
  73:4,4 100:1
  101:1,13,19,25
  105:24 108:18
  131:10
**days**  22:2 52:17
  63:20 114:11
  138:12
**de**  47:2
**deadly**  7:8
**deal**  127:7
  128:10
**dealing**  127:4,5
  129:18
**death**  53:10
**debate**  99:16
**debit**  54:3
**decades**  18:21
**december**
  71:22
**decide**  65:5
  86:25 109:7
  123:10,16
**decision**  38:25
  76:12 78:22
**decisions**  4:14
  19:13 41:22
  63:8 77:10,13
  77:23 78:17
  137:8

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[declarations - dhs]

| | | | |
|---|---|---|---|
| declarations 62:22 | 131:15 | 48:23 73:14 | 111:3 |
| declared 121:3 | democrats 105:22 109:13 | depend 8:21 | detail 24:23 35:16 118:19 |
| dedicated 25:3 | 130:22 131:3 | depends 110:1 | 119:1 137:3 |
| dedication 18:11 21:18 | demonstrates 4:13 | deploy 44:9 | detailed 82:13 118:22 |
| deep 18:2 | department 2:1 | deployed 39:15 39:16 90:14 | detained 137:25 |
| deeper 2:10 | 4:5 5:17,21 | deployment 45:20 | detaining 21:14 |
| deeply 3:12 109:6,10 | 7:18,24 8:8,17 9:3,16 12:1 | deployments 39:19 40:13 | detect 23:17 |
| defend 108:14 119:3 123:20 | 15:17,20 18:3 19:2,5 20:1 | deport 69:24 | detention 69:10 103:16 |
| defended 123:14 | 24:3 25:4,12 28:8 30:5 31:1 | deportation 69:10 77:10 98:8 | determination 10:21 11:17 |
| defense 6:3 66:23 | 31:6,12 32:1 42:17 43:13,19 | deporting 21:14 98:23 | determine 99:15 |
| defiance 56:23 | 48:21 49:25 | depriving 93:9 | determined 50:7 |
| define 141:11 | 50:17 51:21,25 52:2 58:10 | depth 5:10 | devastated 40:6 |
| defined 111:25 | 59:23 63:10 | deputies 97:10 | devastating 8:6 8:14 52:12 |
| definitely 44:19 45:9 | 66:11,23 67:4 70:6 71:21 | derecho 24:10 | 69:15 |
| defunding 23:2 | 72:18 74:25 | describe 2:4,4 13:17 124:13 | devastation 62:1 |
| degrees 104:14 114:17 | 76:19 77:6 78:11,20 81:12 | deserve 3:24 | device 129:6 |
| delayed 129:3 | 83:4,5 84:7,8 | deserved 36:11 | dha 60:12 |
| delighted 51:15 52:3 | 90:22 96:22 100:12 102:9 | deserves 65:13 | dhs 2:6,17,19 3:2,12,22 6:2 |
| deliver 64:5 65:2 | 103:2,15 | design 136:17 136:20 | 7:4,14 8:1 20:3 |
| delivered 63:12 | 105:25 107:17 123:4 131:22 | desire 143:1 | 26:15,23 29:4 |
| demands 6:25 21:21 | department's 8:22 28:13 | desperately 11:19 139:24 | 57:15,16 58:5 58:24 59:4 |
| democrat 105:19,20 106:4,7,23 | departments 4:19 35:9 | despise 122:19 | 72:9 81:21 84:24 85:21,24 |
| | | destination 55:19 | 93:11 96:12,14 |
| | | destruction 8:13 61:25 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[dhs - dramatic]**

110:22 112:15
113:10 115:6
117:23 119:15
120:16,17
125:2,13,18
129:22 130:12
135:14,22
**dhs's**  3:14
57:24
**dictate**  64:6
**difference**
93:24
**different**  12:19
39:18 41:14,16
44:16 83:3
90:19,20,21
104:24 106:25
133:20 136:13
136:15
**difficult**  4:13
114:11 133:19
**difficulty**
136:25
**digital**  22:8
**dignity**  21:19
**diligence**  5:15
61:18 121:18
131:9
**diligently**  28:8
**direct**  56:22
76:15 77:22
**direction**  28:2
**directly**  19:17
56:11 76:14
78:1,2 79:2,3

**director**  34:16
**disagree**  131:6
**disagreements**
62:15
**disappear**
135:9
**disappointed**
62:2
**disaster**  8:19
61:23 62:22,23
63:11 65:14
72:20,23,25
83:15,16 88:14
90:8 94:19
113:5 117:18
118:2
**disasters**  6:2
8:11 19:20
20:12 24:2,8
62:17,19 83:18
88:16
**discount**  80:25
**discrimination**
62:9
**discuss**  25:11
**discussed**  6:5
26:19 28:8
43:4 49:8,14
61:21 119:21
140:18,20
**discussion**  9:2
68:14 99:16
**discussions**  5:9
15:13

**disgrace**  52:1
**disgraceful**
104:4
**disinformation**
3:3 32:24
57:17 58:4
86:23 125:1
**dismantled**
37:23
**displayed**  68:9
**dispute**  108:7
111:3,5
**disregard**  11:6
**disrupt**  26:2
**disruptions**
25:25
**dissent**  2:24
**distinction**
51:23
**distinguished**
16:24
**distorted**  3:12
**distract**  118:10
**distribute**  65:9
**distributors**
47:4
**disturbs**  73:9
**division**  76:4
**documented**
11:13
**documents**
32:2 58:25
**doge**  71:14
**doing**  16:11
22:10 37:12,14

40:9 48:25
53:2 70:8,20
72:19 73:5
74:13 80:14
86:25 87:6
89:3,4 93:17,19
94:23 104:25
106:5 121:9
123:4,24
128:13 133:24
134:8,25 135:1
144:2
**doj**  128:20
**dollar**  3:6,7
**dollars**  64:17
65:9 88:1
94:21 112:21
**domestic**  2:24
7:12 30:16
66:1 107:20
108:5 140:18
140:23
**donald**  14:1
17:2 52:18
**door**  132:12
**dose**  139:2
**double**  50:13
**doubled**  13:12
**doubt**  4:24
121:21,22
**doug**  15:16
**dozen**  24:8
**dozens**  87:25
**dramatic**  43:24
118:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [drift - enforcement]

**drift** 3:5
**drive** 98:11 110:3 132:3
**driving** 69:3,4
**drone** 129:5,15
**drones** 36:5 128:11,12,13 128:17 129:3 130:7 133:22 133:24 134:3,4 134:7,11,16,18 134:23
**drop** 53:8
**dropped** 89:18
**drug** 11:12 19:19 38:17 39:22 40:7 105:8 144:4
**drunk** 69:3
**due** 5:15 10:15 54:15,16 61:18 63:6 64:8 121:18 131:8
**duly** 26:8
**durable** 129:24
**duties** 77:19
**duty** 36:14 63:1 67:23 110:18 118:24
**dysfunctional** 84:4,7

**e**

**e** 146:1
**earlier** 11:3 99:1 135:21

**earn** 2:12 25:15 140:2
**east** 109:4
**easy** 63:6
**economic** 45:16 110:2
**economy** 6:22 8:7 45:21 109:17 110:1
**edge** 22:7
**edit** 123:11
**educate** 90:5,10
**education** 22:12
**effect** 59:16 123:7
**effective** 20:21 33:22 93:7
**effectively** 7:18 8:18,22 21:10 24:5
**effects** 38:12,14 40:6
**efficiency** 71:15
**efficient** 20:21 90:18
**efficiently** 24:5
**effort** 18:12 55:5 60:10,25 82:5 140:13 141:24 142:5 142:16 143:15
**efforts** 46:3 140:14

**eight** 10:1 17:22 39:17
**eighth** 19:24
**either** 14:23 57:20
**el** 104:14
**elect** 17:2 18:24 22:16 24:20 62:3 78:17
**elected** 20:23 74:1
**election** 13:24 30:14 102:20 126:1
**elections** 87:2
**electricity** 24:15
**element** 118:19
**elements** 35:14 67:4 109:23
**eliminate** 116:3
**eliminated** 56:14
**elite** 108:1
**elon** 123:17
**embark** 25:16
**emblematic** 2:10
**emergencies** 88:16
**emergency** 8:9 24:12 43:9 88:20,24 90:8 118:3 119:1

**emerging** 22:13
**emphasis** 72:3 139:18
**employee** 19:16
**employees** 5:20 50:15 71:17 72:10,22 77:5 83:1 117:18,23
**empower** 48:15
**empowering** 76:24 78:20,21
**enable** 139:22
**enact** 49:5 71:6 79:20
**encountered** 69:1
**endanger** 37:4
**ends** 47:13 93:8
**energy** 10:22 21:22
**enforce** 60:14 71:4,11 72:7
**enforcement** 21:13 22:17,20 22:23 23:1,3,6 23:8,16 38:24 40:23,23 44:1 46:3 65:25 85:10,12 89:19 96:11 97:5 103:10 110:18 110:23,25 111:11 112:3,9 128:21 135:24 136:6

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[enforcing - explosive]**

| | | | |
|---|---|---|---|
| enforcing 72:6 84:11 | entities 32:15 49:1 73:20 89:22 90:11 | established 50:3 57:17 | exceptional 21:7 |
| engage 2:2 77:21 83:12 | entity 136:15 | esteemed 17:13 | excited 114:15 |
| enhance 24:11 | entrance 9:19 | ethics 144:17 | excitement 15:15 |
| enjoyed 44:11 | entries 11:11 | evade 103:9 | exciting 108:12 |
| enormous 10:22 | entry 6:21 27:1 27:18 46:21 117:11 142:11 | evaluated 49:25 | excuse 57:10 |
| enormously 10:17 | environment 7:14 128:4 | evaluation 56:21,23 57:3 | executive 4:8 62:25 77:17 |
| ensure 6:9 7:17 8:17 21:7 23:15 24:13 25:6 27:25 28:21 42:19 43:7 44:20 45:1 46:24 54:12 56:5,14 57:4 59:13 73:8 74:24 93:11 98:17 109:23 111:23 113:2 115:9 124:24 | environmental 116:24 | event 29:24 30:2,7 31:14 | exercising 2:21 |
| | epidemic 40:7 144:4 | events 8:16 34:14 35:21 140:23 141:2 | exist 126:18 |
| | equally 44:17 118:5 | eventually 13:12 57:24 | existing 48:24 |
| | equipment 44:10 | everybody 114:25 134:16 135:11 | exists 128:25 |
| | equipped 23:17 | everybody's 90:6,16 | expand 140:13 |
| | ernst 68:3,4 71:9 74:5,17 84:16 | evidence 55:7 55:11 | expansive 31:24 |
| | escort 26:1 | evolved 19:4 | expect 36:15 |
| ensuring 6:6 27:5 45:9 47:14 84:15 87:3 113:8 | especially 6:15 12:17 19:8 42:18 79:11 95:1 139:18 | evolving 20:2 28:15 | experience 11:16 24:25 43:18 50:16 64:12 76:8,10 96:19 99:19 |
| | | exactly 110:20 120:10 128:1 | expert 109:5 |
| enter 15:12 | espionage 33:8 73:11 | example 62:4 64:17 96:9,10 | expertise 34:11 |
| enthusiasm 15:15 | essential 7:14 10:4 26:23 129:7 | examples 35:12 108:5 110:21 | experts 133:18 |
| entire 5:8 12:25 17:23 37:23 69:16 101:3 | | exception 144:19 | expire 129:20 |
| | essentially 61:1 | | expired 67:15 74:18 |
| | | | expiring 143:6 |
| | | | explain 72:23 |
| | | | explode 88:8 |
| | | | exploitation 118:13 |
| | | | explosive 129:5 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[expose - federal]**

| | | | |
|---|---|---|---|
| expose  86:12 87:12,13 | faces  5:23 | failed  13:8 73:1 90:4 | far  27:21 31:3 32:21 77:25 |
| express  17:6,11 | facilitate  6:20 27:11 47:9 | failing  37:25 | 100:8 108:22 |
| extend  128:19 | 50:24 94:5 | failure  24:21 | 125:25 141:8 |
| extended 104:10 129:14 | 115:21 116:10 | 91:4 120:17 | 142:24 |
| extension 104:22 | facilitated 83:24 | failures  19:6 35:10 40:3,4 | farm  13:8,12 |
| extensions 104:20 129:18 139:22 | facilitating 85:5 115:24 141:15 | 60:5 | farmer  17:20 99:11 |
| | | fair  20:20 92:20 122:15 126:17 | faster  22:3 115:21,24 116:10 |
| extensively 54:20 94:16 | facilities  94:20 136:13,17,17 136:20 137:8 | fairly  126:12 | fatigues  111:8 |
| extent  2:13 90:12 | facing  19:1,21 135:5 142:24 | fall  42:16 | fbi  29:5 34:21 65:24 67:10 |
| extraordinary 10:8 21:8 | fact  7:22 22:2 22:25 27:1 | falling  39:12 | 118:14 119:7 123:4 128:20 |
| extremely  20:7 33:13 41:16 | 29:18 42:12 50:9 61:22 | familiar  6:12 24:23 55:3 56:9 | fear  62:12 |
| extremism  7:13 29:3 66:1 | 70:4 72:16 85:13 110:14 | families  38:3 39:14 40:5 | february 146:15 |
| extremist  66:18 | 126:21 128:25 129:2 141:9 143:21 | 41:24 43:2 53:23 54:4,6 68:21 70:17 | federal  4:19 5:19 8:8 20:15 30:5 31:24 |
| eye  67:19 81:3 | facts  59:10,13 59:20 60:13 | 73:1 142:10,11 142:12 143:18 144:1 | 32:4,5 35:4 36:5 37:18,24 38:20 39:18 |
| **f** | 61:2 66:5 89:25 107:13 | family  9:18 14:8 42:25 | 40:3,4,9 41:8 42:4 53:24 |
| f  146:1 | 108:24 127:5,7 127:11 132:3,7 | 45:17 53:20 55:20 60:23 | 55:22 56:9 62:21 73:23 |
| face  4:14 6:8 7:5 20:2 31:19 | 132:9 133:19 133:21,23 | 69:8,15,20 71:7 110:2 142:8,18 | 74:13 82:25 83:15 88:9,13 |
| 33:6 79:21 92:16 126:23 | factual  108:18 | 143:20 | 89:21 90:25 94:3 95:16 |
| 128:14 130:7 138:14 | fail  40:10 | fantastic  17:4 51:20 54:24 | 97:4 99:9 102:15 110:22 |
| facebook 122:13 | | 58:11 60:9 | |
| faced  101:6 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[federal - food]

110:25 111:1
111:11 112:3
113:8 117:22
131:8 135:24
136:6
**federally** 88:22
96:4
**feeds** 73:20
**feel** 15:18 18:20
70:17
**feeling** 41:23
**fellow** 16:6
71:10
**felt** 18:21 36:8
136:1
**fema** 24:7
72:20 73:1
89:10 90:4
93:23 94:19
112:18,25
113:10 117:17
117:23
**fema's** 24:12
89:3
**fentanyl** 3:1
46:4 47:4
80:21 117:10
**field** 137:7
**fight** 13:4
141:11
**figure** 94:9
134:1,5 137:6
**file** 144:20
**filed** 144:13

**files** 125:7
**filming** 123:9
**final** 99:6
**finally** 8:8 36:7
59:2
**financial** 21:23
92:11 118:11
144:14,16,20
**find** 12:6 14:3
32:13 42:6
52:13 56:7
87:12 120:21
126:22 143:1
**finding** 61:22
135:10
**finish** 139:10
**fire** 61:24 92:14
**fire's** 61:24
**firefighters**
16:7 95:21
**fires** 62:6,7
87:19,23 91:10
**firmly** 20:12
**first** 4:16,21 5:7
6:3 12:10 13:5
13:5,6 18:21
21:2 23:7
37:20 54:11
58:6 70:5
73:25 79:14
81:23 86:18
87:11,17 94:15
95:6 99:22
106:21 118:15
122:11,12,16

122:17,25
123:14 130:14
135:15
**firsthand** 3:20
18:25 114:1
**fit** 75:9
**five** 13:3
126:11 137:21
**fix** 84:3 86:15
109:10 136:22
**fixed** 11:14
60:6 109:14
**fixing** 35:10
68:17
**flag** 117:20
**fled** 69:7
**flee** 10:11
**flew** 129:3
**flexibility**
136:24
**flooded** 80:21
**flooding** 8:16
62:19
**floods** 24:9
88:6 112:19
**floor** 11:24
122:21
**florida** 40:16
**flow** 45:21
46:22 47:18
**fly** 56:10 102:5
**flying** 117:20
134:3,23
**focus** 7:15
19:11 27:20,24

28:4 29:10
30:16 47:23
53:9 66:7
67:17 80:12
81:2 82:3 99:4
99:7 131:5,15
143:25
**focused** 2:22
19:12 23:7
27:16 35:20
66:10 69:17
85:24 114:3
118:9 128:10
130:24
**focusing** 2:16
60:3 72:14
118:23
**folks** 41:18
111:8 114:6
116:19 118:6
129:14 137:7
**follow** 47:24
49:6 65:6
70:14 109:21
121:16 131:24
**followed** 99:13
142:20
**following** 28:11
43:21 48:21
56:15 65:17
92:4 103:12
113:8
**food** 54:3 80:16
80:18

Page 18

**[football - getting]**

| | | | |
|---|---|---|---|
| **football** 15:3 | 142:1 | **fueling** 47:13 | **g** |
| **force** 122:15 | **fought** 139:6 | **fuels** 47:19 | **gain** 3:19 83:20 |
| 133:15 | **found** 35:2 | **fulfill** 2:12 25:5 | **gallego** 91:25 |
| **forces** 85:10 | 55:17 71:20 | 33:23 36:14 | 92:1 94:25 |
| **foregoing** 146:3 | 120:24 121:1 | 75:20 89:2 | 98:5 99:20 |
| **foreign** 7:12 | **founded** 107:6 | **fulfilled** 28:25 | **game** 15:3 |
| 8:3 21:24 | **founder** 71:14 | **fulfilling** 50:2 | 129:2,4 |
| 23:19 79:11,13 | **founding** 81:22 | 85:16 | **games** 128:25 |
| 79:14 102:5 | **four** 11:5 101:3 | **full** 12:6 44:9 | **gangs** 104:25 |
| **form** 85:23 | 102:11 120:2 | 55:16 114:4 | **gary** 12:17 |
| **formed** 19:3 | **frank** 5:12 92:3 | 138:7 | **gather** 4:3 |
| **former** 4:12 | **frankly** 10:9,23 | **fully** 22:3 23:17 | **gathering** |
| 12:15,23 37:24 | 11:17 36:3 | 28:17,25 45:3 | 120:13 |
| 43:5 58:18 | 52:2 58:23 | 54:17 57:6 | **gavin** 112:22 |
| 74:1 106:19 | **fraud** 3:21 | 58:1 74:11 | **gaze** 2:18 |
| 112:2 119:13 | **free** 10:14 58:6 | 109:15 | **geared** 80:22 |
| **forth** 72:8 | 123:20 131:16 | **fun** 114:18 | **gears** 79:10 |
| **forum** 119:19 | 135:2 | **function** 3:19 | **general** 55:15 |
| 123:23 | **freedom** 25:7 | 77:16 | 83:16 92:13,14 |
| **forward** 9:1 | **freer** 19:12 | **functions** 77:5 | 116:9 |
| 11:22,24 25:14 | **frequent** 62:20 | **fund** 102:25 | **generally** 140:1 |
| 28:20,20 37:3 | **frequently** | **funded** 74:11 | **generation** |
| 43:17 60:16 | 55:17 | **funding** 28:11 | 80:23 |
| 68:1 70:3 | **friday** 144:23 | 92:8,10 116:23 | **generations** |
| 74:12 77:3 | **friend** 12:15 | 117:8 | 19:14 25:8 |
| 86:20 87:9,18 | 17:14 22:17 | **funds** 93:10,25 | **generator** |
| 89:19 98:1 | 60:9 | 94:21 116:21 | 91:17 |
| 99:14 103:4 | **friends** 13:1 | **further** 98:11 | **generous** 17:15 |
| 104:21 112:11 | 45:17 51:18 | **future** 17:25 | **genuine** 2:25 |
| 121:22 126:5 | 133:6 | 25:12 32:19 | **georgia** 103:17 |
| 126:15 127:10 | **front** 20:6 | 58:18 87:4 | **getting** 21:15 |
| 127:11 130:5 | 73:17 106:8 | 97:19 110:6 | 35:23 48:22 |
| 130:21 131:17 | 112:23 129:12 | 127:5 130:25 | 49:12 73:4 |
| 135:10 138:22 | **frustrated** | 137:4 | 85:17 89:8,9,18 |
| 138:24 140:14 | 43:16 59:22 | | 89:25 94:17 |

Page 19

**[give - governor]**

give   16:16 40:20 54:2 62:5,6 79:19 100:18 108:16 109:16 112:6 115:15 119:23 136:23

given   17:8 22:15 31:9 32:3 41:4 55:14 65:1 72:5 75:22 94:2 112:21 113:19 116:21 116:23

giving   76:13

glad   52:21 56:16 58:14 63:23 81:8 109:11

global   22:11 24:11

go   16:11 25:23 26:12 33:12,17 37:2 40:24 53:20 54:4,4 56:7 57:2 76:2 94:10 97:9 100:8 110:19 118:8 120:7 126:25 131:10 134:5 138:11

goal   36:12 101:13 111:22

goals   103:5 112:15

god   16:18

goes   85:15 126:9 133:12

going   5:10 6:17 10:4,18,20,24 14:7 16:10 18:24 25:22 26:11 34:7,16 34:23 39:8,22 40:7,19,21 41:19 42:11 44:13 47:12 57:9 61:25 62:19 63:14 70:3,25 74:3 75:9,14 76:3 77:23 78:19 84:18,25 85:1,9 90:16,25 95:11 96:13,21 98:23 99:6 100:8,11 103:4 104:20 105:17 106:13 106:25 107:4 107:18 108:10 109:12 110:13 111:4 114:16 114:21,23 115:4 121:5 123:8 125:15 125:18 126:1 126:10,15 127:4,10

129:20 132:18 132:20 133:9 134:9,13 136:4 136:8 137:2 139:10 140:9 142:25 143:3,6 143:14 144:6

good   12:7,14 16:22 28:7 68:14 75:4,5,21 90:12 91:6 96:10 132:14

goodness 133:18

gordie   6:18 27:9 112:12

gotten   32:21 134:14

gov   1:14

government 3:20 4:20 19:6 22:1 23:21 30:5 34:23 35:5 36:6 37:18,25 38:20 40:3,4,9 41:8 42:4 50:22 53:25 55:23 56:10 62:21 71:15,18 82:25 88:9 89:21 91:1,25 94:3 105:8 117:22 122:24 123:15 123:24 124:2

124:10,22 125:10,12 131:8 134:24 139:1 144:17

government's 134:25

governments 48:8,17 49:2,2 49:11 74:23

governor   4:4,9 4:11 5:2,6 6:12 8:23 9:6,14 10:2 11:21 13:20 14:11 15:10,16,19 16:5,14,19,20 16:22 17:22 19:18 21:3 22:19 24:7 25:18 26:4,5,10 26:15 27:13 28:19 29:15,22 30:1,19 31:10 32:10 34:2,4,6 34:9,11,25 37:24 38:2,11 40:15 41:1,7,23 42:18,24 43:1,5 43:16,19 44:8 44:11,24 46:11 46:17 47:21 48:14,18 49:15 49:19,24 50:5 51:9,13 52:15 53:18 54:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[governor - happened]**

56:1 57:2 58:8 59:17 60:15,18 60:21 61:14 62:5,15 63:2,7 63:17,20 64:2 64:23 65:10,13 65:18 66:9,20 67:20 68:1,5,9 69:9,12 72:13 74:1,2,4,6,21 75:1,4,5,16 76:6,15 77:1 78:5,24 79:21 80:4,9 81:2 82:20,22 83:25 86:19 87:15 88:15 90:20 91:8 92:2 93:21 96:18,19 98:21 99:23 100:3,10,25 101:13,19,25 102:7,13,19 103:1,11,19 104:1,17 105:9 106:15,18 107:23 108:17 109:20 110:4 110:11,24 111:12,14,20 112:2 113:6,14 113:16 114:5 114:11,20 115:8 116:2,16 117:2,12 118:1

118:17 119:20 121:16,21,24 122:1,3,4 124:23 126:5 126:15 129:22 130:5,17,21 131:11,11 132:1,6 137:9 138:17,20 139:15 141:6 141:25 142:17 143:8,17 144:9

**governors** 14:13 15:21 16:6 38:22,23 41:5,10 43:6,13 49:19 67:23

**grandchildren** 70:22

**grandma** 71:3 71:10

**grandmother** 14:4 17:20 70:18

**grant** 49:10 50:20,21 51:5

**granted** 18:18 56:22 117:15

**grants** 49:24 50:4

**grateful** 17:15 18:14 115:19 135:18

**gratitude** 17:6 17:12

**grave** 29:16

**great** 5:6 11:21 15:15 16:3 19:1 23:14 29:1 34:8,10 51:19 60:8 68:9 96:5,7 113:14,16 114:7 121:11 125:8 128:5,10

**greater** 61:11 71:15 83:16,17

**greatest** 3:15 105:16

**grenade** 129:5

**grids** 21:22

**grotesque** 88:4

**ground** 49:13

**groups** 22:23 29:7 79:11,13 79:15 81:3 82:4,15 140:24

**grow** 14:5 50:13,22 70:25

**growing** 66:13 67:12 128:12

**grown** 4:9 19:4

**gsa** 136:15

**guard** 21:3 28:10 38:6 39:1,2,5,11,17 40:14 110:18

**gubernatorial** 24:22

**guess** 75:11,13 75:23 76:2 77:7 79:12

**guns** 46:5

**guy** 139:3

**guys** 106:11

**h**

**h** 139:21

**hack** 7:24 33:13 40:16

**hackers** 7:23 31:25

**hacking** 74:8

**hacktivists** 8:4

**half** 142:4

**hamas** 80:9

**hampshire** 43:23 45:13 48:6

**hand** 4:1,1 16:15 23:16,17 34:15

**handed** 10:12 118:3

**handled** 122:6

**happen** 24:21 27:24 46:22,23 69:18 73:3 89:13,20,23 90:7

**happened** 13:7 34:17 60:5 69:14 71:7 73:12 86:6 89:15 90:1

Page 21

**[happened - homeland]**

120:12 141:8
143:11
**happening**
30:12 39:4
63:4,7 120:10
125:9 135:7
**happens** 59:14
73:18 133:7,13
**happy** 131:4
**hard** 8:10 10:6
10:17,25 17:24
98:13 113:25
123:12
**harden** 32:13
33:24
**hardening**
32:18 87:7
**hardest** 108:2
**harm** 20:19
23:14
**harming** 105:1
**hassan** 14:13
42:22,23 43:2
44:23 45:11
47:17,22 49:6
51:3,10
**hawley** 51:11
51:12 52:20
54:8,24 56:16
57:13 58:11
60:7,25
**hazard** 83:17
88:7,12
**he'll** 77:12

**head** 20:13
34:21 53:1
84:6 103:15
119:7 132:11
**healthy** 139:2
**hear** 9:20 52:21
78:16,17 108:9
108:13 109:11
115:19 119:18
**heard** 46:18
69:7 70:5
72:16 116:12
123:25 126:16
126:23 127:8
**hearing** 1:13
4:6 5:11 6:5
16:9 25:22,24
26:3 43:17
53:7 55:15
136:3 144:19
144:22,25
**hearings** 64:11
**heartbreaking**
62:1
**heavy** 10:12
**heck** 53:15
**held** 54:6
137:25
**helicopters**
39:21
**helm** 15:17,19
**help** 16:18 18:6
21:4,16 23:10
30:6 32:14,16
33:2,24 38:22

38:23 43:19
49:13 67:23
79:3 112:12,21
117:25 119:2
121:15 125:21
126:2 133:21
136:7 142:5,13
**helped** 22:11
**helpful** 127:2
136:9
**helping** 38:10
48:25 51:1
61:5 93:15
**helps** 132:21
**hhs** 34:18
**high** 11:13
15:18 48:4
60:8,24 114:19
114:19,20
**higher** 83:18
**highest** 32:7
**highlight** 57:14
**highly** 93:4
**highway** 22:22
97:11
**hills** 91:20
**hire** 6:23 97:2
**hispanic** 21:2
**historic** 24:9
112:19
**historically**
136:5
**history** 51:24
57:24 104:7
105:16 110:5

131:1
**hit** 53:1 62:18
144:4
**hmm** 14:1
**hold** 32:4 73:22
87:14
**hollywood**
111:9
**homan** 75:24
75:25 76:3,6,15
77:9 78:16
**homan's** 75:13
**home** 6:15 15:5
19:22 27:10
35:3 42:6
69:15 71:23
73:5 78:15
98:20 141:11
**homegrown**
30:17,18,19
65:20,22 66:12
67:21,25 81:6
107:24
**homeland** 1:13
3:8,16 4:5 5:17
5:22 7:10 9:16
12:1 13:9,20
15:8,20 17:1
18:4,16 19:2,4
20:1,6 24:1,4
25:4,13 29:6,17
30:6 31:2,13
34:19 42:17
43:13,20 51:21
51:25 58:10

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[homeland - immigration]**

59:18 63:10 65:1 66:12 67:5 70:6 76:19,25 81:12 82:13 84:9,20 90:22 96:22 100:12,14,22 102:9 103:2,15 103:25 106:13 107:7,18 109:4 111:15 119:6,9 120:2 123:4 127:16 128:21 130:9 131:23 140:11
**homes**  18:7,24 91:15
**honest**  36:4 60:13,13 107:13
**honestly**  88:8 108:15
**honor**  15:25 25:9
**honored**  16:25
**hope**  4:6 25:14 31:10,15,16 49:21 51:23 59:8 67:22 79:3 94:1 104:1 112:10 127:4 128:1 140:11 141:23 142:15

**hopeful**  141:12
**hopefully**  25:15 105:23 117:13 131:20 139:9
**hopes**  15:18
**hoping**  61:7
**horrible**  107:20 108:1 130:2
**horrific**  7:7 29:24 71:6 72:23
**hose**  91:17
**hospital**  92:14 95:21
**hospitality** 12:21
**host**  11:10
**hostage**  32:4
**hosting**  122:23
**hot**  104:13
**hotel**  102:17
**house**  9:23,23 13:6,7,10 35:7 45:1 61:10 78:1 99:14 102:17 113:22 117:21
**how's**  121:7
**howe**  6:18 27:9 112:12
**huge**  72:3
**human**  19:19 46:4 76:7 96:12

**humanitarian** 116:9
**humanity**  95:4
**humility**  18:3
**hundreds** 22:21 88:1
**hunt**  32:13 33:24
**hunter**  137:12
**hunting**  137:15 137:23
**hurricane**  88:5
**hurricanes** 8:13
**husband**  18:9
**hyde**  146:2
**hyper**  127:15
**hypothetical** 64:8,11
**hypotheticals** 64:3

**i**

**ice**  21:18 76:14 85:10
**idea**  2:6 55:22 111:8
**ideal**  95:2
**identify**  46:12 67:1,12 138:13
**identifying** 31:3 44:12
**ideologies** 23:19 29:8
**ignoring**  99:9

**illegal**  20:8 21:14 46:5 52:24 53:13 55:3 69:3,11,20 83:10 94:5 115:25 124:17
**illegally**  37:10 54:1
**illegals**  55:24 102:16,24
**imagine**  53:21 112:2 123:7,7 123:12,13 124:9
**immediately** 26:2 37:14 69:25 88:9 101:9 102:2
**immense**  68:12
**immigrant**  69:3
**immigrants** 21:15 55:3 69:11,20
**immigration** 7:2 20:9,20 21:1,12 37:23 56:15 57:6,7 68:17 83:10 92:12 93:13 95:18 98:17 104:4 109:11 109:12,18,21 139:19,20 140:7,15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[immigration's - inslee]**

| | | | |
|---|---|---|---|
| **immigration's** 110:4 | **improve** 48:16 | 46:15 83:17 | 42:9 48:3 56:4 |
| **impact** 73:23 | **improvement** 85:15 | **increasingly** 8:5 31:23 | 59:6 60:4 |
| **impacted** 41:24 41:25 72:25 | **improving** 43:12 | **incredible** 60:10 74:24 | 61:17 73:20 74:14 79:1 |
| **impacts** 38:1 | **ina** 67:8 | 76:7,10 96:21 | 85:22 86:5,9,11 |
| **impede** 45:21 | **inaugural** 114:16 | 97:7,16 | 91:3 99:17 |
| **implement** 32:6 | **incentivize** 83:9 | **incredibly** 8:25 60:11 67:5 | 108:20 113:9 120:3 121:6 |
| **implemented** 74:12 89:1 | **incidences** 66:13 | 114:11 128:23 | 125:6 132:7 144:18 |
| **implementing** 61:9 98:8 | **incident** 107:21 130:2 | **indian** 15:21 | **informed** 88:19 |
| **importance** 6:6 34:22 42:1 | **incidents** 7:8 29:2 30:20 | **indigenous** 15:24 | **infrastructure** 20:10 21:22 |
| 68:16 81:1,17 | **included** 24:9 | **indiscernible** 40:25 99:20 | 32:12,15,15 |
| **important** 6:15 8:25 12:25 | **including** 6:13 16:5 19:17 | **individuals** 29:7,20 35:23 | 33:2,3,12,18,25 46:20 47:10 |
| 14:12,17 19:18 27:15 30:25 | 21:1 27:9 43:8 46:10 48:5 | 51:1 83:23 85:17 99:7 | 48:15 49:3 83:11 86:1 |
| 41:16 43:6 45:19 46:20 | 57:21 98:19 104:25 122:10 | 102:11 105:1 117:9 121:9 | 97:24 |
| 50:17 61:23 67:16 82:2 | 140:20 141:19 | **industry** 50:6 | **initiation** 87:23 |
| 94:19 106:22 107:15 126:23 | **incoming** 75:10 81:19 107:2 | **infiltrate** 45:6 73:21 80:18 | **injured** 53:3 |
| 127:3,16 128:24 132:9 | **incompetence** 2:9 | **infiltrated** 7:23 32:1 73:12 | **innocent** 134:12 |
| 135:16,19 143:18 | **incorrectly** 93:20 | **inflation** 98:16 | **innovation** 20:14 |
| **importantly** 59:13 86:13 | **increase** 27:2 43:24 | **influence** 3:11 87:3 125:20 | **innovative** 20:5 |
| **imposed** 10:12 | **increased** 6:24 38:16,16 40:8 | **influx** 83:10 | **input** 20:16 23:23 49:18 |
| **impoundment** 64:16 | **increasing** 6:2 7:22 8:10 | **influxes** 92:9 93:13 | **inside** 12:17 109:7 |
| | | **information** 3:19 32:9 33:10,16 41:5 | **insight** 17:9 76:8 99:18 |
| | | | **insignia** 111:6 |
| | | | **inslee** 62:16 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[inspection - joe]**

inspection 144:21

inspections 46:15

inspector 55:15

inspire 79:17

inspired 9:19

instance 76:13

instances 56:24

institute 139:6

institutions 21:23

instructed 117:18

integration 128:11

intelligence 23:15 65:24 66:23 67:3,7 73:15 107:17 108:9

intend 9:2 53:16

intended 32:23 55:19 94:18 104:22

intense 57:25

intent 29:11

intention 131:21

intentions 42:7

interact 39:10

interaction 67:8,10

interdiction 19:20 39:22

interest 4:15 120:19

interests 10:1 130:9,10

interior 15:17

interject 91:10

internally 126:3

international 6:19 16:6 27:9

internet 57:18

interrupt 134:7 143:6

interrupting 64:9

interview 77:11 105:13 123:9

interviews 59:1

introduce 9:13 11:21 17:17 18:9

introduced 9:7 142:9

introducing 14:20

introductions 16:3,12

invaluable 17:7

invasion 27:22 39:4,7 85:5 94:6

invasive 3:4

invested 78:22

investigate 86:10

investigating 35:18 61:3

investigation 55:16 60:1 61:4,19 66:4 86:14 118:20 118:21 125:11 125:17

investigations 35:17 108:21

investigators 35:17

investments 46:2,9,13

invited 15:10

involve 140:11

inward 2:18

iowa 63:16 68:20 69:16 100:2,6,7

ip 80:20

iran 81:16

iraq 106:20

irgc 81:15

isis 29:9 65:23 66:4,6,7,17 80:10 81:14,15 140:21

islamophobia 141:23

issue 2:10 3:18 10:17 11:18

43:15 47:24 75:18 89:16 94:7 122:24 127:16 137:10

issues 5:11 19:18 44:13 46:11 92:20 97:1 107:4 113:25 120:18 126:14 127:23 131:7

it'll 99:5

**j**

j 17:3 52:18

jail 137:24

janet 15:14

january 1:12 69:1 144:23

jersey 36:5

jets 102:3,11

job 10:3 33:1 34:8 36:13 40:10 70:8 73:6 84:24 100:16 105:12 111:14 114:7 121:11 125:8 136:2,4

jobs 72:19 85:1 85:1,3

joe 29:19 30:12 37:21 57:10 101:4,7 112:2 112:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[john - large]**

**john** 9:7
**johnson** 34:3
  42:22 51:11
  60:19,21 61:3
  61:20 68:5
  82:19,20,23
  85:19 87:11,16
  91:6,9
**join** 93:15
**joined** 105:21
  106:19
**journal** 122:14
**judges** 57:7
**judgment**
  51:18
**judiciary**
  140:10
**jump** 40:24
**jurisdiction**
  15:23
**justice** 69:9
  139:6

**k**

**kansas** 53:12
**keep** 18:6 25:22
  25:23 30:7
  31:14 41:20
  50:12 131:7
  142:10 144:1,3
**keeping** 27:11
  130:24 131:16
  143:17
**keeps** 95:22
**kept** 42:12
  95:25

**kevin** 9:8
**khorasan** 81:15
**kids** 17:25
  142:14
**kill** 80:23
**killed** 52:23
  53:2,11 69:2
**killer** 69:5,11
**kim** 75:2,3,7,21
  76:10,23 77:2
  78:13 79:9,25
  80:8,25 81:8
**kind** 12:21 43:3
  55:23 70:3,24
  70:25 83:19
  86:17 140:2
  142:16
**kindergartners**
  48:4
**kinds** 139:21
**knew** 3:17
  42:11 70:10,11
  131:14
**know** 2:13 6:11
  7:1 13:4 14:3
  16:10 24:3
  26:16 30:11
  31:12,15 35:2
  37:18,24 38:4
  38:23 40:18
  47:12 49:14
  55:20 56:5,18
  59:21,25 60:15
  64:10,14,23
  66:5,5 67:16

71:10 72:2
73:10,13 74:23
77:24,25 82:5
86:5 90:13,24
94:16 99:10
107:16 108:8
108:20,22
110:20 112:1
112:13 113:4
114:4,24 115:3
116:20 117:15
118:7 121:4
123:17 124:10
126:18,19
127:1 139:20
139:25 140:1,4
140:19 141:1
143:22
**knowing** 30:22
  56:12 113:21
  113:23 116:4
  131:6
**knowledge**
  73:14 80:3
  82:14
**known** 9:16
  30:9
**knows** 14:4
  114:25
**kramer** 44:5
**kristi** 1:14 4:4
  9:17 12:12,22
  12:23 13:1,11
  13:17 14:23
  15:19 70:8

114:13

**l**

**labeling** 2:23
**labels** 143:11
**lack** 38:19
  44:14,14 59:22
  97:2 143:1
**laid** 69:6
**lake** 40:24
**laken** 53:8
  103:24 143:19
**lakota** 39:20
**land** 82:8 95:16
  97:25
**landry** 31:10
  114:5
**lands** 96:3
**landscape** 22:9
**landscapes**
  44:16 97:25
**language** 2:6
  86:16
**lankford** 46:10
  113:13,14,17
  114:21 115:11
  116:7,19 117:5
  117:17 118:6
  119:4,25
  121:20,25
  132:22 134:19
  135:2,3 137:11
  138:19,24
  140:12
**large** 33:9
  36:13,13 96:2

Page 26

**[largely - live]**

| largely | 10:14 |
| --- | --- |

largely  10:14
95:14,15 126:1
largest  5:19
91:14
las  7:8
lastly  112:10
launched  47:25
law  2:18 3:6
11:8 19:24
22:17,19,23
23:1,3,6,8,15
36:22,24 38:24
40:23,23 44:1
46:3 48:22
49:10 56:18,23
56:25 59:2,4
60:15 63:1,22
65:3,6,17,25
71:5 84:11,12
85:10,12 86:16
89:18 96:11
97:4 99:15
103:9 110:17
110:22,25
111:11 112:3,8
113:8 121:17
123:1 124:7
128:21 135:24
136:6 144:2
lawful  6:20
20:20 45:22
laws  37:4 54:7
56:15 64:6
78:22 84:13,14
94:14,24 98:24

99:9,13,14
102:15 103:12
103:13 104:4
109:12,21
110:7 142:20
lead  4:10 8:2
9:3 18:3 61:5
98:10
leader  9:7,22
12:7 13:11
14:10 17:12
22:12 50:11
leaders  61:3
88:17
leadership  3:25
5:23 8:17
10:15,25 15:25
17:3 31:15
35:5,12 36:3
58:3,9,23,24
60:25 63:3,9
90:20 91:5
114:8,12
leading  4:18
20:1
leads  3:21
116:11
learn  12:15
87:20
learning  12:17
leave  61:25
71:1
leaving  30:22
led  10:6 19:6
19:10 23:7

61:1 88:16,17
142:5
ledanski  146:2
lee  53:11
left  11:9 14:14
24:14 93:12
100:7 130:20
137:15,18,22
legal  46:21,23
56:15 57:5
69:4 98:17
103:7 109:10
109:17,18,21
115:6 122:22
146:10
legally  57:8
100:21
legislation  6:23
44:6 46:11
77:2 81:23
86:13 87:9
128:19 129:1
131:4 141:10
legislative
141:9
legislator  14:10
legislature  9:22
17:21
legitimate
54:14 57:20,20
111:2 132:19
length  26:19
126:13
lethal  66:2

letter  14:23
15:5 16:5
letters  16:8
level  33:4 50:25
73:19 74:13
90:4 110:1
138:11
levels  23:21
83:17
leverage  22:6
liability  124:8
liberties  31:5
124:25
liberty  4:1
life  17:23 24:14
100:2 110:3
light  57:14,15
limit  69:4
142:10
limited  56:19
64:10
line  6:3 25:23
76:16 107:11
list  29:21
100:21,24
listen  80:14
lists  81:13,14
81:14
litmus  106:3
little  5:10 9:20
46:7 70:7,23
100:16 112:5
129:17 140:17
live  90:24 105:1
120:9

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[lives - mandate]**

| | | | |
|---|---|---|---|
| **lives** 24:6 88:1 136:18 | 130:5 131:17 134:20 135:10 138:22,24 142:1 | **luck** 91:7 | 72:8,11 74:13 76:24 78:20,25 |
| **living** 13:14 | | **lumped** 92:21 93:6,18 | 79:7 81:16,21 82:12 89:24 |
| **local** 32:14 33:2 40:23 48:8,17 49:1,11 50:25 73:19 74:21,22 85:10,11 87:7 88:17,25 89:18 89:18,22 90:11 91:12,25 97:10 98:18 128:21 | **looked** 50:1 | **luxury** 102:17 | 90:16,23 91:2 94:22 95:24 |
| | **looking** 63:3 97:1,17 112:11 121:22 126:3 130:21 | **m** | 96:12 99:13 100:11 101:20 |
| | | **ma'am** 29:12 | 102:1 103:13 106:13 108:11 |
| | **loopholes** 115:15 | **made** 7:11 10:9 16:9 38:24 41:2,22 62:4 75:19,23 119:5 122:21 | 110:6 112:16 113:7 125:13 127:13 135:20 137:1,2,7 141:13,17 144:2 |
| **locally** 88:16 | **loose** 37:5,8 | **magnet** 10:10 | |
| **lock** 127:20 | **lose** 27:23 69:19 | **main** 50:5 | **making** 5:7 19:11,13 31:6 |
| **lone** 108:3 | **losses** 95:13 | **maintain** 27:7 32:6 116:3 | 35:20 36:18 61:21 69:17 |
| **long** 9:17 85:3 99:8 113:21 129:24 133:12 136:5 | **lost** 4:11 19:8 37:16 87:25 143:24 | **major** 61:10 62:18 79:13,14 | 72:1 76:12 77:9,13,23 78:16,23 85:17 100:5 111:22 125:22 |
| | **lot** 12:15 44:4 45:17 50:14 67:16 79:22 85:15 95:16 109:1 113:20 114:2 115:12 122:5,10 126:16,24 127:8 134:7,12 135:23 140:3 | **majority** 9:7 12:7 13:11 17:12 21:2 84:18 108:6 | |
| **longer** 94:3,7 102:8 104:19 116:5 124:12 124:21 143:20 | | | **malibu** 91:16 |
| | | **make** 4:13 20:10 22:11,20 22:25 23:10 25:13 28:5,23 28:24 31:19 32:17 36:16 45:7,22 46:13 46:25 47:10 50:1 51:6 54:5 54:22 56:7 57:5,8 58:25 59:11,20 61:16 66:25 67:10 70:2,14 71:5 | **man** 52:22 |
| **look** 9:1 11:22 11:24 14:7 25:14 28:20,20 43:16 47:3 60:16 68:1 70:23 74:12 81:22 86:19 87:8,18 89:14 98:1 101:2,6 104:24 112:11 114:23 125:18 126:5 127:10 | | | **managed** 10:7 |
| | **louis** 53:12 | | **management** 8:9 48:2 |
| | **louisiana** 29:22 67:20 114:9 | | **managing** 10:6 43:8 |
| | **love** 18:14 41:9 49:18 | | **mandate** 20:24 30:14,15 |
| | **low** 57:14,14 84:25 | | |

[manhattan - mission]

**manhattan** 102:18

**manipulate** 87:1

**manipulated** 104:18

**manipulation** 80:19

**manner** 46:23 98:14 131:19

**march** 129:20

**mark** 123:25

**markings** 111:7

**mass** 56:17,22 95:4 98:8

**massive** 82:25 83:1,4,10,20

**materials** 86:23

**matt** 125:7

**matter** 129:10 130:1 131:14

**mayorkas** 34:18 52:1 100:19 101:10 101:16,23 104:5,10 105:14,19 106:7 112:4

**mayors** 85:12

**mean** 15:23 83:22 87:16 88:3 108:1 128:17

**meaner** 40:25

**meaning** 52:10

**meaningful** 15:13

**means** 17:24 51:16 87:21 88:22 92:13 108:14 139:14

**measure** 140:8 142:9

**meddled** 32:25

**media** 2:23 123:13,16 124:13,22

**meet** 6:24 20:13 45:2 62:21 88:20 100:7 124:13 124:19,22

**meeting** 43:4 44:12 49:8 92:3 93:5 119:22 123:5 123:15 124:2 127:14

**meetings** 25:10 73:25 84:2

**member** 4:12 5:3 9:11,24 12:5,24 14:11 16:23 25:20 61:6 68:8 104:7 122:8 126:20 128:8 133:24

**members** 9:11 16:24 27:20 69:20 84:2 128:8

**men** 17:16 21:11 25:4

**mention** 136:11

**mentioned** 56:17 58:13 70:5 77:8 81:10 115:13 115:23 127:6 128:22 132:22 135:21

**met** 100:1 112:14

**mexican** 105:8

**mexico** 54:10 54:16,22 139:4

**michael** 125:7

**michigan** 6:16 12:20 27:10 28:10 63:15

**middle** 109:4

**migrant** 52:24 53:5,9,15 67:18 92:9 103:7 108:7 140:21

**migrants** 53:13 107:22

**mile** 18:23 91:20

**miles** 136:18

**military** 66:6 106:21 108:1

110:19 112:9

**militia** 109:5

**million** 48:11 64:19,20

**millions** 48:3 112:21

**mind** 59:4 100:17 106:3 129:13

**mine** 77:16

**mineola** 146:13

**minimis** 47:2

**minimize** 82:1 82:6

**minute** 120:11 126:11 142:4

**minutes** 25:20

**miserably** 73:2

**misinformation** 32:23 83:14 86:22 89:25 123:11 125:1

**mismanagem...** 88:4

**missing** 142:22

**mission** 2:12 3:5 6:14 20:3 20:24 21:10 25:5 26:25 28:9,17,24 31:6 32:11,12,21 33:23 35:19 36:12 39:6 48:23 50:2 66:11 81:22,23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[mission - need]

81:24 82:9,17
83:13 84:8,19
85:16 88:23
89:2 102:8
103:3 107:6
108:13 118:10
119:1 126:6
127:3
**missions** 28:14
**missouri** 51:20
68:24
**mistakes** 96:1
**misunderstand**
122:11
**misuse** 86:16
**misused** 83:6
83:22 86:7
**mixed** 78:13
**mom** 14:4
70:18
**moment** 3:8,9
114:8
**moments** 4:22
**monday** 105:24
114:15,18,22
**money** 51:6
62:5,7,10,14
63:15,19 64:13
64:22 95:20
133:16
**monitoring**
2:23 3:6
**montana** 13:2
**month** 31:25
43:5 74:8

102:18 120:12
133:4
**months** 5:1
23:23 137:15
**moral** 83:17
88:7,12
**morale** 84:24
135:22
**moreno** 99:21
99:22 100:4
101:10,16,22
102:3,10,16,23
103:6,14,23
104:3 105:3,12
**morning** 9:6
16:23 17:16
**mosques**
141:20
**mother** 17:19
**motor** 53:1
**move** 23:4
71:12 93:1
98:1 127:10
128:3 140:14
**moved** 77:3
**movie** 111:9
**moving** 25:24
38:18 96:2
135:7
**mowed** 52:24
52:25
**multiple** 15:10
120:17
**murderers**
101:11,14

**murders** 37:3,5
**musk** 123:17

**n**

**n** 146:1
**name** 68:25
70:5
**names** 111:8
**nation** 3:11
5:23 7:6 8:18
8:20 19:1
20:17 36:16,16
36:17 62:17
84:14,15 96:10
139:19
**nation's** 6:1,6
6:16 22:8
33:24 66:10
76:1 94:14,24
103:12 110:7
**national** 3:25
9:4 21:3 28:10
35:21 38:6
39:1,2,5,11,17
40:14 50:11
75:17 80:16
92:12 96:16
110:18 119:13
120:24 121:4,7
130:8 135:17
**natural** 6:2
8:10 19:20
20:11 24:8
62:17,19,22
90:7

**naturally** 14:1
**nature** 19:3
81:11 93:1
124:9
**near** 142:11
**nearly** 12:11
**necessarily**
30:11 47:9
73:10
**necessary**
26:24 35:22,24
38:3 45:4
**need** 6:9 8:16
11:19 21:9
22:13 24:18
27:11 28:24
30:3,16 35:12
42:15 44:2,15
44:18 45:15,23
46:1,19,21 47:3
47:5 49:5
50:12 56:7,13
56:14 62:20
63:19 64:14
67:9 71:15,16
71:25 72:7,14
73:8 74:9 79:1
79:4 84:23,23
88:21 89:10
93:10 94:8,21
99:4 109:16,19
109:20,22
110:6 115:14
118:18 119:2
119:25 122:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[need - north]

| | | | |
|---|---|---|---|
| 127:13 129:11 | **new** 4:7 7:8 | 42:24 43:1 | 118:17 119:20 |
| 132:7,8 133:22 | 19:9 29:2,24 | 44:11,24 46:11 | 121:16,24 |
| 134:21 138:9 | 31:21 36:5 | 46:17 47:21 | 122:1,3,4 |
| 138:22 139:21 | 43:23 45:13 | 48:14,18 49:24 | 124:23 126:5 |
| 140:1 141:22 | 47:6 48:5 | 51:9,13 52:15 | 130:5,17,21 |
| **needed** 40:11 | 52:17 60:11 | 53:18 54:19 | 132:1,6 137:9 |
| 44:8 51:1 55:7 | 65:21 66:14 | 56:1 57:2 58:8 | 138:17,20 |
| 59:14 70:11 | 78:9 88:11 | 59:17 60:15,18 | 139:15 141:6 |
| 90:9 95:7 | 89:5 90:1 | 60:21 61:14 | 141:25 142:17 |
| 139:24 | 92:21,24 93:20 | 63:2,7,20 64:2 | 143:8,17 144:9 |
| **needs** 15:21 | 102:22 107:20 | 64:23 65:10,13 | **noem's** 16:5 |
| 20:24 31:2 | 108:21 134:23 | 65:18 66:9,20 | **nominate** 107:3 |
| 33:22 35:14 | **newsom** 62:5 | 68:1,5 69:12 | **nominated** 9:14 |
| 42:17 61:17 | 112:23 | 72:13 74:6 | 11:14 70:5 |
| 85:14 92:8 | **newspaper** | 75:5,16 76:6,15 | 72:17 76:18 |
| 101:8 105:10 | 55:8 | 77:1 78:5,24 | 111:15 |
| 108:22,23 | **nfl** 129:1 | 79:21 80:4,9 | **nomination** 4:4 |
| 109:22 110:1 | 134:20,24 | 81:2 82:20,22 | 11:23 16:5 |
| 115:12 118:24 | **night** 14:22 | 83:25 86:19 | 31:17 34:5 |
| 125:11 133:9 | 18:23 41:20 | 87:15 88:15 | 51:14 60:16 |
| 139:1,19 | **nimble** 33:23 | 91:8 93:21 | 74:20 |
| **neighbor** 68:10 | **nine** 99:25 | 96:18 98:21 | **nominations** |
| **neighbors** 27:8 | 100:9 | 100:3,25 | 135:15 |
| 65:15 | **nod** 113:18 | 101:13,19,25 | **nominee** 1:14 |
| **networks** 8:3 | **noem** 1:14 4:4 | 102:7,13,19 | 4:25 17:1 18:3 |
| 32:4 | 4:9 5:2,6 8:23 | 103:1,11,19 | 110:16 144:13 |
| **nevada** 107:21 | 9:7,17 13:17,20 | 104:1,17 105:9 | **nominees** 26:5 |
| 108:22 | 15:10,19 16:14 | 106:15 107:23 | **non** 135:16 |
| **never** 18:18 | 16:19,20,22 | 108:17 109:20 | **nonsense** |
| 24:21 29:25 | 25:19 26:5,6,10 | 110:4,11 | 106:11 |
| 32:23 41:4 | 26:15 27:13 | 111:14,20 | **normalized** |
| 55:9,14 58:1,1 | 28:19 29:15 | 113:6,14,16 | 39:14 |
| 58:4 59:14 | 30:19 32:10 | 114:20 115:8 | **north** 12:20 |
| 125:23 142:18 | 34:2,6,9,25 | 116:2,16 117:2 | 14:25 15:2,16 |
| | 38:11 41:7 | 117:12 118:1 | 45:17 46:22 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[north - opportunity]

47:14 72:24 113:2
**northern** 6:11 6:13 12:18 26:21,24 27:3,6 27:17,23 28:9 28:14,17 43:25 44:1,4,6,10,13 44:20 45:9,14 112:11
**northwest** 68:10
**norway** 110:2
**note** 45:12 60:8 60:24 74:18 144:7
**notice** 51:15
**notion** 126:20
**november** 110:17
**nsa** 50:14
**number** 6:2 8:10 10:3 13:21,21,22,23 13:25 29:17 69:23 70:1,10 74:3 101:1,4 131:13
**numbers** 126:24 127:1 135:8
**numerous** 7:25
**ny** 146:13

**o**

**o** 146:1
**o'odham** 96:10
**oath** 52:8,9 63:21 110:14 111:21
**obama** 40:17
**objection** 16:8 144:18
**objectively** 104:5,6
**observed** 9:21
**obviously** 10:5 30:13 76:17 117:7 134:16 140:10
**occasionally** 114:14
**occasions** 15:10 22:22
**occur** 125:11 130:2
**ocean** 91:15,18 91:22
**odds** 4:1
**offer** 103:8
**offered** 97:4
**office** 5:10 25:11 27:14 59:8,8 68:15 71:13,18 93:22 106:9,18 128:2 131:20 132:12 144:17

**officer** 53:10 106:19,21 108:9 109:2
**officers** 6:24 23:4 53:12 97:3,5,5 110:25 118:23
**offices** 12:12 14:20 15:14 71:25 72:15 77:5 144:21
**officials** 66:25 87:8
**oh** 70:8 104:1 105:9 124:15 130:17 132:25
**okay** 111:10 122:4 139:15
**oklahoma** 114:25 115:2 115:17 137:12
**oklahomans** 116:12
**old** 51:22 52:23 146:11
**once** 12:5 23:22 25:1 91:24 123:13
**ones** 79:16 107:5
**ongoing** 7:10 7:24
**opaque** 86:4
**open** 5:12 6:19 10:14 38:8,14

52:12 59:9 104:13 109:9 112:24 113:1 119:12 123:23 144:22
**opened** 37:22 83:24
**opening** 5:4 16:21 26:17,21
**openly** 119:17
**opens** 112:16
**operate** 46:24 127:9
**operates** 3:23
**operating** 5:20
**operational** 105:6
**operations** 2:14 40:1 47:6 88:24 98:19 102:24
**operative** 104:9
**opinion** 122:13 122:14
**opinions** 107:1
**opponents** 3:9
**opportunities** 19:1
**opportunity** 4:16 12:9 14:18 22:15 25:9 48:20 56:2 94:2 97:15,20 100:15 105:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[opportunity - paul]**

126:13
opposed 124:10
opposite 23:2
optimistic 144:7
order 11:1 44:22 54:15 71:16 83:20
orderly 81:20
orders 76:13 99:7
oregon 110:24
organization 66:18 107:6 134:22
organizational 77:6
organizations 16:8 80:1,3,5 80:11 81:14
origins 3:17
orleans 7:8 65:21 66:15 89:6 90:1 107:20 108:21 134:23
ought 40:22 67:20 134:24 134:25
outlined 26:17
outrageous 55:24
outset 25:25
outside 114:17 137:22 140:24

outstanding 9:14 21:11
overreach 3:21
overseas 137:17,18 138:4
oversee 24:17 78:12 136:20
overseeing 139:9
overseen 19:15 22:21
oversight 4:23 61:18 77:20 112:25 120:16 121:10,12,18
overstayed 99:8
overwhelmed 21:5
overwhelmin... 40:13 140:8
own 2:8,11,14 14:5 24:22 59:2 93:14 97:22 120:22 125:17

**p**

p.m. 144:22
pacific 91:15 91:18
packed 137:16
page 90:17
paid 56:10 123:18,20

pandemic 10:7 24:11 86:21
paperwork 85:4
parents 142:6 142:15 143:16
paris 40:16
parole 55:13 56:17,18,22,25 57:3 116:8,9,14
part 14:14 16:9 82:5 85:21 97:22 102:22 104:4 110:5,6 140:9,12 144:18
participate 49:20
particular 75:11 81:15,21
particularly 47:19 51:22 107:16
partisan 3:3 135:16
partisanship 127:15,17
partner 31:13 39:24 54:21 57:5 85:12
partnered 40:2 50:13 67:8
partners 20:15 66:22 96:6

partnership 80:13
partnerships 22:6 85:9 97:13
parts 96:2 124:7
party 105:19 106:4 132:18
pass 13:8 59:2 123:1 129:24
passed 7:1 140:7
passionate 84:22
past 11:5 96:8 115:2 120:2 143:12
path 80:10 140:2
patrol 21:8,18 22:22 85:2 97:11 136:19
paul 2:1 5:6 9:6 12:3,5 16:2,20 16:23 25:18 26:11 68:3 75:2 82:19 91:9 99:21 106:16 113:13 122:2,5 123:6 125:3 126:7,20 132:15 135:4 139:1,13 144:12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[pause - please]**

pause   49:18
pay   48:11
  55:23 93:12
  95:20 131:9
  134:21,24
paying   3:13
penalized   57:22
pennsylvania
  90:2
people   3:1,13
  3:24 4:16 7:16
  8:21 10:10
  11:7 15:24
  17:4 19:22
  22:4,25 23:14
  23:24 25:22
  27:22 29:10,23
  30:7,15,21,22
  31:11,11 34:14
  35:4 36:1,15
  37:9,16 38:19
  40:11,12 41:2
  45:21 53:10,25
  54:2 56:10
  57:8,11 58:25
  60:14 63:12
  66:19 67:24
  70:4,9,13,20
  71:6,25 72:15
  75:20 78:14
  80:14 84:9,17
  84:19,25 87:2
  87:25 89:8
  90:10,24 92:18
  92:25 93:1,19

  94:5,7 95:10,19
  97:22 100:20
  100:23 101:23
  102:1,5,20
  104:15 105:1
  108:19,23
  109:2,16 111:7
  112:8,24 113:3
  115:1 119:18
  119:24 120:22
  121:1 123:17
  124:12 125:12
  125:17,19,23
  127:19,22
  128:6 130:2,15
  131:9 133:17
  135:23 140:3
  141:5,19,20
  143:21,23
people's   2:13
  33:10,15 74:14
  86:18 134:13
percent   18:22
  54:21 106:1
perfect   35:12
perfectly   71:11
permanent
  61:4
permanently
  92:24
perpetuate
  54:1 69:21
  97:19
perpetuated
  98:25

perpetuating
  36:19
perpetuators
  37:8
persistence
  10:21
persistent   7:20
  29:6 66:2
person   13:10
  34:17,21
  131:12
person's   100:8
personal   9:18
  48:2
personnel   44:2
  44:9 46:3
  83:21
perspective
  41:14 70:17
peters   5:5 9:11
  12:5 13:15
  16:23 26:13,14
  27:13 28:7
  29:1 31:22
  34:1 43:22
  65:20 119:21
  126:8,10,12
  130:14,19
  131:24 132:2
  132:14,16
phone   44:3
  55:2 100:5
  115:20
phones   55:6

physical   105:4
pick   102:5
  117:24
picked   138:6
pickup   139:4
piece   86:13
pieces   131:4
pima   93:18
pittsburgh
  141:3
place   12:7
  54:11,23 55:1
  60:8 102:14
  110:12 134:15
placed   38:10
  42:14
places   92:21
  93:16 94:10
plain   2:5
plan   22:2 29:13
  69:9 74:16
  96:14 98:16
  102:17 119:2
  132:17
planes   41:3
  134:4 138:10
planned   78:10
plans   88:24
plant   33:20
play   77:12
playing   113:4
playoff   129:2,4
please   16:14
  108:16 130:4
  130:15

Page 34

[pleased - preventing]

**pleased** 9:12 11:20 75:25
**pledge** 58:2 59:9 65:8 110:14 111:22
**plus** 37:9
**pocket** 137:22
**point** 49:7 75:14 93:6,16 123:24 130:25
**polarization** 127:18
**police** 26:1 57:18 92:14 97:6,9
**policies** 21:1 22:24 30:13 37:25 38:14 52:9,11 91:11 91:12 101:7
**policing** 2:22
**policy** 38:8 54:22,25 80:16 80:16,17 106:25 122:20 132:4 142:8,14 142:19,19
**political** 2:23 3:8 4:14 63:11 65:4,11 107:9 118:4 125:19 126:17 128:3 132:4,8
**politicization** 107:9

**politicize** 93:15 108:11 117:24
**politicized** 93:5 95:25
**politicizing** 112:8
**politics** 62:10 63:17 113:4
**pornography** 124:16
**ports** 6:21 26:25 27:17 46:21 117:10 142:11
**position** 8:25 70:12 72:17 75:12 76:19 124:11 125:14
**positioned** 71:11
**positions** 78:8
**possess** 128:13
**possesses** 10:20
**possible** 5:11 70:1 108:19 140:4
**potential** 62:9 67:21 92:16 98:6 120:23 121:4
**potentially** 32:2 79:17 142:24
**power** 48:1,7 57:21

**powerful** 96:21 97:7
**powers** 2:20
**practice** 16:13
**prairies** 14:6
**prayers** 53:20
**praying** 114:6
**prc** 32:3 33:8 33:12
**pre** 90:14
**predecessor** 52:5 57:16
**predecessors** 110:22
**predictable** 87:21
**predicted** 87:21
**prediction** 141:1
**prehearing** 144:15
**prepare** 119:3
**prepared** 30:6 32:16 33:5 133:4,11
**preparedness** 24:12
**present** 56:21 58:21 140:22
**preserve** 56:5
**president** 9:15 11:15 13:19,25 17:2 18:24 20:23 22:16 24:19 29:19

30:13 36:8 37:17 40:17,18 46:18 52:17,18 54:9,10,20 58:18,19,19,19 62:3,13,24 63:13,19,21 64:12,15,22,25 69:17,24 70:13 75:16,18 76:16 76:17 78:17 79:2,3 84:11 94:4,12 98:6,22 98:22 101:4 102:14 103:4 107:2,2 108:13 110:15,16 111:10 113:19 115:9,20 116:8 116:16 117:3 118:2
**president's** 70:10
**press** 55:8
**pressure** 4:15
**prevent** 8:4 23:18 31:4 81:24 87:22,24 88:5,6
**preventable** 87:22
**prevented** 88:5
**preventing** 5:25 82:9

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[prevention - public]**

| | | | |
|---|---|---|---|
| **prevention** 24:1 | **proactively** 51:1 90:5 | 94:17 95:3,8,22 96:9,11 97:17 104:18,21 139:22 | 124:18,20,25 134:20,21 |
| **previous** 83:5 101:2 140:19 | **probably** 83:1 100:1 | | **protecting** 8:2 14:8 31:4 35:22 70:15 84:22 98:18 106:6 107:7,12 109:4 141:17 141:19 |
| **previously** 125:5 | **problem** 2:5 55:9 62:8 112:15 129:19 135:22 136:21 | **programs** 42:16 56:13 64:6 65:2,4 89:2 92:22,23 93:7 94:18 96:8 | |
| **price** 3:13 | | | |
| **primary** 81:22 81:23 82:8 84:19 118:9 | | | **protection** 6:24 83:7 124:8 |
| **principled** 5:23 13:16 | **problems** 2:15 10:6 126:22 140:22 | **proliferate** 38:18 | **protections** 49:5 |
| **priorities** 3:12 26:16 43:18 50:6 131:5 | **procedures** 17:10 | **promise** 75:19 | **protective** 24:23 35:16 104:9,11 118:19,22 119:1 |
| | **proceed** 18:8 25:19 | **promised** 58:1 70:13 94:4,12 | |
| **prioritize** 21:25 69:10 | **proceedings** 146:4 | **promptly** 137:24 | **protector** 14:3 |
| **priority** 7:13 13:21,21,22,24 13:25 20:17 28:21 37:15 69:23 70:1,11 74:3,10 87:5,8 98:23 99:1,6 118:15,20 131:13 | **process** 7:2 17:8 31:5 42:10 57:8,9 76:12 81:20 87:12 138:1,12 138:15 | **properly** 77:19 | **protested** 119:14 |
| | | **property** 24:6 88:2 111:3 | **protests** 111:4 |
| | | **propose** 86:13 | **protocols** 35:22 |
| | | **proposed** 128:19 | **proud** 23:8 40:14 127:21 140:9 |
| | **processed** 54:15,17 | **protect** 14:5 15:7 20:5 22:8 24:5 30:7 31:14 32:7,18 38:3 40:11 50:12 67:24 83:8 91:3 98:3 108:4,14 129:25 135:25 136:7 141:22 | |
| **private** 22:6 33:10 102:3,11 105:13 122:18 135:1 | **processes** 98:17 | | **proven** 22:9 |
| | **processing** 85:4 115:21,24 116:10 | | **provide** 23:7 55:7 86:10 121:13 140:2 |
| **privilege** 113:21 | **program** 49:11 49:14,16,20,23 51:5 54:10,18 56:8,17,24 65:11 92:10 93:5,16,23 | | **providing** 54:6 86:8,9 |
| **proactive** 20:5 22:14 31:4 | | **protected** 20:10 45:10 124:14 | **public** 9:19 17:5 18:11 22:6 36:7 43:3 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[public - really]

43:8 59:12 61:13 62:13 86:12 89:24 90:5 97:1 119:18 135:5 144:21
**publish** 122:13 122:14
**pulled** 41:25
**pump** 91:19
**purpose** 80:22
**purposely** 51:5
**pursue** 61:22
**pursued** 18:18
**purview** 42:16 78:2
**push** 111:18
**pushed** 124:3
**pushiness** 124:1
**put** 4:15 37:19 56:25 59:15,24 62:6,7 72:3 76:18 89:11,19 90:9 91:20,22 92:25 102:14 106:12 110:12 137:24 143:7,8 143:10,11
**puts** 3:25 99:14
**putting** 86:24 94:15 106:11 111:1

**q**

**qaeda** 29:9 81:14
**qualifications** 5:16 113:24
**qualities** 11:16
**question** 8:1 26:4 27:4 28:15 29:12 30:18 35:1 43:22 51:17 84:5 86:7 118:14 128:7 129:21 130:20 132:23 133:8,9 138:2
**questioners** 139:13
**questioning** 36:10 67:15
**questionnaires** 144:14
**questions** 25:14 25:19 26:12 36:6 88:10 100:18 115:1 122:6,7,8 126:8 138:5,9 144:15 144:24
**quick** 28:15 136:10
**quickly** 24:15 31:18 49:7
**quite** 88:8 119:21

**quiz** 81:10
**quote** 53:5 62:4
**quotes** 77:8

**r**

**r** 146:1
**race** 141:21
**racism** 141:23
**racist** 141:2
**radical** 23:18 109:8
**radicalization** 7:9 140:21
**radicalized** 29:7,10 30:22 65:23 66:3 67:13 108:3
**radicalizing** 66:7,18
**raging** 61:25 87:24
**rain** 91:21
**raise** 16:15 34:15 77:15 78:3
**raised** 79:10 82:11
**ramification** 63:8
**ranch** 14:4,6
**rancher** 17:20 99:11
**ranging** 8:23
**ranking** 5:3 9:11 12:5 16:23 61:5

122:8 126:19 133:24
**ransom** 48:12 73:22
**rape** 37:3
**rapists** 37:7 101:17
**rather** 57:9 116:22,25 132:8
**read** 15:9 61:7
**readily** 90:15
**ready** 24:4 91:23
**real** 3:9 7:10 33:21 45:13 108:10 120:16 127:7,8,12 129:25 140:22
**reality** 19:8
**really** 2:6 10:4 12:25 14:17,17 14:18 15:1 33:23 35:8,15 42:7,24 44:15 45:4,16 47:17 47:23 60:5 62:2 67:21 72:4 73:22 85:24 90:13 93:15 95:11,12 96:10 98:13 100:8 112:15 122:17,21 123:3,11

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[really - removed]**

| | | | |
|---|---|---|---|
| 133:13,15 | 41:21 | **reform** 138:22 | **releases** 92:17 |
| 134:2 135:16 | **recommendat...** | 139:19,20 | **relentlessly** |
| 136:3,14 | 61:9 | 140:7,16 | 18:17 |
| 139:16 | **record** 4:11 | **reforms** 24:19 | **relevant** 59:5 |
| **reason** 33:14 | 16:10 22:9 | 59:15 61:10 | **relief** 61:24 |
| 33:17 65:24 | 48:1 144:19,25 | 118:18 | 62:24 63:11 |
| 70:9 77:7 81:9 | 146:4 | **refreshing** | 65:14 83:15,16 |
| 104:15 135:14 | **records** 132:17 | 52:20 60:11 | 88:14,19 |
| **reasons** 37:16 | 132:19,20,21 | **refugees** 40:17 | 117:18 118:3 |
| **reassurance** | 133:19 | 40:19 42:2,5,14 | **remain** 7:9 |
| 30:4 | **recourse** | **refused** 58:24 | 15:18 20:17 |
| **reassured** 36:9 | 122:22 | 58:25 119:11 | 23:12 27:16 |
| 79:4 | **recreated** 85:16 | 119:16 | 29:3 54:10,22 |
| **reauthorize** | **recruited** 23:3 | **regarding** | 144:22 |
| 49:22 | 85:7 | 75:12 | **remaining** |
| **recall** 140:7 | **reducing** 88:7 | **regardless** | 58:12 |
| **received** 14:22 | 88:12 | 141:21 | **remains** 25:6 |
| 16:4 42:9 | **reelected** 34:13 | **reignite** 98:16 | **remarks** 5:4 |
| 112:18 | **reevaluated** | **rein** 87:10 | **remediation** |
| **recent** 7:22 | 94:22 | **reinstate** 54:9 | 116:25 |
| 19:9 27:3 92:5 | **reevaluating** | 54:18,22 | **remember** 13:5 |
| 107:19 108:4 | 95:1 103:3 | **relate** 107:5 | 69:13 128:24 |
| 110:21 129:2 | **refer** 11:2 | **relates** 86:7 | 135:4 137:22 |
| **recently** 43:23 | **referenced** | **relation** 130:8 | **remind** 85:1 |
| 44:1 47:25 | 30:18 89:7 | **relationship** | 129:13 |
| 62:18 90:2 | **referencing** | 45:16 96:20 | **reminded** 29:3 |
| 129:14 | 64:24 | **relationships** | **reminder** 7:9 |
| **recognize** 22:13 | **referring** 62:5 | 45:18 96:5 | 18:10 |
| 23:25 40:8 | **reflect** 97:21 | 97:8,13 | **remote** 72:14 |
| 84:24 | **reflected** | **relayed** 108:23 | **removal** 99:6 |
| **recognized** 9:9 | 131:21 | **release** 55:11 | **remove** 124:7 |
| 16:21 36:9 | **reflects** 20:22 | 103:18 116:11 | **removed** 36:20 |
| 96:4 | 65:23 | 116:14,18 | 57:22 101:5 |
| **recognizing** | **refocused** | **released** 69:22 | 102:2 106:9 |
| 32:19 40:2 | 32:25 | 92:19 120:25 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[rename - right]**

rename 85:21
renew 4:22
repeated 29:25
repeatedly 52:5
52:7,8 66:1
repeats 31:20
report 7:15
19:17 55:8,8,16
55:16 59:24
60:1 61:8
reports 62:13
represent 19:22
23:24
representatives
9:23,24 13:8
113:23
represented
64:21
representing
9:25
republican
131:15
republicans
100:6 105:21
109:13 130:22
131:2
repudiated
58:1
reputation 84:4
request 26:7
119:5 120:18
125:16
requested
112:20

requests 61:22
62:21 125:4,5,6
132:17,20
require 10:19
10:20 59:4
required 32:5
requirements
10:12 50:21
51:5
requires 5:22
23:20 56:20
64:16
research 3:19
reservation
15:4 26:6
reservations
49:15 97:3
reserve 26:11
resilience 24:2
resolve 20:14
resource 17:8
resourced
28:22 36:2
44:21 88:22
resources 3:2
6:10 21:9
23:20 26:24
27:10 31:1
32:22 33:4
38:10 44:3,22
45:1,15,23 49:4
51:2 54:3 57:4
57:18 67:1
83:9,21 90:13
109:22 117:14

127:13
respect 63:6
64:8 96:24
98:3 112:6
respecting
97:24
respects 23:5
respond 20:11
23:18 24:4
72:22 93:12
responded
118:4
responding 6:1
responds 8:18
response 3:14
19:5 24:7
72:21 89:12
90:9,25 94:19
responses
144:13
responsibilities
43:6 75:12
118:8
responsibility
18:2 20:18
41:13,17,20
68:12 73:2
121:10 125:23
130:12
responsible 7:5
21:13 66:6
72:20 76:20
responsive
88:18

rest 26:12
62:16 69:6
restore 4:7
21:19
restored 24:16
restrict 124:5
125:21 126:4
restriction
125:25
result 8:11
65:22 90:21
142:7
resulted 127:18
resulting 83:18
results 72:24
86:15
return 104:16
reunite 142:6
143:15
reunited
143:13
revamped 23:6
review 5:15
100:16 118:7
reviewed
144:17
rhetoric 107:8
rich 14:16
134:22
rid 95:8 134:14
right 16:15
19:14 20:18
23:25 35:7
37:9 42:20
44:23 48:13

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[right - secretary]**

84:10 99:4
106:19,24
107:2,19 111:9
112:13,19
121:2 134:15
135:22 136:11
138:9
**rights** 2:21 31:5
41:1 58:6
86:18 124:24
**riley** 53:8
103:24
**riley's** 143:20
**riots** 111:4
**rise** 30:20
140:24
**rising** 3:11
21:20 141:14
**risk** 120:24
121:4
**riveted** 67:21
**road** 146:11
**robust** 27:8
**rock** 14:24 15:5
15:11 18:13
**role** 4:23 7:11
22:18 38:9
41:12 77:12
78:1,11 79:23
88:11 117:24
121:23 131:22
135:16,17,17
**roles** 75:11
90:6

**room** 14:12
26:2
**rooms** 102:17
**root** 68:25 69:2
69:8 83:22
**rooting** 125:22
**roots** 69:6
**round** 37:12
126:11 140:19
**rounds** 137:14
137:20 138:6
**rule** 11:8 19:23
48:22 63:22
65:5 122:25
**rules** 111:20
**run** 43:19 96:3
114:23 115:2
136:14
**running** 34:18
**rural** 17:23
95:15,15
**rushing** 88:9
**russia** 87:3

**s**

**sacred** 18:17
**sacrifice** 23:5
**safe** 6:7 18:6,19
18:20 23:11
27:12 30:7
31:14 45:8
50:12 73:8
74:14,15 98:17
102:1 128:10
130:24 144:3

**safeguard** 20:9
**safely** 104:16
**safer** 19:12
21:17 22:20,25
70:2
**safety** 8:20 11:7
25:7 43:7,8
97:1
**sake** 23:24
**salt** 7:24 33:7
**salvador**
104:14
**sarah** 68:25
69:2 71:7
**sarah's** 69:5,11
69:13
**sat** 52:5 71:3
**satellites** 47:8
**saving** 24:14
**saw** 24:19
31:20 36:4
38:16,16,17,19
66:14 72:24
86:21 87:2
89:5,6,15
**saying** 62:4
78:16 100:7
115:18 124:12
**says** 122:12
123:1
**scan** 117:6,8,15
**scanned** 137:19
**scanners** 47:5
**scenarios** 64:24

**schellenberger**
125:7
**school** 48:1,4,7
50:14
**schools** 48:8
49:1
**scott** 34:3,4,7
34:10,25 37:21
40:15 41:23
42:21 43:11
**scour** 133:18
**screen** 121:8
**screening**
138:15
**screens** 120:9
**scrutinized**
4:19
**sea** 82:8
**seamlessly**
39:13
**second** 132:15
**seconds** 58:12
130:20
**secrecy** 3:23
**secret** 24:17,25
34:16 35:11,13
35:15,18 58:13
58:22 59:5,15
61:2,11 89:14
89:16 118:7,11
118:15,17
**secretary** 1:14
4:5 5:17 9:15
11:25 17:1
19:24 21:7,25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[secretary - senator]**

| | | | |
|---|---|---|---|
| 22:15,18 24:11 | **securing** 2:17 | 103:25 106:14 | 68:20 69:7,8 |
| 24:17 26:15 | 3:7 5:24 13:20 | 107:18 109:1 | 77:8 80:17 |
| 48:20 51:24 | 18:16 36:15 | 111:16 119:6,9 | 91:5 104:24 |
| 56:3 57:16 | 39:25 68:16 | 120:2,24 121:4 | 114:1 140:24 |
| 59:18 60:12 | 83:23 85:6,24 | 123:5 127:17 | 141:7 |
| 64:5 65:1 | 106:6 115:10 | 128:18,21,23 | **seize** 46:5 |
| 66:24 76:20,25 | **security** 1:13 | 130:9,9 131:23 | **selfridge** 28:10 |
| 77:7 78:21 | 2:25 3:10,16,25 | 135:17 137:17 | **senate** 11:25 |
| 82:13 93:11 | 4:5 5:18,22,24 | 138:3,4,11,16 | 17:10 31:8 |
| 94:2 96:14 | 7:4 8:6,20 9:4 | 140:1,11 | 44:25 71:14 |
| 99:15 100:11 | 9:16 11:6,10 | **see** 5:6 7:7 | 99:14 106:22 |
| 100:14,19,22 | 12:1 15:20 | 29:25 30:20 | 140:6 |
| 103:25 106:13 | 17:2 18:4 19:3 | 33:19 35:17 | **senator** 2:1 5:5 |
| 111:15 112:4 | 19:19 20:1,16 | 38:1 39:9,9 | 9:6,8,8,10 12:3 |
| 119:5,8,11 | 24:1,4 25:5,7 | 50:1 51:15 | 12:3,4,13 13:15 |
| 129:22 131:23 | 27:7 28:14 | 52:3 60:8 75:4 | 14:10,13 16:2 |
| 135:14 | 29:18 30:6 | 75:5 91:15 | 16:20 17:7,12 |
| **section** 124:8 | 31:2,13 34:19 | 113:15,16 | 25:18 26:11,13 |
| **sector** 105:13 | 35:21 40:1 | 114:9 117:19 | 26:14 27:13,15 |
| **secure** 6:7,10 | 42:17 43:7,13 | 120:15 126:9 | 28:4,7,19 29:1 |
| 6:25 13:9 18:7 | 43:20 44:14 | 128:13 132:12 | 29:15 31:22 |
| 20:7,18 25:13 | 47:24 48:16 | 135:12 | 32:10 34:1,3,3 |
| 27:25 28:12 | 51:21,25 58:10 | **seeing** 27:21 | 34:4,7,10,25 |
| 30:15 38:10 | 59:18 63:10 | 129:8,9 | 37:21 40:15 |
| 45:4 47:1 51:2 | 65:2 66:3,8,11 | **seek** 23:22,23 | 41:23 42:21,22 |
| 52:7,8,13,16,19 | 66:12 67:5,18 | 54:12 | 42:22,23 43:2 |
| 69:24 72:12 | 70:6 72:9 73:7 | **seekers** 55:5,12 | 43:11,22 44:5 |
| 73:9 74:4,9 | 75:18 76:20,25 | **seeking** 55:10 | 44:11,23 45:11 |
| 79:6 82:7 83:8 | 77:10 81:12 | **seemed** 135:8 | 46:18 47:17,22 |
| 84:9,20 94:13 | 82:10,13 83:12 | **seen** 3:20 7:20 | 48:19 49:6,9 |
| 96:23 97:20 | 85:22 90:23 | 11:5 18:25 | 51:3,10,11,11 |
| 105:10 130:25 | 92:19 96:7,16 | 27:2 29:19 | 51:12 52:8,10 |
| **secured** 19:23 | 96:23 100:12 | 31:23 33:11 | 52:15,20 53:18 |
| 72:1,2 | 100:15,23 | 38:11,13 40:5 | 54:8,19,24 56:1 |
| | 102:9 103:2,15 | 43:23 48:9 | 56:16 57:13 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[senator - several]**

| | | | |
|---|---|---|---|
| 58:8,11 59:17 | 109:25 110:9 | 111:10 125:4 | **served**  17:21 |
| 60:7,9,19,19,20 | 110:13 111:14 | 133:18 | 41:15 106:20 |
| 60:20,25 61:3 | 111:18 112:1 | **sending**  38:24 | 113:22 121:10 |
| 61:19,20 62:8 | 113:6,11,13,13 | 124:12,21 | **servers**  71:23 |
| 63:2,5,13,20,25 | 113:14,17 | **sends**  78:13 | **service**  17:5 |
| 64:7 65:8,12,16 | 114:21 115:8 | 95:19 | 18:11 23:5 |
| 65:19,20 66:9 | 115:11,13 | **seniors**  48:4 | 24:18 25:1 |
| 66:16,21 67:14 | 116:2,7,16,19 | **sense**  18:2 41:2 | 34:16 35:11,13 |
| 68:3,3,4,4 | 117:2,5,12,17 | 76:5 79:19 | 35:15,18 43:3 |
| 69:12 71:9 | 118:1,6,17 | 80:2 139:2,8 | 55:2,24 58:13 |
| 72:13 74:5,17 | 119:4,20,20,25 | **sensitive**  32:8 | 58:23 59:5,15 |
| 75:2,2,3,7,21 | 121:16,20,25 | 112:7 | 60:23 61:2,11 |
| 76:10,23 77:2 | 122:2,5 123:6 | **sent**  15:4 38:6 | 68:7,7,8 89:14 |
| 78:13,25 79:9 | 124:23 125:3 | 38:23 39:3,19 | 89:17 94:23 |
| 79:22,25 80:8 | 126:5,7,8,9,10 | 39:23 43:14 | 99:24 118:7,11 |
| 80:25 81:8 | 126:12 130:5 | 110:23 112:3 | 118:16,18 |
| 82:19,19,20,23 | 130:14,19 | 125:5 143:24 | 123:22 |
| 83:25 84:16 | 131:1,24 132:2 | **separate**  95:25 | **services**  24:15 |
| 85:19 86:19 | 132:14,15,16 | **separated** | 88:20 92:10 |
| 87:11,16 88:15 | 132:22 134:19 | 142:7 143:13 | 128:9 |
| 91:6,9,9,25 | 135:2,3,4 137:9 | **separation** | **serving**  41:15 |
| 92:1 93:21 | 137:11 138:17 | 142:8,11,18 | 106:10 121:22 |
| 94:25 96:18 | 138:19,24 | **september**  19:7 | **session**  64:19 |
| 98:5,21 99:20 | 139:1,10,12,16 | 77:4 | 119:12 140:13 |
| 99:21,21,22 | 140:12 141:6 | **series**  9:3 | 141:10 |
| 100:4,25 | 141:16 142:1,3 | **serious**  5:23 | **set**  4:6 10:5,19 |
| 101:10,16,22 | 142:17 143:5 | 7:21 18:17 | 14:9 35:24 |
| 102:3,7,10,16 | 143:10,17 | 24:18 29:4 | 72:8 133:21 |
| 102:19,23 | 144:6,10,12 | 106:5 118:13 | **seven**  25:20 |
| 103:1,6,14,23 | **senators**  16:10 | **serve**  4:4 5:3,17 | 95:10 |
| 104:1,3,17 | 20:16 28:23 | 8:24 9:15 18:6 | **several**  16:4 |
| 105:3,9,12 | 46:10 89:9 | 22:15 48:20 | 22:22 56:13 |
| 106:15,16,16 | 106:1 | 52:4 82:24 | 68:15 115:23 |
| 106:17 107:24 | **send**  21:3 39:1 | 85:7 94:2 | 142:13 |
| 108:17,25 | 39:20 40:19 | | |

Page 42

**[severe - south]**

| | | | |
|---|---|---|---|
| **severe**  8:15 | **showing**  72:19 | **sir**  61:14 64:23 | **smart**  45:20 |
| **severely**  53:3 | 125:8 | 80:4 102:19 | **smarter**  22:3 |
| **sex**  102:23 | **shows**  91:24 | 103:11,19 | **smartest**  14:2 |
| **sexual**  37:7 | **shut**  33:19 56:3 | 130:18 132:6 | **smugglers**  46:4 |
| **shadow**  96:9 | **side**  18:13 | **sister**  71:2 | **smuggling** |
| 97:15 | 118:20,21 | **sitting**  12:13 | 96:13 |
| **shape**  85:22 | **sidelined**  136:1 | 15:5 41:11 | **social**  2:23 |
| **share**  43:2 | **sidelines**  71:3 | 52:6 53:4,4 | **society**  37:4 |
| 99:17 126:20 | **sides**  107:10 | 114:16 | **software**  71:24 |
| **shared**  59:20 | 122:23 131:3 | **situation**  38:22 | **soldiers**  41:24 |
| 68:23 | 133:6 | 70:3 103:20 | **solo**  18:12 |
| **sharing**  68:18 | **sign**  117:20 | **situations** | **solution**  97:23 |
| **shelter**  54:3 | 132:20 | 69:18 90:14 | **solutions**  11:19 |
| 92:9,22,23 | **signal**  134:8 | 111:24 119:2 | 126:22 131:19 |
| **sheriff**  133:25 | **signals**  78:14 | **six**  16:7 19:11 | 146:10 |
| **sheriffs**  85:11 | **signature**  146:6 | 39:23 95:10 | **solve**  11:18 |
| **sherpa**  12:13 | **signed**  135:24 | 105:21 | 127:23 |
| **shifted**  2:17 | 136:3 | **size**  50:14 | **somebody** |
| **shipments**  47:2 | **significant**  4:14 | **skill**  10:5,19 | 11:14 36:9 |
| **shocked**  7:7 | 6:8 20:7 40:5 | 14:9 35:24 | 103:18 105:14 |
| **shocking**  86:24 | 46:2 81:5 | **skip**  117:20 | 136:18 |
| 86:24 101:8 | **siloed**  67:5 | **sky**  134:1 | **sonya**  146:2 |
| **shooting**  34:14 | 73:16 | **slotkin**  27:15 | **soon**  51:23 |
| 133:25 | **similar**  12:19 | 28:4 106:16,17 | 56:21 58:19 |
| **short**  57:24 | 68:22 | 107:24 108:25 | 59:8 69:25 |
| 129:16,17,20 | **simply**  55:11 | 109:25 110:9 | 132:12 |
| **shortages**  98:11 | **sincere**  17:6 | 110:13 111:18 | **sorry**  53:19 |
| **shorthand** | **single**  17:24 | 112:1 113:11 | **sort**  104:12 |
| 141:4 | 54:5 101:1 | 115:13 | 108:2 124:4 |
| **shortly**  6:18 | 105:20,24 | **small**  29:7 33:3 | 139:17 |
| 30:3 122:9 | 119:10 131:10 | 48:10,13 49:1,3 | **south**  4:11 8:14 |
| **shoulder**  41:18 | 131:12 | 92:17 93:3,9 | 9:13,25 10:2,9 |
| 51:17 | **sioux**  14:25 | 94:8 95:9,14,23 | 11:4 15:1,2,12 |
| **show**  73:3 | 15:11 | **smaller**  33:22 | 17:4 19:10 |
| 84:17,21 | | 73:19 | 22:10,20,21 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[south - states]**

23:3,4 24:8 35:3 38:12 39:16 40:11,12 46:23 47:12 50:4,15,20 68:10 74:11 97:2,3,6 114:18 131:12
**southbound** 46:15 47:18
**southern** 6:9 10:18 11:8 21:4 26:22 27:6,21 29:18 37:22 38:7 39:17,25 44:17 45:24 46:1,13 52:6,13,16 93:23 96:23 120:11
**southward** 46:6
**southwest** 2:17
**sovereignty** 15:22 96:17,24
**space** 125:1
**spade** 107:19 107:19
**span** 6:18
**speak** 17:17 64:2 108:10 132:9
**speaker** 13:10
**speaks** 15:24

**special** 12:9 14:18 120:19
**specific** 46:12
**specifically** 39:10 123:1
**specifics** 79:23 80:1 103:20
**specter** 62:9
**speech** 2:22 57:18 58:6 123:2,21 124:5 124:14,18,20 125:20,21,25 126:4
**speeches** 122:20
**spend** 5:14 107:4
**spent** 3:2,6,7,8 17:22 51:6 81:5 108:6
**spiked** 140:25
**spins** 133:20
**spirit** 127:24,25 128:1,6
**spoke** 97:17 99:1
**springing** 133:8
**spying** 3:3
**ssp** 92:10 93:5 93:16 94:16
**st** 53:11
**stabbed** 53:14
**stable** 5:22 13:16

**staff** 5:15 31:11 98:7
**staffed** 27:7 28:5 36:1
**staffing** 6:25 28:3 112:13,14
**stand** 16:15 28:9 63:18 64:15 70:19
**standard** 26:4
**standards** 32:7 72:7,7
**standing** 14:24 15:5,11
**start** 25:21 43:21 68:18 88:7,12 91:17 126:10
**started** 77:4
**starting** 31:21
**startling** 105:18
**state** 6:12,16 9:22,23 10:7,13 11:3,3 12:25 15:2,2,12 17:21 19:12,15,16,23 20:15 22:7,11 22:21,24 23:4,7 27:10 29:23 32:14 33:4 35:3 38:1,4,9,9 38:13,18 39:3 39:24 40:10,19 40:22 41:13

42:20 48:17 49:2,11,12 50:7 50:9,10,22,25 51:19 52:22 53:9 57:21 62:14 63:18 64:13 66:24 68:9 69:16 73:19 78:15 88:21 89:1,22 90:4 93:20,25 95:12,15 97:11 97:14 99:12,25 103:9 106:23 110:23 111:11 114:5,6,7 131:12,16 138:3 141:12
**state's** 9:25
**statement** 16:21 120:6
**statements** 16:4 62:3 144:16,24
**states** 3:11 8:13 10:10,13 11:25 25:6 27:18 29:11 36:20 38:13 39:25 41:8 42:9,13 43:14 48:17 55:19 62:11,25 63:16 64:19,21 67:24 68:22 80:6 81:25 94:1 95:2 96:1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[states - sure]**

98:20 102:4
104:7,24 105:7
105:10,17
109:19 110:20
128:18 135:25
139:23 140:6
141:5
**statistic** 105:18
**statistics** 99:2
**status** 104:9,11
**statute** 59:4
**stay** 49:4 73:17
79:5 87:6
104:15
**stayed** 10:14,14
**steal** 33:15
**stealing** 80:20
**step** 52:3 68:11
87:11,17
**stepped** 114:5
135:18
**stepping** 114:2
**steps** 38:3
**stiff** 133:13
**stole** 32:1
**stolen** 33:9
**stop** 2:15 46:4
56:25 66:17
67:2,11,18
73:13 96:12
114:22 115:24
116:15 117:21
126:1 143:4
**stopping** 47:15

**storms** 8:12,15
**story** 9:18
53:22,24 68:18
68:23 69:13
**straddles** 14:25
**straight** 36:7
**strategy** 44:7
98:8
**streamline** 7:2
**streamlined**
89:21
**streamlining**
89:5
**street** 92:16
120:7 122:14
**streets** 21:16
**strength** 74:24
**strengthen**
24:12 44:6
45:14
**strengthening**
24:25
**strengthens**
47:20
**stress** 126:15
**stretch** 44:4
**strike** 24:3
**strikes** 8:19
68:21
**strived** 126:19
**strong** 5:22
13:16 45:16
70:14 113:24
**stronger** 19:12
77:12

**strongly** 119:14
**struck** 69:2
**structure** 49:16
117:1 136:12
**stuck** 32:24
**students** 48:5
48:11
**study** 3:18
**stuff** 2:3 134:1
**stymied** 58:20
58:22
**sub** 85:23
**subcommittee**
61:4 86:11
**subject** 84:13
**submission**
144:23
**submitted**
144:15
**succeeding**
51:24
**success** 20:3
74:25
**successful**
44:22 47:25
**sucking** 91:18
**suffers** 62:17
**sufficient** 6:10
**sufficiently**
27:7
**suggest** 133:2
**suite** 146:12
**summons** 26:7
**sunny** 104:14

**super** 30:2
31:12 67:20
128:23 134:21
**supervisors**
117:19
**supply** 47:15
80:18
**support** 16:1,4
16:9 17:5,15
20:25 21:9
31:17 33:1
44:7 46:2,8
102:21 111:12
142:16
**supported**
19:23 88:21
**supporters**
129:1
**supporting**
28:13 60:16
88:23
**supportive**
40:13
**supposed** 87:6
120:14
**supremacy**
29:8
**supremely**
67:16
**sure** 9:20 13:23
20:10 28:5,23
28:24 31:6,19
32:17 35:20
36:16,18 41:22
45:22 46:25

Page 45

**[sure - temperature]**

47:11 50:2 51:6 53:15 54:5,23 55:3 56:7,9 57:5,8 59:20 61:16 66:25 67:10 69:17 70:15 71:5 72:1,8,11 74:13 76:24 78:20,25 79:7 81:16,21 82:12 85:17 89:24 90:16,23 91:2 94:22 95:24 96:12 99:13 101:20 102:1 103:13 110:6 112:16 113:7 125:13,22 127:13 132:1 135:20 141:13 141:17 144:2
**surge** 48:9
**surprise** 70:7 71:22
**surprised** 13:19 138:20
**surveillance** 3:4 39:21 47:6
**suspect** 102:25
**swear** 16:14,15
**swiftly** 24:5
**switch** 79:9 104:3

**sworn** 111:15
**synagogues** 141:20
**syrian** 40:17
**system** 20:21 37:23 48:2 54:13 57:1,6 68:17 93:14 95:18 109:11 109:13,14
**systems** 32:18 48:10 51:2 72:12 73:8,12 73:20,23 74:4,6 74:9 87:7 92:14 95:22

**t**

**t** 146:1,1
**table** 15:11 34:12,24 50:18
**tackle** 10:16 99:4
**tag** 57:19
**taibbi** 125:8
**take** 10:25 13:4 19:25 22:14 38:2 50:19 54:4 63:21 67:19 68:11 74:16 76:22 87:17 91:22 94:9 100:15 127:15 130:3 134:10,11 144:7

**taken** 18:18 33:10,11 78:10 96:1
**takes** 81:3
**talk** 34:22 38:7 46:18 51:8 77:21 78:6 85:13 89:23 104:8 119:12 119:17 124:14 126:13 133:5 134:6 136:12 140:17 142:23
**talked** 27:14 38:5 46:7 50:19 54:20 68:16 73:7 84:16 91:11 94:16 109:1 111:6 116:13
**talking** 36:4 81:6,17 95:9 98:8 108:6 110:21 125:12
**tangible** 126:22
**target** 2:20 101:11,17
**targeted** 120:23
**targeting** 2:18 3:8
**task** 85:10,18 135:19
**tasked** 35:15 121:19

**tax** 95:17
**taxes** 131:9
**taxpayer** 57:17
**taxpayers** 102:4
**teachers** 48:5
**technical** 133:8
**technological** 46:2,12
**technologies** 3:5 22:8 44:14 45:3 47:7 117:13
**technology** 45:20 46:22 47:11 50:8
**telecommuni...** 7:25
**telecoms** 33:9
**telework** 72:10
**teleworking** 71:17
**tell** 13:9 34:16 35:7,7 40:21,22 40:22 60:12 64:4,25 70:9 88:10 114:13 117:21 120:1 124:20 125:16 133:9
**telling** 53:22 69:13 122:18 124:4
**temperature** 114:14,22

Page 46

**[temporary - thousand]**

**temporary** 104:8,9,10,22
**tend** 100:13
**tens** 48:3
**tense** 58:21
**term** 54:11 129:18,24
**terms** 79:17 86:6 105:3
**terrible** 72:25 73:3 89:12
**terrific** 116:19 137:11
**terror** 90:1 100:20,23
**terrorism** 2:24 5:25 7:9,12,15 20:12 23:13 29:3 30:17,17 30:19 66:12 67:22 79:11 81:6 82:9 107:20 108:5 109:5 114:10 140:18,23 141:18
**terrorist** 7:19 11:11 19:7,9 29:21 40:16 65:22 66:3,14 67:2,25 79:11 79:13,15 80:5 80:11 81:24 82:4,6,14 89:6 90:8 141:4

**terrorists** 29:14 30:9,10 65:21
**terrorizing** 29:11
**test** 106:3
**testify** 26:7
**testifying** 99:23
**testimony** 16:16 135:21 144:13
**texas** 21:4 38:21 39:24 40:2 64:20
**thank** 5:2,5,7 8:23,25 9:10 11:22 12:1,4,10 12:20 16:2,11 16:22 17:2 25:8,10,18 26:14 29:1 34:1,2,6,9 35:1 42:21,23 43:1 48:18 51:9,10 51:12 53:21 59:23 60:7,18 60:21,22,23 65:12 67:25 68:4,5,6,12 69:13 72:13 74:17,25 75:1,3 78:24 82:21,22 91:6 92:1,2 93:21 98:5 99:22 106:9,10 106:14,15

113:11 115:11 116:7 119:4,25 121:24,25 122:1 130:10 130:17 132:14 135:3 138:19 138:25 139:12 141:25 144:10 144:12
**thanking** 60:24
**thanks** 60:20 75:7 106:17,18 113:17,18,19 114:12 135:3
**theater** 126:17 132:4,8
**thing** 12:10 38:5 41:19 42:20 58:12 74:19 106:22 107:8 112:10 121:13 125:3 134:18
**things** 10:3 11:1 35:19 43:11 71:6 73:3,9 84:16 89:3 91:13 93:17,19 100:13 106:5 107:9,14 108:2 114:1,24 115:4 115:12 118:13 120:19 123:16 126:2 136:10

139:8
**think** 2:6 10:2 10:22 11:12,13 13:16 14:3 22:3 27:18 34:7,10,15,19 34:20 45:19 47:2,5 48:12 49:19 50:16 54:24 55:24 57:24 67:15 70:4,8,24 71:2 76:11 79:21,24 81:3 82:2 83:1 83:2,6 84:5,18 84:23 86:20 89:4 93:7 96:1 98:13 100:12 107:7 109:2,9 112:5 122:6,8,9 122:10,12 125:10,24 126:1,8,16 127:2 129:10 132:9,22 133:21,22 134:14 135:23 137:21
**third** 5:19
**thirds** 20:25
**thought** 70:7 114:17
**thoughts** 17:10
**thousand** 48:11 143:12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[thousands - toxic]**

**thousands**  32:2 92:18
**threat**  7:21,22 21:20 22:14 29:6,13,17 66:2 66:8 67:22,25 81:13,16 82:1 110:19 128:25 129:8,25 141:14
**threatened** 80:6 124:5,6,7
**threats**  2:16,25 3:9,15 5:24 7:5 7:10,15,19 8:23 19:3 20:2 23:18 24:19 28:1,15 29:4 31:3,19 33:21 35:8 39:9 66:10 67:12 79:22 81:4 85:25,25 108:10,15 111:1,2 119:13 119:17 127:12 127:14 128:12 130:7
**three**  13:17,18 52:17 63:20 69:4 70:22 81:13 82:3 106:20 139:6
**thriving**  131:16

**thrown**  126:24
**thune**  9:8,8,10 14:10 17:12
**ties**  71:20,24
**tilt**  126:2
**time**  3:2 5:14 7:1 9:17 11:13 13:15 14:20 17:5 18:21 25:10 26:12 38:24,25 44:9 45:12 51:4 55:6 64:9 67:14 74:18 78:7 81:5 85:3 88:12 90:10 91:3 92:15 95:21 105:17 106:18 107:4 111:1 112:16 113:22 114:9 126:25 129:10 129:16,17,21 130:1 134:3 136:6,13 139:14 143:6
**times**  39:18,23 41:19 69:4 73:18 105:5,5 115:23 127:6 133:1
**tiny**  129:17
**title**  39:2
**today**  4:3,16 5:7 9:1,13

11:21 16:25 18:1,10,15 25:10 37:16 43:17 52:14,16 53:4 54:25 58:3 68:6,18 74:12 79:23 89:4 90:12 100:1 103:24 108:6 130:11 138:21 144:23
**today's**  6:5
**toe**  32:24
**together**  12:18 13:1 18:6 23:16 25:5,16 30:4 59:25 67:11 71:20,24 73:16 78:6,7 79:7 85:13 96:15 99:12 113:22 127:19 128:6 130:15 132:13,20 133:3 137:6 142:10,12 143:18 144:1
**tohono**  96:10
**told**  41:18 44:2 52:7 53:4 80:14 93:4 132:17
**tolerance** 142:19

**tolerate**  25:25
**tom**  75:13,24 75:25 76:6,15 78:5 79:1
**tone**  4:6
**took**  23:2 25:11 122:20 139:5
**tool**  82:10 96:21 97:8
**tools**  21:9
**top**  7:13,24 20:17 49:4 61:10 82:17
**topic**  71:12 84:1
**topography** 47:8
**tornadoes**  24:9
**touched**  43:22
**touching**  14:22
**tough**  10:25 11:18 114:8 126:22
**toughest**  14:2
**toughness** 10:24 11:17
**tours**  106:20
**toward**  140:15
**towards**  24:25 95:5 121:18
**towers**  134:12
**towns**  36:20 92:17 94:8
**toxic**  128:3

Page 48

**[tps - typhoon]**

tps  104:12
track  7:15 22:9
tracking  79:16
  82:15 120:10
trade  6:20 27:8
  27:11
traditional  80:5
traffic  2:25
  46:6
traffickers  46:5
  47:4
trafficking
  11:12 19:19
  20:8 38:18
  40:7 124:16
  142:25 144:4
tragedy  63:4
  65:21 66:14
  68:21 69:1
  87:19,24
train  50:14
  90:10 97:4
  118:22
trained  39:5,10
training  23:6,8
  35:24 50:11
  97:15 109:5
transcript
  146:3
transition  74:2
translate  4:18
transparency
  3:24 4:8 34:22
  59:19,22 61:12
  61:16 86:9

89:10 113:9
transparent
  99:17 108:18
  121:17
travel  6:20
travis  52:22
  53:10,19 54:25
treasury  7:23
  32:1 71:21
  118:14
treated  118:5
tremendous
  10:20 22:16
  115:16
trends  32:3
tribal  14:24
  15:22 23:7
  96:3,11 97:3,6
  97:9
tribe  14:25
  15:11
tribes  23:10
  96:4,5,15,20
  97:7,19 98:4
trip  137:15,17
  137:23
troopers  22:21
  97:11
troops  21:3
  38:6
truck  139:4,5,7
true  21:11 35:3
  100:3 104:2
  118:24 133:19
  136:5 146:3

truly  72:9
  74:19 84:22
  94:23
trump  9:15
  13:19 14:1
  17:3 18:24
  20:23 22:16
  24:20 30:13
  36:8 37:17
  46:18 52:18
  54:9 58:20
  62:3,13,24
  63:14,21 64:12
  64:25 69:17
  75:10,23 78:17
  85:20 94:4
  95:6 98:6,22
  101:2,4 102:14
  106:23 110:15
  110:16 115:9
  117:3,20,20
  142:17
trump's  103:4
  114:15 116:17
  118:2
trust  2:13
  18:17 25:15
  35:4,5 36:13
  37:17
truth  16:17,17
  16:18 35:7,8
  60:4,12 86:12
  86:25 87:12
  89:8,9 108:24
  132:9 134:2

try  78:19,19
  79:20 81:19
  82:5,7 88:6,11
  91:12 126:21
trying  10:11
  76:4,11 79:17
  81:10 87:1
  93:1 125:20
  126:3
tsa  138:3,8,20
turn  16:1 45:23
  58:20,22,24
  59:5 128:7
  134:19
turned  13:19
twitter  123:17
  123:19 125:7,9
two  6:16 7:7
  13:1,2 15:20
  17:15 20:25
  29:2 31:22
  35:14 39:18
  49:19 56:19
  72:11 81:3
  82:3 91:21
  136:10
type  82:1 95:22
types  7:18 67:2
  67:11 69:18
  94:21 95:13
typhoon  7:24
  33:7,13

Page 49

**[u.s. - utmost]**

| u | | | |
|---|---|---|---|
| **u.s.**  6:23 7:25 9:23 21:12 27:8 29:6,13 30:21 32:8 | 53:24 78:14 81:18 82:17 87:20 95:1 106:25 107:1 112:22 127:12 127:21 | 81:25 102:4 104:7 105:7,9 105:16 109:19 110:20 128:18 135:25 139:23 140:6 141:5 | **uproar**  123:15 **upset**  112:5 **urge**  78:18 **usage**  130:7 **uscis**  76:14 **use**  20:14 47:5 |
| **uas**  129:15 | **understanding** 50:15 82:14 118:21 | **units**  77:6 | 55:12,25 57:10 |
| **ukraine**  128:15 | | **universal**  27:19 | 57:20 58:21 |
| **unanimously** 59:3 | **understands** 35:13 | **university** 22:11 50:10 | 104:13 110:17 115:5,23 116:6 |
| **unauthorized** 27:2 43:24 | **undertake** 36:13 | **unlimited** 139:14 | 116:20,22 117:6,13,14 |
| **unbelievable** 59:7 | **undertaking** 102:8 | **unmatched** 21:19 | **used**  2:20 13:15 39:11,21 86:1,2 |
| **unbroken** 119:10 | **underway**  66:4 | **unprecedented** 21:6 124:2 | 115:17,18 116:8 118:22 |
| **uncertain** 75:11 | **undocumented** 140:3 | **unrelated** 140:23 | 135:5 |
| **unchecked** 3:20 4:9 | **unequally** 84:12 | **unsolicited** 14:23 | **users**  55:10,17 **using**  32:22 |
| **unclassified** 32:2 | **unfair**  122:23 | **unsure**  2:10 | 47:4 55:6 57:17 83:7,11 |
| **unconstitutio...** 86:17 | **unfortunately** 7:6 98:15 | **unthinkable** 13:7 | 95:2 |
| **under**  2:19 21:23 30:12 | **unfounded** 62:12 | **unvetted**  41:4 **upcoming**  30:2 | **usually**  133:7 **utility**  33:20 |
| 38:15 39:2,23 42:16 52:7,9 | **unguarded**  3:1 | **updates**  136:16 | **utilize**  45:7 93:25 |
| 57:25 58:3,9 63:9 78:2,8 | **uniformed** 112:9 | **upgrade**  44:10 105:15,16 | **utilized**  31:2 45:3 57:6 83:9 |
| 85:19,20 86:3 87:4 95:5 | **unit**  108:1 | **upgrades**  32:6 | 83:13 94:17 |
| 103:4,22 112:3 118:1 | **united**  11:25 25:6 27:18 29:11 42:8 | **uphold**  63:21 94:13 99:15 111:16,17 | **utilizing**  47:11 94:21 |
| **understand** 15:21 17:23 | 48:17 55:18 62:25 67:24 68:22 80:6 | 144:1 **upholding** 94:23 | **utmost**  21:21 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[vacation - way]**

| v | violate  86:1,2 | w | 132:15 133:4 |
|---|---|---|---|
| vacation | 86:17 | wait  54:16 | 133:10,25 |
| 137:16 | violation  62:25 | 105:24 | 134:22 136:10 |
| values  20:22 | violence  36:19 | waiting  143:13 | 139:17 140:17 |
| 97:21 | 47:13 98:25 | wake  19:8 | 140:22 141:1 |
| variety  29:8 | 141:8 | walk  18:23 | 141:16 142:4 |
| vast  2:20 | violent  8:12 | walked  113:20 | 143:3 |
| vegas  7:8 | 66:1 141:4 | wall  40:2 46:19 | wanted  75:8 |
| vehicle  53:1 | visa  139:22 | 46:19 97:24 | 78:3 80:2 85:7 |
| vehicles  117:7 | visas  139:21 | 116:22 117:1,4 | 110:3 |
| 117:9,15 | vision  4:17 | 122:14 | wants  107:3 |
| veil  3:23 | visited  71:13 | want  5:7 11:2 | 108:13 117:3 |
| venezuelans | visiting  60:22 | 12:10 14:21 | 132:19 134:16 |
| 104:23 | visits  131:20 | 17:2 18:8 | war  39:8 |
| veritext  146:10 | vital  93:10 | 20:16 25:24 | warfare  128:14 |
| versus  93:25 | vocal  98:7 | 29:25 44:24 | warrant  134:9 |
| vested  77:6 | volt  33:13 | 45:21,22,23 | warriors  50:11 |
| veteran  64:10 | volumes  15:24 | 47:23 48:12 | washington |
| 66:6 | vote  25:15,21 | 59:23 61:23 | 22:4 62:14 |
| vetted  40:21 | 25:23 105:23 | 63:5 67:17,18 | 64:13 114:23 |
| 42:5 109:17,18 | 106:1,8 | 68:6 71:2,12 | waste  3:21 |
| 109:22 | voted  105:20 | 74:18 75:13 | watch  29:21 |
| vetting  42:10 | 106:7 | 76:24 79:9,12 | 31:13 100:21 |
| 56:12 121:7 | voters  13:24 | 81:16,18,21 | 100:23 103:22 |
| victimization | 106:9 | 82:12 84:6,20 | water  24:15 |
| 142:24 | votes  100:5 | 88:11 94:10 | 33:20 91:14,18 |
| victimized | voting  11:24 | 95:23 96:5 | 91:22,23 |
| 38:19 | vulnerabilities | 103:21 108:4,8 | way  4:11 8:2 |
| victims  142:14 | 32:19 | 108:8 112:16 | 10:9 14:12 |
| view  12:17 | vulnerability | 112:17 114:9 | 51:4,7 70:23 |
| 61:10 | 84:10 | 115:2,3 116:20 | 77:22 79:8 |
| viewpoints | vulnerable | 118:7 121:12 | 85:22 86:2 |
| 57:19 123:23 | 11:10 73:18 | 126:15,21 | 93:2 104:6,21 |
| vigilant  20:4 | | 127:7,22 | 109:17 113:1 |
| 23:12 | | 129:13 130:1 | 119:6 124:13 |

Page 51

[way - workers]

126:2 127:9,17
133:12,14
**ways** 32:22
43:10 51:16
134:15 135:11
**we've** 3:20 7:20
11:5 23:9 27:1
29:19 33:11
37:5,7 40:5
74:7 83:4 88:7
91:5 97:8
104:24 108:6
109:1 116:12
117:7 120:1
122:5 126:13
126:16,23
127:19,20
134:10 136:21
136:23 140:24
141:7
**weaponization**
128:16
**weapons** 47:19
**wearing** 111:5
111:7
**weather** 104:13
**website** 135:5
**week** 11:4 92:3
123:25 135:15
**weekly** 123:6
**weeks** 4:25 7:6
68:15
**weighs** 41:17
**weiss** 125:8

**welcome** 42:24
42:25 51:13
60:21 82:21
**went** 29:23
34:12 137:16
137:17 138:2,3
142:21
**west** 14:6
**whined** 114:13
**whining** 114:22
**whipping** 100:5
**white** 29:8 35:6
78:1
**who've** 87:25
**wide** 8:23
**wife** 17:19
70:18 100:6
114:14
**wildfire** 91:24
**wildfires** 8:14
24:10 26:18
**willing** 46:14
52:3 68:11
110:17 132:10
133:23
**willingness**
4:13 5:2,14
8:24 17:16
82:24
**wins** 15:1
**wisdom** 17:9
23:22 76:9
**wish** 23:13 45:6
87:10 90:19

**withdrew**
57:25
**withhold** 63:15
**withholding**
62:10,14,23
64:13
**withholds**
64:22
**witness** 53:3
**witnessed**
15:13 29:2
**witnesses** 16:14
**wolf** 68:24
97:15 108:3
**wolfe** 52:23
53:10
**wolves** 96:9
**woman** 14:4
68:25
**women** 21:12
25:4
**won** 30:13
106:23,24
**wonder** 130:3
**wondering**
15:6
**word** 104:10
**words** 2:2
13:15,17,18
15:9,22 52:25
55:21
**work** 4:7 8:9
12:18 17:24
18:5 21:20
23:9 24:24

25:16 30:4
32:14 44:25
45:8 46:14
49:21,22 54:5,9
54:17 58:16
59:19 60:3,10
61:15,15 66:21
71:23 72:2,14
72:16 75:9
76:3,13 78:6
79:6 81:19
82:6 84:15,17
84:21 96:15,23
96:25 98:3
99:12,19 101:1
101:19,25
107:11 111:23
113:7,25 115:9
124:24 125:13
125:18,20
131:10,18
132:13 133:23
136:19 137:6,8
138:13,18
141:12
**worked** 6:22
22:19 24:7,22
44:5 46:9 49:8
59:24 74:21
80:15 96:8,12
109:3 131:2
136:23 138:1
**workers** 71:18
98:18 139:23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[workforce - zuckerberg]**

| | | |
|---|---|---|
| **workforce** 19:16 98:11 | **wow** 91:16 | 100:9 101:3 |
| **working** 23:16 25:2 28:8,16,20 28:22 37:19 42:6 44:19 49:17 52:9 67:11 68:2 71:19 73:5,16 78:7 79:1,2,7 86:20 87:7,9,18 96:20 98:1,13 102:13 121:7 126:6 127:11 129:23 130:6 130:22 133:17 137:5,10 138:23 142:1 | **wrap** 14:21 | 102:12 106:12 |
| | **wray** 34:20 | 119:9 120:3 |
| | **writes** 15:14 | 139:7 |
| | **written** 65:11 | **yesterday** 53:3 |
| | **wyoming** 13:3 | **yield** 5:3 25:17 |
| | **y** | 82:18 113:12 |
| | **yeah** 34:25 47:17 59:17 68:1 71:9 76:6 78:5,5,24 86:19 96:18 100:3 102:7 104:17 108:25 114:20 117:2 126:12 132:25 137:9 144:9 | 138:25 |
| | | **york** 92:21,24 |
| | | 93:20 |
| | | **young** 52:22 |
| | | 68:25 |
| | | **youtube** 122:19 |
| | | 122:23 |
| | | **yuma** 93:17 |
| **works** 24:24 | **year** 6:20 13:5 13:5,6 24:20 31:21 52:24 96:25 103:16 117:17 119:6 119:10,10 120:21 121:2 141:9 | **z** |
| **world** 91:14 95:3 109:7 128:15 129:8 | | **zero** 101:1 142:19 |
| **worried** 112:8 123:3 | | **zone** 39:8 |
| **worse** 124:4 | | **zuckerberg** 123:25 |
| **worship** 141:21 | | |
| **worst** 51:24 104:6 | **year's** 19:9 29:2,24 31:21 | |
| **worth** 88:2 134:12 | **years** 10:1 11:5 17:14,22 18:14 18:22 19:2,11 22:17 27:3 31:22 52:23 63:9 69:1 76:7 79:24 80:15,15 92:5 99:25 | |
| **would've** 50:22 50:23 75:22 83:3 90:19 103:17 | | |

Page 53

# Exhibit 4

10/16/25, 9:18 PM
Vance Vows an End to Programs for Legal Immigrants - The New York Times

# *Vance Vows an End to Programs for Legal Immigrants*

Hundreds of thousands of immigrants live and work in the United States through programs that give them temporary legal status. In the border state of Arizona, JD Vance vowed they would stop.

---

 **Listen to this article · 3:28 min** Learn more

 **By Chris Cameron**
Reporting from Peoria, Ariz.

Oct. 22, 2024

Senator JD Vance of Ohio, former President Donald J. Trump's running mate, escalated Mr. Trump's attacks against legal immigration on Tuesday, vowing to end programs that authorize hundreds of thousands of immigrants to live and work in the United States.

"What Donald Trump has proposed doing is we're going to stop doing mass parole. We're going to stop doing mass grants of Temporary Protected Status," Mr. Vance said at a campaign event in Peoria, Ariz. "Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."

Later in Tucson, Mr. Vance deflected questions from local reporters about deporting DACA recipients and restarting family separations at the border. Without specifically addressing DACA, which stands for Deferred Action for Childhood Arrivals, Mr. Vance said "we also have to deport people, not just the bad people who came into our country, but people who violated the law coming into this country. We've got to be willing to deport them."

About 864,000 immigrants have legal residency through a program known as Temporary Protected Status, which Congress created in 1990 for people fleeing war and other crises in their home countries. The program currently grants legal protection to immigrants from 16 countries, with most coming from Venezuela, El Salvador and Haiti.

This month, Mr. Trump had vowed to revoke that legal status for Haitian immigrants, who have been the target of accusations by the former president and Mr. Vance — most prominently in Springfield, Ohio. Mr. Vance's remarks on Tuesday appeared to widen that pledge, suggesting that all immigrants granted Temporary Protected Status would have to find other methods to stay in the country or face deportation. Immigrants from many of those countries would not have a clear alternative path to temporary protection.

A representative for Mr. Vance declined to comment when asked about specifics of the plan to end Temporary Protected Status.

Mr. Vance also appeared to propose the end of other parole programs that allow hundreds of thousands of immigrants to live in the United States for a short period without a visa or green card. This month, the Biden administration said it would allow one of those programs — for people from Cuba, Venezuela, Haiti and Nicaragua — to lapse, reflecting the political pressure President Biden and Vice President Kamala Harris face on immigration, and the desire to blunt attacks from Republicans on the issue in the final days before the election.

A reporter from Telemundo had asked Mr. Vance in Peoria about Mr. Trump's vow to deport Haitians living in the United States under Temporary Protected Status, and if that effort would extend to immigrants from other countries and in other migration programs. Mr. Vance again described immigrants in those programs as "illegal immigrants," even though they are in the country legally, and blamed them for rising costs and other issues.

"What Kamala Harris has done," Mr. Vance said at a factory for military equipment in Peoria, "is she has used programs that are meant to help people who are escaping tyranny, and she's used it to grant amnesty to millions upon millions of

**JA 256**

people who have no legal right to be in the country, and that has to stop."

**Chris Cameron** covers politics for The Times, focusing on breaking news and the 2024 campaign.

# Exhibit 5

10/10/25, 3:53 PM       Case 1:25-cv-08686-KPF     Sweeping Raids and Mass Deportations: Inside Trump's 2025 Immigration Plans - The New York Times   Page 2 of 15

If he regains power, Donald Trump wants not only to revive some of the immigration policies criticized as draconian during his presidency, but expand and toughen them.

▶    **Listen to this article · 18:02 min**   <u>Learn more</u>

---

  

**By Charlie Savage, Maggie Haberman and Jonathan Swan**

Nov. 11, 2023

Former President Donald J. Trump is planning an extreme expansion of his first-term crackdown on immigration if he returns to power in 2025 — including preparing to round up undocumented people already in the United States on a vast scale and detain them in sprawling camps while they wait to be expelled.

The plans would sharply restrict both legal and illegal immigration in a multitude of ways.

Mr. Trump wants to revive his first-term border policies, including banning entry by people from certain Muslim-majority nations and reimposing a Covid 19-era policy of refusing asylum claims — though this time he would base that refusal on assertions that migrants carry other infectious diseases like tuberculosis.

He plans to scour the country for unauthorized immigrants and deport people by the millions per year.

To help speed mass deportations, Mr. Trump is preparing an enormous expansion of a form of removal that does not require due process hearings. To help Immigration and Customs Enforcement carry out sweeping raids, he plans to reassign other federal agents and deputize local police officers and National Guard soldiers voluntarily contributed by Republican-run states.

To ease the strain on ICE detention facilities, Mr. Trump wants to build huge camps to detain people while their cases are processed and they await deportation flights. And to get around any refusal by Congress to appropriate the necessary funds, Mr.

Trump would redirect money in the military budget, as he did in his first term to spend more on a border wall than Congress had authorized.



"Trump will unleash the vast arsenal of federal powers to implement the most spectacular migration crackdown," said Stephen Miller, Mr. Trump's former White House aide who was the chief architect of his border control efforts.  Cooper Neill for The New York Times

In a public reference to his plans, Mr. Trump told a crowd in Iowa in September: "Following the Eisenhower model, we will carry out the largest domestic deportation operation in American history." The reference was to a 1954 campaign to round up and expel Mexican immigrants that was named for an ethnic slur — "Operation Wetback."

The constellation of Mr. Trump's 2025 plans amounts to an assault on immigration on a scale unseen in modern American history. Millions of undocumented immigrants would be barred from the country or uprooted from it years or even decades after settling here.

10/10/25, 3:53 PM    Case 1:25-cv-08686-KPF    Document 20-5    Filed 10/21/25    Page 4 of 15

Such a scale of planned removals would raise logistical, financial and diplomatic challenges and would be vigorously challenged in court. But there is no mistaking the breadth and ambition of the shift Mr. Trump is eyeing.

In a second Trump presidency, the visas of foreign students who participated in anti-Israel or pro-Palestinian protests would be canceled. U.S. consular officials abroad will be directed to expand ideological screening of visa applicants to block people the Trump administration considers to have undesirable attitudes. People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.

Similarly, numerous people who have been allowed to live in the country temporarily for humanitarian reasons would also lose that status and be kicked out, including tens of thousands of the Afghans who were evacuated amid the 2021 Taliban takeover and allowed to enter the United States. Afghans holding special visas granted to people who helped U.S. forces would be revetted to see if they really did.

And Mr. Trump would try to end birthright citizenship for babies born in the United States to undocumented parents — by proclaiming that policy to be the new position of the government and by ordering agencies to cease issuing citizenship-affirming documents like Social Security cards and passports to them. That policy's legal legitimacy, like nearly all of Mr. Trump's plans, would be virtually certain to end up before the Supreme Court.

In interviews with The New York Times, several Trump advisers gave the most expansive and detailed description yet of Mr. Trump's immigration agenda in a potential second term. In particular, Mr. Trump's campaign referred questions for this article to Stephen Miller, an architect of Mr. Trump's first-term immigration policies who remains close to him and is expected to serve in a senior role in a second administration.

10/10/25, 3:53 PM        Case 1:25-cv-08686-KPF  Document 20-5  Filed 10/21/25  Page 5 of 15

**Sign up to get Maggie Haberman's articles emailed to you.**  Maggie Haberman is a White House correspondent reporting on President Trump. Get it sent to your inbox.

All of the steps Trump advisers are preparing, Mr. Miller contended in a wide-ranging interview, rely on existing statutes; while the Trump team would likely seek a revamp of immigration laws, the plan was crafted to need no new substantive legislation. And while acknowledging that lawsuits would arise to challenge nearly every one of them, he portrayed the Trump team's daunting array of tactics as a "blitz" designed to overwhelm immigrant-rights lawyers.

"Any activists who doubt President Trump's resolve in the slightest are making a drastic error: Trump will unleash the vast arsenal of federal powers to implement the most spectacular migration crackdown," Mr. Miller said, adding, "The immigration legal activists won't know what's happening."

Todd Schulte, the president of FWD.us, an immigration and criminal justice advocacy group that repeatedly fought the Trump administration, said the Trump team's plans relied on "xenophobic demagoguery" that appeals to his hardest-core political base.

"Americans should understand these policy proposals are an authoritarian, often illegal, agenda that would rip apart nearly every aspect of American life — tanking the economy, violating the basic civil rights of millions of immigrants and native-born Americans alike," Mr. Schulte said.

10/10/25, 3:53 PM    Case 1:25-cv-08686-KPF   Sweeping Raids and Mass Deportations: Inside Trump's 2025 Immigration Plans - The New York Times

## 'Poisoning the Blood'



Migrants gather outside the Roosevelt Hotel in Midtown Manhattan in August, waiting to be processed.   Jeenah Moon for The New York Times

Since Mr. Trump left office, the political environment on immigration has moved in his direction. He is also more capable now of exploiting that environment if he is re-elected than he was when he first won election as an outsider.

The ebbing of the Covid-19 pandemic and resumption of travel flows have helped stir a global migrant crisis, with millions of Venezuelans and Central Americans fleeing turmoil and Africans arriving in Latin American countries before continuing their journey north. Amid the record numbers of migrants at the southern border and beyond it in cities like New York and Chicago, voters are frustrated and even some Democrats are calling for tougher action against immigrants and pressuring the White House to better manage the crisis.

**JA 263**

Mr. Trump and his advisers see the opening, and now know better how to seize it. The aides Mr. Trump relied upon in the chaotic early days of his first term were sometimes at odds and lacked experience in how to manipulate the levers of federal power. By the end of his first term, cabinet officials and lawyers who sought to restrain some of his actions — like his Homeland Security secretary and chief of staff, John F. Kelly — had been fired, and those who stuck with him had learned much.

In a second term, Mr. Trump plans to install a team that will not restrain him.

Since much of Mr. Trump's first-term immigration crackdown was tied up in the courts, the legal environment has tilted in his favor: His four years of judicial appointments left behind federal appellate courts and a Supreme Court that are far more conservative than the courts that heard challenges to his first-term policies.

The fight over Deferred Action for Childhood Arrivals provides an illustration.

DACA is an Obama-era program that shields from deportation and grants work permits to people who were brought unlawfully to the United States as children. Mr. Trump tried to end it, but the Supreme Court blocked him on procedural grounds in June 2020.

Mr. Miller said Mr. Trump would try again to end DACA. And the 5-4 majority of the Supreme Court that blocked the last attempt no longer exists: A few months after the DACA ruling, Justice Ruth Bader Ginsburg died and Mr. Trump replaced her with a sixth conservative, Justice Amy Coney Barrett.

Mr. Trump's rhetoric has more than kept up with his increasingly extreme agenda on immigration.

His stoking of fear and anger toward immigrants — pushing for a border wall and calling Mexicans rapists — fueled his 2016 takeover of the Republican Party. As president, he privately mused about developing a militarized border like Israel's, asked whether migrants crossing the border could be shot in the legs and wanted a proposed border wall topped with flesh-piercing spikes and painted black to burn migrants' skin.

10/10/25, 3:53 PM    Case 1:25-cv-08686-KPF    Scooping Raids and Mass Deportations: Inside Trump's 2025 Immigration Plans - The New York Times    Document 20-5    Filed 10/21/25    Page 8 of 15

As he has campaigned for the party's third straight presidential nomination, his anti-immigrant tone has only grown harsher. In a recent interview with a right-wing website, Mr. Trump claimed without evidence that foreign leaders were deliberately emptying their "insane asylums" to send the patients across America's southern border as migrants. He said migrants were "poisoning the blood of our country." And at a rally on Wednesday in Florida, he compared them to the fictional serial killer and cannibal Hannibal Lecter, saying, "That's what's coming into our country right now."

Mr. Trump had similarly vowed to carry out mass deportations when running for office in 2016, but the government only managed several hundred thousand removals per year under his presidency, on par with other recent administrations. If they get another opportunity, Mr. Trump and his team are determined to achieve annual numbers in the millions.

## Keeping People Out

10/10/25, 3:53 PM        Case 1:25-cv-08686-KPF    Document 20-5    Filed 10/21/25    Page 9 of 15
Sweeping Raids and Mass Deportations: Inside Trump's 2025 Immigration Plans - The New York Times



Migrants wait to be escorted by Border Patrol agents to a processing area in September. Mr. Trump's stoking of fear and anger toward immigrants fueled his 2016 takeover of the Republican Party.   Mark Abramson for The New York Times

Mr. Trump's immigration plan is to pick up where he left off and then go much farther. He would not only revive some of the policies that were criticized as draconian during his presidency, many of which the Biden White House ended, but also expand and toughen them.

One example centers on expanding first-term policies aimed at keeping people out of the country. Mr. Trump plans to suspend the nation's refugee program and once again categorically bar visitors from troubled countries, reinstating a version of his ban on travel from several mostly Muslim-majority countries, which President Biden called discriminatory and ended on his first day in office.

https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html?searchResultPosition=1                                                    8/14

Case: 25-2995, 03/11/2026, DktEntry: 39.1, Page 271 of 303

**JA 266**

10/10/25, 3:53 PM    Case 1:25-cv-08686-KPF   Document 20-5   Filed 10/21/25   Page 10 of 15
Developing Raids and Mass Deportations Inside Trump's 2025 Immigration Plans - The New York Times

Mr. Trump would also use coercive diplomacy to induce other nations to help, including by making cooperation a condition of any other bilateral engagement, Mr. Miller said. For example, a second Trump administration would seek to re-establish an agreement with Mexico that asylum seekers remain there while their claims are processed. (It is not clear that Mexico would agree; a Mexican court has said that deal violated human rights.)

Mr. Trump would also push to revive "safe third country" agreements with several nations in Central America, and try to expand them to Africa, Asia and South America. Under such deals, countries agree to take would-be asylum seekers from specific other nations and let them apply for asylum there instead.

While such arrangements have traditionally only covered migrants who had previously passed through a third country, federal law does not require that limit and a second Trump administration would seek to make those deals without it, in part as a deterrent to migrants making what the Trump team views as illegitimate asylum claims.

At the same time, Mr. Miller said, the Centers for Disease Control and Prevention would invoke the public health emergency powers law known as Title 42 to again refuse to hear any asylum claims by people arriving at the southern border. The Trump administration had internally discussed that idea early in Mr. Trump's term, but some cabinet secretaries pushed back, arguing that there was no public health emergency that would legally justify it. The administration ultimately implemented it during the coronavirus pandemic.

Saying the idea has since gained acceptance in practice — Mr. Biden initially kept the policy — Mr. Miller said Mr. Trump would invoke Title 42, citing "severe strains of the flu, tuberculosis, scabies, other respiratory illnesses like R.S.V. and so on, or just a general issue of mass migration being a public health threat and conveying a variety of communicable diseases."

Mr. Trump and his aides have not yet said whether they would re-enact one of the most contentious deterrents to unauthorized immigration that he pursued as president: separating children from their parents, which led to trauma among

10/10/25, 3:53 PM    Case 1:25-cv-08686-KPF and Mass Deportations: Inside Trump's 2023 Immigration Plans - The New York Times

migrants and difficulties in reuniting families. When pressed, Mr. Trump has repeatedly declined to rule out reviving the policy. After an outcry over the practice, Mr. Trump ended it in 2018 and a judge later blocked the government from putting it back into effect.

## Mass Deportations



Federal immigration-enforcement officers gathered for an arrest operation in May in Pompano Beach, Fla. Saul Martinez for The New York Times

Soon after Mr. Trump announced his 2024 campaign for president last November, he met with Tom Homan, who ran ICE for the first year and a half of the Trump administration and was an early proponent of separating families to deter migrants.

**JA 268**

In an interview, Mr. Homan recalled that in that meeting, he "agreed to come back" in a second term and would "help to organize and run the largest deportation operation this country's ever seen."

Trump advisers' vision of abrupt mass deportations would be a recipe for social and economic turmoil, disrupting the housing market and major industries including agriculture and the service sector.

Mr. Miller cast such disruption in a favorable light.

"Mass deportation will be a labor-market disruption celebrated by American workers, who will now be offered higher wages with better benefits to fill these jobs," he said. "Americans will also celebrate the fact that our nation's laws are now being applied equally, and that one select group is no longer magically exempt."

One planned step to overcome the legal and logistical hurdles would be to significantly expand a form of fast-track deportations known as "expedited removal." It denies undocumented immigrants the usual hearings and opportunity to file appeals, which can take months or years — especially when people are not in custody — and has led to a large backlog. A 1996 law says people can be subject to expedited removal for up to two years after arriving, but to date the executive branch has used it more cautiously, swiftly expelling people picked up near the border soon after crossing.

The Trump administration tried to expand the use of expedited removal, but a court blocked it and then the Biden team canceled the expansion. It remains unclear whether the Supreme Court will rule that it is constitutional to use the law against people who have been living for a significant period in the United States and express fear of persecution if sent home.

Mr. Trump has also said he would invoke an archaic law, the Alien Enemies Act of 1798, to expel suspected members of drug cartels and criminal gangs without due process. That law allows for summary deportation of people from countries with which the United States is at war, that have invaded the United States or that have engaged in "predatory incursions."

10/10/25, 3:53 PM    Case 1:25-cv-08686-KPF...Sweeping Raids and Mass Deportations: Inside Trump's 2025 Immigration Plans... the New York Times



Tom Homan, who ran ICE for the first year and a half of the Trump administration, said he told Mr. Trump he would "help to organize and run the largest deportation operation this country's ever seen."  Rebecca Noble for The New York Times

The Supreme Court has upheld past uses of that law in wartime. But its text seems to require a link to the actions of a foreign government, so it is not clear whether the justices will allow a president to stretch it to encompass drug cartel activity.

More broadly, Mr. Miller said a new Trump administration would shift from the ICE practice of arresting specific people to carrying out workplace raids and other sweeps in public places aimed at arresting scores of unauthorized immigrants at once.

To make the process of finding and deporting undocumented immigrants already living inside the country "radically more quick and efficient," he said, the Trump team would bring in "the right kinds of attorneys and the right kinds of policy thinkers" willing to carry out such ideas.

And because of the magnitude of arrests and deportations being contemplated, they plan to build "vast holding facilities that would function as staging centers" for immigrants as their cases progress and they wait to be flown to other countries.

Mr. Miller said the new camps would likely be built "on open land in Texas near the border."

He said the military would construct them under the authority and control of the Department of Homeland Security. While he cautioned that there were no specific blueprints yet, he said the camps would look professional and similar to other facilities for migrants that have been built near the border.

Such camps could also enable the government to speed up the pace and volume of deportations of undocumented people who have lived in the United States for years and so are not subject to fast-track removal. If pursuing a long-shot effort to win permission to remain in the country would mean staying locked up in the interim, some may give up and voluntarily accept removal without going through the full process.

The use of these camps, Mr. Miller said, would likely be focused more on single adults because the government cannot indefinitely hold children under a longstanding court order known as the Flores settlement. So any families brought to the facilities would have to be moved in and out more quickly, he said.

The Trump administration tried to overturn the Flores settlement, but the Supreme Court did not resolve the matter before Mr. Trump's term ended. Mr. Miller said the Trump team would try again.

To increase the number of agents available for ICE sweeps, Mr. Miller said, officials from other federal law enforcement agencies would be temporarily reassigned, and state National Guard troops and local police officers, at least from willing Republican-led states, would be deputized for immigration control efforts.

While a law known as the Posse Comitatus Act generally forbids the use of the armed forces for law enforcement purposes, another law called the Insurrection Act creates an exception. Mr. Trump would invoke the Insurrection Act at the border, enabling the use of federal troops to apprehend migrants, Mr. Miller said.

"Bottom line," he said, "President Trump will do whatever it takes."

**JA 271**

Sweeping Raids and Mass Deportations: Inside Trump's 2025 Immigration Plans - The New York Times

Zolan Kanno-Youngs and Eileen Sullivan contributed reporting. Kitty Bennett contributed research.

**Charlie Savage** writes about national security and legal policy.

**Maggie Haberman** is a senior political correspondent reporting on the 2024 presidential campaign, down ballot races across the country and the investigations into former President Donald J. Trump.

**Jonathan Swan** is a political reporter covering the 2024 presidential election and Donald Trump's campaign.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Trump's '25 Immigration Plan: Giant Camps, Mass Deportation

# Exhibit 6

 
# Trump says he would revoke Temporary Protected Status for Haitian migrants in Springfield if elected

By Rashard Rose and Kate Sullivan, CNN

🕐 3 min read · Published 1:06 AM EDT, Thu October 3, 2024



A man walks through downtown Springfield, Ohio, on September 16. Jessie Wardarski/AP

**(CNN)** — Former President Donald Trump on Wednesday said that he would revoke Temporary

10/16/25, 9:27 PM

Protected Status for the Haitian migrants in Springfield, Ohio, and deport them if he is reelected in November.

"You have to remove the people, and you have to bring them back to their own country. They are, in my opinion, it's not legal," Trump said in an interview with NewsNation.

Trump, asked if he would revoke the migrants' Temporary Protected Status, said, "Absolutely. I'd revoke it, and I'd bring them back to their country."

The former president and his allies have continued to spread misinformation about Haitian migrants in the city of Springfield.

Many Haitians came into the country under a Biden-Harris administration parole program that gives permission to enter to vetted participants with US sponsors. And many have "Temporary Protected Status," as CNN has previously reported, which shields them from deportation and allows them to live and work in the country for a limited period of time.

Some received that protection after the Biden-Harris administration expanded the number of Haitians eligible in June. Others have been living in the US with Temporary Protected Status since before the Biden-Harris administration.



**RELATED ARTICLE**
Haitians fled their country for peace. Now, many are having it disrupted in Springfield

Trump, pressed in the Wednesday interview on what would happen if Haiti refused to receive them, said: "They will," without providing additional details.



**Do you want the latest in US politics summarized each day?**

Sign up for CNN's What Matters newsletter.

Email address

By subscribing you agree to our Privacy Policy.

Sign me up

"Well, they're going to receive them, they'll receive them. If I bring them back, they're going to

10/16/25, 9:27 PM

receive them," Trump said.

During the Trump administration, the Department of Homeland Security was aggressive in ending a number of temporary protected status designations that had been on the books, in some cases, for decades.

Trump in recent weeks has spread debunked conspiracy theories about Haitian migrants eating pets in Springfield, including at last month's presidential debate, as part of his efforts to stoke fears about immigrants and push his hardline immigration policy proposals, including mass deportations.

From the September 10 debate through September 20, Springfield received more than 35 threats of violence, including bomb threats, according to Springfield Mayor Rob Rue. The threats prompted evacuations of elementary schools and supermarkets, lockdowns of hospitals and a transition to remote learning at several local colleges.

Rue, Ohio Republican Gov. Mike DeWine and other local officials have decried the rumors as false and destructive to the community. A staffer for Sen. JD Vance, Trump's running mate who helped to propel the misinformation, was told early last month by Springfield City Manager Bryan Heck that "there was no verifiable evidence or reports to show" that the rumors are true, CNN reported.

The city of Springfield notes on its website that approximately 12,000 to 15,000 immigrants live in Clark County — which has a population of roughly 136,000 — and that Haitian immigrants are there legally.

Haitian workers play a significant role in Springfield's economy, filling much-needed jobs, the city has said. DeWine has acknowledged the city was having some issues adjusting to the influx of mostly Haitian immigrants, but he said in an interview last month they were working to deal with the issues and called the Haitian immigrants "positive influences" on the community.

*CNN's Jack Forrest, Daniel Dale, Danya Gainor, Catherine E. Shoichet, Elizabeth Wolfe, Melissa Alonso, Jeff Winter and Chelsea Bailey contributed to this report.*

## Up next

ICE arrests police officer in Chicago suburb and accuses him of being in US illegally

1 minute read



10/16/25, 9:27 PM    Case 1:25-cv-08686-KPF    Document 20-6    Filed 10/21/25    Page 5 of 14 elected | CNN Politics

Federal judge demands answers from Trump admin on following order to avoid violent encounters with Chicago protesters

6 minute read



4 universities decline White House offer for expanded access to federal funding in exchange for demands. Here's what we know

6 minute read



Former Trump national security adviser John Bolton indicted

3 minute read



# Most read

**1**   ICE arrests police officer in Chicago suburb and accuses him of being in US illegally

**2**   Federal judge demands answers from Trump admin on following order to avoid violent encounters with Chicago protesters

**3**   4 universities decline White House offer for expanded access to federal funding in exchange for demands. Here's what we know

## MORE FROM CNN



'It's killing business': Trump's mass deportation push is crushing …



'There is no sanctuary here': Meet the Border Patrol chief in …



Trump threatens to yank World Cup games from Boston, though …

## NEWS & BUZZ

 ICE arrests police officer in Chicago suburb and accuses him of ...

 Federal judge demands answers from Trump admin on following ...

 4 universities decline White House offer for expanded access ...

Search CNN...

Subscribe

Sign in

Live TV

Listen

Watch

US

World

Politics

Business

Markets

Health

CNN Underscored

JA 278

Trump says he would revoke Temporary Protected Status for Haitian immigrants in Springfield | CNN Politics

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

About CNN

**Politics**

**FOLLOW CNN POLITICS**

   

Terms of Use      Privacy Policy      Manage Cookies      Ad Choices      Accessibility & CC      About      Subscribe      Newsletters

Transcripts      Help Center

© 2025 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

JA 279

Trump says he would revoke temporary protected status for Haitian migrants in Springfield | CNN Politics

**JA 280**

10/16/25, 9:27 PM Case 1:25-cv-08686-KPF Document 20-6 Filed 10/21/25 Page 9 of 14

**JA 281**

**JA 282**

Trump says he would revoke Temporary Protected Status for Haitian migrants in Springfield, elected | CNN Politics

**JA 283**

**JA 284**

Case 1:25-cv-08686-KPF   Document 20-6   Filed 10/21/25   Page 13 of 14

Trump says he would revoke Temporary Protected Status for Haitian migrants in Springfield | CNN Politics

**JA 285**

# Exhibit 7

## DECLARATION OF AARON REICHLIN-MELNICK

1. I, Aaron Reichlin-Melnick, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

2. I am a Senior Fellow at the American Immigration Council ("Immigration Council"), a nonprofit and non-partisan organization whose mission includes the use of facts to educate the public on the important and enduring contributions that immigrants make to America.

3. As a Senior Fellow at the Immigration Council, I have since 2018 tracked and analyzed trends in Department of Homeland Security ("DHS") policies and data. I have testified before Congress seven times between 2021 and 2025 on topics which rely on my knowledge of DHS immigration data and publications.[1] I have also previously submitted expert declarations analyzing government-produced immigration statistics.[2]

4. Since 2018, I have been tasked with maintaining and updating the American Immigration Council's fact sheet on Temporary Protected Status ("TPS"),[3] which has required me to read and analyze every TPS designation and redesignation, extension, or termination in the past seven years. As part of my policy work, I have also analyzed and tracked the size of the TPS population through regular analysis of the relevant U.S. Citizenship and Immigration Data.[4] In

---

[1] *See, e.g.*, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration Integrity, Security, and Enforcement, Testimony of Aaron Reichlin-Melnick for hearing on Presidential Power to Secure the Border (Mar. 24, 2024), *available at* https://docs.house.gov/meetings/JU/JU01/20240307/116925/HMTG-118-JU01-Wstate-Reichlin-MelnickA-20240307.pdf.

[2] *See, e.g.*, *Innovation Law Lab v. Wolf*, 3:19-cv-00807-RS (N.D. Cal. filed Feb. 14, 2019), *Padilla v. ICE*, No. 2:18-cv-00928-MJP (W.D. Wash. filed June 25, 2018), *East Bay Sanctuary Coalition II v. Wolf*, 3:19-cv-04073-JST (N.D. Cal filed July 16, 2019); *Miot v. Trump*, 1:25-cv-02471, ECF No. 26-7 (D.D.C. filed July 30, 2025).

[3] American Immigration Council, "Temporary Protected Status: An Overview," https://www.americanimmigrationcouncil.org/wp-content/uploads/2017/08/Temporary-Protected-Status-An-Overview-0925.pdf, *last updated* Sept. 25, 2025.

[4] *See, e.g.*, U.S. Citizenship and Immigration Services, "Form I-821, Application for Temporary Protected Status Receipts, Approvals, Denials, and Pending by Country of Designation (Fiscal Year 2025, Q3)," Oct. 8, 2025, https://www.uscis.gov/sites/default/files/document/data/i821_radp_fy2025_q3.xlsx.

preparation for this declaration I have reviewed every prior TPS designation and re-designation, extension, and termination, from 1990 through present.

5.    My review of the 35-year history of TPS finds that before 2025, the sole rationale cited to justify termination of TPS has been an end to the temporary country conditions which authorized the initial designation. In 22 Federal Register Termination Notices from 1992 through 2018 that I reviewed, no Secretary or Attorney General has ever listed national interest as a ground for termination.

6.    In each of the 22 terminations of TPS from 1992 through 2018 that I reviewed, the Secretary or Attorney General has explained that the termination was an informed decision resulting from the interagency review process of the country conditions underlying the initial designation. This review determined whether there remained an armed conflict, environmental disaster (or other prerequisite under INA § 244(b)(1)(B)), or other "extraordinary and temporary conditions" in the foreign state.

7.    References to "public interest" in Termination Notices prior to 2025 are rare and cursory. In total, the phrase is referenced in just three Termination Notices out of 22.

8.    The first Termination Notice which references "national interest" is the June 1997 termination of TPS for Rwanda, and comes within a single sentence of boilerplate declaring compliance with the consultation requirement of INA § 244(b)(3).

9.    The second reference is contained in a March 1998 Termination Notice for TPS for Liberia, which contains substantively identical boilerplate.[5] Following a renewed outbreak of hostilities

---

[5] *Compare* Termination of Designation of Rwanda Under Temporary Protected Status Program After Final 6-Month Extension, 62 Fed. Reg. 33443 (June 19, 1997) ("pursuant to section 244(b)(3) of the Act, I have had consultations with the appropriate agencies of the U.S. Government concerning (a) the conditions in Rwanda; and (b) whether permitting nationals of Rwanda (and aliens having no nationality who last habitually resided in Rwanda) to remain temporarily in the United States is contrary to the national interest of the United States") *with* Termination of Designation of Liberia Under the Temporary Protected Status Program, 64 Fed. Reg. 41463 (July 30, 1999) (same, substituting Liberia).

in Liberia, that termination was mooted by September 1998 redesignation which does not reference national interest.[6] This was followed by a second Termination Notice in July 1999 which also did not reference national interest.[7]

10.  The third reference occurs in a 2004 Termination and Redesignation Notice for Liberia. The Termination ends a 2002 designation of TPS under INA § 244(b)(3)(A) for the existence of an "ongoing armed conflict." Secretary Ridge first determined that the peace process following the Second Liberian Civil War had brought an end to the "armed conflict," which required termination of the 2002 designation. He then simultaneously re-designated TPS under INA § 244(b)(3)(C), and in so doing recited the statutory factors for a initial grant of TPS, including that the new grant was not contrary to national interest.

11.  Similar references to the phrase "national interest" in designations, redesignations, and extensions are equally cursory. Until 2025, no Attorney General or Secretary has explained their conclusion that it is not "contrary to the national interest" to permit TPS beneficiaries to remain temporarily in the United States," or ever justified a termination on national interest grounds.

12.  By contrast, Termination Notices, as well as extensions and designations, routinely provide a detailed explanation as to the existence (or lack thereof) of the country conditions which justify TPS. A comprehensive list of each TPS termination prior to 2025, as well as the dispositive rationale provided for termination in each case, is below.

a.  **Kuwait (1991-1992)**: "I find after consultation with the appropriate agencies of the United States Government, that the extraordinary and temporary conditions found to exist in Kuwait on March 27, 1991, are not presently in existence, in that

---

[6] Redesignation of Liberia Under Temporary Protected Status Program, 63 Fed. Reg. 51958 (Sept. 29, 1998).

[7] Termination of Designation of Liberia Under the Temporary Protected Status Program, 64 Fed. Reg. 41463 (July 30, 1999).

substantial progress has been made toward the rebuilding of Kuwait society so that the temporary impediments to safe return posed on March 27, 1991, by the immediate aftermath of the Iraqi occupation and the subsequent military conflict no longer remain."[8]

b. **Lebanon (1991-1993)**: "I find, after consultation with the appropriate agencies of the United States Government, that the extraordinary and temporary conditions found to exist in Lebanon on March 21, 1991, and on January 20, 1992, are not presently in existence."[9]

c. **Rwanda (1994-1997):** "As a result of these consultations, I have determined that Rwanda no longer continues to meet the conditions for designation of TPS under section 244(b)(1) of the Act. … While other avenues of immigration relief, including asylum, remain available to Rwandans in the United States who believe that their particular circumstances make return to Rwanda unsafe, we have determined that TPS is no longer appropriate for Rwandans in general."[10]

d. **Liberia (1991-1999)**:

   i. 1998 initial termination: "As a result of these consultations, I have determined that Liberia no longer continues to meet the conditions for designation of TPS under section 244(b)(1) of the Act. … In view of the Department of State's recommendation for termination, I have determined

---

[8] Termination of Designation of Kuwait under Temporary Protected Status Program, 57 Fed. Reg. 2930 (Jan. 24, 1992).

[9] Termination of Designation of Lebanon Under Temporary Protected Status Program, 58 Fed. Reg. 7477 (Feb. 8, 1993).

[10] Termination of Designation of Rwanda Under Temporary Protected Status Program After Final 6-Month Extension, 62 Fed. Reg. 33443 (June 19, 1997).

that TPS is no longer appropriate for Liberia in general."[11] Following a renewed outbreak of civil unrest, this termination did not take effect.

    **ii.** 1999 final termination: "the Attorney General has determined that conditions in Liberia no longer support a TPS designation."[12]

**e.** **Guinea-Bissau (1999-2000)**: "Based upon a more recent review of conditions within Guinea-Bissau by the Departments of Justice and State, the Attorney General finds that conditions no longer support a TPS designation. … I have consulted with the appropriate agencies of Government concerning conflict and security conditions in Guinea- Bissau. 8 U.S.C. 1254a(b)(3). Based on these consultations, I have determined that Guinea-Bissau no longer meets the conditions for designation of TPS under section 244(b)(1) of the Act."[13]

**f.** **Kosovo (1998-2000)**: "Based upon a more recent review of conditions within the Kosovo Province by the Departments of Justice and State, the Attorney General finds that conditions in the Kosovo Province no longer support a TPS designation. … I have consulted with the appropriate agencies of Government concerning conflict and security conditions in the Kosovo Province. 8 U.S.C. 1254a(b)(3). Based on these consultations, I have determined that the Kosovo Province no longer meets the conditions for designation of TPS under section 244(b)(1) of the Act."[14]

---

[11] Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension, 63 Fed. Reg. 15437 (Mar. 31, 1998).

[12] Termination of Designation of Liberia Under the Temporary Protected Status Program, 64 Fed. Reg. 41463 (July 30, 1999).

[13] Six-Month Extension and Termination of Designation of Guinea-Bissau Under the Temporary Protected Status Program, 65 Fed. Reg. 15016 (Mar. 20, 2000).

[14] Termination of the Province of Kosovo in the Republic of Serbia in the State of the Federal Republic of Yugoslavia (Serbia-Montenegro) Under the Temporary Protected Status Program, 65 Fed. Reg. 33356 (May 23, 2000).

g. **Bosnia-Herzegovina (1992-2001)**: "I have consulted with the appropriate agencies of Government concerning conflict and security conditions in Bosnia-Herzegovina. 8 U.S.C. 1254a(b)(3). Based on these consultations, I have determined that Bosnia-Herzegovina no longer meets the conditions for designation of TPS under section 233(b)(1) of the Act"[15]

h. **Angola (2000-2003)**: "Based upon a recent review of conditions within Angola by the Departments of Justice and State, the Attorney General finds that conditions in Angola no longer support a TPS designation. … For the foregoing reasons, the Attorney General determines that Angolan TPS beneficiaries may return safely to Angola at this time and, therefore, terminates the TPS designation for Angola."[16]

i. **Liberia (2002-2004)**: "Based upon this review, the Secretary of DHS, after consultation with appropriate government agencies, finds that the conditions that prompted designation of Liberia for TPS are no longer met. 8 U.S.C. 1254a(b)(3)(A) and (B). The armed conflict has ceased."[17]

j. **Montserrat (1997-2005)**: "Based upon this review, the Secretary of DHS, after consultation with appropriate government agencies, finds that Montserrat no longer continues to meet the conditions for designation under the TPS program. 8 U.S.C. 1254a(b)(3)(A). Because the volcanic eruptions are unlikely to cease in the

---

[15] Termination of Bosnia-Herzegovina Under the Temporary Protected Status Program, 65 Fed. Reg. 52789 (Aug. 30, 2000).

[16] Termination of Designation of Angola Under the Temporary Protected Status Program, 68 Fed. Reg. 3896 (Jan. 27, 2003).

[17] Termination and Re-Designation of Liberia for Temporary Protected Status, 69 Fed. Reg. 52297 (Aug. 25, 2004).

foreseeable future, they can no longer be considered 'temporary' as required by Congress when it enacted the TPS statute."[18]

k. **Liberia (2004-2007)**: "Based upon this review, the Secretary, after consultation with appropriate Government agencies, determined that the extraordinary and temporary conditions that prompted the re-designation of Liberia for TPS no longer prevent Liberians (or aliens having no nationality who last habitually resided in Liberia) from returning to their home country in safety, and that the designation of Liberia for TPS should be terminated."[19]

l. **Burundi (1997-2007)**: "Based upon this review, the Secretary finds, after consultation with the appropriate Government agencies, that the armed conflict is no longer ongoing, that the extraordinary and temporary conditions that prompted the designation and re-designation of Burundi for TPS no longer prevent Burundians (or aliens having no nationality who last habitually resided in Burundi) from returning in safety, and that the designation of Burundi for TPS should be terminated."[20]

m. **Guinea (2014-2017)**: "Based on the reviews and after consulting with DOS, the Secretary has determined that the termination of the TPS designation of Guinea, after a 6-month extension of TPS benefits for orderly transition, is required because the extraordinary and temporary conditions that prompted Guinea's

---

[18] Termination of the Designation of Montserrat Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation, 69 Fed. Reg. 40642 (July 6, 2004).

[19] Termination of the Designation of Liberia for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Liberia TPS Beneficiaries, 71 Fed. Reg. 55000 (Sept. 20, 2006).

[20] Termination of the Designation of Burundi for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Burundi TPS Beneficiaries, 72 Fed. Reg. 61172 (Oct. 29, 2007).

designation for TPS have substantially resolved and no longer prevent nationals of Guinea from returning in safety."[21]

n. **Sierra Leone (2014-2017)**: "Based on the reviews and after consulting with DOS, the Secretary has determined that the termination of the TPS designation of Sierra Leone, after a 6-month extension of TPS benefits for orderly transition, is required because the extraordinary and temporary conditions that prompted Sierra Leone's designation for TPS have substantially resolved and no longer prevent nationals of Sierra Leone from returning in safety."[22]

o. **Liberia (2014-2017)**: "Based on the reviews and after consulting with DOS, the Secretary has determined that the termination of the TPS designation of Liberia, after a 6-month extension of TPS benefits for orderly transition, is required because the extraordinary and temporary conditions that prompted Liberia's designation for TPS have substantially resolved and no longer prevent nationals of Liberia from returning in safety."[23]

p. **Sudan (1997-2018, termination blocked in court):** "Based on this review and consultation, the Secretary has determined that conditions in Sudan have sufficiently improved for TPS purposes. Termination of the TPS designation of Sudan is required because it no longer meets the statutory conditions for designation. The ongoing armed conflict no longer prevents the return of nationals of Sudan to all regions of Sudan without posing a serious threat to their personal

---

[21] Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary Protected Status, 81 Fed. Reg. 66064 (Sept. 26, 2016).

[22] Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Liberia's Designation for Temporary Protected Status, 81 Fed. Reg. 66059 (Sept. 26, 2016).

[23] Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Sierra Leone's Designation for Temporary Protected Status, 81 Fed. Reg. 66054 (Sept. 26, 2016).

safety. Further, extraordinary and temporary conditions within Sudan no longer prevent nationals from returning in safety to all regions of Sudan."[24]

q. **Nicaragua (1998-2018, termination blocked in court):** "Based on the review, including input received from other relevant U.S. Government agencies, the Secretary has determined that conditions for Nicaragua's 1999 designation for TPS on the basis of environmental disaster due to the damage caused by Hurricane Mitch are no longer met."[25]

r. **El Salvador** (**2001-2019, termination blocked in court**): "Based on the review, including input received from other appropriate U.S. Government agencies, including the Department of State, the Secretary of Homeland Security has determined that the conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster due to the damage caused by the 2001 earthquakes are no longer met."[26]

s. **Haiti (2010-2019, termination blocked in court)**: "Based on the review, including input received from other appropriate U.S. Government agencies, the Acting Secretary of Homeland Security determined on November 20, 2017 that the conditions for Haiti's designation for TPS—on the basis of 'extraordinary and temporary conditions' relating to the 2010 earthquake that prevented Haitian nationals from returning in safety—are no longer met."[27]

---

[24] Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47228 (Oct. 11, 2017).
[25] Termination of the Designation of Nicaragua for Temporary Protected Status, 82 Fed. Reg. 59636 (Dec. 15, 2017).
[26] Termination of the Designation of El Salvador for Temporary Protected Status, 83 Fed. Reg. 2654 (Jan. 18, 2018).
[27] Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2648 (Jan. 18, 2018).

    **t.** **Nepal (2015-2019, termination blocked in court)**: "Based on the review—which considered input received from other appropriate U.S. Government agencies, including the Department of State—the Secretary of Homeland Security has determined that the conditions supporting Nepal's 2015 designation for TPS on the basis of environmental disaster due to the April 25, 2015 earthquake are no longer met."[28]

    **u.** **Honduras (1998-2020, termination blocked in court)**: "Based on the review, which considered input received from other appropriate U.S. Government agencies, including the Department of State, the Secretary of Homeland Security has determined that the conditions supporting Honduras's 1999 designation for TPS on the basis of environmental disaster due to the damage caused by Hurricane Mitch in October 1998 are no longer met."[29]

_10/16/2025_

DATE:

                                          AARON REICHLIN-MELNICK

---

[28] Termination of the Designation of Nepal for Temporary Protected Status, 83 Fed. Reg. 23705 (May 22, 2018).
[29] Termination of the Designation of Honduras for Temporary Protected Status, 83 Fed. Reg. 26074 (June 5, 2018).

Case 1:25-cv-08686-KPF    Document 20-8    Filed 10/21/25    Page 1 of 2

# Exhibit 8



← **Post**

 **Secretary Kristi Noem** ✔ 🛡     ⊘  ···
@Sec_Noem

Today, I am revoking Joe Biden's extension of Venezuelan Temporary Protected Status that Secretary Mayorkas forced through at the very end of the administration.

This program was abused, exploited, and politicized. No more immigration schemes that make Americans less safe.



White House
3:37 PM ET

**BREAKING NEWS**                                   **LIVE**
**TRUMP ENDS PROTECTED STATUS FOR VENEZUELANS**  CNN
Kristi Noem  |  Homeland Security Secretary        3:37 PM ET
0:42 ATED BY THE UNITED STATES, ACCORDING TO A US DEFENSE OFFICIAL.  CNN.c NEWS CENTRAL

6:57 PM · Jan 29, 2025 · **2.4M** Views

 1.7K          ⇄ 18K          ♡ 102K          🔖 1.1K          ↑